## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) ) | |
| Defendant. | ) | **PUBLIC VERSION FILED: May 17, 2018** |

## [PROPOSED] FINAL PRETRIAL ORDER

ME1 27200429v.1

**TABLE OF CONTENTS**

I.    INTRODUCTION TO THE CASE...................................................................................1

    A.    Nature of the Action........................................................................................1

    B.    Jurisdiction .......................................................................................................3

II.    STIPULATIONS AND STATEMENTS...........................................................................3

    A.    Statements of Uncontested Facts ....................................................................3

    B.    Statements of Contested Issues of Fact and Law............................................3

III.    TRIAL EXHIBITS .......................................................................................................4

IV.    WITNESS LISTS AND EXPERT QUALIFICATION STATEMENTS ..........................7

V.    DEPOSITION DESIGNATIONS .................................................................................8

VI.    STATEMENT OF SPECIAL DAMAGES.....................................................................9

VII.    WAIVERS OF ANY CLAIMS OR DEFENSES .............................................................9

VIII.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ..........................10

IX.    STATEMENT REGARDING SETTLEMENT NEGOTIATIONS ...............................10

X.    STATEMENT REGARDING DISCOVERY ...............................................................10

XI.    MOTIONS (*In Limine* and Daubert) ...................................................................10

XII.    TRIAL PARAMETERS ..............................................................................................10

XIII.    ORDER TO CONTROL COURSE OF ACTION ........................................................12

ME1 27200429v.1

This matter having come before the Court at a pretrial conference held pursuant to Fed.

R. Civ. P. ("Rule") 16, Local Rule 16.3, and this Court's Scheduling Order and:

MCCARTER & ENGLISH, LLP
405 N. King Street, 8th Floor, Wilmington, Delaware 19801
(302) 984-6300

FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas, New York, New York 10104
(212) 218-2100

having appeared as counsel for Plaintiffs Pernix Ireland Pain DAC and Pernix Therapeutics, LLC

(collectively, "Pernix") and

SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor, Wilmington, Delaware 19801
(302) 298-0700

AXINN, VELTROP & HARKRIDER LLP
90 State House Square, Hartford, CT 06103
(860) 275-8100

AXINN, VELTROP & HARKRIDER LLP
950 F. Street N.W., 7th Floor, Washington, DC 20004
(202) 912-4700

having appeared as counsel for Defendant Alvogen Malta Operations Ltd. ("Alvogen"), the

following actions were taken:

## I. INTRODUCTION TO THE CASE

### A. **Nature of the Action**

1.      This is a civil action for patent infringement, arising under Title 35 of the United

States Code, Section 271, based on Alvogen's filing of its Abbreviated New Drug Application

("ANDA") with the Food and Drug Administration ("FDA") seeking to commercially

manufacture, use and sell hydrocodone bitartrate extended-release capsules in 10, 15, 20, 30, 40,

1

ME1 27200429v.1

and 50 mg strengths ("Alvogen's ANDA Product") as generic versions of Pernix's Zohydro® ER 10, 15, 20, 30, 40, and 50 mg capsules.

2.    Pernix Ireland Pain DAC owns United States Patent Nos. 9,265,760 ("the '760 patent") and 9,339,499 ("the '499 patent"), both of which are listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") for Zohydro® ER capsules.

3.    On March 4, 2016, Pernix filed a Complaint for infringement of the '760 patent against Alvogen, alleging that the filing of Alvogen's ANDA for the purpose of obtaining approval to engage in the commercial manufacture, use, or sale of Alvogen's ANDA Product prior to the expiration of the '760 patent constituted an act of infringement.

4.    By letter ("Notice Letter") dated May 19, 2016, Alvogen advised Pernix that it had submitted ANDA No. 206986 to the FDA seeking approval to manufacture, use, or sell Alvogen's ANDA Product prior to the expiration of the '760 patent.

5.    The May 19, 2016 Notice Letter also advised Pernix that Alvogen's ANDA submission included a certification under 21 U.S.C. § 355(j)(2)(B)(iv) that, in Alvogen's opinion, the claims of the '760 patent are invalid, unenforceable and/or not infringed.

6.    On May 31, 2016, Pernix amended its Complaint ("the First Amended Complaint") in order to, *inter alia*, include details regarding Alvogen's May 19, 2016 Notice Letter and to allege infringement of the '499 patent.

7.    By Notice Letter dated September 14, 2016, Alvogen advised Pernix that it had amended ANDA No. 206986 to include a certification under 21 U.S.C. § 355(j)(2)(B)(iv) that, in Alvogen's opinion, the claims of the '499 patent are invalid, unenforceable and/or not infringed.

ME1 27200429v.1

8.    On October 12, 2016, Pernix again amended its Complaint ("the Second Amended Complaint") in order to, *inter alia*, include details regarding Alvogen's September 14, 2016 Notice Letter.

9.    Alvogen answered the Second Amended Complaint on November 30, 2016.  In its Answer, Alvogen denied infringement of the '760 and '499 patents and alleged that both patents are invalid.  Alvogen also asserted counterclaims seeking declaratory judgment that the '760 and '499 patents are invalid and would not be infringed by the commercial manufacture, use, offer for sale, or sale of Alvogen's ANDA Product.

10.    On December 23, 2016, Pernix filed its Answer denying Alvogen's counterclaims.

B.    **Jurisdiction**

11.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).  Jurisdiction is not disputed.

## II.    STIPULATIONS AND STATEMENTS

12.    The following stipulations and statements were agreed upon by the parties and are made a part of this Order.

A.    **Statements of Uncontested Facts**

13.    The parties stipulate to and admit the facts set forth in the attached **Exhibit 1**. These uncontested facts require no proof at trial and will become part of the evidentiary record in this case.

B.    **Statements of Contested Issues of Fact and Law**

14.    Pernix's statement of issues of fact and law that remain to be litigated is attached as **Exhibit 2**.

3

15. Alvogen's statement of issues of fact and law that remain to be litigated is attached as **Exhibit 3**.

16. If any statement in a party's statement of issues of fact that remain to be litigated should properly be considered an issue of law, then such statement shall be so considered as an issue of law.

17. If any statement in a party's statement of issues of law that remain to be litigated should properly be considered an issue of fact, then such statement shall be so considered as an issue of fact.

## III.    TRIAL EXHIBITS

18. Pernix's list of pre-marked trial exhibits that it may offer at trial, including Alvogen's objections thereto (if any), is attached as **Exhibit 4**.

19. Alvogen's list of pre-marked trial exhibits that it may offer at trial, including Pernix's objections thereto (if any), is attached as **Exhibit 5**.

20. The parties' joint list of pre-marked exhibits that may be offered by either party at trial is attached as **Exhibit 6**. The listing of an exhibit on the joint trial exhibit list is not an admission by either party that such exhibit is relevant or admissible when offered by the opposing party for the purpose that the opposing party wishes to admit the exhibit. The parties reserve the right to present objections to the introduction at trial of any exhibit on the joint exhibit list.

21. Neither party will remove a document once it has been added to the party's exhibit list without agreement from the other party, unless it provides the other party the opportunity to add the document to its exhibit list.

22. The parties reserve the right to offer exhibits set forth in the opposing party's exhibit list, even if not set forth in its own exhibit list.

4

23.    The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the listed document or any other listed document.

24.    Statements by a party opponent from any request for admission responses, interrogatory responses, or pleadings may be read at trial and need not be included on the exhibit lists.

25.    A party may not add exhibits to its exhibit list after the date of this Order, except for good cause shown or by agreement of the other parties.  A party may not introduce at trial any exhibit not appearing on its list, except for good cause shown, by agreement of the other parties, or as otherwise set forth herein.

26.    The parties agree that exhibits to be used solely for impeachment need not be included on the lists of trial exhibits or disclosed in advance of being used at trial.

27.    Demonstrative trial exhibits need not be listed on the parties' exhibit lists.

28.    Any document shall be deemed to be authentic absent a specific objection set forth in an exhibit list challenging that document's authenticity.  Any document that on its face appears to have been authored by an employee, officer, or agent of a party shall be deemed to be *prima facie* authentic, subject to the right of any party against whom such a document is offered to adduce evidence to the contrary or to require that the offering party provide authenticating evidence if the opposing party has a reasonable basis to believe the document is not authentic.

29.    Each party shall produce to the opposing party by email a list of all exhibits that the party intends to use during the direct examination of each witness (identified by exhibit number) by 7:00 PM EDT two calendar days before such materials are to be used at trial.  A party in receipt of the above list shall inform the producing party of any objections to the use of

5

the listed exhibits by 9:00 PM EDT that same evening and the parties shall meet and confer to resolve those objections by 10:00 PM EDT that same evening.

30.     Each party shall produce to the opposing party by email and/or electronic media (for large exhibits and any videos or animations to be offered) a copy of each demonstrative exhibit that the party will use during the direct examination of each witness (except for demonstrative exhibits that will be created live in the courtroom) by 7:00 PM EDT two calendar days before such demonstrative exhibits are to be used at trial.  A party in receipt of the above materials shall inform the producing party of any objections to those materials by 9:00 PM EDT that same evening and the parties shall meet and confer to resolve those objections by 10:00 PM EDT that same evening.

31.     Each demonstrative exhibit shall disclose, on its face, all trial exhibits that form the basis of the demonstrative exhibit.

32.     Demonstratives to be used on cross-examination are not required to be provided in advance of the cross-examination.

33.     For the avoidance of doubt, ballooning, blow-ups, excerpting or highlighting of exhibits or parts of exhibits that do not change, characterize or add anything to the exhibit are not required to be provided to the opposing party in advance of their use, but ballooning, blow-ups, excerpting or highlighting of exhibits or parts of exhibits that add titles, comments or otherwise characterize or change the exhibit are considered to be demonstratives and are required to be provided to the opposing party in advance of their use.

34.     Legible copies of documents may be offered and received into evidence to the same extent as an original.

6

## IV.    WITNESS LISTS AND EXPERT QUALIFICATION STATEMENTS

35.    Pernix's list of names of the witnesses that it will or may call at trial is attached as **Exhibit 7**.

36.    Alvogen's list of names of the witnesses that it will or may call at trial is attached as **Exhibit 8**.

37.    Pernix's statement setting forth the qualifications of its expert witnesses, along with Alvogen's objections thereto (if any), is attached as **Exhibit 9.**

38.    Alvogen's statement setting forth the qualifications of its expert witnesses, along with Pernix's objections thereto (if any), is attached as **Exhibit 10.**

39.    Witnesses whose testimony is expected to be by means of a deposition are so designated on the parties' witness lists.

40.    The parties' witness lists represent the parties' good faith understanding and expectation about which witnesses are expected to be called live at trial.  To the extent that a witness's circumstances change, or a witness otherwise becomes unavailable for trial, each party reserves the right to call that witness by deposition, subject to resolution of objections by the other parties.

41.    The parties further reserve the right to call: (1) one or more additional witnesses whose testimony is necessary to establish authenticity or admissibility of any trial exhibit, if the authenticity or admissibility of the exhibit is challenged by an opposing party; and (2) additional witnesses to respond to any issues raised by the Court's pretrial or trial rulings.  The parties agree to act in good faith to identify any such witness that they intend to call in time to allow the opposing party to respond with any objections.

42.    Except as set forth herein, no fact or expert witness called by a party shall be permitted to testify at trial unless identified on a party's witness list.

7

43.     By 7:00 PM EDT two calendar days before a witness will be called to testify live, the name of the witness will be identified by email to opposing counsel, along with the expected order of presentation.

44.     Each party will give notice by email to the opposing party by 7:00 PM EDT two calendar days before it expects to complete its presentation of evidence.

## V.     DEPOSITION DESIGNATIONS

45.     Pernix's deposition designations, Alvogen's objections to such designations, Alvogen's counter-designations, Pernix's objections to such counter-designations, and Pernix's counter-counter designations are attached as **Exhibit 11**.

46.     Alvogen's deposition designations, Pernix's objections to such designations, Pernix's counter-designations, Alvogen's objections to such counter-designations, and Alvogen's counter-counter designations are attached as **Exhibit 12**.

47.     The parties may not list new deposition designations or counter-designations, or provide new objections to listed designations or counter-designations, except for good cause shown or by agreement of the parties.

48.     Each party reserves the right to offer deposition testimony designated by the opposing party (whether as a designation or a counter-designation).

49.     For deposition testimony provided to the Court, the party providing the designated testimony ("party 1") shall serve the other party with a list of the specific deposition designations, by line and page number, of each deposition transcript that the party will use that day, including an identification of whether the designations will be played by video, or read into the record, by 8:00 PM EDT three calendar days before such testimony is to be introduced.  The other party ("party 2") will identify any objections to the designated testimony and any specific pages and lines from that deposition to counter-designate by 6:00 PM EDT the following day.

8

Party 1 will identify any objections to the counter-designated testimony and any specific pages and lines from that deposition to counter-counter designate by 8:00 PM EDT the same day.  The parties shall meet and confer to resolve any objections to designated deposition testimony by 10:00 PM EDT that same evening.

50.     When deposition designations are introduced, all designations and counter-designations to be read or played for that witness will be introduced in the sequence in which the testimony was originally given.  All colloquies between counsel and objections shall be eliminated when the deposition is read or played at trial.  To the extent that deposition designations are read or played at trial, each party will be charged for the time taken to read or play its designations.

51.     If a party chooses to read a witness's designations at trial, all counter-designations will also be read.  If a party chooses to play in a video of a witness's designations at trial, all counter-designations will also be played in video.

52.     Any deposition testimony to be used at trial may be used whether or not the transcripts of such deposition have been signed and filed.

## VI.     STATEMENT OF SPECIAL DAMAGES

53.     The parties do not intend to seek damages at this time, except the parties reserve the right to seek attorneys' fees, costs and expenses pursuant to 35 U.S.C. § 285.  Pernix reserves the right to seek damages if Alvogen manufactures, uses, sells, offers to sell, or imports its Alvogen ANDA Product prior to the expiration date of the patents-in-suit.

## VII.     WAIVERS OF ANY CLAIMS OR DEFENSES

54.     The parties have agreed that the only issues to be presented at trial are those that relate to:

9

- Whether the commercial manufacture, use, offer for sale, sale, and/or importation of Alvogen's ANDA Product will infringe claims 1-4, 11, 12, 17 and/or 19 of the '760 patent or claim 1 of the '499 patent.

- Whether the asserted claims of the '760 and '499 patents are invalid under 35 U.S.C. §§ 101, 102, 103, or 112.

## VIII.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

55.    A brief statement of what Pernix intends to prove in support of its claims and defenses, in the form of Proposed Findings of Fact and Conclusions of Law, is set forth in **Exhibit 13**.

56.    A brief statement of what Alvogen intends to prove in support of its claims and defenses, in the form of Proposed Findings of Fact and Conclusions of Law, is set forth in **Exhibit 14**.

## IX.    STATEMENT REGARDING SETTLEMENT NEGOTIATIONS

57.    The parties certify that they have engaged in a good faith effort to explore the resolution of the controversy by settlement.  A settlement has not been reached.  It is uncertain at this time whether additional negotiations are likely to be productive.

## X.    STATEMENT REGARDING DISCOVERY

58.    All fact and expert discovery in this action is complete.  No further discovery shall be permitted except for good cause or by agreement of the parties.

## XI.    MOTIONS (*In Limine* and Daubert)

59.    The briefing schedule for Daubert motions and motions *in limine* is set forth in D.I. 110.

## XII.    TRIAL PARAMETERS

60.    The Court's scheduling order (D.I. 110) allotted five trial days beginning on June 11, 2018.

10

ME1 27200429v.1

61.    This is a bench trial.

62.    Each side will be allotted twelve hours.  Time that a party is objecting to evidence in open court, examining or cross-examining witnesses, presenting evidence by reading or playing a deposition transcript, or otherwise speaking or arguing on behalf of a party will be counted as the time of that party (with the exception of closing arguments).  Closing arguments will not be charged against a party's allotted time.

63.    In accordance with D.I. 110 and D.I. 195, Written Opening Statements will be provided to the Court by 5:00 PM on June 4, 2018.  Opening Statements shall be limited to a maximum of 20 pages.

64.    Subject to the approval of the Court, the parties request that the trial be conducted as follows:

    a.  Pernix shall present its affirmative case on infringement of the '760 and '499 patents, which will include testimony and evidence relating to the background of the claimed invention.

    b.  Upon conclusion of Pernix's testimony and evidence on infringement, Alvogen shall present its testimony and evidence relating to its allegations of non-infringement.

    c.  Upon conclusion of the infringement issues, Alvogen shall present testimony and evidence that the asserted claims of the '760 and '499 patents are invalid, including testimony and evidence relating to objective indicia of obviousness or non-obviousness.

    d.  Pernix shall present its rebuttal case on validity upon completion of Alvogen's testimony and evidence on that issue.

**[ADDITIONAL PROVISION PROPOSED BY ALVOGEN, OBJECTED TO BY PERNIX:**

    e.  **Alvogen may present rebuttal testimony and evidence relating to Pernix's presentation concerning objective indicia of obviousness or non-obviousness that was not already addressed in Alvogen's prior presentation.]**

11

f.  Closing arguments will occur following completion of post-trial briefing.

## XIII.  ORDER TO CONTROL COURSE OF ACTION

65.    This order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice.


MCCARTER & ENGLISH LLP

/s/ Daniel M. Silver
Michael P. Kelly (No. 2295)
Daniel M. Silver (No. 4758)
Benjamin A. Smyth (No. 5528)
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6331
mkelly@mccarter.com
dsilver@mccarter.com
bsmyth@mccarter.com


OF COUNSEL:
Dominick A. Conde
Christopher P. Borello
Brendan M. O'Malley
Josh Calabro
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, New York 10104-3800
Tel: (212) 218-2100
Fax: (212) 218-2200
*dconde@fchs.com*
*cborello@fchs.com*
*bomalley@fchs.com*

*Attorneys for Plaintiffs*


SHAW KELLER LLP

/s/ David M. Fry
Karen E. Keller (No. 4489)
Jeffrey T. Castellano (No. 4837)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
I.M. Pei Building
1105 N. Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
dfry@shawkeller.com


OF COUNSEL:
Matthew J. Becker
Chad A. Landmon
Thomas K. Hedemann
David K. Ludwig
Edward M. Mathias
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06106-3702
(860) 275-8100

Seth I. Heller
Christopher M. Gallo
AXINN, VELTROP & HARKRIDER LLP
950 F. Street, NW
Washington, DC 20004
(202) 912-4700

*Attorneys for Defendant*

12

Dated: May 10, 2018

        SO ORDERED this _____ day of _____, 2018.


_____

THE HONORABLE WILLIAM C. BRYSON

13

ME1 27200429v.1

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) ) | |
| Defendant. | ) ) ) ) | |

**EXHIBIT 1**
**STATEMENT OF UNCONTESTED FACTS**

**I.    The Parties**

1.    Pernix Ireland Pain DAC ("Pernix Ireland") is a corporation organized and existing under the laws of Ireland, having its principal place of business at 3 Burlington Road, Dublin, Ireland D04 RD68.

2.    Pernix Therapeutics, LLC ("Pernix Therapeutics," and collectively with Pernix Ireland, "Pernix") is a corporation organized and existing under the laws of Louisiana having its principal place of business at 10 North Park Place, Suite 201, Morristown, New Jersey 07960.

3.    Alvogen Malta Operations Ltd. ("Alvogen") is a corporation organized and existing under the laws of Malta.

**II.    The Patents-in-Suit**

4.    The patents-in-suit are U.S. Patent No. 9,265,760 (the "'760 patent") and U.S. Patent No. 9,339,499 (the "'499 patent").

1

5.      Pernix alleges that Alvogen infringes claims 1-4, 11, 12, 17, and 19 of the '760 patent and claim 1 of the '499 patent.

6.      No other patent claims are at issue in this litigation.

**A.      The '760 Patent**

7.      The '760 patent is entitled "Treating Pain in Patients with Hepatic Impairment."

8.      The '760 patent issued on February 23, 2016.

9.      The '760 patent names as inventors Andrew Hartman, Christopher M. Rubino, and Cynthia Y. Robinson.

10.     Pernix Ireland is the owner by assignment of the '760 patent.

11.     Pernix Ireland has standing to bring suit on the '760 patent.

12.     U.S. Application No. 14/815,219 (the "'219 Application"), which issued as the '760 patent, was filed with the United States Patent and Trademark Office ("PTO") on July 31, 2015.

13.     The '760 patent is a continuation of U.S. Application No. 14/523,162, filed on October 24, 2014, which is a continuation-in-part of U.S. Application No. 13/950,969, filed on July 25, 2013.

14.     The '760 patent claims priority to U.S. Provisional Application No. 61/779,698, filed on March 13, 2013 and U.S. Provisional Application No. 61/677,601, filed on July 31, 2012.

**B.      The '499 Patent**

15.     The '499 patent is entitled "Treating Pain in Patients with Hepatic Impairment."

16.     The '499 patent issued on May 17, 2016.

17.     The '499 patent names as inventors Andrew Hartman, Christopher M. Rubino, and Cynthia Y. Robinson.

2

18.    Pernix Ireland is the owner by assignment of the '499 patent.

19.    Pernix Ireland has standing to bring suit on the '499 patent.

20.    U.S. Application No. 14/978,217, which issued as the '499 patent, was filed with the PTO on December 22, 2015.

21.    The '499 patent is a continuation of the '219 Application, filed on July 31, 2015, which is a continuation of U.S. Application No. 14/523,162, filed on October 24, 2014, which is a continuation-in-part of U.S. Application No. 13/950,969, filed on July 25, 2013.

22.    The '499 patent claims priority to U.S. Provisional Application No. 61/779,698, filed on March 13, 2013 and U.S. Provisional Application No. 61/677,601, filed on July 31, 2012.

## III.    Hydrocodone Bitartrate

23.    Hydrocodone bitartrate is an opioid agonist and occurs as fine, white crystals, or as a crystalline powder.

24.    The chemical name for hydrocodone bitartrate is 4,5(alpha)-epoxy-3-methoxy-17-methylmorphinan-6-one tartrate (1:1) hydrate (2:5) or morphinan-6-one, 4,5-epoxy-3-methoxy-17-methyl-, (5 alpha)-, [R (R*, R*)]-2,3-dihydroxybutanedioate (1:1), hydrate (2:5).  It has the following structural formula:

3

## IV.  Pernix's NDA and Zohydro® ER Extended-Release Capsules

25.  Pernix Ireland is the holder of an approved New Drug Application ("NDA") No. 202880 for hydrocodone bitartrate extended-release capsules in 10, 15, 20, 30, 40, and 50 mg strengths, which are prescribed and sold in the United States under the trademark Zohydro® ER extended-release capsules.

26.  The United States Food and Drug Administration ("FDA") approved NDA No. 202880 on October 25, 2013.

27.  The '760 patent and the '499 patent are listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") for Zohydro® ER capsules.

## V.  Alvogen's Product and ANDA

28.  Alvogen submitted ANDA No. 206986 to the FDA under § 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), seeking to commercially manufacture, use and sell hydrocodone bitartrate extended-release capsules in 10, 15, 20, 30, 40, and 50 mg strengths ("Alvogen's ANDA Product") as generic versions of Pernix's Zohydro® ER 10, 15, 20, 30, 40, and 50 mg capsules.

4

29.     On May 25, 2017, the FDA tentatively approved Alvogen's ANDA No. 206986.

30.     The product label that will be included with Alvogen's ANDA Product can be found at ALVHYDRO-PTX00013439-13466 ("Alvogen Draft Label").

31.     The Alvogen Draft Label is ███████████████████████████████ ███████████████████████████████████████

32.     Alvogen's ANDA Product is ██████████████████████ ███████████████████████████████████████ ██████████████████████

33.     The Alvogen Draft Label ████████████████████████████ ████████████

34.     The Alvogen Draft Label states that ████████████████████ ████████████████████████████████ The Alvogen Draft Label states that ████████████████████████████████ ███████████████████████████  ███████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ███████████████████████

35.     ██████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

## VI.    Claim Construction

36.    This Court construed the term "administering" to mean "delivering into the body."

37.    This Court construed the phrase "starting dose is not adjusted relative to a patient without hepatic impairment" to mean "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced due to that hepatic impairment relative to the dose prescribed to a patient without hepatic impairment when initiating treatment."

38.    This Court construed the terms "subject" and "average [or mean]" in the phrases "[average/mean] hydrocodone [AUC0-inf/Cmax] ... [in/dosed to] subjects . .," and "[average/mean] hydrocodone [AUC0-inf/Cmax] ... [in/dosed to] subjects ... relative to subjects," to have their plain and ordinary meanings.

6

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ALVOGEN MALTA OPERATIONS LTD., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 1:16-cv-00139 (WCB) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**EXHIBIT 2**
**PERNIX'S STATEMENT OF**
**CONTESTED ISSUES OF FACT AND LAW**

1.      Pernix submits the following list of contested issues of fact and law, which it expects to address at trial.  The identification of these issues is based upon the pleadings and discovery to date and Pernix's current understanding of (1) the arguments that Alvogen is likely to make at trial and (2) the evidence that Alvogen is likely to present at trial.  Pernix reserves the right to supplement, amend, or modify this list, for example, to respond to any new issues, arguments, or evidence from Alvogen, or in the event of any Court ruling that might raise new issues.

2.      Pernix incorporates by reference herein its Proposed Findings of Fact and Conclusions of Law to the extent any such proposed findings may be contested by Alvogen.

## I.      INFRINGEMENT OF THE PATENTS-IN-SUIT

3.      Whether Pernix has proven by a preponderance of the evidence that the commercial manufacture, use, offer for sale, sale, and/or importation of Alvogen's ANDA Product will infringe claims 1-4, 11-12, 17 and/or 19 of U.S. Patent No. 9,265,760 (the "'760

1

patent") and/or claim 1 of U.S. Patent No. 9,339,499 (the "'499 patent") (collectively, the "asserted claims").

## II.   VALIDITY OF THE PATENTS-IN-SUIT

4.   Whether Alvogen has proven by clear and convincing evidence that the asserted claims are invalid:

a.   as directed to patent-ineligible subject matter under 35 U.S.C. § 101; or

b.   as anticipated under 35 U.S.C. § 102; or

c.   as obvious under 35 U.S.C. § 103; or

d.   for lack of written description under 35 U.S.C. § 112.

## III.   REMEDIES

5.   Whether Pernix is entitled to a judgment that Alvogen has infringed the '760 and '499 patents.

6.   Whether Pernix is entitled to an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of ANDA No. 206986 shall be a date that is not earlier than the expiration dates of the '760 and '499 patents, inclusive of any extensions.

7.   Whether Pernix is entitled to an injunction under 35 U.S.C. § 271(e)(4)(B) permanently enjoining Alvogen, its officers, agents, servants, and employees, and those persons in active concert or participation with any of them, from engaging in the commercial manufacture, use, offer for sale, sale, and/or importation of Alvogen's ANDA Product within or into the United States prior to the expiration dates of the '760 and '499 patents, inclusive of any extensions.

8.   Whether Pernix is entitled to damages or other monetary relief under 35 U.S.C. § 271(e)(4)(C) as appropriate with respect to the '760 and '499 patents.

2

9.      Whether Pernix is entitled to a judgment that this is an exceptional case and an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

10.     Whether Pernix is entitled to such other and further relief as the Court may deem just and proper.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) | |
| Defendant. | ) ) ) ) | |

**EXHIBIT 3
ALVOGEN'S STATEMENT OF
CONTESTED ISSUES OF FACT AND LAW**

Alvogen hereby submits its statement of contested factual and legal issues. Alvogen reserves all rights to amend or supplement this submission as appropriate, including to the extent Plaintiffs seek to introduce different or additional arguments than those disclosed pursuant to the Court's Scheduling Order and present in the Joint Pretrial Order. Alvogen reserves its rights to contest those arguments and to present any and all rebuttal evidence in response to those arguments.

To the extent that any issue of fact is deemed to be an issue of law, it should be considered as such; and to the extent that any issue of law is deemed to be an issue of fact, it should be considered as such. Alvogen incorporates by reference herein its Proposed Findings of Fact and Conclusions of Law to the extent any such proposed findings may be contested by Pernix.

1

## I.    INVALIDITY

1.    What is the appropriate standard for a person of ordinary skill in the art ("POSA") relevant to the '760 and '499 patents.

**Prior Art**

2.    U.S. Patent No. 8,808,740 ("Huang") was filed by another on December 21, 2011 as U.S. Application No. 13/333,560, which claims priority to U.S. Provisional Application No. 61/426,306, filed on December 22, 2010.  Huang issued on August 19, 2014 and is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(e).

3.    Purdue Pharma L.P., *Clinical Study Report:  A Phase 1, Open-Label, Parallel-Group Study to Assess the Effect of Hepatic Impairment on the Single-Dose Pharmacokinetics and Safety of Hydrocodone Bitartrate Extended-Release Tablets (HYDC)* was conducted using ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ of Huang, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮

4.    Alessandra Cipriano et al., *Effect of hepatic impairment on the pharmacokinetics of hydrocodone and its metabolites following administration of a novel hydrocodone single-entity, once- daily, extended-release tablet [HYD]*, PAINWeek 2013 Accepted Abstracts 80-81 ("Cipriano Abstract"), published in November 2013, reports the result of a hepatic impairment study performed with ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ of Huang, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮

5.    The hydrocodone bitartrate extended-release formulation prepared as ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ of Huang ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮

6.    U.S. Patent No. 6,733,783 (filed October 30, 2001) ("Oshlack"), issued May 11, 2004, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents

2

claim priority.  Oshlack is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

7.    U.S. Patent Application Publication No. 2010/0010030 A1 ("Jain") published on January 14, 2010, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  Jain is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

8.    U.S. Patent Application Publication No. 2006/0240105 A1 ("Devane") published October 26, 2006, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  Devane is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

9.



10.

11.

12.    U.S. Food & Drug Administration, *Guidance for Industry, Pharmacokinetics in Patients with Impaired Hepatic Function: Study Design, Data Analysis, and Impact on Dosing*

3

*and Labeling* (May 2003) ("FDA Guidance") published in May 2003, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. The FDA Guidance is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

13.     Department of Veteran Affairs, *VA/DoD Evidence Based Practice, Clinical Practice Guideline: Management of Opioid Therapy for Chronic Pain* (May 2010) ("VA Guideline") published in May 2010, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. The VA Guideline is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

14.     FDA Drug Safety Communication:  Prescription Acetaminophen Products to be Limited to 325 mg per Dosage Unit; Boxed Warning will Highlight Potential for Severe Liver Failure (Jan. 13, 2011) ("FDA Acetaminophen Communication"), published January 13, 2011, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. The FDA Acetaminophen Communication is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

15.     Nat'l Inst. Health, *Prescription Drug Abuse*, NIH Publ. No. 11-4881 (Oct. 2011) ("NIH Publication"), published by another in October 2011, which is before the earliest U.S. filing date to which the '760 and '499 patents claim priority. The NIH Publication is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(a).

16.     Sarah J. Johnson, *Pain Treatment Topics: Opioid Safety in Patients with Renal or Hepatic Dysfunction* (Nov. 2007) ("Johnson") published in November 2007, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. Johnson is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

4

17.     David E. Joranson et al., *Trends in Medical Use and Abuse of Opioid Analgesics*, 283 JAMA 1710 (2000) ("Joranson"), published in 2000, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  Joranson is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

18.     Anne M. Larson et al., *Acetaminophen Hepatoxicity*, 11 Clinics in Liver Disease 525 (2007) ("Lasrson"), published in 2007, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  Larson is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

19.     R.K. Portenoy et al., *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 Cases*, 25 Pain 171 (1986) ("Portenoy"), published in May 1986, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. Portenoy is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

20.     Howard S. Smith, *Opioid Metabolism*, Mayo Clin Proc. 84(7): 613-624 (2009) ("Smith"), published in July 2009, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  Smith is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

21.     Gregory L. Holmquist, *Opioid Metabolism and Effects of Cytochrome P450*, 10 Pain Med. S20-29, S25 (2009) ("Holmquist"), published in 2009, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  Holmquist is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

22.     T.J. Baumann et al, *Analgesic Safety and Efficacy of Controlled Release Hydrocodone*, 76 J. Pharm. Scis. S107 (Nov. 1987) ("Baumann"), published in 1987, more than

one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. Baumann is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

23.    Avinza® ER Label (morphine sulfate extended-release capsules), 30 mg, 45 mg, 60 mg, 75 mg, 90 mg, 120 mg, Revised: 05/2011, published in May 2011, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. The Avinza® ER Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

24.    Kadian® Label (morphine sulfate capsule, extended release), Revised: February 2010, published in February 2010, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. The Kadian® Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

25.    Lortab® Label 10/500, Hydrocodone Bitartrate and Acetaminophen Tablets, USP, Rev. May 2011, Janssen Pharms., Inc. published in May 2011, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority. The Lortab® Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

26.    Nucynta® ER Label, Tapentadol Hydrochloride Tablet, Film Coated, Extended Release, Revised: August 2011, Janssen Pharms., Inc., published by another in August 2011, which is before the earliest U.S. filing date to which the '760 and '499 patents claim priority. The Nucynta® ER Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(a).

27.    Opana® ER Label (oxymorphone hydrochloride) Extended-Release Tablets, CII published in September 2010, more than one year prior to the earliest U.S. filing date to which

6

the '760 and '499 patents claim priority.  The Opana® ER Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

28.    TussiCaps® Label, Extended-Release, Hydrocodone Bitartrate and Chlorpheniramine Maleate Capsule, Extended Release, CIII, Rev: July 2010, published in July 2010, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  The TussiCaps® Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

29.    Vicodin® Label (hydrocodone bitartrate acetaminophen tablets, 5mg/500mg, Rev. September 2011, published by another in September 2011, which is before the earliest U.S. filing date to which the '760 and '499 patents claim priority.  The Vicodin® Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(a).

30.    Vicoprofen® Label (hydrocodone bitartrate and ibuprofen) 7.5mg/200mg, Rev: January 2006, published in January 2006, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  The Vicoprofen® Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

31.    Exalgo® ER Label (hydromorphone HCl) Extended-Release Tablets, Revised: March 2010, published in March 2010, more than one year prior to the earliest U.S. filing date to which the '760 and '499 patents claim priority.  The Exalgo® ER Label is prior art to the asserted claims of the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

**Ineligible Subject Matter**

32.    Whether Alvogen has proven by clear and convincing evidence that the asserted claims of the '760 and '499 patents are invalid as directed to a patent-ineligible subject matter under 35 U.S.C. § 101.

7

33.    In particular, whether Alvogen has proven by clear and convincing evidence that the asserted claims of the '760 and '499 patents are directed to a natural law and do not contain an inventive concept sufficient to render them eligible subject matter under Section 101.

**Anticipation**

34.    Whether Alvogen has proven by clear and convincing evidence that the asserted claims of the '760 and '499 patents are invalid as anticipated, either expressly or inherently, under 35 U.S.C. § 102 by United States Patent Application Publication No. 2006/0240105 ("Devane").

35.    Whether Alvogen has proven by clear and convincing evidence that the asserted claims of the '760 and '499 patents are invalid as anticipated, either expressly or inherently, under 35 U.S.C. § 102 by United States Patent No. 8,808,740 ("Huang").

**Obviousness**

36.    Whether Alvogen has proven by clear and convincing evidence that the asserted claims of the '760 and '499 patents are invalid as obvious under 35 U.S.C. § 103 over Devane in view of one or more of Jain, the Vicodin Product Label, the Lortab Product Label, or the VA Guideline.

37.    Whether Alvogen has proven by clear and convincing evidence that claims 1-4 and 12 of the '760 patent and claim 1 of the '499 patent are invalid as obvious under 35 U.S.C. § 103 over Jain in view of the FDA Acetaminophen Communication.

38.    Whether Alvogen has proven by clear and convincing evidence that a POSA would have had one or more rationales to combine or modify the teachings of the prior art to arrive at the subject matter of the asserted claims of the '760 and '499 patents and would have had a reasonable expectation of success in doing so.

39.     Whether there is evidence of any asserted secondary considerations of nonobviousness, including long-felt but unmet need, failure of others and unexpected results, and whether any such evidence impacts the obviousness or nonobviousness of the asserted claims of the '760 and '499 patents.

40.     Whether Alvogen has proven that there was simultaneous invention of the asserted claims of the '760 and '499 patents.

41.     Whether there is a "nexus" between any asserted secondary consideration and any alleged novel feature of the asserted claims of the '760 and '499 patents.

**Written Description**

42.     Whether Alvogen has proven by clear and convincing evidence that the asserted claims of the '760 and '499 patents are invalid for lack of written description under 35 U.S.C. § 112.

## II.    NONINFRINGEMENT

43.     Whether Pernix has proven by a preponderance of the evidence that Alvogen will directly infringe any asserted claim of the '760 and '499 patent.

44.     Whether Pernix has proven by a preponderance of the evidence that Alvogen will induce direct infringement of any asserted claim of the '760 and '499 patents.

45.     In particular, whether Pernix has proven by a preponderance of the evidence that a prescribing physician and/or a patient will practice any asserted claim of the '760 and '499 patents in such a way as to directly infringe that claim.

46.     In particular, whether Pernix has proven by a preponderance of the evidence that any step of the method of treatment in any asserted claim of the '760 and '499 patents that is allegedly performed by the patient is attributable to the prescribing physician because the physician directs or controls the patient's performance of that step.

9

47.     In particular, whether Pernix has proven by a preponderance of the evidence that the Alvogen Draft Label will encourage, recommend or promote direct infringement of any asserted claim of the '760 and '499 patents.

# EXHIBIT 4

**United States District Court**
**District of Delaware**
**Plaintiffs' Trial Exhibit List**
**Pernix Ireland Pain DAC et al. v. Alvogen Malta Operations Ltd.**
**Civ. No. 16-139-WCB (D. Del)**

| PRESIDING JUDGE: William C. Bryson | TRIAL DATES: June 11-15, 2018 | COURTROOM DEPUTY: |
|---|---|---|
| PLAINTIFFS' ATTORNEY: | DEFENDANT'S ATTORNEY: | COURT REPORTER: |

| PTX | Date Offered | Marked | Admitted | Description | Source | Date | Bates Range | Objections |
|---|---|---|---|---|---|---|---|---|
| PTX 5 | | | | Paragraph IV Notice Letter re: U.S. Patent No. 9,265,760 | | 5/19/2016 | | H, R, P |
| PTX 6 | | | | Paragraph IV Notice Letter re: U.S. Patent No. 9,339,499 | | 9/14/2016 | | H, R, P |
| PTX 7 | | | | Curriculum Vitae of Dr. John J. Koleng | | | | H, P |
| PTX 8 | | | | Curriculum Vitae of Dr. Jeffrey Gudin | | | | H, P |
| PTX 13 | | | | Botros, M. and Sikaris, K.A., The De Ritis Ratio: The Test of Time, 34 CLIN. BIOCHEM. REV. 117 (Nov. 2013) | Gudin Opening Report (Infringement) | 11/2013 | | H, R, P |

1

| PTX 14 | | | | Chandok, N., and Watt, K.D.S., Pain Management in the Cirrhotic Patient: The Clinical Challenge, 85 MAYO CLINIC PROC. 451 (May 2010) | Gudin Opening Report (Infringement)<br><br>Gudin Reply Report (Infringement)<br><br>Gudin Rebuttal Report (Validity) | 05/2010 | | H, R, P |
|---|---|---|---|---|---|---|---|---|
| PTX 17 | | | | Exalgo® Prescribing Information dated July 2012 | Gudin Opening Report (Infringement) | 07/2012 | | H, R, P |
| PTX 21 | | | | Imani, F., et al., Therapeutic Use of Analgesics in Patients with Liver Cirrhosis, 14 HEPAT. MONTHLY e23539 (Oct. 2014) | Gudin Opening Report (Infringement)<br><br>Gudin Reply Report (Infringement) | 10/2014 | | R, P, LA, H |
| PTX 23 | | | | Kadian® Prescribing Information dated July 2012 (REF. ID: 3155723) | Gudin Opening Report (Infringement) | 07/2012 | | H, R, P |
| PTX 26 | | | | Norco® Prescribing Information dated May 2012 | Gudin Opening Report (Infringement) | 05/2012 | | H, R, P |
| PTX 28 | | | | Opana® ER Prescribing Information dated July 2012 | Gudin Opening Report (Infringement) | 07/2012 | | H, R, P |
| PTX 30 | | | | United States Department of Justice, Drug Enforcement Administration, Practioner's Manual: An Information Outline of the Controlled Substances Act (2006 Edition) | Gudin Opening Report (Infringement)<br><br>Gudin Reply Report (Infringement) | 2006 | | LA, H, R, P |
| PTX 31 | | | | Vantrela® ER Briefing Document, FDA Advisory Committee Meeting (June 7, 2016) | Gudin Opening Report (Infringement) | 6/7/2016 | | R, P, M, H |

| PTX 33 | | | | Verbeeck, R.K., Pharmacokinetics and Dosage Adjustment in Patients with Hepatic Dysfunction, 64 EUR. J. CLIN. PHARM. 1147 (2008) | Gudin Opening Report (Infringement) | 9/2/2008 | | R, P, H |
|---|---|---|---|---|---|---|---|---|
| PTX 37 | | | | American Academy of Pain Medicine, Agreement on Controlled Substances Therapy for Chronic Pain Treatment, available at http://www.painmed.org/files/agreement-on-controlled-substances-therapy.pdf, last visited Jan. 30, 2018 | Gudin Reply Report (Infringement) | | | A, H, INC, R, P |
| PTX 38 | | | | Risk Evaluation and Mitigation Strategy (REMS) for Opioid Analgesics, available at https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm163647.htm, last visited Jan. 29, 2018 | Gudin Reply Report (Infringement) | | | A, H, INC, R, P |
| PTX 39 | | | | Sample Patient Agreement Forms, available at https://www.drugabuse.gov/sites/default/files/files/SamplePatientAgreementForms.pdf, last visited Jan. 30, 2018 | Gudin Reply Report (Infringement) | | | A, H, INC, R, P |
| PTX 40 | | | | QuickStats: Death Rates for Chronic Liver Disease and Cirrhosis, by Sex and Age Group — National Vital Statistics System, United States, 2000 and 2015, available at https://www.cdc.gov/mmwr/volumes/66/wr/mm6638a9.htm, last visited Jan. 29, 2018 | Gudin Reply Report (Infringement) | | | A, H, INC, SUM, R, P |
| PTX 41 | | | | U.S. & World Population Clock, available at https://www.census.gov/popclock/, last visited Jan. 29, 2018 | Gudin Reply Report (Infringement) | | | A, H, INC, SUM, R, P |

3

| PTX 42 | | | | Baumann, et al., Analgesic Safety and Efficacy of Controlled Release Hydrocodone, Journal of Pharmaceutical Sciences, 76:11, S107 (Nov. 1987) | Gudin Rebuttal Report (Validity)  Weinberger Deposition | 11/1987 | PERNIX_HEP 0016662 | LA, H, R, P |
| PTX 43 | | | | Bunionectomy Study (ELN154088-201) | Gudin Rebuttal Report (Validity) | 11/24/2003 | PERNIX_HEP 0018759-22009 | H, R, P |
| PTX 51 | | | | Elbekai, R.H., et al., The Effect of Liver Cirrhosis on the Regulation and Expression of Drug Metabolizing Enzymes, 5 CURR. DRUG METAB. 157 (2004) | Gudin Rebuttal Report (Validity) | 2004 | | LA, H, R, P |
| PTX 52 | | | | Email string involving A. Hartman (Zogenix), J. Lally (Alkermes), and Brooks Boyd (Zogenix) dated 12/12/2012 through 12/18/2012 | Gudin Rebuttal Report (Validity) | 12/18/2012 | ZGNX_ 00021052-21053 | INC, A, F, MD, H, R, P, O |
| PTX 55 | | | | Gudin, J., Risk Evaluation and Mitigation Strategies (REMS) for Extended-Release and Long-Acting Opioid Analgesics: Considerations for Palliative Care Practice, J. PAIN & PALLIATIVE CARE PHARMACOTHER., 26:136 (Jul. 2012) | Gudin Rebuttal Report (Validity) | 07/2012 | | R, LA, P, H |
| PTX 57 | | | | List and Summaries of Clinical Studies Relating to Vicodin CR from AbbVie Website, available at https://www.abbvie.com/our-science/clinical-trials/clinical-trials-data-and-information-sharing/clinical-study-report-csr-synopses/hydrocodone-bitartrate-and-acetaminophen-tablets-usp-vicodin.html | Gudin Rebuttal Report (Validity) | | | INC, A, H, R, P, SUM, B |
| PTX 58 | | | | List and Summaries of Clinical Studies Relating to Vicodin CR from ClinicalTrials.gov, available at https://clinicaltrials.gov/ct2/results?cond= | Gudin Rebuttal Report (Validity) | | | INC, A, H, R, P, SUM, B |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | &term="vicodin+cr" | | | |
| PTX 59 | | | | Meeting Highlights from PAINWeek 2013, available at https://www.practicalpainmanagement.com/meeting/painweek-2013 | Gudin Rebuttal Report (Validity) | 2013 | | R, P, A, H, INC, B, SUM |
| PTX 60 | | | | PAINWeek 2013 Accepted Abstracts, available at https://www.painweek.org/assets/documents/painweek-page/650-painweek2013acceptedabstracts.pdf | Gudin Rebuttal Report (Validity) | 2013 | | R, P, A, H |
| PTX 64 | | | | U.S. Patent No. 6,228,398 | Gudin Rebuttal Report (Validity) | 5/8/2001 | | R, P |
| PTX 65 | | | | U.S. Patent No. 6,902,742 | Gudin Rebuttal Report (Validity) | 6/7/2005 | | R, P |
| PTX 67 | | | | U.S. Patent No. 9,265,760 Notice of Allowance | Gudin Rebuttal Report (Validity) | 12/24/2015 | | P, H |
| PTX 70 | | | | USPTO Assignment Data re: Devane | Gudin Rebuttal Report (Validity) | | | INC, R, H, P, SUM, B |
| PTX 74 | | | | Vicodin® Prescribing Information dated February 2017 | Gudin Rebuttal Report (Validity)  Schmidt Deposition | 02/2017 | PERNIX_HEP 1285520-1285546 | R, P, M, H |
| PTX 75 | | | | Vicoprofen® Prescribing Information dated December 2016 | Gudin Rebuttal Report (Validity) | 12/2016 | | R, P, M, H |
| PTX 78 | | | | Alvogen's First Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories, dated Oct. 20, 2017 | Gudin Opening Report (Infringement) | 10/20/2017 | | H, R, P |
| PTX 81 | | | | Florida Statutes § 456.44 - Controlled Substance Prescribing | Candiotti Deposition Ex. 4 | | | P, H, A, INC, R |

5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PTX 82 | | | | Consent for Chronic Opioid Therapy - 2013 American Academy of Pain Medicine | Candiotti Deposition Ex. 5 | | P, H, A, INC, R |
| PTX 84 | | | | Expert Report of Fernano Muzzio Re: Invalidity, 15-cv-687 (unredacted) | Mayersohn Deposition Ex. 2 | 4/18/2017 | R, P, H, F |
| PTX 85 | | | | Expert Reply Report of Fernano Muzzio Re: Invalidity, 15-cv-687 (redacted) | Mayersohn Deposition Ex. 3 | 6/23/2017 | R, P, H, F |
| PTX 87 | | | | Alvogen's First Supplemental Invalidity Contentions [CORRECTED], 15-cv-687 (redacted version 1) | Mayersohn Deposition Ex. 13 | 3/3/2017 | P, LA, H, R, B |
| PTX 88 | | | | Physician's Desk Reference, 1997, Oxycontin | Mayersohn Deposition Ex. 14 | 1997 | H, R, P |
| PTX 89 | | | | Expert Report of Michael Mayersohn Re: Invalidity, 15-cv-687 (unredacted) | Mayersohn Deposition Ex. 15 | 4/17/2017 | R, P, H, F |
| PTX 92 | | | | Percocet® Prescribing Information dated November 2006 | Schmidt Deposition Ex. 3 | 11/2006 | R, P, H |
| PTX 93 | | | | Percodan® Prescribing Information dated June 2010 | Schmidt Deposition Ex. 4 | 06/2010 | R, P, H |
| PTX 94 | | | | FDA Approved Drug Products, OxyContin | Schmidt Deposition Ex. 5 | | INC, R, P, H |
| PTX 95 | | | | Hutchinson, M.R., et al., CYP2D6 and CYP3A4 Involvement in the Primary Oxidative Metabolism of Hydrocodone by Human Liver Microsomes, 57 BR. J. CLIN. PHARMACOL. 287 (Mar. 2004) (with cover) | Schmidt Deposition Ex. 9 | 03/2004 | LA, P, H, R |
| PTX 96 | | | | Valtier, S., Excretion Profile of Hydrocodone, Hydromorphone and Norhydrocodone in Urine Following Single Dose Administration of | Schmidt Deposition Ex. 10 | 7/10/2012 | ALVHYD 00082877-82884 | H, P, R |

6

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Hydrcodone to Healthy Volunteers, Journal of Analytical Toxicology 2012; 36:507-514 (July 10, 2012) | | | |
| PTX 97 | | | | FDA Dilaudid Labels Page available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=019892 | Schmidt Deposition Ex. 12 | | P, H, INC, R |
| PTX 98 | | | | Dilaudid® Oral Liquid And Dilaudid® Tablets Prescribing Information dated 2007 | Schmidt Deposition Ex. 13 | 11/9/2007 | H, P, R |
| PTX 99 | | | | Demerol® Prescribing Information dated October 2011 | Schmidt Deposition Ex. 14 | 10/2011 | H, P, R |
| PTX 100 | | | | Center for Drug Evaluation and Research - NDA 207975 (Vantrela) Administrative and Correspondence Documents | Schmidt Deposition Ex. 22 | | R, P, LA, H |
| PTX 101 | | | | NDA 204031 Approval Letter dated March 11, 2014 | Schmidt Deposition Ex. 25 | 03/2014 | H, P, R |
| PTX 102 | | | | Darwish et al., Effects of Renal Impairment and Hepatic Impairment on the Pharmacokinetics of Hydrocodone after Administration of a Hydrocodone Extended-Release Tablet Formulated with Abuse-Deterrence Technology,  CLIN. PHARM. DRUG DEV. 1 (2015) | Schmidt Deposition Ex. 28 | 2015 | PERNIX_HEP 0001520-1528 | R, P, H |
| PTX 103 | | | | Opana® ER Prescribing Information dated January 2011 | Weinberger Deposition Ex. 8 | 01/2011 | H, P, R |
| PTX 104 | | | | Opana® ER Prescribing Information dated July 2012 | Weinberger Deposition Ex. 9 | 07/2012 | H, P, R |
| PTX 105 | | | | FDA Approved Drug Products, Opana | Weinberger Deposition Ex. 10 | | H, P, R |

7

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PTX 107 | | | | | Andrew Hartman LinkedIn Profile | Def. Ex. 2 (Hartman Deposition ) | | INC, A, R, H, P |
| PTX 108 | | | | | File History Excerpts | Def. Ex. 16 (Hartman Deposition; Bozicevic Deposition) | ACT-HYD2 -021363-21476 | INC, A, F, H, P |
| PTX 109 | | | | | File History Excerpts | Def. Ex. 18 (Hartman Deposition) | ACT-HYD2- 021744-21820 | INC, A, F, H, P |
| PTX 116 | | | | | Alkermes Pharma Ireland Limited and Zogenix, Inc. Commercial Manufacturing and Supply Agreement | Def. Ex. 71 (Smith Deposition) | 11/2/2012 | DARA_Z 0223465-223516 | H, R, P |
| PTX 123 | | | | | Treating Pain in Patient's With Hepatic Impairment | Def. Ex. 106 (Boyd Deposition) | | ZGNX_ 00012807-12831 | H, P, R |
| PTX 127 | | | | | Alvogen's Preliminary Invalidity Contentions, 15-cv-687 (redacted) | | 3/24/2016 | | R, P, H |
| PTX 128 | | | | | Exhibit A to Alvogen's Preliminary Invalidity Contentions, 15-cv-687 (redacted) | | 3/24/2016 | | R, P, INC, H |
| PTX 129 | | | | | Alvogen's First Supplemental Invalidity Contentions, 15-cv-687 (redacted) | | 3/2/2017 | | R, P, H |
| PTX 130 | | | | | Exhibit A to Alvogen's First Supplemental Invalidity Contentions, 15-cv-687 (redacted) | | 3/2/2017 | | R, P, INC, H |
| PTX 131 | | | | | Alvogen's First Supplemental Invalidity Contentions [CORRECTED], 15-cv-687 (redacted version 2) | | 3/3/2017 | | R, P, H |
| PTX 132 | | | | | Exhibit A to Alvogen's First Supplemental Invalidity Contentions [CORRECTED], 15-cv-687 (redacted) | | 3/3/2017 | | R, P, INC, H |

8

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PTX 133 | | | | Expert Report of Michael Mayersohn Re: Invalidity, 15-cv-687 (redacted) | | 4/17/2017 | | R, P, H |
| PTX 134 | | | | Expert Reply Report of Michael Mayersohn Re: Invalidity, 15-cv-687 (redacted) | | 6/22/2017 | | R, P, H |
| PTX 135 | | | | Exhibit A to Expert Report of Michael Mayersohn Re: Invalidity, 15-cv-687 | | | | R, P, INC, H |
| PTX 136 | | | | Exhibit B to Expert Report of Michael Mayersohn Re: Invalidity, 15-cv-687 (redacted) | | | | R, P, INC, H |
| PTX 137 | | | | Exhibit C to Expert Report of Michael Mayersohn Re: Invalidity, 15-cv-687 | | | | R, P, INC, H |
| PTX 138 | | | | Exhibit D to Expert Report of Michael Mayersohn Re: Invalidity, 15-cv-687 (redacted) | | | | R, P, INC, H |
| PTX 139 | | | | Exhibit A to Expert Reply Report of Michael Mayersohn Re: Invalidity, 15-cv-687 (redacted) | | | | R, P, INC, H |
| PTX 140 | | | | Expert Report of Fernano Muzzio Re: Invalidity, 15-cv-687 (redacted) | | 4/18/2017 | | R, P, H |
| PTX 141 | | | | Expert Reply Report of Fernano Muzzio Re: Invalidity, 15-cv-687 (redacted) | | 6/23/2017 | | R, P, H |
| PTX 142 | | | | Exhibit A to Expert Report of Fernano Muzzio Re: Invalidity, 15-cv-687 | | | | R, P, INC, H |
| PTX 143 | | | | Exhibit B to Expert Report of Fernano Muzzio Re: Invalidity, 15-cv-687 (redacted) | | | | R, P, INC, H |
| PTX 144 | | | | Exhibit A to Expert Reply Report of Fernano Muzzio Re: Invalidity, 15-cv-687 | | | | R, P, INC, H |

9

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | (redacted) | | | |
| PTX 145 | | | | Expert Report of Chang Ryu Re: Indefiniteness, 15-cv-687 (redacted) | | 4/14/2017 | R, P, H |
| PTX 146 | | | | Reply Expert Report of Chang Ryu Re: Indefiniteness, 15-cv-687 (redacted) | | 6/23/2017 | R, P, H |
| PTX 147 | | | | Exhibit A to Expert Report of Chang Ryu Re: Indefiniteness, 15-cv-687 | | | R, P, INC, H |
| PTX 148 | | | | Exhibit B to Expert Report of Chang Ryu Re: Indefiniteness, 15-cv-687 | | | R, P, INC, H |
| PTX 149 | | | | Exhibit C to Expert Report of Chang Ryu Re: Indefiniteness, 15-cv-687 (redacted) | | | R, P, INC, H |
| PTX 150 | | | | Exhibit A to Reply Expert Report of Chang Ryu Re: Indefiniteness, 15-cv-687 | | | R, P, INC, H |
| PTX 151 | | | | Revised Exhibit 1 to Rebuttal Validity Expert Report of John J. Koleng, Jr., Ph.D. | | | H, P, R |
| PTX 152 | | | | FDA Approval Letter for Nucynta® Prescribing Information dated July 2012 | | 7/9/2012 | H, P, R |
| PTX 153 | | | | FDA Approval Letter for Kadian® Prescribing Information dated July 2012 | | 7/9/2012 | H, P, R |
| PTX 154 | | | | FDA Approval Letter for Exalgo® Prescribing Information dated July 2012 | | 7/9/2012 | H, P, R |
| PTX 157 | | | | Kadian® Prescribing Information dated July 2012 (Ref. ID: 3154883) | | 07/2012 | H, P, R |

10

## OBJECTION CODES

| Code | Objection |
|------|-----------|
| LA | Limited Admissibility (FRE 105) |
| INC | Incomplete (FRE 106) |
| R | Relevance (FRE 401/402) |
| P | Prejudice, Misleading, Confusion of Issues, Duplicative, Waste of Time and/or Cumulative (FRE 403) |
| C | Inappropriate Character Evidence (FRE 404-406) |
| S | Settlement (FRE 408) |
| F | Foundation/Lack of Personal Knowledge (FRE 602) |
| O | Improper Opinion Testimony (FRE 701-702) |
| 703 | Relied Upon by Expert, but Otherwise Inadmissible FRE 703) |
| H | Hearsay (FRE 801(c), 802, 805) |
| A | Authenticity (FRE 901) |
| B | Best Evidence Rules (FRE 1002-1003) |
| SUM | Improper Summary Evidence (FRE 1006) |
| M | Subjection to Motion *in Limine* or *Daubert* Motion, or Relevance Subject to Decision on Motion for Summary Judgment |
| A/C | Attorney-Client Privilege |
| T | Not Timely Produced or Designated (FRCP 37(c)) |
| 26(a) | Exhibit Inadmissible During Expert Testimony Where Expert Did Not Disclose Document in Expert Opinion Served Under FRCP 26(a)(2)(B) |
| MD | Multiple Documents/Improper Conclusion |
| MIS | Mischaracterization in Description |
| I | Illegible (Partly or Wholly) |

11

# EXHIBIT 5

**United States District Court**
**District of Delaware**
**Defendant's Trial Exhibit List**
**Pernix Ireland Pain DAC et al. v. Alvogen Malta Operations Ltd.**
**Civ. No. 16-139-WCB (D. Del)**

| PRESIDING JUDGE: William C. Bryson | TRIAL DATES: June 11-15, 2018 | COURTROOM DEPUTY: |
|---|---|---|
| PLAINTIFFS' ATTORNEY: | DEFENDANT'S ATTORNEY: | COURT REPORTER: |

| DTX | Date Offered | Marked | Admitted | Description | Source | Bates Range | Objections |
|---|---|---|---|---|---|---|---|
| DTX001 | | | | Notice of Subpoena to Karl Bozicevic | | | R, NOT EVIDENCE |
| DTX004 | | | | Defendants' Supplemental Invalidity Contentions (Oct. 2017) | | | H, R, U, NOT EVIDENCE |
| DTX005 | | | | 13950969 REQUEST FOR CONTINUED EXAMINATION (RCE)TRANSMITTAL | | | C, F, I |
| DTX006 | | | | U.S. Patent Application No. 14/523162, Amendment/Response Under 37 CFR 1.111 | | | C, F, I |
| DTX007 | | | | Declaration of ███████ (Nov. 17, 2011) | | | C, H, I |
| DTX008 | | | | NON-PARTY RORY P. ALEGRIA AND SERVILLA WHITNEY LLC'S PRIVILEGE LOG | | | R, NOT EVIDENCE |
| DTX009 | | | | Weinberger CV | | | |

1

| DTX010 | | | | SEC Form 10-K Annual Report Filed by Zogenix, Inc. for Fiscal Year Ending Dec. 31, 2012, Table of Contents | | | H, I |
|---|---|---|---|---|---|---|---|
| DTX011 | | | | U.S. Patent No. 9,737,605 | | | R |
| DTX013 | | | | Notice of Subpoena to Rory Alegria | | | R, NOT EVIDENCE |
| DTX014 | | | | Post Session E-1:  Clinical Pharmacy, Thursday Dec. 3, Monarch Room, Royal Hawaiian, Posters E 03-X-01 through E 03-X-27 | | | C, F, H, R |
| DTX015 | | | | Curriculum Vitae of William K. Schmidt, Ph.D. | | | |
| DTX017 | | | | ZX002 Hydrocodone ER Master Timeline | | | I |
| DTX018 | | | | Curriculum Vitae of Michael L. Weinberger, M.D. | | | |
| DTX020 | | | | 9/7/2017 Rubino Production | | | F, S |
| DTX022 | | | | Curriculum Vitae of Michael Mayersohn, Ph.D. | | | |
| DTX024 | | | | Institute for Clinical Pharmacodynamics, De-Risking Antibiotic Drug Development with PK-PD (White Paper) | | | F, R, H |
| DTX026 | | | | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Christopher Rubino, Case 1-16-cv-00138-GMS, D.I. 50 (Oct. 24, 2016) | | | R, NOT EVIDENCE |
| DTX027 | | | | Kadian - morphine sulfate capsule, extended release, Revised: 12/2011 | | | |
| DTX029 | | | | Second Production from Plaintiffs, Sept. 26, 2017 | | | F, S |
| DTX030 | | | | PubMed Search Results for Author "CM Rubino" | | | S |
| DTX032 | | | | Hartman Subpoena | | | R, NOT EVIDENCE |
| DTX033 | | | | NON-PARTY KARL BOZICEVIC AND BOZICEVIC | | | R, NOT |

2

| | | | | FIELD & FRANCIS LLP'S PRIVILEGE LOG | | | EVIDENCE |
|---|---|---|---|---|---|---|---|
| DTX036 | | | | SEC Form 10-K Annual Report Filed by Zogenix, Inc. for Fiscal Year Ending Dec. 31, 2012 | | | H |
| DTX037 | | | | Actavis Laboratories FL, Inc.'s Notice of Deposition to Plaintiffs Pursuant to Fed. R. Civ. P. 30(b)(6) to Take Deposition of Pernix Ireland Pain Ltd. and Pernix Therapeutics, LLC | | | R, NOT EVIDENCE |
| DTX038 | | | | Declaration of ▮▮▮▮▮▮ (Nov. 2017) | | | C, H, I |
| DTX039 | | | | 37 CFR Ch. I (Ed. July 1, 2014) | | | I, R |
| DTX041 | | | | Opening Expert Report of Michael Mayersohn, Ph.D. Regarding the Invalidity of U.S. Patent Nos. 9,265,760 and 9,339,488, Exhibit S, Calculations | | | H, I, R, NOT EVIDENCE |
| DTX042 | | | | Transcript of Deposition of Christopher Rubino (Oct. 19, 2017) | | | H, I |
| DTX043 | | | | U.S. Provisional Application Nos. 61/677,601 and 61/779,698, Patent Family Tree | | | F, H, S |
| DTX045 | | | | Determination that Hycodan (Hydrocodone Bitartrate and Homatropine Methylbromide) Tablets, 5 mg/1.5 mg, and Hycodan (Hydrocodone Bitartrate and Homatropine Methylbromide) Oral Solution, 5 mg/5 mL and 1.5 mg/5 mL, were not Withdraw from Sale for Reasons of Safety or Effectiveness, 76 Fed. Reg. 82,302, 82,303 (Dec. 30, 2011) | | ACT-HYD2-021093-21094 | R |
| DTX049 | | | | U.S. Patent No. 6,733,783 | | ACT-HYD2-021346-21362 | |
| DTX051 | | | | European Patent Application 2311442 A1 (filed Jan. 11, 1999) | | ACT-HYD2-021520-21537 | F |
| DTX060 | | | | Vicoprofen® Label (hydrocodone bitartrate and ibuprofen tablets) 7.5 mg/200 mg, Rev: January 2006 | | ACT-HYD2-023197-23210 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DTX065 | | | | TussiCaps® Label, Extended-Release, Hydrocodone Bitartrate and Chlorpheniramine Maleate Capsule, Extended Release, CIII, Rev: July 2010 | | ACT-HYD2-023350-23361 | |
| DTX066 | | | | Nucynta® ER Label, Tapentadol Hydrochloride Tablet, Film Coated, Extended Release, Rev: August 2011 | | ACT-HYD2-023362-23402 | |
| DTX067 | | | | Avinza® ER Label CII (morphine sulfate extended-release capsules) 30 mg, 45 mg, 60 mg, 75 mg, 90 mg, 120 mg, Rev: May 2011 | | ACT-HYD2-023403-23426 | |
| DTX068 | | | | Kadian® Label (morphine sulfate capsule, extended release) | | ACT-HYD2-023427-23442 | |
| DTX069 | | | | Gregory L. Holmquist, Opioid Metabolism and Effects of Cytochrome P450, 10 Pain Med. S20-29, S25 (2009) | | ACT-HYD2-025389-25398 | H |
| DTX070 | | | | Email Correspondence Between Steven Cartt and Sydney Gilman (Mar. 28, 2002) | | DARA_Z 0216920-217077 | A, C, H, F |
| DTX073 | | | | Presentation: Introduction to Zogenix, Inc. | | DARA_Z 0223739-223770 | A, H |
| DTX076 | | | | Zogenix, Inc., End-of-Phase 2 Briefing Document re IND 65,111/Hydrocodone Bitartrate Controlled Release Capsules (May 1, 2008) | | DARA_Z 0258204-258227 | A, H |
| DTX077 | | | | Deposition of Angus Smith, Exhibit 86 | | PERNIX_ZO 0002251-2253 | A, H, I, F |
| DTX078 | | | | Zogenix, Inc., HC-CR Protocol No. ZX002-0802, Appendix C: Opioid Conversion Table and Calculation | | PERNIX_HEP 0081427 | I, F |
| DTX082 | | | | U.S. Patent No. 9,326,982 | | PERNIX_HEP 0001269-1290 | R |
| DTX083 | | | | U.S. Patent No. 9,333,201 | | PERNIX_HEP 0001291-1312 | R |
| DTX085 | | | | U.S. Patent No. 9,421,200 | | PERNIX_HEP 0001335-1356 | R |
| DTX086 | | | | U.S. Patent No. 9,433,619 | | PERNIX_HEP 0001357-1378 | R |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| DTX088 | | | | Letter from Pernix to FDA Regarding IND 65111, Hydrocodone Bitartrate Extended-Release, 10 mg, 15 mg, 20 mg, 30 mg, 40 mg and 50 mg Capsules, SN 0111: Request for Type B, Pre-IND Meeting (June 27, 2016) | PERNIX_HEP 0002521 | F |
| DTX089 | | | | 1.14.1.2 Annotated Draft Labeling Text | PERNIX_HEP 0003204-3230 | R |
| DTX090 | | | | Hydrocodone Bitartrate ER Zogenix, Inc., Summary of Clinical Efficacy | PERNIX_HEP 0003890-3903 | F |
| DTX091 | | | | Exalgo® ER Label (hydromorphone HCl) Extended-Release Tablets, Rev: March 2010 | PERNIX_HEP 0013307-13323 | |
| DTX092 | | | | A Pilot Study in Healthy Volunteers to Assess the Bioavailability of Hydrocodone from Hydrocodone Bitartrate Formulations Relative to Vicodin HP Tablet | PERNIX_HEP 0014654-14791 | I |
| DTX095 | | | | Zogenix, Inc., Clinical Study Report:  A Randomized Double-Blind, Placebo-Controlled Trial to Evaluate the Efficacy, Tolerability and Safety of Hydrocodone Bitartrate Extended-Release Capsules in Opioid-Experienced Subjects with Moderate to Severe Chronic Low Back Pain | PERNIX_HEP 0023871-23983 | I |
| DTX096 | | | | Zogenix, Inc., HC-CR Protocol No. ZX002-0801, Appendix H: Opioid Conversion Table and Calculation | PERNIX_HEP 0024907 | I, F |
| DTX097 | | | | Zogenix, Inc., Clinical Study Report:  A Long-Term Open-Label Safety Study of Hydrocodone Bitartrate Controlled-Release Capsules with Flexible Dosing to Treat Subjects with Moderate to Severe Chronic Pain | PERNIX_HEP00 79882-79992 | I, F |
| DTX098 | | | | T.J. Baumann et al, Analgesic Safety and Efficacy of Controlled Release Hydrocodone, 76 J. Pharm. Scis. S107 (Nov. 1987) | PERNIX_HEP00 81550-81667 | C, F, H, R |
| DTX101 | | | | CLINICAL STUDY REPORT ZX002-1102 6/14/2012 | PERNIX_HEP 1127657-1127854 | I |
| DTX102 | | | | Email Correspondence Between Angus Smith and Joseph C. Sahlhoub (Mar. 26, 2015) | PERNIX_HEP 1166132-1166133 | H |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DTX103 | | | | Presentation:  Zebra Forecast Support | | PERNIX_HEP 1166134-1166142 | H |
| DTX104 | | | | Email Correspondence Between Roger Hawley and Doug Drysdale (Feb. 4, 2015) | | PERNIX_HEP 1168223-1168226 | H, R |
| DTX105 | | | | Presentation: Zohydro® ER (hydrocodone bitartrate) with BeadTekTM: Putting Patients First (May 6, 2015) | | PERNIX_HEP 1172937-1172960 | F, H |
| DTX106 | | | | AMCP Dossier, Zohydro® ER (hydrocodone bitartrate) Extended-Release Capsules, Cll | | PERNIX_HEP 1175573-1175648 | F |
| DTX107 | | | | Zohydro™ ER (Hydrocodone Bitartrate) Extended-Release Capsules Learning System, Module 5 | | PERNIX_HEP 1177567-1177739 | F |
| DTX108 | | | | Presentation:  Project Zebra Update, Pernix Therapeutics | | PERNIX_HEP 1283082-1283138 | H |
| DTX110 | | | | Presentation:  Zohydro ER Hydrocodone Bitartrate Extended-Release (HC-ER), Anesthetic and Analgesic Drug Products Advisory Committee (Dec. 7, 2012) | | PERNIX_ZO 0001444-1563 | H |
| DTX111 | | | | U.S. DUTY OF CANDOR IDS PREPARATION AND MANAGEMENT | | PH_ALEGRIA 0000001-2 | R |
| DTX112 | | | | Incoming Prosecution Checklist | | PH_ALEGRIA 0000003-4 | R |
| DTX114 | | | | PCT Dec 16 2013 | | PH_BOZICEVIC 0000010-30 | R |
| DTX115 | | | | 11.4.1.1 Plasma Concentrations | | PH_RUBINO 0000668-675 | I |
| DTX116 | | | | PROTOCOL No ZX002-100I IND No. 65,111 DRAFT November 10 2011 | | PH_RUBINO 0000676-789 | F |
| DTX118 | | | | Deposition of Christopher Rubino, Exhibit 64 | | PH_RUBINO 0003710 | F |
| DTX119 | | | | Pre-NDA Nonclinical/Clinical Meeting Briefing Document IND 65,111 | | PH_RUBINO 004015-4105 | H |
| DTX120 | | | | Table 2.3.P.1 Hydrocodone Bitarte q24h Film Coated | | PRNX00000001 | I |

6

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Tablets | | |
| DTX122 | | | | | SEC Form 10-K Annual Report for Fiscal Year Ending December 31, 2014 | ZGNX_ 00000140-285 | F, H, R |
| DTX123 | | | | | Memo Regarding End-of-Phase 2 or Type C Guidance Meeting - Potential Questions for FDA | ZGNX_ 00001997-1998 | F, H, R |
| DTX125 | | | | | Zogenix, Inc., Hydrocodone Bitartrate ER, 2.7.1. Summary of Biopharmaceutic Studies and Associated Analytical Methods | ZGNX_ 00007569-7613 | F, H, R |
| DTX126 | | | | | Email Correspondence between Brooks Boyd and Andrew Hartman (Sept. 19, 2013) | ZGNX_ 00008844-8847 | F, H, R |
| DTX127 | | | | | Email Correspondence between Brooks Boyd and Stephen Farr (Sept. 18, 2013) | ZGNX_ 00008848-8849 | F, H, R |
| DTX128 | | | | | Email Correspondence Between Brooks Boyd (Sept. 13, 2013)c | ZGNX_ 00008936-8937 | F, H, R |
| DTX129 | | | | | Email Correspondence between Brooks Boyd and Jeff Schuster (Nov. 13, 2013) | ZGNX_ 00011451 | F, H, R |
| DTX130 | | | | | Zohydro™ ER Hydrocodone Bitartrate Extended-Release Capsules, Anesthetic and Analgesic Drug Products Advisory Committee (Dec. 7, 2012) | ZGNX_ 00011517-11693 | F, H, R |
| DTX131 | | | | | Determination of Hydrocodone, Norhydrocodone, and Hydromorphone in Human Plasma and Urine Samples from ZX002-1001 by HPLC with MS/MS Detection, Final Report | ZGNX_ 00012280-12433 | F, H, R |
| DTX136 | | | | | Email Correspondence between Brooks Boyd and Jeff Schuster (Oct. 7, 2014) | ZGNX_ 00014128-14130 | F, H, R |
| DTX137 | | | | | Meeting Minutes, Regarding IND 65,111 (Nov. 17, 2011) | ZGNX_ 00014530-14572 | F, H, R |
| DTX139 | | | | | Email Correspondence between Jeff Schuster and Stephen Farr (Sept. 18, 2013) | ZGNX_ 00014721-14722 | F, H, R |

7

| DTX140 | | | | Letter from FDA to Zogenix, Inc. Regarding Approval of NDA 202880 | | ZGNX_ 00016666-16751 | F, H, R |
|---|---|---|---|---|---|---|---|
| DTX141 | | | | Email Correspondence Between Jeff Schuster and Brooks Boyd (Oct. 7, 2014) | | ZGNX_ 00021194-21195 | F, H, R |
| DTX142 | | | | Center for Drug Evaluation and Research, Clinical Pharmacology and Biopharmaceutics Review(s) for Application No. 202880 | | ZGNX_ 00022319-22428 | F, H. R |
| DTX143 | | | | Center for Drug Evaluation and Research, Medical Reviews for Application No. 202880 | | ZGNX_ 00022509-22608 | F, H, R |
| DTX145 | | | | Presentation: ZX002 Hydrocodone CR Zogenix-Elan Joint Project Meeting (Oct. 14-15, 2010) | | ZGNX_ 00032617-32626 | F, H, R |
| DTX146 | | | | NIH, Prescription Drug Abuse, NIH Pub. No. 11-4881 (Oct. 2011) | | | |
| DTX149 | | | | Vicodin® (hydrocodone bitartrate and acetaminophen tablets, USP) 5 mg/500 mg, CS-III (Rev: Dec. 2010) | | | |
| DTX150 | | | | Spray et al., Dosage Adjustment for Hepatic Dysfunction Based on Child-Pugh Scores, 64 Am. J. Health-Sys. Pharm. 690 (2007) | | | A, F, H, N, R |
| DTX152 | | | | List and Summaries of Clinical Studies Relating to Vicodin (Hydrocodone Bitartrate and Acetaminophen Tablets, USP) | | | |
| DTX159 | | | | Joranson et al., Trends in Medical Use and Abuse of Opioid Analgesics, 283 JAMA 1710 (2000) | | | H |
| DTX162 | | | | Patent Application No. 13/950,969 (July 25, 2013) | | | C, I |
| DTX163 | | | | Larson et al., Acetaminophen Hepatoxicity, 11 Clinics in Liver Diseases 525 (2007) | | | H |
| DTX164 | | | | U.S. Patent No. 8,647,667 | | ACT-HYD2-021174-21191 | A, F, R, H |

8

| DTX166 | | | | WO 2009/10018 | | | A, F, H, N, R |
|---|---|---|---|---|---|---|---|
| DTX171 | | | | Elan 154088-201 Clinical Study Report (Feb. 12, 2003) | | PERNIX_HEP 0018759-18854 | I |
| DTX179 | | | | Ebtesam Ahmed et al., Evaluating Patient Education Material of Medications Commonly Used in Palliative Care, PainWeek (2013 Accepted Abstracts) | | | |
| DTX180 | | | | U.S. Food & Drug Admin., Acetaminophen Overdose and Liver Injury: Background and Options for Reducing Injury (2009) | Weinberger (Opening Invalidity) | | |
| DTX184 | | | | Patent Application No. 14/523,162 (Oct. 24, 2014) | | | F, R, H |
| DTX185 | | | | Karolina Brook et al., *The Chemical History of Morphine: An 8000-Year Journey, from Resin to De-Novo Synthesis* 3 J. Anesthesia History 50 (2017) | Weinberger (Opening Invalidity) | | |
| DTX186 | | | | American Association for the Study of Liver Diseases, *FDA Advisory Panel Tightens Controls on Acetaminophen Products*(2009) | Weinberger (Opening Invalidity) | | |
| DTX187 | | | | Gerald J. Dal Pan, *Acetaminophen: Background and Overview* (June 29, 2009) | Weinberger (Opening Invalidity) | | |
| DTX188 | | | | Portenoy et al., *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 Cases*, 25 Pain 171 (1986) | Weinberger (Opening Invalidity) | | |
| DTX189 | | | | Product Details for NDA 019516 (MS Contin), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |
| DTX190 | | | | Product Details for NDA 019813 (Duragesic), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |
| DTX191 | | | | Product Details for NDA 020616 (Kadian), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |

9

| DTX192 | | | | Product Details for NDA 021044 (Palladone), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |
| DTX193 | | | | Product Details for NDA 021217 (Exalgo), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |
| DTX194 | | | | Product Details for NDA 021260 (Avinza), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |
| DTX195 | | | | Product Details for NDA 20053 (Nucynta ER), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |
| DTX196 | | | | Product Details for NDA 201655 (Opana ER), *Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations* | Weinberger (Opening Invalidity) | | |

10

**OBJECTION CODES**

| LETTER | OBJECTION | APPLICABLE RULE(S) |
|---|---|---|
| A | Requires authentication or identification | FRE 901 |
| B | Best evidence rules prohibit introduction | FRE 1001-1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Improper designation (designation is neither a question or testimony) | FRE 401, 402 |
| E | Improper examination (vague, ambiguous, loaded, leading, etc.) | FRE 402, 403, 602, 611 |
| F | Lack of foundation/personal knowledge (incl. calls for speculation) | FRE 402, 403, 602, 611 |
| H | Hearsay if offered for the truth of the matter asserted | FRE 801, 802, 805 |
| I | Incomplete document or testimony | FRE 106, 403 |
| M | Offer or discussion for settlement or compromise | FRE 408 |
| N | Exhibit not produced in discovery | FRE 403 |
| O | Improper opinion testimony | FRE 701-704 |
| P | Privileged or attorney work product | FRE 501, 502 |
| R | Lack of relevance | FRE 401, 402 |
| S | Summary requiring underlying data or information | FRE 1006 |
| T | Beyond the scope of the Rule 30(b)(6) topic for which a witness has been designated | FRE 602, FRCP 30(b)(6) |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative | FRE 403 |
| NR | Non-Responsive | FRE 402, 403, FRCP 30 |

11

# EXHIBIT 6

**United States District Court**
**District of Delaware**
**Parties' Joint Trial Exhibit List**
**Pernix Ireland Pain DAC et al. v. Alvogen Malta Operations Ltd.**
**Civ. No. 16-139-WCB (D. Del)**

| PRESIDING JUDGE: William C. Bryson | TRIAL DATES: June 11-15, 2018 | COURTROOM DEPUTY: |
|---|---|---|
| PLAINTIFFS' ATTORNEY: | DEFENDANT'S ATTORNEY: | COURT REPORTER: |

| JTX | Date Offered | Marked | Admitted | Description | Date | Bates Range | Objections |
|---|---|---|---|---|---|---|---|
| JTX 1 | | | | Certified U.S. Patent No. 9,265,760 | 2/23/2016 | | |
| JTX 2 | | | | Certified File History U.S. Patent No. 9,265,760 | 9/20/2016 | PERNIX_HEP 1163260-1163487 | |
| JTX 3 | | | | Certified U.S. Patent No. 9,339,499 | 5/17/2016 | | |
| JTX 4 | | | | Certified File History U.S. Patent No. 9,339,499 | 9/20/2016 | PERNIX_HEP 1164138-1164474 | |
| JTX 5 | | | | Zohydro® ER Prescribing Information dated December 2016 | 12/2016 | | |

1

| JTX 6 | | | | Alvogen ANDA Product Draft Label dated March 2017 | 03/2017 | ALVHYDRO-PTX 00013439-13466 | |
| JTX 7 | | | | Alvogen ANDA Product Draft Label Comparison dated March 2014 | 03/2014 | ALVHYDRO-PTX 00000284-321 | |
| JTX 8 | | | | Bond, M., et al., Effects of Renal Impairment and Hepatic Impairment on the Pharmacokinetics of Hydrocodone Administration After Administration of a Novel Extended-release Hydrocodone Tablet Formulated with OraGuard Technology, 7 PAIN WEEK ACCEPTED ABSTRACTS 12 (2013) | | PERNIX_HEP 0001489-1490 | |
| JTX 9 | | | | Darwish et al., Effects of Renal Impairment and Hepatic Impairment on the Pharmacokinetics of Hydrocodone after Administration of a Hydrocodone Extended-Release Tablet Formulated with Abuse-Deterrence Technology, 5 CLIN. PHARM. DRUG DEV. 141 (Jan. 2016) | 01/2016 | | |
| JTX 10 | | | | Dowell, D., et al., CDC Guideline for Prescribing Opioids for Chronic Pain, available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm, last visited Nov. 7, 2017 | 3/18/2016 | | |
| JTX 11 | | | | Gudin, J., Opioid Therapies and Cytochrome P450 Interactions, 44 J. PAIN & SYMPT. MGMT. S4 (Dec. 2012) | 12/2012 | | |
| JTX 12 | | | | Hutchinson, M.R., et al., CYP2D6 and CYP3A4 Involvement in the Primary Oxidative Metabolism of Hydrocodone by Human Liver Microsomes, 57 BR. J. CLIN. PHARMACOL. 287 (Mar. 2004) | 03/2004 | | |
| JTX 13 | | | | Hysingla® ER Prescribing Information dated December 2016 | 12/2016 | | |
| JTX 14 | | | | June 4, 2008 FDA Meeting Minutes (IND 65,111) | 6/4/2008 | PERNIX_HEP 0003009-3026 | |

2

| JTX 15 | | | | Lortab® Prescribing Information dated May 2011 | 05/2011 | ACT-HYD2-022210-22212 | |
|---|---|---|---|---|---|---|---|
| JTX 16 | | | | Melhem, M. et al., Population Pharmacokinetic Analysis for Hydrocodone Following the Administration of Hydrocodone Bitartrate Extended-Release Capsules, 52 CLIN. PHARMACOKINETICS 907 (May 30, 2013) | 5/30/2013 | | |
| JTX 17 | | | | Nucynta® ER Prescribing Information dated July 2012 | 07/2012 | | |
| JTX 18 | | | | OxyContin® Prescribing Information dated July 2012 | 07/2012 | | |
| JTX 19 | | | | Vantrela™ ER Prescribing Information dated January 2017 | 01/2017 | | |
| JTX 20 | | | | Vicodin® Prescribing Information dated September 2011 | 09/2011 | ACT-HYD2-022213-22216 | |
| JTX 21 | | | | Vicoprofen® Prescribing Information dated April 2008 | 04/2008 | | |
| JTX 22 | | | | Agreement for Using Opioid Pain Medications | | | |
| JTX 23 | | | | Center for Drug Evaluation and Research - NDA 207975 (Vantrela) Administrative and Correspondence Documents | | PERNIX_HEP 1285244-1285459 | |
| JTX 24 | | | | Center for Drug Evaluation and Research - NDA 207975 Summary Review | 1/17/2017 | PERNIX_HEP 1285460-1285512 | |
| JTX 25 | | | | Cephalon Hepatic Impairment Study (C33237/1089) dated Jan. 6, 2012 | 1/6/2012 | VANTRELA 00002158-2266 | |

| JTX 26 | | | | Cephalon Clinical Study Protocol dated Apr. 8, 2011 | 4/8/2011 | VANTRELA 00003145-3238 | |
|---|---|---|---|---|---|---|---|
| JTX 27 | | | | Dilaudid® Oral Liquid And Dilaudid® Tablets Prescribing Information dated 2006 | 6/12/2006 | | |
| JTX 28 | | | | Dilaudid® Oral Liquid And Dilaudid® Tablets Prescribing Information dated 2007 | 11/9/2007 | | |
| JTX 29 | | | | Elan Pharma International Limited and Zogenix, Inc. License Agreement | 11/27/2007 | PH_ALEGRIA 0000047-129 | |
| JTX 30 | | | | FDA Drug Safety Communication: Prescription Acetaminophen Products to Be Limited to 325 mg per Dosage Unit; Boxed Warning Will Highlight Potential for Severe Liver Failure (Jan. 13, 2011) | 1/13/2011 | ACT-HYD2-023247-23266 | |
| JTX 31 | | | | FDA Guidance for Industry: Pharmacokinetics in Patients with Impaired Hepatic Function: Study Design, Data Analysis, and Impact on Dosing and Labeling (May 2003) | 05/2003 | ACT-HYD2-023058-23076 | |
| JTX 32 | | | | Johnson, S., Opioid Safety in Patients With Renal or Hepatic Dysfunction, Pain Treatment Topics (Nov. 2007 ) | 11/2007 | PERNIX_HEP 0001529-1537 | |
| JTX 33 | | | | Purdue Hepatic Impairment Study ███████████ ████ | █████ | PRNX 00000002-821 | |
| JTX 34 | | | | Smith, H.S., Opioid Metabolism, 84 MAYO CLINIC PROC. 613 (July 2009) | 07/2009 | | |
| JTX 35 | | | | VA/DoD Clinical Practice Guideline For Management of Opioid Therapy for Chronic Pain | 05/2010 | ACT-HYD2-022217-22290 | |
| JTX 36 | | | | U.S. Patent No. 8,808,740 (Huang) | 8/19/2014 | ACT-HYD2-022082-22117 | |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JTX 37 | | | | U.S. Patent Publ. No. 2006/0240105 (Devane) | 10/26/2006 | | |
| JTX 38 | | | | U.S. Patent Publ. No. 2010/0010030  (Jain) | 1/14/2010 | PERNIX_HEP 0001571-1607 | |
| JTX 39 | | | | U.S. Provisional Application No. 61/677,601 | 7/31/2012 | ACT-HYD2-022153-22193 | |
| JTX 40 | | | | U.S. Provisional Application No. 61/779,698 | 3/13/2013 | | |
| JTX 41 | | | | Vallejo, R., et al., Pharmacology of Opioids in the Treatment of Chronic Pain Syndromes, 14 PAIN PHYSICIAN E343 (July 2011) | 07/2011 | | |
| JTX 42 | | | | Zogenix, Inc., End of Phase 2 Meeting – Briefing Document dated May 1, 2008 | 5/1/2008 | DARA_Z 0258203-258515 | |
| JTX 43 | | | | Zogenix Hepatic Impairment Study (ZX002-1001 (IND No. 65,111)) dated November 17, 2011 | 11/17/2011 | PERNIX_HEP 0015621-15858 | |
| JTX 44 | | | | Pernix's Amended Responses to Actavis's Corrected First Set of RFA Nos. 1-19, dated October 17, 2017 | 10/17/2017 | | |
| JTX 45 | | | | Keith A. Candiotti, M.D. CV | | | |
| JTX 46 | | | | List of Testimony Offered During The Past Four Years | | | |
| JTX 47 | | | | Clinical Study Report ZX002-1001, dated November 2, 2011 | 11/2/2011 | PH_RUBINO 0000790-911 | |
| JTX 48 | | | | Cipriano et al., Effect of Hepatic Impairment on the Pharmocokinetics of Hydrocodone and its Metabolites Following Administration of a Novel Hydrocodone | 2013 | ACT-HYD2-022333-22334 | |

5

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Single-Entity, Once-daily, Extended-release Tablet, PAINWeek 2013 Accepted Abstracts | | |
| JTX 49 | | | | Hysingla® ER Prescribing Information dated November 2014 | 11/2014 | ACT-HYD2-023211-23243 |
| JTX 50 | | | | US 2008/0075771 (Vaughn) | | |
| JTX 51 | | | | ZX-002 Development Overview, Clearview Projects | | DARA_Z 0223616-223663 |
| JTX 52 | | | | File History Excerpts | | ACT-HYD2-021363-21743 |
| JTX 53 | | | | File History Excerpts | | ACT-HYD2-021744-22081 |
| JTX 54 | | | | Asset Purchase Agreement by and between Pernix Ireland Limited and Zogenix, Inc. | | PERNIX_HEP 1284422-1285243 |
| JTX 55 | | | | Elan Drug Delivery, Inc. and Zogenix, Inc. Development and Clinical Supply Agreement | 12/20/2007 | DARA_Z 0243601-243621 |
| JTX 56 | | | | Alkermes Pharma Ireland Limited and Zogenix, Inc. Commercial Manufacturing and Supply Agreement | 11/2/2012 | ACT-HYD2-022376-22405 |
| JTX 57 | | | | Pre-NDA Non-clinical/Clinical Briefing Document | | ZGNX_ 00014467-14529 |
| JTX 58 | | | | Email involving Brooks Boyd, Andrew Hartman, Chris Rubino, dated 1/10/2013 | 1/10/2013 | ZGNX_ 00012832 |
| JTX 59 | | | | Zohydro® ER Prescribing Information dated XX/XX | | ZGNX_ 00012833-12844 |

6

| JTX 60 | | | | Zogenix IP Action Items | | ZGNX_ 00014613-14615 | |
|---|---|---|---|---|---|---|---|
| JTX 61 | | | | Email involving Brooks Boyd, Andrew Hartman, John Lally, dated 12/12/2012 | 12/12/2012 | ZGNX_ 00012806 | |
| JTX 62 | | | | Email involving Brooks Boyd, Jeff Schuster, Andrew Hartman, dated 7/22/2014 | 7/22/2014 | ZGNX_ 00007382-7383 | |
| JTX 63 | | | | Email string involving Brooks Boyd, Stephen Farr, dated 7/25/2014 | 7/25/2014 | ZGNX_ 00007324 | |
| JTX 64 | | | | Email string involving Brooks Boyd, Erika Senska, Bret Megargel, Barry Siegel, dated 6/23/2015 through 6/24/2015 | 6/24/2015 | ZGNX_ 00000386-388 | |
| JTX 65 | | | | Opana® ER Prescribing Information dated September 2010 | 09/2010 | PERNIX_HEP 1126809-1126835 | |
| JTX 66 | | | | OxyContin® Prescribing Information dated April 2010 | 04/2010 | PERNIX_HEP 1126836-1126872 | |
| JTX 67 | | | | Elan Pharma International Limited and Zogenix, Inc. License Agreement | | PERNIX_HEP 1282048-1282130 | |
| JTX 68 | | | | Brooks Boyd Declaration | | | |

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) ) | |
| Defendant. | ) ) ) ) | |

### EXHIBIT 7
### PERNIX'S WITNESS LIST

Pernix identifies the following witnesses whom it may call live or by deposition at trial. This list is not a commitment that Pernix will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial.  If any third-party witness is unavailable, Pernix reserves the right to use his or her deposition testimony. Pernix also reserves the right to call any witnesses listed or called by Alvogen, and to revise this list in light of further rulings by the Court or any other changed circumstances.  In addition, Pernix reserves the right to call any witness, whether listed below or not, to establish authenticity and/or admissibility of any trial exhibit whose authenticity or admissibility is challenged by Alvogen.

**I.      Witnesses Whom Plaintiffs Will Call to Testify Live**

1.  Jeffrey Gudin, M.D.

2.  John J. Koleng, Jr., Ph.D.

1

**II.      Witnesses Whom Plaintiffs May Call to Testify Live or by Deposition**

1.  Andrew Hartman

2.  Cynthia Y. Robinson, Ph.D.

3.  Christopher M. Rubino, Pharm.D.

4.  Brooks Boyd, Ph.D. (Zogenix 30(b)(6) witness)

5.  William K. Schmidt, Ph.D.

6.  Keith A. Candiotti, M.D.

7.  Michael Mayersohn, Ph.D.

8.  Michael L. Weinberger, M.D.

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) | |
| Defendant. | ) ) ) ) | |

## <u>EXHIBIT 8 – ALVOGEN'S WITNESS LIST</u>

Subject to the availability of each witness at the time of trial and the evidence presented

by Plaintiffs, Alvogen will call the following witnesses in person:

1.   William K. Schmidt, Ph.D.



2.   Keith A. Candiotti, M.D.



3.   Michael Mayersohn, Ph.D.



Subject to the availability of each witness at the time of trial and the evidence presented by Plaintiffs, Alvogen may call the following witnesses to testify live or by deposition:

4.    Michael L. Weinberger, M.D.



5.    Andrew Hartman

6.    Cynthia Y. Robinson

7.    Christopher M. Rubino

8.    Angus Smith

9.    Brooks Boyd

10.    Rory P. Alegria

11.    Karl Bozicevic

Alvogen reserves the right to call any witnesses listed on Plaintiffs' witness list.  Alvogen also reserves the right to call such other witnesses as may be necessary to rebut any evidence introduced by Plaintiffs at trial.

2

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) ) |
| Defendant. | ) ) ) ) |

EXHIBIT 9
PERNIX'S EXPERT WITNESS QUALIFICATIONS

### 1. Dr. Jeffrey Gudin

Background/Qualifications:  Dr. Gudin has been the Director of Pain Management and Palliative Care at Englewood Hospital and Medical Center in New Jersey since 2000.  After earning his M.D. degree from Albany Medical College in 1992, Dr. Gudin trained as a Resident in the Department of Anesthesiology at Yale University School of Medicine (1993-96), where he was also Chief Resident, followed by a Postdoctoral Fellowship at the Yale Center for Pain Management (1996-97).

Dr. Gudin is Board Certified in the areas of Pain Management, Anesthesiology, Addiction Medicine, and Hospice and Palliative Medicine.  As part of Dr. Gudin's medical practice for the last 21 years, he has treated patients suffering from chronic pain, including patients with mild, moderate, and severe hepatic impairment.  Many of these patients have been treated with opioid medications.

1

Expected Testimony:  At trial, Dr. Gudin's expected testimony will:

1)      provide background on opioids and hepatic impairment;

2)      describe the level of skill of a person of ordinary skill in the art;

3)      explain how administering the Alvogen Proposed ANDA Product fulfills all of the elements of the asserted claims of the '760 and '499 patents;

4)      explain why the prior art does not render obvious the asserted claims of the '760 and '499 patents;

5)      explain that objective evidence of nonobviousness supports the patentability of the asserted claims of the '760 and '499 patents;

6)      explain why the prior art does not anticipate the asserted claims of the '760 and '499 patents;

7)      explain why the asserted claims of the '760 and '499 patents are directed to patent-eligible subject matter;

8)      address any other issues reflected in or relating to his expert reports.

## 2.  Dr. John J. Koleng, Jr.

Background/Qualifications:  Dr. Koleng has been an Adjunct Assistant Professor of Pharmaceutics at the University of Texas at Austin, College of Pharmacy since 2009.  He received a B.S. degree in Pharmacy from the University of Texas at Austin in 1994, and a Ph.D. in pharmaceutics from the University of Texas at Austin in 2002.  He is a licensed pharmacist.

Dr. Koleng is also a Partner at AlphaVektor, LLC in Austin Texas, which he cofounded and where he has been providing consulting services for nine years.  Dr. Koleng's current consulting expertise focuses on the development, formulation, optimization, testing, scale up, manufacturing, packaging, and project management of drug products and drug product development programs.  His product development experience includes injectables, tablets, capsules, pulmonary, nasal, topical, and ophthalmic products manufactured by a variety of technologies.  He has extensive research, development, and manufacturing experience and has coauthored publications and given presentations related to drug dosage forms.

2

Expected Testimony:  At trial, Dr. Koleng's expected testimony will:

1)      describe the level of skill of a person of ordinary skill in the art;

2)      explain why the asserted claims of the '760 and '499 patents are not invalid for lack of written description;

3)      address any other issues reflected in or relating to his expert report.

3

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ALVOGEN MALTA OPERATIONS LTD., <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 1:16-cv-00139 (WCB)<br>)<br>)<br>)<br>)<br>)<br>) |

**EXHIBIT 10**
**ALVOGEN'S EXPERT WITNESS QUALIFICATIONS**

Subject to the availability of each witness at the time of trial and any future stipulations entered into by the parties, Alvogen will or may call the following expert witnesses in person.  In addition to identifying the expert witness that Alvogen intends to call at trial, Alvogen has included a brief statement of the expert's qualifications and expected testimony.

**1.     Keith A. Candiotti, M.D.**

**a.        Background/Qualifications**

Dr. Candiotti is a licensed physician with almost thirty years of experience in pain treatments, including treatments with drugs containing hydrocodone, a Tenured Professor of Anesthesiology and Internal Medicine at the University of Miami, and the Chief Operating Officer and Vice Chair of Clinical Research for the Department of Anesthesiology, Perioperative Medicine and Pain Management at the University of Miami.

Dr. Candiotti has been a member of numerous professional organizations relating to the treatment of pain, including the American Academy of Pain Medicine, the American Society of

1

Anesthesiologists, the Association of Clinical Research Professionals, the Association of University Anesthesiologists, the European Society of Anesthesiology (ESA) and, among others, the International Society of Pharmacogenomics.

Dr. Candiotti earned his M.D. in 1989 from the University of Miami and his B.A. in Biology, cum laude, in 1989 from Washington University in St. Louis.

Dr. Candiotti has published over 100 peer-reviewed scientific articles, over 80 published articles and over 10 book chapters and manuscripts.  Notably, many of these publications relate to pain management and drugs used to treat pain.  Others relate to hepatic impairment and the variability of drug metabolism in patients.

**b.      Expected Testimony**

In response to Dr. Gudin's testimony, Dr. Candiotti may testify that Alvogen will not and cannot infringe, either directly or indirectly, claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent.

**2.      Michael Mayersohn, Ph.D.**

**a.      Background/Qualifications**

Dr. Mayersohn is Professor Emeritus at the College of Pharmacy at the University of Arizona, where he remains active in conducting original research and advising doctoral-student research committees.  Prior to the University of Arizona, Dr. Mayersohn was an Assistant Professor, and later Associate Professor, in the Faculty of Pharmacy at the University of Toronto.

Dr. Mayersohn's research focuses on the pharmaceutical sciences, with particular emphasis in pharmaceutics, biopharmaceutics, pharmacokinetics and pharmacodynamics.  Most notably, Dr. Mayersohn's research activities have concerned the relationship between the physical-chemical characteristics of a drug and its dosage form, the fate and performance of that

2

drug in the body and the design of dosing regimens based upon analytical, mathematical and clinical data.  Dr. Mayersohn, additionally, has published over 160 peer-reviewed scientific articles, 18 book chapters and symposia and 15 professional or educational publications.  Dr. Mayersohn has also given over 70, and contributed to over 170, presentations.

Dr. Mayersohn earned his Ph.D. in Pharmaceutics/Pharmacokinetics in 1971 from the School of Pharmacy, the State University of New York at Buffalo and his B.S. in Pharmacy in 1966 from the College of Pharmaceutical Sciences, Columbia University.

From 1995 to 1998, Dr. Mayersohn served as a member of the Food and Drug Administration's Committee for Pharmaceutical Sciences, where he helped to advise FDA in setting standards for bioavailability and bioequivalence and in resolving other matters of scientific interest.  And between 1995 and 2004, Dr. Mayersohn twice served as a member of the United States Pharmacopeia's Dissolution and Bioavailability Committee.

Dr. Mayersohn has been elected to several scientific and professional organizations including the Academy of Pharmaceutical Sciences, the American Association of Pharmaceutical Scientists and the American College of Clinical Pharmacology.

**b.      Expected Testimony**

Dr. Mayersohn will testify about the level of skill and experience of a person of ordinary skill in the art ("POSA") and the state of the relevant art as of July 31, 2012.  Dr. Mayersohn will testify that claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent are invalid as anticipated and that such claims are invalid for lack of written description.

3

**3.      William K. Schmidt, Ph.D.**

**a.      Background/Qualifications**

Dr. Schmidt is an experienced pharmacologist, whose work includes over seventeen years at DuPont Pharmaceuticals in various research-and-development roles, including as Principal Research Scientist.  Dr. Schmidt also served as Vice President at numerous companies, where he oversaw all aspects of the development of analgesic products, including therapeutic concept development preclinical and clinical trials, the FDA-approval process and commercial marketing.  Those products included opioid-related analgesic products, including nalbuphine, hydrocodone, oxycodone and oxymorphone.

Dr. Schmidt is involved in the development of a potent non-narcotic analgesic that is highly effective against inflammatory and neuropathic pain, recently contributed to the development of novel abuse-deterrent opioid prodrugs, and worked on the development of the first-ever FDA-approved peripherally acting opioid antagonist designed to treat postoperative ileus and opioid-induced constipation.

Dr. Schmidt earned his Ph.D. in Pharmacology in 1978 from the University of California, San Francisco and his B.A. in Biochemistry in 1972 from the University of California, Berkeley.

Dr. Schmidt has authored and edited book chapters on developments in pain management, and published over 200 papers, abstracts, presentation or seminars on developments in pain management using opioid-based treatments.  Dr. Schmidt is also a named inventor on thirteen patents on opioid-based treatments for pain management.

Dr. Schmidt is also active in scientific and medical societies related to pain management; he serves on the Board of Directors of, and as the Parliamentarian and Past-President of, the Eastern Pain Association.  Dr. Schmidt also serves on several academic, government, and

commercial advisory boards concerning pain management, including the Tufts Health Care Institute Program on Opioid Risk Management, the Laboratory on the Biology of Addictive Diseases at Rockefeller University and the Harvard-based Internet advisory group, The Pain Research Forum.  Dr. Schmidt's experience also extends to conferences and symposiums on pain management.  Dr. Schmidt serves as Chair of the Arrowhead Pain and Migraine Summit, which addresses issues of drug innovation and development and is attended by members of the pharmaceutical industry, academia and FDA.

### b.    Expected Testimony

Dr. Schmidt will testify about the level of skill and experience of a POSA and the state of the relevant art as of July 31, 2012.  He will further testify that claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent are directed to patent-ineligible subject matter; that the subject matter of claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent are invalid as anticipated; and that the subject matter of claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent would have been obvious to a POSA.  Dr. Schmidt will also offer testimony, including rebuttal testimony, on secondary considerations of obviousness and nonobviousness.

### 4.    Michael L. Weinberger, M.D.

#### a.    Background/Qualifications

Dr. Weinberger is a licensed, board-certified physician with almost 30 years of experience in pain management and anesthesiology, and Medical Director of the Pain Management Center in the Department of Anesthesiology at Columbia University Medical Center at the New York Presbyterian Hospital.  Dr. Weinberger's board certifications include the American Board of Internal Medicine (Internal Medicine), the American Board of

5

Anesthesiology (Anesthesiology, Pain Medicine, Hospice and Palliative Medicine) and the American Board of Hospice and Palliative Medicine (Hospice and Palliative Medicine).

Dr. Weinberger has also served as Fellowship Director of the Division of Pain Medicine at Columbia University Medical Center, and as an Instructor in, and later Assistant Professor of, Anesthesiology at Cornell University Medical College.

Dr. Weinberger earned his M.D. in 1983 from Columbia University and his B.A. in 1979 from Clark University.

Dr. Weinberger has co-authored several book chapters relating to, and lectured extensively on, pain management and treatments for pain management, including on topics such as opioids and chronic pain, and current concepts in the management of back pain and the role of opioids.  Most recently, Dr. Weinberger lectured on "Opioid Prescribing, Avoiding Pitfalls and Employing Safe Strategies" at Columbia University.

Dr. Weinberger is also active in scientific and medical societies related to pain management; he serves on the Board of Directors of the Eastern Pain Association, where he was formerly President, the pain committee for the American Society of Anesthesiology, and the program committee for the New York State Anesthesiology Society Annual Meeting.

**b.      Expected Testimony**

If Dr. Weinberger testifies at trial, then he will testify about the level of skill and experience of a POSA and the state of the relevant art as of July 31, 2012.  Dr. Weinberger will further testify that claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent are directed to patent-ineligible subject matter; and as to the general knowledge and standard prescribing practices in the art as of the earliest effective filing date of the '760 and '499 patents.

6

He will also offer testimony, including rebuttal testimony, on secondary considerations of obviousness and nonobviousness.

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) ) | |
| Defendant. | ) ) ) ) | |

**EXHIBIT 11
PERNIX'S DEPOSITION DESIGNATIONS**

| Christopher Rubino October 19, 2017 Deposition Testimony | | | | | | |
|---|---|---|---|---|---|---|
| **Plaintiffs' Designations** | | **Defendant's Objections** | **Defendant's Counter-designations** | | **Plaintiffs' Objections to Counter-designations** | **Plaintiffs' Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| Start | End | | Start | End | | | |
| 4:10 | 4:11 | | | | | | |
| 5:24 | 6:8 | | | | | | |
| 7:10 | 7:16 | | | | | | |
| 8:10 | 10:18 | | | | | | |
| 11:9 | 12:13 | | | | | | |
| 12:21 | 14:6 | | 14:7 | 14:15 | | | |
| 15:13 | 17:18 | | 17:19 | 17:24 | | | |
| 17:25 | 18:5 | | | | | | |
| 18:8 | 18:16 | | 18:17 | 18:19 | | | |
| 20:1 | 20:3 | | | | | | |
| 20:5 | 20:11 | | 20:12 | 21:1 | | | |
| 20:15 | 21:1 | F, R | | | | | |
| 21:4 | 21:13 | | | | | | |
| 25:11 | 25:16 | | 26:24 | 27:23 | E | | |
| 30:7 | 31:17 | | 31:18 | 32:2 | | | |
| 32:3 | 32:21 | | | | | | |
| 36:11 | 36:13 | | 36:7 | 36:9 | R | | |
| 36:15 | 39:5 | | | | | | |
| 39:7 | 39:12 | | | | | | |
| 52:14 | 52:23 | | 52:24 | 53:8 | | | |
| 54:11 | 54:20 | | | | | | |
| 55:5 | 56:14 | | 57:8 | 57:10 | E, O | 57:16-17 | S, O, F |
| 56:17 | 57:7 | U, F | 57:16 | 57:17 | | | |
| 74:4 | 75:16 | | | | | | |
| 76:6 | 76:25 | | | | | | |
| 92:16 | 93:6 | | | | | | |
| 93:7 | 96:9 | | | | | | |
| 96:11 | 97:14 | | | | | | |
| 111:1 | 111:23 | | 112:13 | 112:21 | | | |
| 113:4 | 114:3 | | | | | | |
| 114:5 | 115:9 | | | | | | |
| 146:14 | 146:16 | | 145:25 | 146:3 | E | | |
| 146:19 | 147:5 | | 146:6 | 146:7 | U | | |

2

| 163:23 | 164:13 | | | | | | |
|---|---|---|---|---|---|---|---|
| 164:15 | 165:22 | | | | | | |
| 166:3 | 166:15 | | | | | | |
| 166:20 | 167:2 | | 167:19 | 167:22 | E, I | 210:16-211:24, 212:5-213:3 | O, F |
| 168:16 | 168:19 | U | 167:24 | 167:25 | U, E, U | 210:16-211:24, 212:5-213:3 | O, F |
| 169:3 | 169:6 | | | | | | |
| 169:8 | 169:17 | U | | | | | |
| 169:21 | 169:24 | | | | | | |
| 170:1 | 170:8 | | | | | | |
| 170:10 | 170:19 | | 170:20 | 170:24 | E, U , I | 210:16-211:24, 212:5-213:3 | O, F |
| 170:25 | 171:13 | | | | | | |
| 212:17 | 213:3 | | | | | | |

### Cynthia Y. Robinson, Ph.D.

### October 13, 2017 Deposition Testimony

| Plaintiffs' Designations | | Defendant's Objections | Defendant's Counter-designations | | Plaintiffs' Objections to Counter-designations | Plaintiffs' Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
|---|---|---|---|---|---|---|---|
| Start | End | | Start | End | | | |
| 8:22 | 9:4 | | | | | | |
| 13:24 | 15:20 | | | | | | |
| 16:3 | 16:9 | | | | | | |
| 16:11 | 18:19 | | | | | | |
| 23:21 | 24:17 | | | | | | |
| 25:3 | 25:23 | | | | | | |
| 27:3 | 27:12 | | | | | | |
| 29:15 | 29:25 | | | | | | |
| 51:10 | 51:23 | | | | | | |
| 52:6 | 52:9 | | 52:10 | 52:12 | | | |
| 59:24 | 61:3 | F, U | 59:16 | 59:23 | | | |
| 61:6 | 61:25 | F, U | | | | | |
| 71:2 | 71:11 | | | | | | |
| 100:22 | 100:25 | | | | | | |
| 101:2 | 101:25 | | | | | | |
| 102:2 | 102:8 | | | | | | |

3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 103:25 | 104:15 | | | | | | |
| 104:18 | 105:11 | | | | | | |
| 105:13 | 106:24 | F, U | | | | | |
| 108:16 | 108:25 | | | | | | |
| 109:2 | 109:25 | | | | | | |
| 110:2 | 110:3 | | 110:4 | 110:18 | E | | |
| 112:2 | 112:7 | | 112:23 | 113:13 | E, U | | |
| 112:10 | 112:21 | F, U | | | | | |
| 114:17 | 114:23 | | | | | | |
| 115:2 | 115:6 | H | | | | | |
| 115:8 | 116:2 | H, U | 116:3 | 116:15 | | | |
| 185:9 | 186:4 | | | | | | |
| 193:5 | 193:10 | | | | | | |
| 193:13 | 193:22 | | | | | | |
| 216:12 | 216:15 | | | | | | |
| 216:18 | 216:22 | H, F | | | | | |
| 216:22 | 219:21 | H, F | | | | | |
| 222:7 | 222:21 | | 222:22 | 222:25 | Improper Counter Designation, E, U, O, R | | |
| 224:8 | 224:11 | | 223:8 | 223:23 | Improper Counter Designation, E, U, O, R | | |
| 224:14 | 225:7 | | 225:17 | 225:24 | | 225:9-16 | F |
| 225:9 | 225:16 | | | | | | |
| 225:25 | 226:3 | | | | | | |
| 226:6 | 226:17 | | | | | | |
| 258:19 | 258:21 | | | | | | |
| 258:24 | 259:6 | | | | | | |
| 260:19 | 260:25 | F, O | | | | | |
| 261:2 | 261:16 | F, O | 262:16 | 262:23 | | 270:24-272:9 | U, E |
| 262:24 | 262:25 | | | | | | |
| 263:2 | 263:19 | F, H, U | 262:24 | 264:3 | | | |
| 270:24 | 272:9 | U, O, F | | | | | |
| | | | | | | | |

**Brooks Boyd, Ph.D.**

**February 6, 2018 Deposition Testimony**

| Plaintiffs' Designations | Defendant's Objections | Defendant's Counter-designations | Plaintiffs' Objections to Counter-designations | Plaintiffs' Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter |
|---|---|---|---|---|---|

4

| | | | | | | | | Designations |
|---|---|---|---|---|---|---|---|---|
| Start | End | | | Start | End | | | |
| 22:18 | 23:14 | U | | | | | | |
| 27:1 | 27:8 | | | | | | | |
| 27:13 | 28:3 | | | | | | | |
| 28:5 | 28:7 | | | | | | | |
| 28:10 | 28:11 | F, U | | | | | | |
| 30:20 | 31:6 | F. U | | | | | | |
| 35:19 | 37:1 | F. U | | | | | | |
| 49:4 | 51:16 | | | | | | | |
| 51:20 | 60:19 | | | | | | | |
| 61:25 | 62:3 | | | | | | | |
| 62:5 | 64:5 | F, H | | | | | | |
| 67:25 | 68:1 | | | | | | | |
| 68:5 | 68:15 | | | | | | | |
| 68:17 | 68:24 | | | | | | | |
| 69:1 | 70:17 | | | | | | | |
| 72:25 | 73:8 | | | | | | | |
| 82:21 | 83:4 | | | | | | | |
| 83:6 | 84:24 | | | | | | | |
| 85:9 | 85:22 | | | | | | | |

**Objection Codes**

| Abbreviation | Objection | Applicable Rule(s) |
|---|---|---|
| A | Requires authentication or identification | FRE 901 |
| B | Best evidence rules prohibit introduction | FRE 1001-1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Improper designation (designation is neither a question nor testimony) | FRE 401, 402 |
| E | Improper examination (vague, ambiguous, loaded, leading, etc.) | FRE 402, 403, 602, 611 |
| F | Lack of foundation/personal knowledge | FRE 402, 403, 602, 611 |
| H | Hearsay | FRE 801, 802 |
| I | Incomplete document or testimony | FRE 106, 403 |
| M | Offer or discussion for settlement or compromise | FRE 408 |
| N | Exhibit not produced in discovery | FRE 403 |
| O | Improper opinion testimony | FRE 701-704 |
| P | Privileged or attorney-work product | FRE 501, 502 |
| R | Relevance | FRE 401, 402 |
| S | Summary requiring underlying data or information | FRE 1006 |
| T | Beyond the scope of the Rule 30(b)(6) topics for which witness has been designated | FRE 602, FRCP 30(b)(6) |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative | FRE 403 |
| FRCP 32 | Impermissible use of deposition | FRCP 32 |
| Improper Counter Designation | Improper Counter Designation | |

6

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) | |
| Defendant. | ) ) ) | |

**EXHIBIT 12
ALVOGEN'S DEPOSITION DESIGNATIONS**

1

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 9:18 | H | | | | |
| 23:5-13 | I, H | 21:16-23:3 | H | | |
| 23:14-16 | E, H | | | | |
| 24:22-25:16 | H | | | | |
| 27:25-28:8 | H | | | | |
| 55:17-22 | H, D | | | | |
| 56:20-23 | H, F, E | | | | |
| 58:24-59:4 | E, H | 204:20-24, 205:2-4 | H | | |
| 59:5-60:8 | H | 204:20-24, 205:2-4 | H | | |
| 60:9-13 | H | | | | |
| 62:10-12 | E, I, H | | | | |
| 62:14 | H | | | | |

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 62:20-63:3 | I, F, O, E, H | | | | |
| 62:20-63:14 | I, F, O, E, H | | | | |
| 64:3-65:6 | H | | | | |
| 65:1-6 | H | | | | |
| 66:5-7 | A, H | | | | |
| 67:5-12 | A, H | | | | |
| 67:24-68:3 | I, H | 67:13-23 | H | | |
| 68:4-8 | E, H | | | | |
| 68:10-71:6 | H | | | | |
| 71:7-72:5 | H | 204:20-24, 205:2-4 | H | | |
| 71:10-14 | H | 204:20-24, 205:2-4 | H | | |
| 71:10-72:5 | H | 204:20-24, 205:2-4 | H | | |

3

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 71:10-72:6 | I, H | 204:20-24, 205:2-4 | H | | |
| 71:21-25 | H | | | | |
| 72:1-5 | H | 204:20-24, 205:2-4 | H | | |
| 72:14-16 | I, E, H | | | | |
| 72:18-22 | H | | | | |
| 73:8-10 | E, H | | | | |
| 73:13 | I, H | 73:12-13 | H | | |
| 73:20-74:6 | H | | | | |
| 76:5-7 | F, E, H | | | | |
| 76:9-17 | F, E, H | | | | |
| 76:22-24 | H | | | | |
| 77:2-7 | F, E, H | | | | |

4

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 77:9-10 | I, H | 77:12-78:3; 78:5-7 | H | | |
| 86:1-20 | O, F, E, H | | | | |
| 90:3-9 | H | | | | |
| 91:14-16 | E, H, O | | | | |
| 91:18-23 | H | | | | |
| 92:14-18 | H | | | | |
| 96:16-18 | H | | | | |
| 96:20-24 | I, H, D | | | | |
| 98:19-99:6 | H | 204:7-24, 205:2-4 | H | | |
| 99:10-16 | E, H | | | | |
| 99:20-23 | H | | | | |
| 101:17-20 | H | | | | |

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 105:8-21 | O, H | | | | |
| 105:17-106:4 | H | | | | |
| 105:22-106:6 | H | | | | |
| 106:14-107:4 | H | 204:20-24, 205:2-4 | | | |
| 106:24-107:4 | H | 204:20-24, 205:2-4 | | | |
| 108:8-12 | H | | | | |
| 109:3-5 | H, D | | | | |
| 109:22-25 | H | | | | |
| 110:17-25 | I, H | 110:21-111:24; 112:4-6; 112:15-21 | H | | |
| 113:1-4 | H | | | | |
| 113:15-25 | H | | | | |
| 116:16-117:25 | E, I, H | | | | |

6

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 118:6-9 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 118:14-17 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 119:14-120:3 | E, H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 119:20-25 | H | | | | |
| 120:1-3 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 120:4-6 | E, H | | | | |
| 120:15-24 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 120:18-24 | H | | | | |
| 121:22-122:7 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 133:8-14 | R, H | | | | |
| 135:5-136:8 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |
| 135:24-136:8 | H | 205:22-206:22; 206:25; 207:2-13 | H | | |

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 137:16-138:2 | H | | | | |
| 140:5-20 | H | | | | |
| 140:21-141:19 | H | | | | |
| 141:20-22 | H | | | | |
| 141:23-142:1 | H | | | | |
| 142:2-5 | E, H | | | | |
| 142:9-12 | E, D, H | | | | |
| 142:13-15 | E, H | | | | |
| 142:19-24 | H | | | | |
| 143:1-2 | E, H | | | | |
| 143:6 | H | | | | |
| 143:17-144:24 | H | 143:8-13; 145:5-7 | H | 145:17-18 | H |

8

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 147:15-149:10 | H, D, I | 145:19-146:14; 146:16-147:4; 147:7-12; 147:14 | H | 145:17-18 | H |
| 149:2-12 | H | | | | |
| 149:13-150:17 | H | | | | |
| 149:16-24 | H | | | | |
| 150:18-151:16 | H | | | | |
| 152:7-15 | H | | | | |
| 153:18-25 | H | 204:20-24, 205:2-4 | H | | |
| 154:1-155:8 | I, H | 155:8-11; 155:12-15 | H, F, U | | |
| 154:2-8 | H | 204:20-24, 205:2-4 | H | | |
| 154:9-155:9 | H | 207:14-208:6; 208:16-210:7 | H, U | | |
| 154:13 | H | | | | |

9

| | | Deposition of Andrew Hartman September 29, 2017 | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 154:19-155:8 | H | 155:8-11; 204:20-24, 205:2-4 | H, U | | |
| 156:4-8 | I, H | 156:8-11, 204:20-24, 205:2-4 | H | | |
| 156:18-20 | H | | | | |
| 156:18-157:14 | I, H | 157:14-17 | F | 157:18-158:5 | H |
| 156:25-157:17 | H | 210:8-212:7; 213:3-22 | U | | |
| 159:7-9 | H | | | | |
| 159:17-21 | D, H | | | | |
| 161:19-25 | H | | | | |
| 162:19-163:4 | H | | | | |
| 163:5-15 | I, H | 163:15-164:2 | F, H, U | 164:3-165-2 | H |
| 165:12-23 | H | | | | |
| 166:9-13 | H, O | 163:15-164:2 | F, H, U | 164:3-165-2 | H |

10

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 167:24-168:2 | E, H | | | | |
| 168:4-5 | H, E, F | | | | |
| 170:7-18 | H | | | | |
| 171:5-17 | H | | | | |
| 174:1-175:19 | I, E, H | | | | |
| 176:23-177:9 | H | | | | |
| 177:12-178:18 | H | | | | |
| 178:20-180:20 | H | | | | |
| 181:4-19 | I, H | | | | |
| 181:20-182:3 | I, H | | | | |
| 182:7-10 | H | | | | |
| 182:11-17 | H | | | | |

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 183:3-6 | E, F, H | | | | |
| 183:8-10 | H | | | | |
| 184:4-16 | I, H | 184:16-18 | U, F | | |
| 187:8-188:13 | H | | | | |
| 189:13-16 | E, H | | | | |
| 189:19-190:1 | H | | | | |
| 190:3-11 | I, H | 190:11-14 | | | |
| 190:15-191:3 | E, H | | | | |
| 191:5-9 | H | | | | |
| 191:11-13 | H | | | | |
| 199:15-200:5 | H | 204:7-24, 205:2-4 | L | | |
| 200:23-201:13 | E, H | 204:7-24, 205:2-4 | L | | |

12

| Deposition of Andrew Hartman September 29, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 201:15-21 | I, H | 201:15-22 | | | |
| 201:24-202:2 | I, H | 202:2-12; 203:12-204:4; 204:7-24 | | 213:24-215:16 | H |

| Deposition of Cynthia Robinson October 13, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 8:3-10 | | | | | |
| 8:17-20 | | | | | |
| 10:10-12 | | | | | |
| 29:21-25 | | | | | |
| 38:19-39:11 | | | | | |
| 45:12-19 | E | | | | |
| 45:22-46:2 | E | | | | |
| 46:5-11 | | | | | |
| 46:13-25 | | | | | |
| 87:15-88:6 | | | | | |
| 134:19-135:3 | | | | | |
| 138:18-24 | I | 138:23-139:17 | H | | |

14

| Deposition of Cynthia Robinson October 13, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 139:18-140:5 | E, I | | | | |
| 149:13-150:17 | I | | | | |
| 150:18-151:16 | E, I | | | | |
| 152:5-19 | | | | | |
| 153:16-18 | | | | | |
| 153:19-25 | | | | | |
| 154:10-155:9 | | | | | |
| 158:18-159:9 | E, I, D, F | | | | |
| 198:19-22 | | | | | |
| 199:6-16 | | | | | |
| 201:14-15 | | | | | |
| 201:16-21 | E | | | | |

| Deposition of Cynthia Robinson October 13, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 201:24-202:19 | | | | | |
| 202:21-25 | | | | | |
| 203:1-15 | | 203:16-204:8 | H | | |
| 205:12-206:15 | | | | | |
| 206:16-19 | E, D | 206:23 | U, H | | |
| 206:24-207:4 | E | | | | |
| 207:7 | | 207:14-15 | F | | |
| 207:9-11 | E | | | | |
| 207:14-21 | | | | | |
| 207:23-208:10 | | | | | |
| 209:9-16 | O, R, U | | | | |
| 210:2-12 | | | | | |

| Deposition of Cynthia Robinson October 13, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 210:16-24 | E | | | | |
| 211:4-212:2 | I | 212:3 | | 212:4-212:15 | |
| 212:16-23 | E | | | | |
| 213:2-10 | | 213:12-14; 213:17-22; 213:24-214:8 | | | |
| 214:9-23 | | | | | |
| 227:4-8 | E | | | | |
| 227:11-12 | O, R, U | 216:12-15; 216:18-219:21, 225:25-226:3, 226:6-17, 226:19-22, 226:25-227:2 | | 219:22-25 | |
| 229:12-230:5 | | | | | |
| 242:2-8 | | | | | |
| 242:9-24 | | | | | |
| 242:25-243:7 | | | | | |

| Deposition of Cynthia Robinson October 13, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 243:10-24 | | | | | |
| 244:2-14 | | | | | |
| 244:15-17 | E | | | | |
| 244:20-245:13 | O, R, U | | | | |
| 245:15-21 | O, R, U | | | | |
| 253:3-4 | | | | | |
| 253:12 | | | | | |
| 254:20-22 | E, O, F, R, U | | | | |
| 254:25 | | | | | |
| 255:3-7 | E, O, F, R, U | | | | |
| 256:14-17 | | | | | |
| 257:4-19 | | | | | |

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 4:10-11 | | | | | |
| 5:13-15 | | | | | |
| 5:24-6:8 | | | | | |
| 7:10-13 | | | | | |
| 21:4-13 | | | | | |
| 21:14-16 | E | | | | |
| 21:18-22:3 | | | | | |
| 22:7-24 | | | | | |
| 25:17-19 | | | | | |
| 29:22-30:2 | E | | | | |
| 36:1-5 | E | | | | |

19

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 36:7-9 | | | | | |
| 37:13-21 | | | | | |
| 43:9-12 | R, I | 42:12-43:8, 150:13-16 | | | |
| 46:25-47:2 | | | | | |
| 47:3-9 | | | | | |
| 47:10-11 | | | | | |
| 48:5-49:4 | H | | | | |
| 49:5-8 | O, R, U | | | | |
| 49:9-15 | I, O, R, U | 49:9-50:1 | U | | |
| 49:16-20 | I, O, R, U | 49:9-50:1 | U | | |
| 49:21-50:1 | I, O, R, U | 49:9-50:1 | U | | |
| 58:13-59:4 | | | | | |

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 59:5-7 | | | | | |
| 60:6-9 | | | | | |
| 60:13-16 | | | | | |
| 60:19-61:4 | | | | | |
| 61:5-11 | | | | | |
| 61:12-15 | E | | | | |
| 61:17-23 | | | | | |
| 64:19-23 | E | | | | |
| 64:25 | | | | | |
| 69:17-70:4 | | | | | |
| 70:5-9 | | | | | |
| 70:9-11 | D | | | | |

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 70:13-16 | | | | | |
| 73:10-16 | | | | | |
| 73:17-19 | | | | | |
| 78:16-24 | | | | | |
| 78:22-79:15 | | | | | |
| 79:11-18 | | | | | |
| 85:19-86:6 | E | | | | |
| 86:8-9 | I | 86:10-19 | H, M | | |
| 92:6-9 | | | | | |
| 149:22-150:1 | | | | | |
| 150:9-16 | | | | | |
| 152:3-9 | | | | | |

22

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 153:16-19 | | | | | |
| 154:10-19 | | | | | |
| 156:17-24 | | | | | |
| 158:7-17 | | | | | |
| 158:18-20 | E | | | | |
| 158:22 | | | | | |
| 159:5-10 | I | 159:11-15, 159:17-23 | | 159:24-160:3 | |
| 160:13-17 | | | | | |
| 160:18-19 | | | | | |
| 161:4-6 | | | | | |
| 161:7-21 | | | | | |
| 166:20-23 | | | | | |

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 166:24-167:2 | | | | | |
| 168:1-4 | E | | | | |
| 168:6-19 | I, O, F, E, R, U | 125:9-14, 125:16-24, 169:5-6, 169:8-12, 169:21-24, 170:1-8, 170:10-19 | | 125:25-126:9, 126:11-12; 209:3-15 | E, O, R, Improper Designation |
| 172:10-173:19 | E | | | | |
| 173:21-174:5 | E | | | | |
| 174:7-9 | | | | | |
| 178:19-179:22 | I, O, F, E, R, U | 180:23-181:1, 181:3-5 | H | | |
| 179:24-180:3 | I, O, F, E, R, U | 180:23-181:1, 181:3-5 | H | | |
| 180:5 | I, O, F, E, R, U | 180:23-181:1, 181:3-5 | H | | |
| 199:13 | E | | | | |
| 199:17-22 | | | | | |

24

| Deposition of Christopher Rubino October 19, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 200:19-22 | E | | | | |
| 200:24-25 | I | 200:24-201:5 | | | |
| 201:1-5 | I | 200:24-201:5 | | | |
| 229:16-19 | | | | | |

| Deposition of Angus Smith October 20, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 4:12 | | | | | |
| 4:13-18 | | | | | |
| 5:1-7 | | | | | |
| 6:10-15 | | | | | |
| 14:7-17 | | | | | |
| 28:10-22 | | | | | |
| 39:4-22 | | | | | |
| 40:21-25 | | | | | |
| 46:8-47:1 | | | | | |

| Deposition of Angus Smith October 20, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 47:23-25 | | | | | |
| 79:20-23 | | | | | |
| 80:8-13 | I | 79:24-25, 80:3-7 | | | |
| 85:2-7 | T | | | | |
| 99:22-100:5 | R,U | | | | |
| 100:15-24 | R,U | | | | |
| 111:8-19 | | | | | |
| 112:3-10 | | | | | |
| 120:12-15 | R, U, T, I, E | 119:16-120:11, 120:16-17, 120:9-14 | | 120:19-23 | R, I |
| 121:2-4 | R, U, T, I, E | 119:16-120:11, 120:16-17, 120:9-14 | | 120:19-23 | R, I |
| 121:5-7 | R, U, T, I, E | 119:16-120:11, 120:16-17, 120:9-14 | | 120:19-23 | R, I |
| 121:15-18 | R, U, T, I, E | 119:16-120:11, 120:16-17, 120:9-14 | | 120:19-23 | R, I |

| Deposition of Angus Smith October 20, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 121:20-122:2 | R, U, T, I, E | 119:16-120:11, 120:16-17, 120:9-14 | | 120:19-23 | R, I |
| 126:2-11 | R, U, H | | | | |
| 128:1-11 | I | | | | |
| 130:22-25 | O, R, U, T, E | | | | |
| 131:5-11 | O, R, U, T, E | | | | |
| 133:8-11 | R, U, T, H | | | | |
| 133:12-17 | R, U, T, H | | | | |
| 135:21-23 | R, U, T, H | | | | |
| 156:17-157:1 | R, U, T, H | | | | |
| 159:8-10 | R, U, T, H | | | | |
| 159:23-160:8 | R, U, T, H | | | | |
| 162:6-9 | R, U, T, H | | | | |

| Deposition of Angus Smith October 20, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 174:14-17 | | | | | |
| 180:18-24 | | | | | |
| 185:19-186:3 | | | | | |
| 205:19-206:5 | | | | | |
| 207:14-19 | H | | | | |
| 207:20-208:1 | | | | | |
| 208:2-15 | | | | | |
| 210:24-211:2 | E, F, R, U, T, H, I | 188:23-189:12, 208:2-15, 209:5-20, 210:1-13, 211:9-10, 211:12-14, 211:22-212:1 | F, U | | |
| 211:4-8 | E, F, R, U, T, H, I | 188:23-189:12, 208:2-15, 209:5-20, 210:1-13, 211:9-10, 211:12-14, 211:22-212:1 | F, U | | |
| 211:15-21 | E, F, R, U, T, H, I | 188:23-189:12, 208:2-15, 209:5-20, | F, U | | |

| Deposition of Angus Smith October 20, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| | | 210:1-13, 211:9-10, 211:12-14, 211:22-212:1 | | | |

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 8:11-17 | | | | | |
| 9:24-10:1 | | | | | |

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 11:10-17 | | | | | |
| 12:1-4 | | | | | |
| 17:20-18:3 | | | | | |
| 21:13-18 | | | | | |
| 22:24-23:4 | | | | | |
| 24:19-23 | | | | | |
| 25:3-6 | | | | | |
| 25:8-9 | | | | | |
| 25:12-15 | | | | | |
| 25:17-21 | | | | | |
| 25:22-26:3 | I | 26:4-22 | | | |
| 26:23-27:7 | | | | | |

31

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 27:8 | E | | | | |
| 27:13-28:3 | I | 28:5-8, 28:10-11 | F | | |
| 28:12-21 | | | | | |
| 28:22-29:1 | | | | | |
| 29:13-14 | | | | | |
| 29:15-30:15 | | | | | |
| 32:10-33:12 | | | | | |
| 33:21-24 | O | | | | |
| 34:8-18 | | | | | |
| 34:19-24 | I | 34:25-35:4 | I | | |
| 34:25-35:4 | I | 34:20-35:24 | | | |
| 35:19-25 | I | 36:1-20 | | | |

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 39:13-25 | | | | | |
| 40:11-15 | E, H | | | | |
| 40:17 | | | | | |
| 40:19-23 | | | | | |
| 41:7-18 | | | | | |
| 42:1-5 | | | | | |
| 42:10-43:11 | I | 43:15-17 | | | |
| 43:18-23 | I | 43:15-17, 43:24-44:5 | | | |
| 44:18-45:2 | H | | | | |
| 46:18-22 | | | | | |
| 47:1-15 | | | | | |
| 48:1-5 | I | 48:6-21 | | | |

33

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 49:4-15 | | | | | |
| 51:13-15 | | | | | |
| 52:4-15 | | | | | |
| 52:19-53:19 | I | 53:20-22 | | | |
| 53:23-54:5 | I | | | | |
| 55:9-56:2 | I | 56:3-11 | | 56:12-57:2 | I |
| 56:12-57:2 | I | 57:3-19 | | 57:20-59:6 | I |
| 67:25-68:1 | E, O | | | | |
| 68:5-15 | E,O | | | | |
| 68:17-69:7 | E,O | | | | |
| 69:17-70:9 | | | | | |
| 77:21-23 | | | | | |

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 77:24-78:3 | I | 78:4-10 | F, H | | |
| 78:15-25 | | | | | |
| 79:8-13 | H | | | | |
| 79:14-80:2 | H | | | | |
| 80:4 | H | | | | |
| 82:10-13 | I, O | | | | |
| 82:16-19 | | | | | |
| 82:21-22 | I | 82:23 | F | | |
| 82:24-83:4 | | | | | |
| 83:6-21 | O,I | 84:1-24 | F | | |
| 85:9-22 | | | | | |
| 85:23-25 | E, O | | | | |

| Deposition of Brooks Boyd February 6, 2018 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 86:2-3 | E, O | | | | |
| 86:5-8 | E, O | | | | |
| 86:11-23 | | | | | |
| 87:7-13 | | | | | |
| 87:18-88:4 | | | | | |
| 89:10-16 | | | | | |
| 90:9-16 | R, U | | | | |
| 90:23-25 | R, U | | | | |
| 91:2-11 | R, U | | | | |
| 91:15-17 | R, U | | | | |

36

| Deposition of Rory Alegria November 2, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 6:23-7:6 | R, U | | | | |
| 7:10-12 | R, U | | | | |
| 7:13-18 | R, U | | | | |
| 13:8-10 | E, R, U | | | | |
| 14:8-11 | E, R, U | | | | |
| 22:6-10 | R, U | | | | |
| 28:4-22 | E, R, U | | | | |
| 29:22-24 | R, U | | | | |
| 30:4-14 | R, U | | | | |
| 31:4-6 | E, R, U | | | | |
| 31:9-11 | E, R, U | | | | |
| 32:12-21 | R, U | | | | |

| Deposition of Rory Alegria<br>November 2, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 41:5-7 | R, U | | | | |
| 41:17-42:2 | R, U | | | | |
| 61:9-20 | E, T, R, U | | | | |
| 61:21-62:10 | E, T, R, U | | | | |
| 62:11-15 | E, T, R, U | | | | |
| 63:15-64:5 | R, U | | | | |
| 64:6-9 | R, U | | | | |
| 82:5 | R, U | | | | |
| 82:11-83:10 | R, U | | | | |
| 106:20-107:8 | E, T, R, U | | | | |
| 107:19-21 | E, T, R, U | | | | |
| 107:25-108:3 | E, T, R, U | | | | |

| Deposition of Rory Alegria November 2, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 121:10-14 | E, R, U | | | | |
| 121:19-22 | R, U | | | | |
| 122:6-10 | E, R, U | | | | |
| 122:13-16 | R, U | | | | |
| 126:19-24 | R, U | | | | |
| 130:7-11 | R, U | | | | |
| 131:6-21 | R, U | | | | |
| 133:5-7 | R, U | | | | |
| 133:24 | R, U | | | | |
| 146:16-21 | R, U | | | | |
| 147:8-11 | E, R, U | | | | |
| 147:14-15 | R, U | | | | |

| Deposition of Rory Alegria November 2, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 147:18-20 | E, R, U | | | | |
| 148:13-16 | E, R, U | | | | |
| 148:19-23 | R, U | | | | |
| 149:21-25 | E, R, U | | | | |
| 150:4-11 | I, R, U | 150:12-18 | F, U | | |
| 150:19-21 | E, R, U | | | | |
| 150:24-151:3 | R, U | | | | |
| 151:21-24 | R, U | | | | |
| 163:12-14 | E, R, U, T | | | | |
| 163:17-23 | E, R, U, T | | | | |
| 163:24-164:6 | R, U | | | | |
| 167:24-168:3 | R, U | | | | |

| Deposition of Rory Alegria November 2, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 168:8-16 | R, U | | | | |
| 168:22-169:2 | R, U | | | | |
| 170:2-5 | R, U | | | | |
| 170:12-16 | I, R, U | | | | |
| 171:2-4 | R, U | | | | |
| 171:5-18 | R, U | | | | |
| 172:11-22 | R, U | | | | |
| 173:14-19 | R, U | | | | |
| 174:9-18 | R, U | | | | |
| 175:12-17 | E, R, U | | | | |
| 175:20-22 | R, U | | | | |
| 185:8-15 | I, R, U | 186:1-187:11; 187:14-188:4; 188:6- | U | 192:20, 196:12-25, 197:4-15 | R, E |

| | | Deposition of Rory Alegria | | | |
| | | November 2, 2017 | | | |
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
|---|---|---|---|---|---|
| | | 190:4; 190:9-14; 190:19-191:17; 191:20-192:19; 192:23-193:4 | | | |
| 185:15-25 | I, R, U | 186:1-187:11; 187:14-188:4; 188:6-190:4; 190:9-14; 190:19-191:17; 191:20-192:19; 192:23-193:4 | U | 196:12-25, 197:4-15 | R, E |
| 200:16-25 | R, U | | | | |
| 201:3-5 | R, U | | | | |
| 211:4-10 | R, U | | | | |
| 211:14-17 | R, U, I | 211:18-21 | F, U | | |
| 220:11-16 | R, U | | | | |
| 228:12-14 | R, U, T | | | | |
| 228:19 | R, U | | | | |

| Deposition of Rory Alegria November 2, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 230:17-231:2 | R, U | | | | |
| 231:5 | R, U | | | | |
| 231:14-22 | R, U | | | | |
| 233:13-25 | R, U | | | | |
| 234:12-20 | E, F, T, R, U | | | | |
| 235:3-4 | R, U | | | | |
| 235:5-15 | R, U | | | | |
| 248:5-14 | R, U | | | | |
| 248:16-249:4 | R, U | | | | |
| 249:18-21 | R, U | | | | |

| Deposition of Karl Bozicevic October 17, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 7:14-16 | R, U | | | | |
| 12:20-24 | I, R, U | 12:18-19 | | | |
| 13:19-14:6 | E, R, U | | | | |
| 14:10-12 | E, R, U | | | | |
| 14:25-15:15 | R, U | | | | |
| 17:2-5 | R, U | | | | |
| 17:21-18:1 | R, U | | | | |
| 18:3-22 | R, U | | | | |
| 20:23-21:4 | R, U | | | | |
| 21:5-8 | E, R, U | | | | |
| 24:11-25:4 | R, U | | | | |
| 27:4-6 | I, E, R, U | 26:1-5 | | | |

| Deposition of Karl Bozicevic October 17, 2017 | | | | | |
|---|---|---|---|---|---|
| Defendant's Designations | Plaintiffs' Objections | Plaintiffs' Counter-Designations | Defendant's Objections to Counter Designations | Defendant's Counter-Counter Designations | Plaintiffs' Objections to Counter-Counter Designations |
| 28:22-24 | E, R, U | | | | |
| 29:1 | R, U | | | | |
| 35:19-23 | H, R, U | | | | |
| 38:23-39:1 | E, R, U | | | | |
| 95:16-23 | R, U | | | | |
| 96:4-10 | E, I, R, U | | | | |

## OBJECTION CODES

| LETTER | OBJECTION | APPLICABLE RULE(S) |
|---|---|---|
| A | Requires authentication or identification | FRE 901 |
| B | Best evidence rules prohibit introduction | FRE 1001-1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Improper designation (designation is neither a question or testimony) | FRE 401, 402 |
| E | Improper examination (vague, ambiguous, loaded, leading, etc.) | FRE 402, 403, 602, 611 |
| F | Lack of foundation/personal knowledge (incl. calls for speculation) | FRE 402, 403, 602, 611 |
| H | Hearsay if offered for the truth of the matter asserted | FRE 801, 802, 805 |
| I | Incomplete document or testimony | FRE 106, 403 |
| M | Offer or discussion for settlement or compromise | FRE 408 |
| N | Exhibit not produced in discovery | FRE 403 |
| O | Improper opinion testimony | FRE 701-704 |
| P | Privileged or attorney work product | FRE 501, 502 |
| R | Lack of relevance | FRE 401, 402 |
| S | Summary requiring underlying data or information | FRE 1006 |
| T | Beyond the scope of the Rule 30(b)(6) topic for which a witness has been designated | FRE 602, FRCP 30(b)(6) |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative | FRE 403 |
| NR | Non-Responsive | FRE 402, 403, FRCP 30 |
| Improper Designation | Improper Designation | |

46

# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) | **HIGHLY CONFIDENTIAL** |
| Defendant. | ) ) ) ) | **INFORMATION – FILED UNDER SEAL** |

**EXHIBIT 13**
**PERNIX'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

**PROPOSED FINDINGS OF FACT**

I.   INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................2

    A.   Zohydro® ER and Other ER Opioids ......................................................2

    B.   IR Versus ER Hydrocodone Products.......................................................6

    C.   Hepatic Impairment...................................................................................7

III.   THE PERSON OF ORDINARY SKILL IN THE ART....................................8

IV.   CLAIM CONSTRUCTION ................................................................................9

    A.   Agreed Upon Constructions .....................................................................9

    B.   The Court's Constructions.......................................................................10

V.   INFRINGEMENT ..............................................................................................10

    A.   Administering The Alvogen Proposed ANDA Product Fulfills All Of The Elements Of The Asserted Claims Of The Patents-In-Suit......................10

        1.   The Alvogen Draft Label ████████████████ ███████████████████ ████████████ ...........................................................10

        2.   Infringement of the '760 Patent ................................................15

            a.   Claim 1 ...........................................................................15

            b.   Claim 2 ...........................................................................19

            c.   Claim 3 ...........................................................................20

            d.   Claim 4 ...........................................................................21

            e.   Claim 11 .........................................................................22

            f.   Claim 12 .........................................................................24

            g.   Claim 17 .........................................................................25

            h.   Claim 19 .........................................................................26

3.  Infringement of the '499 Patent ...........................................................27

    a.  Claim 1 ....................................................................................27

4.  Physicians Direct and/or Control the Manner in Which Patients Take a Prescribed Drug ........................................................30

5.  Alvogen's Label Will Induce Infringement of the Asserted Claims Because It Encourages, Recommends, and/or Promotes the ANDA Product for the Claimed Use................................33

6.  Alvogen Induces Infringement Despite Alleged "Substantial Non-Infringing Uses" .........................................................35

VI. VALIDITY...................................................................................................35

    A.  The Asserted Claims Are Not Anticipated...........................................35

        1.  Devane Does Not Anticipate the Asserted Claims...................................35

            a.  Devane Is Licensed by Pernix and Discloses the Zohydro® ER Formulation, Not Methods of Administration to Patients Having Mild or Moderate Hepatic Impairment.......................................................35

            b.  Devane Does Not Disclose "Administering to the Patient Having Mild or Moderate Hepatic Impairment" or That The "Starting Dose Is Not Adjusted Relative to a Patient without Hepatic Impairment"...................................................................38

            c.  Devane Does Not Disclose the Pharmacokinetic Limitations of the Asserted Claims Either Expressly or Inherently ................................................................41

        2.  Huang Does Not Anticipate the Asserted Claims ...................................42

            a.  Huang Does Not Disclose the "Starting Dose is Not Adjusted" Limitation of the Asserted Claims ............................42

            b.  Huang Does Not Disclose "Administering to the Patient Having Mild or Moderate Hepatic Impairment" or That The "Starting Dose is Not Adjusted Relative to a Patient without Hepatic Impairment"...................................................................44

c.      Huang Does Not Disclose the Pharmacokinetic Limitations of the Asserted Claims Either Expressly or Inherently ...................................................46

B.     The Asserted Claims Are Nonobvious.................................................47

    1.     The Asserted Claims Are Not Rendered Obvious by Devane or Huang in View of "General Knowledge of Standard Prescribing Practices" or "Common Dosing Practices" ...............................................................47

    2.     The Asserted Claims Are Not Rendered Obvious by Devane or Huang in View of the Labels for IR Hydrocodone Products .............................................51

    3.     The Patents' Statement that the IR Hydrocodone Products Were "Contraindicated" Is Not Inaccurate and Is Not Relevant to the Issue of Dosing Hydrocodone in Hepatically Impaired Patients ................................................56

    4.     The Asserted Claims Are Not Rendered Obvious by Devane in View of One or More of Jain, the Vicodin/Lortab Product Labels, and the VA Guideline or by Jain in View of the FDA Communications and Huang .......................60

        a.      Jain Does Not Teach or Provide a POSA with a Reasonable Expectation That One Could Administer to a Patient Having Mild or Moderate Hepatic Impairment a Starting Dose of an Oral Dosage Unit Having Hydrocodone as the Only Active Ingredient Without Adjusting the Starting Dose .....................................................................60

        b.      A POSA Would Not Have Been Motivated to Remove Acetaminophen from the Jain Formulation Based on the Baumann Abstract.................................................67

        c.      A POSA Would Not Have Been Motivated to Remove Acetaminophen from the Jain Formulation Based on the FDA Acetaminophen Communication and Huang..................................................................68

        d.      The 2010 VA Guideline Does Not Teach Not Adjusting the Starting Dose in Patients with Mild or Moderate Hepatic Impairment.....................................71

e.  Johnson Does Not Teach Not Adjusting the Starting Dose for Patients with Mild or Moderate Hepatic Impairment ...................................................................74

f.  Smith Does Not Teach Not Adjusting the Starting Dose for Patients with Mild or Moderate Hepatic Impairment ...................................................................76

5.  Objective Indicia of Nonobviousness.....................................................78

a.  Unexpected Results.......................................................78

b.  Long-Felt Need and Failure of Others ........................................80

c.  Alleged "Near Simultaneous Invention".....................................81

C.  The Asserted Claims Are Directed To Patent Eligible Subject Matter ..................................................................................82

1.  The Asserted Claims Are Not Directed to Natural Phenomena or Law of Nature ................................................82

2.  The Asserted Claims Recite an Inventive Concept................................84

D.  The Asserted Claims Do Not Lack Written Description ....................................85

**PROPOSED CONCLUSIONS OF LAW**

I.  INFRINGEMENT ...........................................................................91

II.  OBVIOUSNESS UNDER 35 U.S.C. § 103 ...................................................92

III.  ANTICIPATION UNDER 35 U.S.C. § 102....................................................97

IV.  PATENT ELIGIBLE SUBJECT MATTER UNDER 35 U.S.C. § 101 ..........................98

V.  WRITTEN DESCRIPTION UNDER 35 U.S.C. § 112................................................100

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)................................................................................96, 98

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014)................................................................................98, 99

*All Dental Prodx, LLC v. Advantage Dentals Prods, Inc.*,
    309 F.3d 774 (Fed. Cir. 2002).............................................................. 100, 101

*Amgen Inc. v. F. Hoffmann-La Roche Ltd.*,
    580 F.3d 1340 (Fed. Cir. 2009)................................................................................96

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010).............................................................. 100, 101

*Ass'n for Molecular Pathol. v. Myriad Genetics, Inc.*,
    133 S. Ct. 2107 (2013)................................................................................98

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010)................................................................................91, 92

*Braintree Labs., Inc. v. Breckenridge Pharm., Inc.*,
    688 F. App'x 905 (Fed. Cir. 2017)................................................................................91

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991)................................................................................97

*Corning Inc. v. SRU Biosystems*,
    400 F. Supp. 2d 653 (D. Del. 2005) ................................................................................96

*Creative Compounds, LLC v. Starmark Labs.*,
    651 F.3d 1303 (Fed. Cir. 2011)................................................................................91, 93

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
    845 F.3d 1357 (Fed. Cir. 2017)................................................................................91, 92

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
    619 F.3d 1329 (Fed. Cir. 2010)................................................................................95, 96

*Eli Lilly & Co. v. Teva Pharms., USA Inc.*,
    2005 U.S. App. LEXIS 14583 (Fed. Cir. July 13, 2005)................................................................................98

*Eli Lilly & Co. v. Teva Pharms., USA, Inc.*,
 2004 U.S. Dist. LEXIS 14724 (S.D. Ind. July 29, 2004) .................................................97

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016)...........................................................................................99

*Glaxo, Inc. v. Novopharm Ltd.*,
 52 F.3d 1043 (Fed. Cir. 1995)..............................................................................................97

*Glaxo, Inc. v. Novopharm Ltd.*,
 830 F. Supp. 871 (E.D.N.C. 1993).......................................................................................97

*Graham v. John Deere Co.*,
 383 U.S. 1 (1966) ...........................................................................................................93, 97

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
 840 F.2d 902 (Fed. Cir. 1988)..............................................................................................95

*In re Cyclobenzaprine*,
 676 F.3d 1063 (Fed. Cir. 2012).................................................................... 93, 94, 96, 97

*In re Hedges*,
 783 F.2d 1038 (Fed. Cir. 1986).............................................................................................94

*In re Wesslau*,
 353 F.2d 238 (C.C.P.A. 1965) ..............................................................................................95

*Innogenetics, N.V. v. Abbott Labs.*,
 512 F.3d 1363 (Fed. Cir. 2008)........................................................................................94, 96

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007) ........................................................................................................93, 95

*Mayo Collab. Servs. v. Prometheus Labs., Inc.*,
 132 S. Ct. 1289 (2012)....................................................................................................98, 99

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
 837 F.3d 1299 (Fed. Cir. 2016).............................................................................................99

*Mehl/Bio. Int'l Corp. v. Milgraum M.D.*,
 192 F.3d 1362 (Fed. Cir. 1999).............................................................................................97

*Microsoft Corp. v. i4i Ltd. P'ship*,
 131 S.Ct. 2238 (2011)......................................................................................................93, 97

*Net MoneyIn, Inc. v. Verisign, Inc.*,
 545 F.3d 1359 (Fed. Cir. 2008).............................................................................................98

*Novartis Pharms. Corp. v. Breckenridge Pharm., Inc.*,
    248 F. Supp. 3d 578 (D. Del. 2017) ...............................................................91

*Ortho-McNeil Pharm. Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008).............................................................95, 96

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012)....................................................................94

*Pfaff v. Wells Elecs.*,
    525 U.S. 55 (1998) ......................................................................................97

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009)......................................................................94

*Ralston Purina Co. v. Far-Mar-Co., Inc.*,
    772 F.2d 1570 (Fed. Cir. 1985)..................................................................101

*Rapid Lit. Mgt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016)....................................................................99

*Rapoport v. Dement*,
    254 F.3d 1053 (Fed. Cir. 2001)....................................................................97

*Sanofi v. Watson Labs. Inc.*,
    875 F.3d 636 (Fed. Cir. 2017)...............................................................91, 92

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
    295 F.3d 1292 (Fed. Cir. 2002)....................................................................97

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir. 2013)....................................................................99

*Unigene Labs., Inc. v. Apotex Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011)....................................................................95

*Vanda Pharms. Inc. v. West-Ward Pharms.*,
    2018 U.S. App. LEXIS 9360 (Fed. Cir. April 13, 2018).......................92, 100

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991)..................................................................101

*WildTangent, Inc. v. Ultramercial, LLC*,
    134 S. Ct. 2870 (2014).................................................................................99

**Statutes**

35 U.S.C. § 101..................................................................................................98

35 U.S.C. § 103(a) ................................................................................................93, 94

35 U.S.C. § 112................................................................................................... 100

35 U.S.C. § 271(b) ...................................................................................................91

35 U.S.C. § 282......................................................................................................92

**Other Authorities**

MPEP § 2163 II.A.3.(b) ......................................................................................... 100

**PERNIX'S PROPOSED FINDINGS OF FACT**

## I.   INTRODUCTION

1.      Plaintiffs ("Pernix") sued Alvogen for infringement of patents that cover methods of treating pain in hepatically impaired patients using Pernix's Zohydro® ER (hydrocodone bitartrate) Extended Release Capsules ("Zohydro® ER").  Alvogen seeks to sell infringing generic copies of Zohydro® ER before the Patents-in-Suit expire.

2.      There are two Patents-in-Suit: U.S. Patent Nos. 9,265,760 ("the '760 Patent") and 9,339,499 ("the '499 Patent"), both of which are listed in the FDA's Orange Book for Zohydro® ER.

3.      Pernix asserts that Alvogen infringes '760 Patent claims 1-4, 11, 12, 17 and 19 and '499 Patent claim 1 (the "Asserted Claims").

4.      The Asserted Claims recite methods of treating pain in a patient with mild or moderate hepatic impairment by administering a single entity (*i.e.*, one active ingredient) extended release ("ER") hydrocodone oral dosage unit.  The claims require specific pharmacokinetic profiles in patients with mild, moderate, and no hepatic impairment, respectively, and/or require no adjustment in the starting dose for patients with mild and moderate hepatic impairment relative to patients without hepatic impairment.

5.      Alvogen contends that the Asserted Claims are anticipated under 35 U.S.C. § 102, obvious under 35 U.S.C. § 103, directed to patent-ineligible subject matter under 35 U.S.C. § 101, and lack written description under 35 U.S.C. § 112.

6.      Alvogen's contentions fail because the Asserted Claims are novel, non-obvious, directed to patent-eligible subject matter, and satisfy the written description requirement.

## II.    BACKGROUND

### A.    Zohydro® ER and Other ER Opioids

7.    Zohydro® ER contains hydrocodone bitartrate, an opioid drug, as its only active ingredient.[1]

8.    Zohydro® ER is prescribed "for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

9.    Opioid drugs, including hydrocodone, are metabolized in the liver, and patients suffering from impaired liver function ("hepatic impairment") metabolize (break down) opioid drugs more slowly than patients with normal liver function.

10.    Slower drug metabolism can lead to drug accumulation in the body, which can cause symptoms of overdose, including excessive or persistent sedation, respiratory depression, and death.

11.    Because opioid drugs are metabolized more slowly in hepatically impaired patients, the single-entity opioid formulations available prior to Zohydro® ER resulted in build-up of drug in the hepatically impaired patient's bloodstream, resulting in potential overdose due to higher maximum drug concentrations ($C_{max}$) and higher total drug exposure ($AUC_{0-inf}$).  For that reason, a reduced starting dose was required when treating hepatically impaired patients with the single-entity opioid formulations available prior to the filing of the Patents-in-Suit.

12.    Liver function and hepatic impairment can impact dosing because the liver is the site of both major metabolic pathways for opioid drugs.

---

[1] Hydrocodone bitartrate is a salt form of hydrocodone commonly used in hydrocodone formulations.  Herein, "hydrocodone" is used as shorthand for "hydrocodone bitartrate" unless otherwise indicated.

13.     "Phase I reactions" for metabolism of opioid drugs in the liver are mediated by "cytochrome P450" or "CYP450" enzymes.  For example, hydrocodone is broken down in the liver by two CYP450 enzymes, CYP3A4 and CYP2D6, to form norhydrocodone and hydromorphone, as shown in Figure 1 below:

**Figure 1**

14.     Oxycodone is also metabolized in the liver by CYP3A4 and CYP2D6.  Codeine, methadone, tramadol, and fentanyl are examples of other opioids metabolized in whole or in part by CYP450 enzymes.

15.     Opioid drugs are also metabolized in the liver in "Phase II" reactions including glucoronidation, which converts hydrophobic ("water-hating") drugs to a more hydrophilic ("water-loving") form by conjugating them to hydrophilic molecules such as glucuronic acid.

16.     Glucoronidation is important for the metabolism of morphine, oxymorphone, tapentadol, and hydromorphone (which is itself a metabolite of hydrocodone).

17.     Because both the Phase I and Phase II metabolic pathways for opioid drugs occur in the liver, impairment of liver function can have a negative impact on opioid metabolism, as

reflected in the starting dose adjustments that are required for ER opioids in hepatically impaired patients.

18.    For example, the July 2012 prescribing information for OxyContin® (oxycodone) states that:

> A study of OxyContin in patients with [mild or moderate] hepatic impairment demonstrated greater plasma concentrations than those seen at equivalent doses in persons with normal hepatic function. Therefore, in the setting of hepatic impairment, start dosing patients at 1/3 to 1/2 the usual starting dose followed by careful dose titration.

19.    The July 2012 prescribing information for Nucynta® ER (tapentadol) states:

> In patients with moderate hepatic impairment (Child-Pugh Score 7 to 9), initiate treatment using 50 mg NUCYNTA® ER [the lowest available dose] and administer no more frequently than once every 24 hours.

20.    The Nucynta® ER label also states that Nucynta® ER should not be used at all in patients with severe hepatic impairment, and that no dose adjustment is needed for patients with mild hepatic impairment, though $AUC_{0\text{-inf}}$ was 70% higher and $C_{max}$ was 40% higher in patients with mild hepatic impairment versus unimpaired patients.

21.    The July 2012 prescribing information for Opana® ER (oxymorphone) states that Opana® ER is contraindicated in patients with moderate and severe hepatic impairment, and further states:

> In opioid-naïve patients with mild hepatic impairment, initiate treatment with the 5 mg dose.  For patients on prior opioid therapy, start OPANA ER at 50% lower than the starting dose for a patient with normal hepatic function on prior opioids and titrate slowly.
>
> The bioavailability of orally administered oxymorphone is markedly increased in patients with moderate to severe liver disease.  The disposition of oxymorphone was compared in six patients with mild, five patients with moderate, and one patient with severe hepatic impairment and 12 subjects with normal

hepatic function.  The bioavailability of oxymorphone was increased by 1.6-fold in patients with mild hepatic impairment and by 3.7-fold in patients with moderate hepatic impairment.  In one patient with severe hepatic impairment, the bioavailability was increased by 12.2-fold.

22.     The July 2012 prescribing information for Exalgo® (hydromorphone) states:

Start patients with moderate hepatic impairment on 25% of the EXALGO dose that would be prescribed for patients with normal hepatic function.  Closely monitor patients with moderate hepatic impairment for respiratory and central nervous system depression during initiation of therapy with EXALGO and during dose titration.  Use of alternate analgesics is recommended for patients with severe hepatic impairment *[see Use in Specific Populations (8.7)].*

23.     The July 2012 prescribing information for Kadian® (morphine sulfate) states that:

The pharmacokinetics of morphine were found to be significantly altered in individuals with alcoholic cirrhosis.  The clearance was found to decrease with a corresponding increase in half-life.  The M3G and M6G to morphine plasma AUC ratios also decreased in these patients indicating a decrease in metabolic activity.  Adequate studies of the pharmacokinetics of morphine in patients with severe hepatic impairment have not been conducted.

24.     These statements from the labels of the ER opioid products that were available prior to the Patents-in-Suit indicate that those products were dosed differently in hepatically impaired patients versus patients without hepatic impairment.

25.     Importantly, Zohydro® ER and the Alvogen Proposed ANDA Product[2] avoid the need that exists for the opioid products to adjust starting dose for patients with mild or moderate hepatic impairment, as recognized by the inventors and claimed in the Patents-in-Suit.

_____

[2] "Alvogen Proposed ANDA Product" means the hydrocodone bitartrate extended-release capsule product for which Alvogen seeks approval in its ANDA No. 206986, including all dosage strengths of that product.

**B.      IR Versus ER Hydrocodone Products**

26.      As of the earliest filing date of the Patents-in-Suit, immediate release ("IR") hydrocodone products were only available in combination with other, liver-toxic analgesics (*e.g.*, acetaminophen (also known as APAP) and ibuprofen).  These products included Vicodin®, Lortab®, and Norco® (all of which contain hydrocodone and acetaminophen) and Vicoprofen® (which contains hydrocodone and ibuprofen).

27.      A POSA would not have understood the labels of IR hydrocodone products to be predictive of how ER hydrocodone products could be dosed, because a POSA understood that the risk of oversedation and respiratory depression (*i.e.*, overdose) is magnified for ER opioids due to the large amount of active ingredient contained within one dose, and the extended time to elimination, and is even further magnified when liver function is impaired.

28.      Single-entity ER opioid formulations are designed to be taken only once or twice per day, and thus by necessity they contain significantly more active ingredient in general than their immediate release counterparts, which are taken more frequently throughout the day (*e.g.*, every four to six hours).  For example, immediate release hydrocodone plus acetaminophen tablets typically contain 5 mg of hydrocodone, while Zohydro® ER and the Alvogen Proposed ANDA Product contain up to 50 mg of hydrocodone.

29.      In addition, the labels for IR hydrocodone products, as they existed at the time, contained no data regarding hydrocodone pharmacokinetics in hepatically impaired patients.  A POSA would not have understood those labels to endorse the use of those products in hepatically impaired patients without reducing the starting dose, or to predict how ER hydrocodone products (which were not available until Zohydro® ER was launched in 2014) could potentially be dosed.

## C.   **Hepatic Impairment**

30.   It is common for patients treated with opioid pain medications to suffer from some degree of hepatic impairment.  A patient may suffer from hepatic impairment for any number of reasons, including cirrhosis resulting from chronic alcohol abuse, viral infection (*e.g.*, hepatitis C), or overuse of drugs that are toxic to the liver, including acetaminophen, which is present in the IR opioid formulations that patients are often given when initiating opioid treatment.

31.   The prescribing information for both Zohydro® ER and for the Alvogen Proposed ANDA Product classify hepatically impaired patients using a Child-Pugh Score.  Child-Pugh Score is a common way of classifying patients with hepatic impairment that takes into account five different clinical measures of liver disease.

32.   The Patents-in-Suit define Child Pugh Score as follows:

> Child-Pugh Score: a score based on five clinical measures of hepatic impairment, including levels of total bilirubin, serum albumin, PT/INR, ascites, and hepatic encephalopathy.  Each measure is given a ranking of 1, 2, or 3, and the sum of the five rankings is the Child-Pugh Score.  The Child-Pugh Score can be used to classify hepatic impairment by placing subjects in a Child-Pugh Group.

33.   The Child-Pugh score allows the physician to assign the patient to a Child-Pugh Group (or Child-Pugh Class), which is defined in the Patents-in-Suit as follows:

> Child-Pugh Group, Child-Pugh Class, and the like: a ranking of level of hepatic impairment based on the Child-Pugh Score. Child-Pugh Scores of 5-6 are classified as Child-Pugh Class A (*mild hepatic impairment*) and have an expected 2 year survival rate of 85%. Child-Pugh Scores of 7-9 are classified as Child-Pugh Class B (*moderate hepatic impairment*) and have an expected 2 year survival rate of 57%. Child-Pugh Scores of 10-15 are classified as Child-Pugh Class C (*severe hepatic impairment*) and have an expected 2 year survival rate of 35%.

-7-

34.     A patient's Child-Pugh Score may be determined by the treating physician based on routine testing of total bilirubin, serum albumin, PT/INR, ascites, and hepatic encephalopathy. Physicians practicing in fields such as general medicine, gastroenterology, anesthesiology, and infectious disease may use Child-Pugh score to classify hepatically impaired patients.

35.     Physicians also routinely evaluate liver function using blood tests that measure liver enzyme levels.  Liver enzyme levels and ratios thereof are useful measures of liver function and can be used to assess hepatic impairment.  For example, levels of the liver enzymes aspartate transaminase (AST) and alanine transaminase (ALT) in excess of the upper limit of normal may reflect certain types of liver disease, and the AST/ALT ratio (also called the "De Ritis Ratio") may provide further information about the nature of any liver damage.  For example, in patients with hepatitis C, an increased AST/ALT ratio is predictive of poor survival and correlates with Child-Pugh Score.  AST/ALT ratio is also informative in cases of acute viral hepatitis, alcoholic hepatitis, and fatty liver diseases, all of which are accompanied by impaired liver function.

## III.     THE PERSON OF ORDINARY SKILL IN THE ART

36.     Drug discovery and development, including the study of specific methods of administration, is a multi-stage process that draws upon a broad variety of professional expertise. It is unlikely that any individual would possess all of the relevant knowledge and capabilities that should be ascribed to the hypothetical POSA in this case.  The person of ordinary skill in the art regarding the subject matter of the Patents-in-Suit is a person or more likely a team of people with a medical (*e.g.*, M.D.) degree and/or Ph.D. degree in pharmacy, pharmaceutics, pharmacology, chemistry, or biology, who is familiar with the literature on hydrocodone metabolism and hepatic impairment, and has at least two years of practical experience in drug development, including drug product formulation—or a person or team of people with a

bachelor's or master's degree(s) in pharmacy, pharmaceutics, pharmacology, chemistry, or biology, who is familiar with the literature on hydrocodone metabolism and hepatic impairment, and has at least four years of practical experience in drug development, including drug product formulation. Such a person or team is understood to have access to individuals with comparable levels of experience in relevant drug development disciplines that lie outside his or her primary training.

## IV.    CLAIM CONSTRUCTION

37.    The claim constructions that have been adopted in the present case are discussed below.

### A.    Agreed Upon Constructions

38.    The parties agreed to the meanings of the following claim terms:

i.    *"hepatic impairment"* was agreed to mean "hepatocellular (liver) dysfunction."

ii.    *"mild hepatic impairment"* was agreed to mean "the level of hepatic impairment characterized by Child-Pugh Scores of 5-6 and classified as Child-Pugh Class A."

iii.    *"moderate hepatic impairment"* was agreed to mean "the level of hepatic impairment characterized by Child-Pugh Scores of 7-9 and classified as Child-Pugh Class B."

iv.    *"mild or moderate hepatic impairment"* was agreed to mean "the levels of hepatic impairment characterized by Child-Pugh Scores of 5-6 and Child-Pugh Scores of 7-9, and classified as Child-Pugh Class A and Child-Pugh Class B, respectively."

## B.    The Court's Constructions

39.    The following claim terms were construed by the Court based on arguments made by the parties:

    **i.**    *"administering"* was construed to mean "delivering into the body."

    **ii.**    *"wherein the starting dose is not adjusted relative to a patient without hepatic impairment"* was construed to mean "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced due to that hepatic impairment relative to the dose prescribed to a patient without hepatic impairment when initiating treatment."

## V.    INFRINGEMENT

### A.    Administering The Alvogen Proposed ANDA Product Fulfills All Of The Elements Of The Asserted Claims Of The Patents-In-Suit

#### 1.    The Alvogen Draft Label ███████

40.    Drug labels contain various sections instructing clinicians (*e.g.*, physicians, nurses, and clinical pharmacists) in the use of the drug product.  These sections include, among others, sections entitled "Dosage and Administration" and "Use in Specific Populations."

41.    When treating a hepatically impaired patient, a physician consults and follows all of the parts of the label that pertain to hepatic impairment, including, for example, the "Dosage and Administration," "Use in Specific Populations," "Pharmacokinetics," "Contraindications," and "Warnings and Precautions" sections, as well as any boxed warnings.

42.    Failure to follow dosing instructions for patients with specific health conditions, including hepatic impairment, could have serious consequences for both the patient's health and

the physician's professional status, and for that reason physicians become familiar with and follow the label instructions.

43.     The correct starting dose of Zohydro® ER and the Alvogen Proposed ANDA Product is determined by the clinician.  Because hydrocodone overdose can cause respiratory depression and death, and because hydrocodone has a high potential for abuse, a physician's dosing instructions must be followed to the letter by the patient.  The patient is given no latitude to adjust the dose prescribed by the physician, and it is the physician alone who controls the dose that is taken.

44.     Physicians go to great pains to explain to patients that if more drug than prescribed is taken, that can lead to overdose, and if less drug than prescribed is taken, that can lead to under-treatment of the patient's chronic pain symptoms and difficulty bringing the pain back under control.

45.     In the ██████████████████ subsection of the ████████████ ████████ section of the label, both the Zohydro® ER Label and the ████████████ instruct physicians that ████████████████████████████████████ ████████████████████

46.     A side-by-side comparison of this section of the Zohydro® ER Label and the Alvogen Draft Label shows ████████████████████████████████ ████████████████████████

| Zohydro® ER Label | Alvogen Draft Label |
|---|---|



47.  ██████ of both the Zohydro® ER Label and the Alvogen Draft Label is the

███████████████████████████████████████████ section of the label.

Again, both the Zohydro® ER Label and the Alvogen Draft Label state that ████████

█████████████████████████████████████████



48.  ██████ of the Zohydro® ER Label (████████████) further informs the

physician regarding ████████████████████████████ ██████ seen when

initiating treatment with Zohydro® ER in hepatically impaired patients, based upon a hepatic

impairment study performed using a single 20 mg dose.

49.  The Alvogen Draft Label ████████████ ██████████████████████

████████████:

| Zohydro® ER Label | Alvogen Draft Label |
|---|---|
| | |



50.     Although the hepatic impairment data in the Zohydro® ER Label and the Alvogen Draft Label is derived from a hepatic impairment study where a single 20 mg dose was administered, the dosing instructions for hepatically impaired patients apply to all of the dosage strengths, and both labels make clear that the products' pharmacokinetic properties are independent of dose for all dosage strengths up to a dose of 50 mg, which is the highest available dosage strength:

| Zohydro® ER Label | Alvogen Draft Label |
| --- | --- |



51.     The same percent increases in AUC for patients with mild and moderate hepatic impairment compared to unimpaired patients would be expected regardless of dosage strength. For that reason, the dosing instructions in the Zohydro® ER Label and the Alvogen Draft Label regarding patients with mild and moderate hepatic impairment apply to all dosage strengths (10 mg, 15 mg, 20 mg, 30 mg, 40 mg, and 50 mg).

52.    Alvogen argues that for the 10 mg dose "a physician would not, and could not, even consider adjusting (i.e., lowering) the starting dose due to hepatic impairment . . . because there is no possible lower dose[.]" But the lowest possible dose of any drug is zero. If faced with the choice between prescribing a 10 mg dose that would harm the patient and prescribing a different drug, a physician would choose the latter. With the Alvogen Proposed ANDA Product, a physician may use the 10 mg dosage strength (for, *e.g.*, treating an opioid-naïve patient with mild or moderate hepatic impairment) rather than needing to switch to an entirely different drug.

53.    Alvogen argues that there is no evidence that physicians will give anything other than the 10 mg dosage of the Alvogen Proposed ANDA Product as the starting dose. Contrary to Alvogen's contention, the starting dose given by physicians for the Alvogen Proposed ANDA Product may be the ███████████████████████████████████████. For patients receiving extended release opioids for the management of chronic pain, determination of the correct starting dose must take into account whether patients are transitioning from either an IR opioid or another ER opioid. For that reason, the prescribing information for Zohydro® ER and the Alvogen Proposed ANDA Product contains dosing tables and detailed instructions about how to calculate the correct starting dose for opioid-tolerant patients. Many, if not most, patients will not initiate treatment on the lowest dose because most patients initiating treatment on ER opioid products are transitioning from other IR or ER opioid products. The Alvogen Draft Label states in the ██████████████████████ section that the ██████████████████ should be used when initiating treatment. In all patients except opioid-naïve patients, the lowest effective dosage is likely to be higher than the lowest available dosage. The Alvogen Draft Label ████████ ████████████████████████████████████████████████████████████████████████████

██████████████████████████ Prescribing the lowest available dose to all patients would leave most chronic pain patients at significant risk of being under-treated.

### 2.     Infringement of the '760 Patent

#### a.     Claim 1

54.    Claim 1 of the '760 Patent reads as follows:

> 1.  A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:
>
> administering to the patient having mild or moderate hepatic impairment a starting dose of an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate, and wherein the starting dose is not adjusted relative to a patient without hepatic impairment.

55.    If the method of claim 1 is interpreted to have a single step ("administering"), then the claim will be directly infringed when a single actor—the patient—self-administers the dose of Alvogen's Proposed ANDA Product that has been prescribed by the physician.

56.    If the method of claim 1 is interpreted to have two steps ("administering" and a separate prescribing step performed by the physician) and thus requires two actors, then the claim will be jointly infringed by patients and physicians.  More specifically, when a physician directs a patient with mild or moderate hepatic impairment to take a particular dose of the Alvogen Proposed ANDA Product, and the patient takes that dose, the physician and patient jointly practice the claimed method.

57.    All of the elements of claim 1 of the '760 Patent are met by the Alvogen Proposed ANDA Product because a physician, as instructed by the Alvogen Draft Label, will direct a patient with mild or moderate hepatic impairment to take the same starting dose of the Alvogen Proposed ANDA Product as a patient without hepatic impairment, and the dosage form will be self-administered by the patient as directed by the physician.

-15-

58.     A physician following the Alvogen Draft Label determines the starting dose to be given, and controls the dose that the patient will receive through writing a prescription for a particular dosage strength.  As noted in the Alvogen Draft Label:



59.     After the physician determines the correct starting dose based on the instructions in the label, the patient self-administers the dosage unit according to the physician's instructions. The patient's receipt of the prescribed dose of drug (through filling the doctor's prescription) is conditioned upon the understanding that the patient will use the drug exactly as prescribed, and it is the physician who dictates the manner and timing of the patient's self-administration of the drug.

60.     The Alvogen Draft Label instructs the physician as follows:



61.     The active ingredient in both the Alvogen ANDA Product and Zohydro® ER, hydrocodone, is a Schedule II controlled substance under the Controlled Substances Act.  The Drug Enforcement Administration ("DEA") monitors the prescription of Schedule II controlled substances and imposes certain requirements on a physician that must be met when the physician prescribes a Schedule II drug to a patient.  These requirements include, but are not limited to, detailing the following information in the prescription:  (1) drug name, *(2) dosage strength*, (3)

-16-

dosage form, (4) quantity prescribed, *(5) directions for use*, and (6) number of refills (if any) authorized. Due to the fact that the active ingredient is strictly regulated, the physician conditions the receipt of treatment on taking the drug exactly as prescribed.

62.    The patient's treatment with the Alvogen Proposed ANDA Product is thus conditioned on taking the drug exactly as prescribed, including taking the starting dose that was prescribed.

> **i.    *"A method of treating pain in a patient having mild or moderate hepatic impairment"* and *"administering to the patient having mild or moderate hepatic impairment a starting dose of an oral dosage unit having hydrocodone bitartrate as the only active ingredient"***

63.    When a physician directs a patient with mild or moderate hepatic impairment to take a particular dose of the Alvogen Proposed ANDA Product, and the patient takes that dose, the physician and/or patient practice "a method of treating pain in a patient having mild or moderate hepatic impairment."

64.    The Alvogen Proposed ANDA Product, like Zohydro® ER, is a drug product used for treating pain. More specifically, the Alvogen Proposed ANDA Product is "an opioid agonist indicated *for the management of pain* severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

65.    The dose that a physician determines and prescribes when initiating treatment, and that the patient self-administers according to the physician's instructions, is a "starting dose," and the Alvogen Proposed ANDA Product is an oral dosage unit (a capsule) having hydrocodone bitartrate as the only active ingredient.

66.    It is common for patients to whom the Alvogen Proposed ANDA Product is administered to be patients who suffer from mild or moderate hepatic impairment. The Alvogen

Draft Label ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

> ii.     *"wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate"*

67.     The Alvogen Proposed ANDA Product is referred to throughout the Alvogen Draft Label as "Hydrocodone Bitartrate Extended-Release Capsules."

68.     The Alvogen Draft Label states that modified release "products such as Hydrocodone Bitartrate Extended-Release Capsules deliver the opioid over an extended period of time."

> iii.    *"wherein the starting dose is not adjusted relative to a patient without hepatic impairment"*

69.     The Alvogen Draft Label ██████████████████████████████████████ ███████████████████████████████████████.

70.     ████████████████████████████████████████████████ ███████████████ ██████████████████████████████████████ ████████████████

71.     Given the express instruction that █████████████████████████████ █████████████████████████████████, a physician would not adjust the starting dose when administering the Alvogen Proposed ANDA Product to such patients, and would direct patients with mild and moderate hepatic impairment to administer the same dose as an unimpaired patient, with a clear instruction that the drug should be taken exactly as prescribed, as dictated by the product label.

-18-

\*      \*      \*

72.    All of the elements of claim 1 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### b.    Claim 2

73.    Claim 2 of the '760 Patent contains all of the elements of claim 1, and the entirety of the discussion of claim 1 above also applies to claim 2.  Claim 2 adds limitations regarding the relative increase in $AUC_{0\text{-}inf}$ in patients with mild or moderate hepatic impairment compared to unimpaired patients that results from release of drug from the dosage unit:

> 2. The method of claim 1, wherein the dosage unit provides a release profile of hydrocodone that does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%, and the release profile of hydrocodone does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 50%.

74.    The Alvogen Draft Label states that █████████████████████ ████████████████████████

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

75.    ████████████████████████████████████████████

█████████   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

76.    All of the elements of claim 2 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### c.    Claim 3

77.    Claim 3 of the '760 Patent contains all of the elements of claim 1, and the entirety of the discussion of claim 1 above also applies to claim 3.  Claim 3 further narrows the limitations in claim 2 regarding the relative increase in AUC in patients with mild or moderate hepatic impairment versus unimpaired patients that results from release of drug from the dosage unit:

> 3. The method of claim 1, wherein the dosage unit provides a release profile of hydrocodone that does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%, and the release profile of hydrocodone does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

78.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

79.     All of the elements of claim 3 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### d.     Claim 4

80.     Claim 4 of the '760 Patent contains all of the elements of claim 1, and the entirety of the discussion of claim 1 above also applies to claim 4.  Claim 4 adds limitations regarding the relative increase in $C_{max}$ in patients with mild or moderate hepatic impairment versus unimpaired patients that results from release of drug from the dosage unit:

> 4. The method of claim 1, wherein the dosage unit provides a release profile of hydrocodone that does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%, and the release profile of hydrocodone does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

81.

███████████████████████████████ ███████████████████████

████████████████

82.    All of the elements of claim 4 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### e.    Claim 11

83.    Claim 11 of the '760 Patent contains all of the elements of claim 9 and sets forth more specific AUC ranges for patients with moderate hepatic impairment.  Claim 9 contains all of the elements of claim 1, and the entirety of the discussion of claim 1 above also applies to claims 9 and 11.  Claim 9 specifies ranges for $AUC_{0-inf}$ for patients not suffering from hepatic impairment and patients suffering from mild or moderate hepatic impairment.

84.     Claim 9 of the '760 Patent reads as follows:

> 9. The method of claim 1, wherein the dosage unit provides a release profile of hydrocodone such that:
>
> (1) the average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects not suffering from renal or hepatic impairment is in the range of about 300 ng*h/mL to about 500 ng*h/mL;
>
> (2) the average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from mild hepatic impairment is in the range of about 300 ng*h/mL to about 570 ng*h/mL; and
>
> (3) the average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 300 ng*h/mL to about 700 ng*h/mL.

85.    The Alvogen Draft Label states:

████████████████



86.    The AUC ranges in the Alvogen Draft Label fall within the ranges in claim 9. ▮



87.    Claim 11 specifies a narrower range for $AUC_{0\text{-}inf}$ in patients suffering from

moderate hepatic impairment:

> 11. The method of claim 9, wherein the dosage unit provides a
> release profile of hydrocodone such that the average hydrocodone
> $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects
> suffering from moderate hepatic impairment is in the range of
> about 352 ng*h/mL to about 666 ng*h/mL.

88.    As discussed above regarding claim 9, the AUC range specified in claim 11 is the

exact range specified in the Alvogen Draft Label, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

89.    All of the elements of claim 11 of the '760 Patent are met when physicians direct

patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed

-23-

ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### f.    Claim 12

90.    Claim 12 of the '760 Patent reads as follows:

12. A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,

wherein the dosage unit provides a release profile of hydrocodone that:

(1) does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%;

(2) does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%;

(3) does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%; and

(4) does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

91.    Claim 12 combines elements of claims 1, 3, and 4, which are discussed above. All of the elements of claim 12 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product

according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### g.    Claim 17

92.    Claim 17 of the '760 Patent contains all of the elements of claim 12, and the entirety of the discussion of claim 12 above also applies to claim 17. Claim 17 further specifies ranges for $AUC_{0\text{-}inf}$ for patients not suffering from hepatic impairment and patients suffering from mild or moderate hepatic impairment.

> 17. The method of claim 12, wherein the dosage unit provides a release profile of hydrocodone such that:
>
> (1) the average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects not suffering from renal or hepatic impairment is in the range of about 300 ng*h/mL to about 500 ng*h/mL;
>
> (2) the average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from mild hepatic impairment is in the range of about 300 ng*h/mL to about 570 ng*h/mL; and
>
> (3) the average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 300 ng*h/mL to about 700 ng*h/mL.

93.    As discussed above in connection with claim 11, the Alvogen Draft Label states:



94.    The AUC ranges in the Alvogen Draft Label fall with the ranges in claim 17. ███

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

95.     All of the elements of claim 17 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### h.     Claim 19

96.     Claim 19 of the '760 Patent contain all of the elements of claim 17, and the entirety of the discussion of claim 17 above also applies to claim 19.  Claim 19 sets forth a more specific AUC range for patients with moderate hepatic impairment.  Claim 19 reads as follows:

> 19. The method of claim 17, wherein the dosage unit provides a release profile of hydrocodone such that the average hydrocodone $AUC_{0\text{-inf}}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 352 ng*h/mL to about 666 ng*h/mL.

97.     As discussed above regarding claim 17, █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

98.     All of the elements of claim 19 of the '760 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed

ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

\*        \*        \*

99.     For the reasons discussed above, administration of the Alvogen Proposed ANDA Product fulfills all of the elements of asserted claims 1-4, 11, 12, 17, and 19 of the '760 Patent.

### 3.      Infringement of the '499 Patent

#### a.      Claim 1

100.    Claim 1 of the '499 Patent reads as follows:

> 1. A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:
>
> administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,
>
> wherein the dosage unit provides a release profile of hydrocodone that:
>
> does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and
>
> does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

101.    All of the elements of claim 1 of the '499 Patent are met by the Alvogen Proposed ANDA Product because a physician, as instructed by the Alvogen Draft Label, will direct a patient with mild or moderate hepatic impairment to take the Alvogen Proposed ANDA Product, and the dosage form will be self-administered by the patient as directed by the physician.

102.    When a physician directs a patient with mild or moderate hepatic impairment to take a particular dose of the Alvogen Proposed ANDA Product, and the patient takes that dose, the physician and/or patient practice the claimed method.

103.    A physician following the Alvogen Draft Label determines the starting dose to be given, and controls the dose that the patient will receive through writing a prescription for a particular dosage strength.

104.    After the physician determines the correct starting dose, based on the instructions in the label, the patient self-administers the dosage unit according to the physician's instructions. The patient's receipt of the prescribed dose of drug (through filling the doctor's prescription) is conditioned upon the understanding that the patient will use the drug exactly as prescribed, and it is the physician who dictates the manner and timing of the patient's self-administration of the drug.

105.    Hydrocodone is a Schedule II controlled substance under the Controlled Substances Act.  Due to the fact that the active ingredient in the Alvogen ANDA Product is strictly regulated, the physician conditions the receipt of treatment on taking the drug exactly as prescribed.

> **i.    *"A method of treating pain in a patient having mild or moderate hepatic impairment" and "administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient"***

106.    When a physician directs a patient with mild or moderate hepatic impairment to take a particular dose of the Alvogen Proposed ANDA Product, and the patient takes that dose, the physician and/or patient practice "a method of treating pain in a patient having mild or moderate hepatic impairment."

-28-

107.    The Alvogen Proposed ANDA Product, like Zohydro® ER, is a drug product used for treating pain.

108.    The Alvogen Proposed ANDA Product is an oral dosage unit (a capsule) having hydrocodone bitartrate as the only active ingredient.  The oral dosage unit is self-administered by the patient as directed by the physician.

109.    It is common for patients to whom the Alvogen Proposed ANDA Product is administered to be patients who suffer from mild or moderate hepatic impairment.  The Alvogen Draft Label contains ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████ .

> ii.     *"wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate"*

110.    The Alvogen Proposed ANDA Product is referred to throughout the Alvogen Draft Label as "Hydrocodone Bitartrate Extended-Release Capsules."

111.    The Alvogen Draft Label also states that "modified release products such as hydrocodone bitartrate extended-release capsules deliver the opioid over an extended period of time."

> iii.    *"wherein the dosage unit provides a release profile of hydrocodone that: does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%."*

112.    The Alvogen Draft Label states that for the Alvogen Proposed ANDA Product:



113. ██████████████████████████████████████████

██████████ ████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████, the relative AUC values provided by the Alvogen Proposed ANDA Product are within the ranges specified in claim 1 (not more than 14% higher for patients with mild hepatic impairment, and not more than 30% for patients with moderate hepatic impairment, compared to unimpaired patients).

*     *     *

114. All of the elements of claim 1 of the '499 Patent are met when physicians direct patients with mild or moderate hepatic impairment to self-administer the Alvogen Proposed ANDA Product according to the instructions in the Alvogen Draft Label, and patients self-administer the Alvogen Proposed ANDA Product according to the physician's instructions.

### 4. Physicians Direct and/or Control the Manner in Which Patients Take a Prescribed Drug

115. Patients suffering from "pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate" (*i.e.*, the patients for whom the Alvogen ANDA Product is indicated) fill the prescription and self-administer the drug as directed.

116. Unlike IR opioids, the Alvogen Proposed ANDA Product is not taken on an "as needed" basis; it is taken twice-a-day, long-term, and the patient needs to return to the clinic at defined intervals for a new prescription. That is because Schedule II drugs cannot be refilled in

the same way that other drugs can—they require an office visit and a new written prescription signed by the physician.

117.    Chronic pain patients taking ER opioids generally fill their prescriptions, take their medication as directed and return on a regular basis to the clinic to get a new prescription. The fact that Alvogen is seeking FDA-approval for its ANDA Product shows that Alvogen expects to make sales of that product, meaning that prescriptions for the Alvogen Proposed ANDA Product will be filled and administered.

118.    Chronic pain patients come to the clinician because they want to have their pain treated, and they are made to understand, through the physician's directions, the risks associated with noncompliance.  That includes risks associated with taking too much medication (*e.g.*, respiratory depression) or too little (*e.g.*, inadequate treatment of their pain at the outset of treatment).  That is why chronic pain management physicians are required to direct their patients to take their prescriptions as directed, *i.e.*, to take the dose directed at the time directed.

119.    Chronic pain management physicians are required to enter into express agreements with their patients, where the patient's receipt of treatment is conditioned upon following the physician's treatment instructions.  Such agreements may be oral or written, and include "patient-prescriber agreements" ("PPAs") that make patient compliance with the physician's dosing instructions a pre-condition for receiving the continued benefit of treatment.

120.    Templates for PPAs are widely available; for example, the American Pain Society ("APS") makes available to physicians a PPA template, to be provided  by the physician and signed by the patient, that expressly makes the patient's treatment contingent upon taking the medication "exactly as prescribed"—otherwise the physician may choose to stop treating the patient:

-31-

5. You may not share, sell or otherwise permit others to have access to these medications. ***You must take all medications exactly as prescribed,*** unless you develop side effects. If you develop side effects, you must consult with your doctor or local emergency providers.

\*      \*      \*

**You understand and agree that failure to adhere to these policies will be considered noncompliance and may result in cessation of opioid prescribing by your physician and possible dismissal from this clinic.**

**You affirm that you have full right and power to sign and be bound by this agreement. You further affirm that you have been given the opportunity to ask any questions you may have and that you have read, understand, and accept all of its terms.**

121.    And as another example:

*I agree to take this medication as prescribed, and not to change the amount or frequency of the medication without discussing it with the prescribing doctor.* Running out early, needing early refills, escalating doses without permission, and losing prescriptions may be signs of misuse of the medication, and may be reasons for the doctor to discontinue prescribing to me.

122.    Whether there is such a written agreement, or the physician directs the patient orally, it is standard practice for pain doctors to direct their patients to take ER opioid drugs (including the Alvogen Proposed ANDA Product) exactly as prescribed, to seek an agreement from the patient that they will do so, and to expressly condition the patient's continued treatment on the patient upholding that agreement.

123.    The opioid crisis has been a wake-up call to pain physicians, and has resulted in the widespread adoption of REMS (Risk Evaluation and Mitigation Strategies), including as mandated by the FDA, and the use of tools like PPAs to increase the quality of patient care.

124.    The recent trend has been toward even closer oversight by the physician over the manner in which chronic pain patients take their ER opioid pain medications, and that only increases the likelihood that patients will take the Alvogen Proposed ANDA Product as directed.

125.    In the case of long-term treatment with ER opioids (like the Alvogen Proposed ANDA Product), it is relatively easy to know if the patient has complied with the prescribing instructions.  If patients consume their prescription too quickly, they often seek an early refill, or they will likely have no detectable drug in their urine at their follow-up appointment for the next prescription.  In addition, each state has access to a formal prescription drug monitoring database tracking program, whereby prescription filling data is entered in near real-time for clinicians to monitor for compliance and doctor shopping.

### 5.    Alvogen's Label Will Induce Infringement of the Asserted Claims Because It Encourages, Recommends, and/or Promotes the ANDA Product for the Claimed Use

126.    The Alvogen Draft Label encourages, recommends and promotes treating pain in patients with mild or moderate hepatic impairment.

127.    Through its Dosage and Administration and Use in Specific Populations sections, the Alvogen Draft Label expressly encourages, recommends, and/or promotes administration of the Alvogen Proposed ANDA Product to patients, and specifically instructs that when administering that product to patients with mild or moderate hepatic impairment, no adjustment in starting dose is required.

128.    The Alvogen Draft Label contains express dosing instructions for hepatically impaired patients in its Dosage and Administration section, and it is thus clear that Alvogen understands that its ANDA Product will be administered to those patients in accordance with the label instructions.

129.   IR opioids are very often (*e.g.*, in the perioperative setting) prescribed to otherwise healthy patients.  However, the same is not true of ER opioids, which are most often administered to patients with an underlying medical condition that causes their chronic pain.

130.   Chandok and Imani expressly state that millions of patients suffer from liver disease worldwide.  For example, Imani notes that:

> Liver cirrhosis is a major public health problem, accounting for approximately 770,000 deaths annually.  Based on autopsy studies, its prevalence is 4.5% to 9.5% in the general population, which means that ***hundreds of millions of people are affected worldwide***.

Imani adds that:

> One of the difficult clinical challenges for healthcare professionals is the management of pain in the patient with cirrhosis.

131.   Using the 4.5% to 9.5% numbers from Imani, approximately 333-684 million patients worldwide suffer from liver cirrhosis (based on a world population of about 7.4 billion people).  Even if only considering the U.S. population (of about 327 million), that means about 15-31 million patients in the U.S. have liver cirrhosis.  Even if only a small fraction (*e.g.*, 10%) of those patients suffer from chronic pain as a result of their hepatic impairment or some other comorbid condition, that would leave millions of hepatically impaired patients suffering from chronic pain, many of whom will take ER opioid medications.

132.   Imani's statement that managing pain in patients with liver disease is "one of the most difficult challenges for healthcare professionals" reflects the fact that there is significant overlap between patients with liver disease and patients with chronic pain.

133.   Another article, Darwish, states unambiguously that: "Hepatic or renal impairment and chronic pain ***are common comorbid conditions*** in patients with underlying disease."

-34-

134.   From 2000-2015, death rates for chronic liver disease and cirrhosis in the United States increased 31% among persons age 45 to 64 years.  This is reflective of patients with advanced or severe hepatic dysfunction; the number of patients with mild to moderate hepatic dysfunction far exceeds those statistics.

135.   The data provided in the Alvogen Draft Label referring to a hepatic impairment study are provided to support the Alvogen Draft Label's instructions regarding the starting dose to be used when treating patients with mild or moderate hepatic impairment.

*       *       *

136.   The Alvogen Draft Label expressly encourages, recommends, and/or promotes administration of the Alvogen Proposed ANDA Product to patients, and specifically instructs that when administering that product to patients with mild or moderate hepatic impairment, no adjustment in starting dose is required.

### 6.   Alvogen Induces Infringement Despite Alleged "Substantial Non-Infringing Uses"

137.   As discussed above, the Alvogen Draft Label will induce infringement because it expressly encourages, recommends, and/or promotes administration of the Alvogen Proposed ANDA Product to patients, and specifically instructs that when administering that product to patients with mild or moderate hepatic impairment, no adjustment in starting dose is required. This is true regardless of whether the Alvogen Proposed ANDA Product has substantial non-infringing uses.

## VI.   VALIDITY

### A.   The Asserted Claims Are Not Anticipated

#### 1.   Devane Does Not Anticipate the Asserted Claims

##### a.   Devane Is Licensed by Pernix and Discloses the Zohydro® ER Formulation,

-35-

**Not Methods of Administration to Patients**
**Having Mild or Moderate Hepatic Impairment**

138.    The Asserted Claims are not anticipated by Devane.

139.    The Devane reference discloses the formulation used by the inventors of the Patents-in-Suit under license from Élan (and later Alkermes and Recro), which was later marketed as Zohydro® ER.

140.    Devane discloses hydrocodone compositions "having an immediate release component and a modified release component having a modified release coating." ████████

████████████████████████████████████████████████████

████████████████████████████    ████████████████████████████

████████████████████████████████████████████ The specifications of the Asserted Patents incorporate by reference the entirety of Devane.

141.    Zohydro® ER is made under a license agreement that includes a license to the Devane reference at-issue here and various other references by Devane, at least two of which (U.S. Patent Nos. 6,228,398 and 6,902,742) are listed in the FDA's Orange Book for Zohydro® ER and which were the subject of a prior litigation before this Court.

142.    The inventors were in close contact with the owner of the Devane application (Alkermes) at the time the two provisional applications for the Patents-in-Suit were filed, with whom they expressly discussed adding formulation information to the patent specification before it was filed, and from whom they sought and received input as to appropriate wording for the formulation section of the patent.  The inventors used the Devane formulation pursuant to a license agreement that is still in force today, while collaborating with and receiving advice from the company that owned the formulation.

143.    Devane does not disclose any method of administration of any hydrocodone formulation to patients with mild or moderate hepatic impairment.

144.    Devane does not mention hepatic impairment at all in any context.

145.    Because Devane fails to disclose many of the limitations of the Asserted Claims expressly or inherently, it cannot anticipate the Asserted Claims.

146.    As summarized in the table below, although Devane discloses an "oral dosage unit having hydrocodone bitartrate as its only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate," Devane does not disclose any of the remaining claim limitations either expressly or inherently.

| Limitation | '760 patent claims | '499 patent claims | Disclosed in Devane Expressly or Inherently? |
|---|---|---|---|
| oral dosage unit having hydrocodone bitartrate as [the] only active ingredient, wherein [the] dosage unit comprises an extended release formulation of hydrocodone bitartrate | ALL | 1 | YES |
| administering to [the] patient having mild [or] moderate hepatic impairment | ALL | 1 | NO |
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from mild hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 30% | 2 | n/a | NO |
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from moderate hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 50% | 2 | n/a | NO |
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from mild hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 14% | 3, 12 | 1 | NO |

| Limitation | '760 patent claims | '499 patent claims | Disclosed in Devane Expressly or Inherently? |
|---|---|---|---|
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from moderate hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 30% | 3, 12 | 1 | NO |
| release profile of hydrocodone does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 9% | 4, 12 | n/a | NO |
| release profile of hydrocodone does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 14% | 4, 12 | n/a | NO |
| average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects not suffering from renal or hepatic impairment is in the range of about 300 ng*h/mL to about 500 ng*h/mL | 11, 17 | n/a | NO |
| average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from mild hepatic impairment is in the range of about 300 ng*h/mL to about 570 ng*h/mL | 11, 17 | n/a | NO |
| average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 352 ng*h/mL to about 666 ng*h/mL | 11, 19 | n/a | NO |
| average hydrocodone $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 300 ng*h/mL to about 700 ng*h/mL | 17 | n/a | NO |
| starting dosage not adjusted relative to [a] patient without hepatic impairment | 1-4, 11 | n/a | NO |

**b.      Devane Does Not Disclose "Administering to the Patient Having Mild or Moderate Hepatic Impairment" or That The "Starting Dose Is Not Adjusted Relative to a Patient without Hepatic Impairment"**

147.    All of the Asserted Claims require "administering [a dosage form] to the patient having mild or moderate hepatic impairment."  Asserted Claims 1-4 and 11 of the '760 Patent

-38-

also require that for patients with mild or moderate hepatic impairment, the "starting dose is not adjusted relative to a patient without hepatic impairment."

148.    In addition to discussing the formulation information that also appears in the Patents-in-Suit, ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

149.    The Bunionectomy Study did not include hepatically impaired subjects and thus the lack of need for dosage adjustment with respect to the hepatically impaired cannot be necessarily and inevitably present therein.

150.    The Bunionectomy Study itself makes clear that each subject enrolled in the study underwent a physical examination prior to the study to confirm that they were "***healthy adults with bunions***." The Bunionectomy Study further states under the heading "Diagnosis and Main Criteria for Inclusion" that the subjects were "adult subjects ***with generally good health***." And, the Bunionectomy Study's detailed Inclusion Criteria further state that "[s]ubjects ***were in good health***, as determined by the investigator from medical history, physical examination, ECG, and screening laboratory results."

151.    Two of the inventors of the Patents-in-Suit specifically made reference to the Inclusion Criteria. The following exchange took place at Dr. Robinson's deposition:

> Q:  Do you have any understanding as to why there isn't any exclusion for patient populations with hepatic impairment?
>
> A:  So for a study such as this which was, again, a first in human study in the United States, typically, those studies would have been done in a population that was relatively healthy. So if you look under the inclusion criteria, and I think it's No. 6 on the same page, ***you will see subjects were in good health as determined by the investigator from medical history, . . . So with that in mind, you wouldn't have really looked at anyone who had any other***

-39-

*significant disease such as hepatic impairment that you would need to call out in the exclusion criteria.*

152.    "Healthy adults" and "adult subjects with generally good health" would not include patients with mild, moderate, or severe hepatic impairment.

153.    The Bunionectomy Study is more than 3,000 pages long, and contains detailed medical history information about every subject enrolled in the study.  That detailed information appears in "Listing 4 – Medical Conditions," and is categorized by "Body System/Site" for each study subject, including a "Hepatobiliary/Pancreatic" category where hepatic impairment would have been noted if it had been present.

154.    No study subject in any of the treatment groups was hepatically impaired.  Only two study subjects had any current hepatobiliary/pancreatic condition:  Subject 1002-S103 had "borderline pernicious anemia" (a decrease in red blood cells caused by poor absorption of vitamin B-12) and Subject 1002-S104 had "hypercholesterolemia" (*i.e.*, high cholesterol).  Neither of those conditions is hepatic impairment.

155.    Because Devane does not discuss hepatic impairment at all, and none of the patients in the Bunionectomy Study cited by Devane were hepatically impaired, Devane does not disclose, expressly or inherently, "administering [a dosage form] to the patient having mild or moderate hepatic impairment," nor does Devane disclose, expressly or inherently, that a decision by a physician that "starting dose is not adjusted relative to a patient without hepatic impairment."

156.    Devane contains no express teaching regarding those claim limitations, and because no hepatically impaired patients were treated in the Bunionectomy Study, those limitations are also not necessarily and inevitably present (*i.e.*, inherent) in Devane.

-40-

c.      **Devane Does Not Disclose the Pharmacokinetic Limitations of the Asserted Claims Either Expressly or Inherently**

157.    Devane does not disclose, either expressly or inherently, the pharmacokinetic limitations of the Asserted Claims.

158.    The pharmacokinetic limitations of the Asserted Claims are based on a hepatic impairment study performed by the inventors, which was another step in the approval process of Zohydro® ER.

159.    Because Devane *had not* performed a hepatic impairment study, the inventors of the Patents-in-Suit did so.

160.    The Bunionectomy Study and the hepatic impairment study of the Patents-in-Suit were both part of the same approval process for the same drug—Zohydro® ER—and the owners of the Devane application and the Patents-in-Suit were working cooperatively toward that end.

161.    The pharmacokinetic data obtained in that later study is summarized in Example 8 and Figures 3, 4, 5, and 6 of the Patents-in-Suit.

162.    Given that neither Devane, nor the Bunionectomy Study cited therein, teach or suggest administering HC-ER to a hepatically impaired patient, let alone without adjusting the starting dose relative to an unimpaired patient, Devane does not disclose the pharmacokinetic limitations of the Asserted Claims either expressly or inherently.

\*      \*      \*

163.    Devane and the Bunionectomy Study cited therein teach nothing about administration of a hydrocodone-only, extended-release dosage form to patients with mild or moderate hepatic impairment, nothing about dosing decisions for hepatically impaired patients, and nothing about the pharmacokinetic properties of a dosage form when administered to patients with mild or moderate hepatic impairment.  Those claim elements are not expressly

-41-

disclosed in Devane and are not "necessarily and inevitably" (*i.e.*, inherently) present in Devane's disclosure.

### 2.    Huang Does Not Anticipate the Asserted Claims

#### a.    Huang Does Not Disclose the "Starting Dose is Not Adjusted" Limitation of the Asserted Claims

164.    Huang fails to disclose many of the limitations of the Asserted Claims expressly or inherently, and thus Huang does not anticipate the Asserted Claims.

165.    Huang is listed in the FDA's Orange Book for Hysingla® ER ("Hysingla"), a product marketed by Purdue Pharma.  Like Zohydro® ER, Hysingla is an extended release dosage form having hydrocodone as its only active ingredient.

166.    Alvogen was involved in a recently-terminated case involving proposed generic versions of Hysingla.  As part of that dispute, Alvogen argued that Huang was invalid.

167.    As summarized in the table below, although Huang discloses an "oral dosage unit having hydrocodone bitartrate as its only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate," Huang does not disclose any of the remaining claim limitations either expressly or inherently.

| Limitation | '760 patent claims | '499 patent claims | Disclosed in Huang Expressly or Inherently? |
|---|---|---|---|
| oral dosage unit having hydrocodone bitartrate as [the] only active ingredient, wherein [the] dosage unit comprises an extended release formulation of hydrocodone bitartrate | ALL | 1 | YES |
| administering to [the] patient having mild [or] moderate hepatic impairment | ALL | 1 | NO |
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 30% | 2 | n/a | NO |

| Limitation | '760 patent claims | '499 patent claims | Disclosed in Huang Expressly or Inherently? |
|---|---|---|---|
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 50% | 2 | n/a | NO |
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 14% | 3, 12 | 1 | NO |
| release profile of hydrocodone does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 30% | 3, 12 | 1 | NO |
| release profile of hydrocodone does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 9% | 4, 12 | n/a | NO |
| release profile of hydrocodone does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to patients not suffering from renal or hepatic impairment in an amount more than 14% | 4, 12 | n/a | NO |
| average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects not suffering from renal or hepatic impairment is in the range of about 300 ng*h/mL to about 500 ng*h/mL | 11, 17 | n/a | NO |
| average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from mild hepatic impairment is in the range of about 300 ng*h/mL to about 570 ng*h/mL | 11, 17 | n/a | NO |
| average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 352 ng*h/mL to about 666 ng*h/mL | 11, 19 | n/a | NO |
| average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 300 ng*h/mL to about 700 ng*h/mL | 17 | n/a | NO |
| starting dosage not adjusted relative to [a] patient without hepatic impairment | 1-4, 11 | n/a | NO |

-43-

        **b.**        **Huang Does Not Disclose "Administering to the Patient Having Mild or Moderate Hepatic Impairment" or That The "Starting Dose is Not Adjusted <u>Relative to a Patient without Hepatic Impairment"</u>**

168.    All of the Asserted Claims require "administering [a dosage form] to the patient having mild or moderate hepatic impairment." Asserted Claims 1-4 and 11 of the '760 Patent also require that for patients with mild or moderate hepatic impairment, the "starting dose is not adjusted relative to a patient without hepatic impairment."

169.    Huang does not discuss or refer to any clinical testing in hepatically impaired patients or mention hepatic impairment in any context.

170.    ████████ is disclosed in ████████████ of Huang.[3] ████████ of the Huang does not anticipate the Asserted Claims.

171.    ████████ of Huang states that ████████ was studied in a "randomized, open-label, single-dose, 5-treatment, 4-period crossover, incomplete block study in *healthy adult male and female subjects*." The clinical study of ████████ disclosed in Huang was thus not a study of hepatically impaired patients.

172.    Huang does not teach or suggest that ████████ or any other formulation was tested in hepatically impaired patients, and does not propose or suggest such a study or indicate that there were plans in place to conduct one.

---

[3] Alvogen cites to the ████████ Declarations as stating ████████ is the formulation used in Purdue's hepatic impairment study dated May 23, 2013, ████████ ████████.

173.    The hepatic impairment study later performed by Purdue on ▮▮▮▮▮▮▮▮, as summarized in the Cipriano Abstract, was concluded after the provisional applications leading to the Patents-in-Suit had already been filed.

174.    The Cipriano Abstract would have been part of the book of accepted abstracts distributed at the PAINWeek meeting that began on September 4, 2013.

175.    The first provisional application for the Patents-in-Suit, which includes the data from the inventors' hepatic impairment study shown at Figures 1-6 of the issued Patents-in-Suit, was filed on July 31, 2012, and the second provisional application for the Patents-in-Suit was filed on March 13, 2013, before the Cipriano Abstract was published.

176.    The Cipriano Abstract would have been made available to meeting participants at the September 2013 PAINWeek meeting (after both provisional applications for the Patents-in-Suit were filed), and thus it is not prior art to the Asserted Claims of the Patents-in-Suit.

177.    The hepatic impairment study ▮▮▮▮▮▮▮▮ cited in the Cipriano Abstract is dated ▮▮▮▮▮▮▮▮ (after both provisional applications for the Patents-in-Suit were filed), and thus the ▮▮▮▮▮▮ study is also not prior art to the Patents-in-Suit.

178.    Huang does not teach or suggest performing a hepatic impairment study or mention hepatic impairment in any context, and the information contained in the Cipriano Abstract and the Purdue ▮▮▮▮▮▮ hepatic impairment study did not exist at the time Huang was published on June 28, 2012 or at the time the provisional applications for the Patents-in-Suit were filed.  Thus, the hepatic impairment data in the Cipriano Abstract is not "inherent" in Huang's disclosure.  Because Huang does not disclose treating hepatically impaired patients, the "administering to the patient having mild or moderate hepatic impairment" and "starting dose is

-45-

not adjusted relative to a patient without hepatic impairment" limitations are not "necessarily and inevitably" present (*i.e.*, inherent) in Huang.

### c.     Huang Does Not Disclose the Pharmacokinetic Limitations of the Asserted Claims Either Expressly or Inherently

179.     Huang does not disclose, either expressly or inherently, the pharmacokinetic limitations of the Asserted Claims.

180.     The pharmacokinetic limitations of the Asserted Claims are based on a hepatic impairment study performed by the inventors of the Patents-in-Suit.  As explained above, no such study is taught or suggested by Huang, which does not mention the topic of hepatic impairment, and discloses a study performed in "***healthy*** adult male and female subjects."

181.     Given that Huang does not teach or suggest administering an extended release dosage form with hydrocodone as the only active ingredient to a patient with mild or moderate hepatic impairment, let alone without adjusting the starting dose relative to an unimpaired patient, Huang does not disclose the pharmacokinetic limitations of the Asserted Claims either expressly or inherently.

\*     \*     \*

182.     Huang does not teach or suggest administering a hydrocodone-only, extended-release dosage form to patients with mild or moderate hepatic impairment, and thus teaches nothing about administration of a hydrocodone-only, extended-release dosage form to patients with mild or moderate hepatic impairment, nothing about dosing decisions for hepatically impaired patients, and nothing about the pharmacokinetic properties of a dosage form administered to patients with mild or moderate hepatic impairment.  Those claim elements are not expressly disclosed in Huang and are not "necessarily and inevitably" (*i.e.*, inherently) present in Huang's disclosure.

-46-

### B.   The Asserted Claims Are Nonobvious

#### 1.   The Asserted Claims Are Not Rendered Obvious by Devane or Huang in View of "General Knowledge of Standard Prescribing Practices" or "Common Dosing Practices"

183.   A POSA would not have understood that there existed as of the earliest filing date of the Patents-in-Suit a "general knowledge of standard prescribing practices" that would have suggested administering the Devane or Huang formulations to a patient with mild or moderate hepatic impairment without adjusting the starting dose.

184.   Standard prescribing practices are dictated by the FDA-approved prescribing information that is included with each FDA-approved product.  Each product's prescribing information contains, for example, a section that discusses dosing in patients with hepatic impairment.

185.   There were no standard prescribing practices for ER hydrocodone single-entity products as of the earliest filing date of the Patents-in-Suit because no such products existed— Zohydro® ER was not launched until 2014.

186.   Absent any available ER hydrocodone product, a POSA's expectations regarding the dosing of an ER hydrocodone product in hepatically impaired patients would have been informed by what was known about other ER opioid products for which hepatic impairment clinical data had been obtained, as set forth in their FDA-approved labels, not by the labels of IR hydrocodone products that contained an additional ingredient and no clinical data.

187.   A POSA as of the earliest filing date of the Patents-in-Suit understood that IR hydrocodone products and their prescribing information were not informative of the dosing of ER hydrocodone in a hepatically impaired patient.  That is because as of that time there was no

-47-

clinical data regarding pharmacokinetics in hepatically impaired patients for IR hydrocodone products.

188.    IR products also did not carry the same overexposure concerns as ER products for hepatically impaired patients because they could be given in low doses, on an as-needed basis and over longer dosing intervals.  For example, a patient taking 5 mg of IR hydrocodone (*e.g.*, Vicodin), every six hours is exposed to a maximum of 20 mg of hydrocodone in a 24 hour period, whereas in contrast, a patient taking 15 mg (the second-lowest dose) of ER hydrocodone (*e.g.*, Zohydro® ER) every 12 hours is exposed to 30 mg of hydrocodone, a 50% higher dose than 20 mg, in the same 24 hour period.

189.    The higher doses taken in the context of ER formulations, coupled with the inability to control dosing intervals (*i.e.*, spread the doses out) once the ER capsule has been swallowed, make it inadvisable to rely on the dosing instructions for an IR product (especially where they contain no data) when administering an ER product with the same active ingredient. Moreover, there was no clinical trial data for the use of IR hydrocodone in hepatically impaired patients.

190.    As of the earliest filing date of the Patents-in-Suit, a POSA would have expected, based on the clinical data and dosing instructions available for other ER opioid products, that an adjustment in starting dose was required for hepatically impaired patients.

191.    A POSA would have had no expectation, and no motivation, to administer the formulations disclosed in Devane or Huang to patients with mild or moderate hepatic impairment without adjusting the starting dose.

192.    While developing Vantrela ER, Cephalon performed a hepatic impairment study that ███████████████████████████ ("Cephalon Hepatic Impairment Study").  The

clinical study protocol for the Cephalon Hepatic Impairment Study ████████████████.  The Cephalon Hepatic Impairment Study confirmed that the dosing of ER hydrocodone products in hepatically impaired patients is unpredictable, and that the baseline expectation of a required dose adjustment will most often hold true.  Vantrela ER, like Zohydro® ER, is an extended release, hydrocodone-only product.  But, Vantrela ER requires a reduction in starting dose for patients with mild or moderate hepatic impairment, while Zohydro® ER does not.  That fact shows that one simply cannot predict *a priori* the proper dosing of an ER hydrocodone product in hepatically impaired patients, even based on results seen with another ER hydrocodone product (*e.g.*, Huang), let alone based on an IR hydrocodone product.  The baseline expectation would be that dose adjustment would be required, which the Vantrela ER investigators understood.

193.    Contrary to Alvogen's contentions, arguments made by the patent applicants that there existed a "conventional wisdom in the field" that hepatically impaired patients needed to be dosed differently with opioid drugs, including hydrocodone, compared to normal patients, were accurate.

194.    It is crucial to give patients with hepatic or renal impairment the correct dose, both to avoid overdose and to avoid under-dosing and leaving the patient's pain untreated.  Just as clinicians are concerned about the issue of overdose when prescribing opioid analgesics like hydrocodone to patients, under-dosing is also an important consideration.  Administering a lower starting dose of an opioid analgesic to a patient can result in inadequate treatment of the patient's pain.  As noted in the Centers for Disease Control ("CDC") Guideline for Prescribing Opioids for Chronic Pain, inadequate treatment may lead to persistent pain, and to other "clinical,

psychological, and social consequences" including "limitations in complex activities, lost work productivity, reduced quality of life, and stigma."

195.    There is also concern that patients who are inadequately treated may overuse over-the-counter ("OTC") analgesics, which can lead to several problems, including liver toxicity with acetaminophen, gastrointestinal, renal, cardiovascular, and platelet issues with NSAIDs, or the possibility that the patient may eventually turn to heroin or other illicit opioids. Physicians treating chronic pain are aware that inadequate pain treatment can have a significant impact on patients.

196.    Contrary to Alvogen's contentions, physicians do not simply start with the lowest dose for an opioid naïve patient and give the same dose to an opioid tolerant patient with hepatic impairment that he would give to an unimpaired patient.  Most often with ER opioids, which are indicated for treating chronic pain, the patient is converting from another immediate release or extended release opioid, and it is not feasible to simply give them the lowest dosage available.  A physician instead consults the dosing tables provided in the product package insert to determine the correct dose.  And, if the patient is a member of a special population (*e.g.*, a patient with hepatic impairment), the physician adjusts the ER opioid dose as instructed by the prescribing information.  For the opioid-naïve patient, the physician may decide that the drug is inappropriate, even at its lowest dose.  And for an opioid tolerant patient, the physician may give a lower dose to patients with mild or moderate hepatic impairment than the dose that would be given to an unimpaired patient based on dosing tables.

197.    The claimed inventions avoid the difficulties in determining the proper dose for a patient with mild or moderate hepatic impairment, which exist for other ER opioids, because the

claimed inventions allow a label instruction that "no adjustment in starting dose is required for patients with mild or moderate hepatic impairment."

*   *   *

198. None of the Asserted Claims are rendered obvious by Devane or Huang, alone or in view of alleged "standard prescribing practices."

**2. The Asserted Claims Are Not Rendered Obvious by Devane or Huang in View of the Labels for IR Hydrocodone Products**

199. The labels of prior art immediate release hydrocodone combination products like Vicodin, Norco, Lortab, and Vicoprofen ("IR combination products"), through their silence on the issue of dosing in patients with mild or moderate hepatic impairment, do not implicitly teach that no adjustment in starting dose is required for those patients.

200. As of the earliest filing date of the Patents-in-Suit, IR hydrocodone products were only available in combination with other, liver-toxic analgesics (*e.g.*, acetaminophen and ibuprofen), and were not a desirable choice for treating hepatically impaired patients.

201. The IR combination product labels provide no information and cite to no data that would inform the dosing of a single-entity, extended release hydrocodone formulation in patients with mild or moderate hepatic impairment, as required by the Asserted Claims.

202. The IR labels' lack of pharmacokinetic data from hepatically impaired patient populations would not provide a POSA with an expectation that no adjustment in starting dose would be required, especially when viewed in light of the fact that hydrocodone was metabolized in the liver, and a significant decrease in starting dose was required for other ER opioids based on hepatic impairment studies.

-51-

203.    One of the inventors, Mr. Hartman, pointed out during his deposition that the IR combination product labels recited no data that would have supported specific dosing instructions for patients with hepatic impairment:

Q: The label doesn't include anything saying that [Vicodin] shouldn't be given to individuals with mild or moderate hepatic function?

A: There's no specific mention, no.

Q: And even with respect to severe impairment of hepatic, it doesn't say not to give or prescribe Vicodin tablets, but just that they should be used with caution?

A: That's right.· That's just pretty standard cautionary language. ***They actually had no data to base this statement on because they hadn't run any studies.***

\* \* \*

Q: So the precautions for Lortab do not indicate that it's contraindicated in any hepatic impairment populations, right?

A: That's correct.  As I previously indicated, none of these products had conducted clinical studies in subjects with hepatic impairment, so they had no data.

Q: Does the FDA place any requirements on a company to publish the results of hepatic impairment studies?

A: The FDA does not place any requirements to publish scientific work in scientific forums.  However, if studies are performed for a product that are relevant to prescribing information, the FDA does require that those are summarized in the product prescribing information. ***So if studies in subjects with hepatic impairment had been performed for Vicodin, Lortab, Norco, et cetera, those studies would have been described in the prescribing information.***

204.    A POSA understood that the prescribing information for other ER opioids, for which there was data for using with hepatic patients, would be more predictive of dosing requirements than the prescribing information for IR hydrocodone.  It is the prescribing information for these ER opioid products that informed a POSA of the "common dosing

-52-

practices" of physicians with respect to dosing ER opioids as of the earliest filing date of the Patents-in-Suit, and a POSA understood that physicians reduced the dose for hepatically impaired patients as the labels for the ER opioid products required.

205.   Zogenix initially owned the Zohydro® ER product, which it sold to Pernix. While seeking regulatory approval, Zogenix filed a 505(b)(2) application, meaning that it could rely on the safety and efficacy data that already existed for the active ingredient, hydrocodone. The safety and efficacy data had to come from a "reference drug," meaning a drug product containing hydrocodone as the active ingredient that had already been approved by the FDA.

206.   Zogenix used an IR hydrocodone and ibuprofen combination product, Vicoprofen, as the reference drug. Zogenix did not use a hydrocodone-only product or an ER hydrocodone product as the reference drug because no such products were available at the time. Zogenix also did not use another ER opioid product (with a different active ingredient than hydrocodone) because the FDA requires a reference drug to have the same active ingredient as the drug product for which approval is sought.

207.   Zogenix did not rely on clinical data regarding the use of Vicoprofen in hepatically-impaired patients because no clinical data was available for any IR hydrocodone products, including Vicoprofen, in hepatically impaired patients. As a result, the FDA required the inventors to perform a hepatic impairment study.

208.   That the inventors thought a hepatic impairment study was not necessary shows that the result of the inventors' hepatic impairment study was surprising. One inventor, Dr. Robinson, testified that "Zogenix believed that the optimum risk benefit was achieved for hydrocodone *with individual patient titration* and recommended to the FDA that no additional

studies needed to be conducted on patients with hepatic impairment." A Zogenix FDA submission stated that ████████████████████████████████████████████████████ ██████████████████████████████████████ which is a way of saying "why should we do a hepatic impairment study when we know we are going to need to adjust the dose?" That "established mindset" is what caused the inventors to be surprised by the result of their hepatic impairment study.

209. Despite the existence of the IR combination products and their labels, Cephalon performed the Cephalon Hepatic Impairment Study because the pharmacokinetics of hydrocodone in patients with hepatic impairment had not been characterized:

████████████████████████████████
██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████

█    █    █

██████████████████████████████████
██████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████

210. Nowhere does the clinical study protocol for the Cephalon Hepatic Impairment Study suggest that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████

211.    The results of the Cephalon Hepatic Impairment Study, which were finalized seven months before the filing of the first provisional application for the Patents-in-Suit, showed that for Cephalon's single-entity, extended release hydrocodone formulation, a dose adjustment was required for hepatically impaired patients, which would have been expected by a POSA based on results seen with other extended release opioids.

212.    Cephalon indicated that the requirement for a dose adjustment was in line with its expectations based on another ER opioid, Opana® ER (oxymorphone hydrochloride).  Whether or not the Cephalon Hepatic Impairment Study is prior art to the Patents-in-Suit, the study and the comments of the investigators took place before the earliest filing date of the Patents-in-Suit, and reflect the thinking of a POSA at the time.

213.    The Cephalon Hepatic Impairment Study states:



214.    Based on the results of the Cephalon Hepatic Impairment Study, the Vantrela label instructs:

> ***In patients with mild or moderate hepatic impairment, initiate therapy with one half of the recommended initial dose followed by careful dose titration.*** Use of alternate analgesics is recommended for patients who require a VANTRELA ER dose of less than 15 mg. Monitor closely for adverse events such as respiratory depression. VANTRELA ER is not recommended in patients with severe hepatic impairment [see Hepatic Impairment (8.6) and Clinical Pharmacology (12.3)].

215. The Vantrela ER prescribing information requires a lower starting dose for patients with mild and moderate hepatic impairment, even though the Cephalon Hepatic Impairment Study involved only patients with moderate hepatic impairment, which further supports the conclusion that the "established mindset" required dosage adjustments in hepatically impaired patients absent data to the contrary, and such data did not exist prior to the Patents-in-Suit.

216. As discussed above, based on hepatic impairment study data for other ER opioids, a POSA expected increased hydrocodone exposure (*e.g.*, increased $AUC_{0\text{-inf}}$) in hepatically impaired patients, with an accompanying requirement for dose adjustment in those patient populations. The IR labels, Devane, and Huang would have no impact on a POSA's analysis because, unlike the ER labels, none of those references include any data for using those products in mild or moderate hepatically impaired patients, let alone data suggesting that there would be no need to adjust the starting dose.

217. A POSA therefore would not have been motivated to combine any information from the labels of the IR hydrocodone products with the teachings of Devane, Huang, or any other reference to arrive at the inventions of the Asserted Claims, and none of those references, alone or in combination, render the Asserted Claims obvious.

**3.    The Patents' Statement that the IR Hydrocodone Products Were "Contraindicated"**

**Is Not Inaccurate and Is Not Relevant to the Issue of
Dosing Hydrocodone in Hepatically Impaired Patients**

218.    The Patents-in-Suit state that:

> Products indicated for pain relief are combined with another analgesic such as acetaminophen, or less commonly ibuprofen, both of which can cause liver toxicity and are contraindicated in patients with hepatic impairment.  The lack of a hydrocodone formulation without an additional active ingredient, and the lack of extended release hydrocodone formulations indicated for pain, limits the ability of physicians to treat pain in patients with hepatic impairment.

This statement explains why an extended release, hydrocodone-only formulation was desirable, by focusing on the liver toxicity associated with IR hydrocodone products that also contain acetaminophen (*e.g.*, Vicodin, Lortab, and Norco) or ibuprofen (*e.g.*, Vicoprofen), and on the fact that there were no extended release hydrocodone products available at the time the patent application was filed.

219.    Contrary to Alvogen's contentions, the statement is not inaccurate or misleading based on the fact that labels for IR hydrocodone products did not list mild or moderate hepatic impairment in the "Contraindications" section.  There is nothing in the patent specification to suggest that the inventors used the word "contraindicated" to have anything other than its everyday meaning—*i.e.*, to mean that treating hepatically impaired patients with IR hydrocodone products was not advisable because those products contained a second, liver toxic ingredient. The inventors do not refer to a meaning of the word "contraindication" that is specific to FDA-approved labels.

220.    The following exchange took place at Dr. Rubino's deposition:

> Q:  And are those products [Vicodin, Lortab, and Vicoprofen] contraindicated in patients with hepatic impairment?

-57-

A:  Are you asking me from—*in what way are you asking*, I guess?

Q:  Well, did you have any understanding, at the time of, of the filing of the patent application, that those products were contraindicated in patients with hepatic impairment?

A:  *So, in terms of practical use, I would say yes*.

\*      \*      \*

Q:  . . . What's your understanding of the word "contraindicated"?

A:  I think there's, *there's a legal version of it and then there's a practical version of it.* And legally, it would be tied to the label, and you would say contraindicated in the prescribing information or have some qualifier there. *I think, clinically, there are situations where things are—have relative contraindications, where you would avoid their use and only use them if you had absolutely no other choice.* So, those are the two ways I would say I understand contraindication.

221.    Similarly, Dr. Robinson answered as follows:

Q:  Are hydrocodone products combined with acetaminophen contraindicated in patients with hepatic impairment?

A:  So to clarify, *if you mean contraindicated in the context of a generality, that's one thing*; but contraindicated in a sense of what's in a product label, I'd have to look at the product labels to—to see if, in fact, that's true.

222.    From a practical standpoint, IR hydrocodone products containing other, liver toxic, analgesics are generally poor choices for hepatically impaired patients, and a POSA would avoid treating hepatically impaired patients with those products.

223.    The labels for the IR hydrocodone products themselves make clear that these products are poor choices for hepatically impaired patients. The 2011 Vicodin label states:

**Hepatotoxicity**

-58-

> ***Acetaminophen has been associated with cases of acute liver failure, at times resulting in liver transplant and death.*** Most of the cases of liver injury are associated with the use of acetaminophen at doses that exceed 4000 milligrams per day, and often involve more than one acetaminophen-containing product. The excessive intake of acetaminophen may be intentional to cause self-harm or unintentional as patients attempt to obtain more pain relief or unknowingly take other acetaminophen-containing products.
>
> ***The risk of acute liver failure is higher in individuals with underlying liver disease*** . . . ***while taking acetaminophen.***

A POSA would conclude from this label information that it was not advisable to administer Vicodin to a hepatically impaired patient because of the acetaminophen component.

224. The Vicodin label was revised in February 2017 to expressly state the understanding that a POSA and the inventors already had in 2012:

> Patients with hepatic impairment may have higher plasma hydrocodone concentrations than those with normal function. Use a low initial dose of hydrocodone bitartrate and acetaminophen tablets in patients with hepatic impairment and follow closely for adverse events such as respiratory depression and sedation.

While this Vicodin label is not prior art to the Patents-in-Suit, this statement is informative, and reflects what was already the understanding of a POSA in 2012—that combination IR formulations like Vicodin were generally not preferred treatments (*i.e.*, were "contraindicated," in a practical sense) for hepatically impaired patients, and if they were used at all in those patients, they should be used with a lower starting dose while monitoring the patient closely. This excerpt from the Vicodin label refers to "hydrocodone concentrations" and to "adverse events such as respiratory depression and sedation," which are adverse events associated with hydrocodone, not acetaminophen.

225. Hydrocodone plus ibuprofen formulations also gave rise to concerns about dosing in patients with hepatic impairment. The Vicoprofen label states:

-59-

Inform patients of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, diarrhea, pruritus, jaundice, right upper quadrant tenderness, and "flulike" symptoms).  If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), discontinue VICOPROFEN immediately, and perform a clinical evaluation of the patient.

226.    Because it was inadvisable to use the IR hydrocodone products in hepatically impaired patients, the inventors' statement in the patent specification that IR hydrocodone products were "contraindicated" in hepatically impaired patients is accurate and not misleading.

### 4. The Asserted Claims Are Not Rendered Obvious by Devane in View of One or More of Jain, the Vicodin/Lortab Product Labels, and the VA Guideline or by Jain in View of the FDA Communications and Huang

227.    A POSA would not have been motivated to administer the Devane formulation to a patient with mild or moderate hepatic impairment without adjusting the starting dose, based on the labels of IR products, Jain, and the VA Guideline.

228.    A POSA would have looked to the prescribing information for ER opioid products, not IR hydrocodone products, and based on that ER opioid prescribing information would have had no expectation that one could administer the Devane formulation to hepatically impaired patients without adjusting the starting dose.  Nor did a POSA have such a motivation or expectation based on Jain or the VA Guideline, as discussed below.

#### a. Jain Does Not Teach or Provide a POSA with a Reasonable Expectation That One Could Administer to a Patient Having Mild or Moderate Hepatic Impairment a Starting Dose of an Oral Dosage Unit Having Hydrocodone as the Only Active Ingredient Without Adjusting the Starting Dose

229.    Jain was published on January 14, 2010.

230.    Jain discloses and claims an extended release product (Vicodin CR) containing both hydrocodone and acetaminophen, which was never approved by the FDA.

231. Jain, whether alone or in combination with other references, does not provide a POSA with a reasonable expectation of success in administering to a patient having mild or moderate hepatic impairment a starting dose of an oral dosage unit having hydrocodone as the only active ingredient, wherein the starting dose is not adjusted relative to a patient without hepatic impairment.

232. Jain is listed on the face of the Patents-in-Suit, and was considered and cited by the Examiner during prosecution of the '760 Patent.

233. In allowing the claims of the '760 Patent, the Examiner discussed Jain and noted the unpredictability associated with extended release hydrocodone formulations:

> The closest art discussing hydrocodone bitartrate administration to hepatic impaired patients appears to be **Rita [sic, Jain] (US 2010/0010030)** which teaches administration of an extended release hydrocodone and acetaminophen which does presents pharmacokinetics similarity between hepatic impaired patients and normal subjects (¶ 64). The bitartrate salt was not demonstrated and while it would seem that separating the two components would produce similar effects, various oxycodone [sic, opioid] only extended release products are disclosed by Applicants at instant specification ¶¶ 12-16 which do not demonstrate the desired consistent pharmacokinetics. ***Thus, the predictability of producing an extended release with only hydrocodone bitartrate as the active appears to be unpredictable in the art and would thus not lead the skilled artisan to start the dosage at a dose similar to a normal patient.***

234. Jain at paragraph [0005] states aspirationally that in a prospective "preferred embodiment" the $C_{max}$ and AUC for hydrocodone are "substantially similar" for patients with mild or moderate hepatic impairment versus unimpaired patients. Paragraph [0005] does not discuss the results of a clinical study, and "substantially similar" in that the passage does not refer to data from a clinical study.

235.    A later paragraph of Jain purports to discuss the results of a hepatic impairment study where "following oral administration of a single tablet of Vicodin CR, mean $C_{max}$ and AUC values of hydrocodone were *similar* in normal subjects and subjects with mild and moderate hepatic impairment." In contrast to the rest of the Jain disclosure, this statement is not supported by a single piece of clinical study data, despite the fact that Jain contains eighteen data figures and seventeen data tables presenting data from several other Vicodin CR clinical studies to support Jain's other Examples.[4]

236.    Given the absence of any hepatic impairment study data in Jain, including when viewed in light of the fact that Jain shows extensive data from multiple other clinical studies, a POSA would not infer from the use of the word "similar" that the Vicodin CR formulation did not require a dose adjustment for patients with mild or moderate hepatic impairment and would have no reasonable expectation that that would be the case.

237.    Alvogen argues that a POSA would understand Jain's use of "similar" to refer a pharmacokinetic difference of less than the 25%, which Alvogen argues is the threshold at which the FDA Guidance on Hepatic Impairment Studies permits drug sponsors to draw a conclusion that hepatic impairment has "no effect" on the drug's pharmacokinetic properties.

238.    A POSA would not understand Jain's use of "similar" to refer to a pharmacokinetic difference of less than 25%. The passage from the FDA Guidance relied on by Alvogen addresses criteria for making dosing recommendations based on data from hepatic impairment studies; it does not set forth a definition of the word "similar."

---

[4] Both ClinicalTrials.gov (a public clinical trials database maintained by the National Institutes of Health) and the website of the sponsor of Vicodin CR (now AbbVie, a spin-off of Abbott Laboratories) provide summaries of clinical studies relating to Vicodin CR. AbbVie's website lists twelve Vicodin CR clinical studies, and ClinicalTrials.gov lists ten Vicodin CR clinical trials, none of which relate to hepatic impairment.

239.    Jain does not refer to the FDA Guidance, and Jain provides no hepatic impairment data to confirm this conclusion.  Absent that data a POSA would be skeptical of the unsupported statement in Jain, especially in view of the available information for other ER opioids.

240.    Jain fails to address the problem addressed by the inventors of the Patents-in-Suit, namely that for ER opioid formulations, a reduction in starting dose was generally required for hepatically impaired patients.

241.    At the time the first provisional application for the Patents-in-Suit was filed, significant increases in $C_{max}$ and AUC had been observed in patients with hepatic impairment with several single-entity extended release opioid formulations that are discussed in the patent specification, including formulations containing oxycodone (Oxycontin®), tapentadol (Nucynta® ER), oxymorphone (Opana® ER), hydromorphone (Exalgo®), and morphine sulfate (Kadian®).

242.    For OxyContin®, the Patents-in-Suit state that:

A study of OxyContin in patients with hepatic impairment demonstrated greater plasma concentrations than those seen at equivalent doses in persons with normal hepatic function. Therefore, ***in the setting of hepatic impairment, start dosing patients at ⅓ to ½ the usual starting dose*** . . . . Data from a study involving ***24 patients with mild to moderate hepatic dysfunction show peak plasma oxycodone and noroxycodone concentrations [$C_{max}$] 50% and 20% higher, respectively, than healthy subjects. AUC values are 95% and 65% higher, respectively***.

243.    For Nucynta® ER, the Patents-in-Suit state that:

Extended release tapentadol tablet (Nucynta® ER, Janssen Pharmaceuticals) was demonstrated to have an ***increase of 1.4-fold in $C_{max}$ and an increase of 1.7-fold in AUC for subjects with mild hepatic impairment, and an increase of 2.5- and 4.2-fold in $C_{max}$ and AUC respectively for those with moderate hepatic*** impairment.  The package insert contained the following information: "NUCYNTA® ER has not been studied in patients with severe hepatic impairment.  The use of NUCYNTA® ER in

this population is not recommended.  ***Use NUCYNTA® ER with caution in patients with moderate hepatic impairment.  Initiate treatment in these patients using 50 mg NUCYNTA® ER and administer no more frequently than once every 24 hours.***

244.   For Opana® ER, the Patents-in-Suit state that:

Extended release oxymorphone (Opana® ER, Endo Pharmaceuticals) was shown to have an ***increase in AUC of 1.6-fold and 3.7-fold in subjects with mild and moderate hepatic impairment, respectively, compared to subjects without hepatic impairment.***  The package insert contains the following: "The liver plays an important role in the pre-systemic clearance of orally administered oxymorphone.  Accordingly, the bioavailability of orally administered oxymorphone may be markedly increased in patients with moderate to severe liver disease.  The disposition of oxymorphone was compared in 6 patients with mild, 5 patients with moderate, and one patient with severe hepatic impairment and 12 subjects with normal hepatic function.  ***The bioavailability of oxymorphone was increased by 1.6-fold in patients with mild hepatic impairment and by 3.7-fold in patients with moderate hepatic impairment.***  In one patient with severe hepatic impairment, the bioavailability was increased by 12.2-fold.  The half-life of oxymorphone was not significantly affected by hepatic impairment . . . ***Use OPANA ER with caution in patients with mild impairment, starting with the lowest dose*** and titrating slowly while carefully monitoring for side effects.

245.   For Exalgo®, which contains hydromorphone, a metabolite of hydrocodone, the

Patents-in-Suit state that:

Extended release hydromorphone (Exalgo®, Mallinkrodt) demonstrated an approximately ***4-fold increase in both $C_{max}$ and AUC in subjects with moderate hepatic impairment*** compared to subjects without hepatic impairment.  The package insert contains the language "***Start patients with moderate*** and severe ***hepatic . . . impairment on a reduced dose*** and closely monitor during dose titration.

246.   A POSA's expectation that a dose adjustment would be required for hepatically

impaired patients did not require that every ER opioid required a dose adjustment for all three

Child-Pugh classes.  Rather, based on an assessment of all the available information, a POSA would have expected that a dose adjustment would be required.

247.  Though the opioid drugs mentioned above are not hydrocodone, they are all—like hydrocodone—metabolized in the liver.  Hydrocodone is metabolized by liver enzymes called "cytochrome P450" or "CYP450" enzymes to form products including norhydrocodone and hydromorphone.  The conversion of hydrocodone to norhydrocodone is catalyzed by the CYP450 enzyme CYP3A4, while conversion of hydrocodone to hydromorphone is catalyzed by the CYP450 enzyme CYP2D6.  It was known in the literature well before the filing of the first provisional application for the Patents-in-Suit that in hepatically impaired patients CYP450 enzyme levels, including CYP3A4 levels, are diminished and drug metabolism is impaired.

248.  A POSA as of filing date of the first provisional application for the Patents-in-Suit would have followed the advice in the literature that CYP3A4 substrate drugs should be carefully dosed in hepatically impaired patients.  Decreased CYP2D6 expression can also result in decreased ability to metabolize hydrocodone, as evidenced by the fact that patients with a common genetic mutation in CYP2D6 metabolize hydrocodone poorly.

249.  In September 2013 a published report confirmed that a single-entity hydrocodone formulation could also require a dose adjustment in a hepatically impaired patient.  A published abstract by Teva ("Bond 2013") states that:

> Mean $C_{max}$ in subjects with normal hepatic function or subjects with moderate hepatic impairment was 10.1 and 13.0 ng/mL, respectively; mean $AUC_{0-\infty}$ was 155 and 269 ng•hr/mL, respectively.  ***Systemic exposure to hydrocodone was ~70% higher in subjects with moderate hepatic impairment vs normal hepatic function, likely the result of a change in bioavailability due to intrahepatic shunting and the reduced ability of the liver to clear the drug.***

250.    Comparison of the data from the Patents-in-Suit and from Bond 2013 shows that although the active ingredient (hydrocodone) is the same, and both formulations are extended release formulations, the pharmacokinetic profiles seen when the two formulations were administered to hepatically impaired patients were very different.  "[R]educed ability of the liver to clear the drug," as Teva observed, is exactly what a POSA would have expected in light of the literature on opioid metabolism.

251.    The study described in Bond 2013 was the Cephalon Hepatic Impairment Study, which concluded in January 2012.  The clinical study protocol for the Cephalon Hepatic Impairment Study was dated ███████████.  Nowhere does the Cephalon Hepatic Impairment Study or the related clinical study protocol suggest that no adjustment in starting dose was required for patients with mild or moderate hepatic impairment.

252.    The Cephalon Hepatic Impairment Study indicates that the increased exposure (*i.e.*, $AUC_{0-inf}$) seen in hepatically impaired patients was expected, including based on prior art references including the results for Opana® ER.

253.    Thus, the Cephalon Hepatic Impairment study confirms that a POSA as of the earliest filing date of the Patents-in-Suit expected a dose adjustment to be required for hepatically impaired patients, and had no reasonable expectation that a hydrocodone-only formulation could be administered to a patient with mild or moderate hepatic impairment without adjusting the starting dose.  Nor would a POSA have had any expectation that the specific $C_{max}$ and $AUC_{0-inf}$ ranges specified in the claims of the Patents-in-Suit could be achieved with an extended release hydrocodone formulation.

\*        \*        \*

254.    Given the state of the art and that there is no data in Jain showing that a dose adjustment is not needed for hepatically impaired patients, Jain's unsupported statement that hydrocodone exposure was "similar" in both impaired and unimpaired patients would not have persuaded a POSA that the Jain formulation or the formulations of Devane or Huang could be administered to a patient with mild or moderate hepatic impairment without adjusting the starting dose.  Nothing in any of those references, alone or together, renders obvious the Asserted Claims.

### b.    A POSA Would Not Have Been Motivated to Remove Acetaminophen from the Jain Formulation Based on the Baumann Abstract

255.    A POSA would not have been motivated to remove the acetaminophen from the Jain formulation in view of the Baumann abstract.

256.    Baumann discusses a "controlled release hydrocodone (CRHC)" formulation that was tested in a safety and efficacy study.  Baumann discloses no details about its CRHC formulation other than that it contained either 5 mg or 10 mg of hydrocodone.

257.    Baumann was published in 1987.  Nonetheless, the Jain inventors, more than 20 years after Baumann was published, touted the advantages of "combination opioids," including their Vicodin CR (HC/APAP) formulation, thereby teaching away from the use of hydrocodone in a single-entity formulation:

> [0118] For OA [osteoarthritis] and CLBP [chronic lower back pain] patients whose pain is not effectively managed by APAP or NSAIDs, *combination opioids (codeine, hydrocodone (HC), or oxycodone) may be important treatment alternatives.*
>
> [0119] *Combination opioids, including HC/APAP, have proven effective in the treatment of moderate to severe pain syndromes, such as OA and CLBP, but are currently available only in short-acting formulations.*

* * *

[0090] Results: At Week 12, *statistically significantly greater improvements* on WOMAC™ total score (p=0.001) and all three subscales [Pain, Stiffness, Physical Function (p=0.001 on all measures)] *were observed with HC/APAP CR treatment*. Similarly, at final evaluation, the physical component summary and the bodily pain sub-domain of the SF 36v2™ showed *statistically significant improvements from baseline* (p=0.044 and 0.004, respectively) *with HC/APAP CR* compared with placebo. In addition, statistically *significantly greater benefits with HC/APAP CR* were also observed on the SGA and PGA of arthritis status at Week 12 (p≤0.001).

258.    Based on the disclosure of Jain itself, which touts the advantages of HC/APAP products, a POSA at the time the first provisional application for the Patents-in-Suit was filed would not have been motivated to remove acetaminophen from the Jain formulation.

259.    Given the popularity of IR hydrocodone plus acetaminophen products like Vicodin—which are still routinely prescribed now—and the fact that for hydrocodone products the amount of acetaminophen was reduced either not at all (*e.g.*, Norco) or at most by half (*e.g.*, Vicodin ES), a POSA would not have had any motivation to "remove" acetaminophen from the Vicodin CR product of Jain.

260.    Neither Jain nor Baumann addresses the problem addressed by the inventors of the Patents-in-Suit, namely that for ER opioid formulations, a reduction in starting dose was generally required for hepatically impaired patients.

### c.    A POSA Would Not Have Been Motivated to Remove Acetaminophen from the Jain Formulation Based on the FDA Acetaminophen Communication and Huang

261.    A POSA would not have been motivated to remove the acetaminophen from the Jain formulation in view of the FDA Acetaminophen Communication.

262.    The FDA Acetaminophen Communication dated January 13, 2011 addresses acetaminophen liver toxicity, and states:

> The U.S. Food and Drug Administration (FDA) is asking drug manufacturers to limit the strength of acetaminophen in prescription drug products, which are predominantly combinations of acetaminophen and opioids.  This action will limit the amount of acetaminophen in these products to 325 mg per tablet, capsule, or other dosage unit, making these products safer for patients.

263.    The Communication required only that products contain a maximum of 325 mg of acetaminophen (which was already the case for some hydrocodone products), not that they eliminate acetaminophen entirely.

264.    At most, the Communication would have suggested to a POSA reducing the amount of acetaminophen in Vicodin CR to 325 mg to comply with the FDA guideline.

265.     The Vicodin CR formulation disclosed in Jain contained 15 mg of hydrocodone and like Vicodin and Lortab, 500 mg of acetaminophen.  Based on the Communication, the FDA would have required that Vicodin CR reduce the amount of acetaminophen in the formulation to 325 mg, not zero.

266.    Claims 11, 17, and 19 of the '760 Patent, which recite specific pharmacokinetic profiles, are not obvious over Jain in view of the FDA Communication and Huang.  There is no basis for drawing conclusions about the pharmacokinetic properties of a fictional "modified Jain formulation" where all of the acetaminophen has been removed.

267.    Huang provides pharmacokinetic data for Formulations G, H, or I, but, as discussed above, there is nothing in Huang to suggest that those formulations were ever administered to patients having mild or moderate hepatic impairment.

268.    There is no basis in either Jain or Huang to conclude that a fictional "modified Jain formulation," wherein all the acetaminophen has been removed, would behave the same way as Formulations G, H, and I of Huang.

269.    There is also no basis in either Jain or Huang to conclude that the "modified Jain formulation," wherein all the acetaminophen has been removed, would have the same pharmacokinetic profile for patients with no hepatic impairment as the Huang formulation.

270.    Further, there is no evidence that Jain and Huang disclose similar compositions. Jain does not disclose the composition of the Vicodin CR formulation, other than stating the amounts of hydrocodone and acetaminophen contained therein.  A POSA would not have drawn conclusions about the pharmacokinetics of a fictional "modified Jain formulation," wherein all the acetaminophen has been removed, by referring to Huang, which contains formulations that might have different compositions.

271.    The Devane formulation is "similar" to the Huang formulations in that it contains 20 mg of hydrocodone.  Despite this, the formulations have different pharmacokinetic properties. The mean $AUC_{0\text{-inf}}$ reported in Devane is 255.6 ng*h/mL, as compared to the values in Huang of 312, 326, and 329 ng*h/mL for ███████████████, respectively.  The value reported in Devane is outside the ranges claimed in all of claims 11, 17, and 19 of the '760 Patent, all of which have a lower bound of 300 ng*h/mL.

272.    If Jain's formulation is "modified" to remove acetaminophen, a POSA would not rely on anything in Jain regarding the pharmacokinetics and dosing of the original combination formulation.  Indeed, the FDA expressly found that Cephalon could not rely on pharmacokinetic data on hydrocodone combination products to support dosing Vantrela ER in hepatically impaired patients.

* * *

273. Neither Jain nor the Communication addresses the problem addressed by the inventors of the Patents-in-Suit, namely that for ER opioid formulations, a reduction in starting dose was generally required for hepatically impaired patients.

274. The Huang reference does not teach that the Jain formulation would give rise to the pharmacokinetic profiles of the Asserted Claims.

275. Nothing in Jain, the Communication, or Huang, alone or together, renders obvious any of the Asserted Claims.

### d. The 2010 VA Guideline Does Not Teach Not Adjusting the Starting Dose in Patients with Mild or Moderate Hepatic Impairment

276. The VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010) does not teach or suggest that no adjustment in starting dose is required in patients with mild or moderate hepatic impairment.

277. First, the VA Guideline is based on information from literature searches limited to "January 2003 through March 2009" (no ER hydrocodone product was available until Zohydro® ER was launched in 2014), states that its recommendations are not necessarily supported by evidence, and that "several of the recommendations in this guideline are based on weak evidence."

278. More specifically, the VA Guideline states:

> *If evidence exists*, the discussion following the recommendations for each annotation includes an evidence table that identifies the studies that have been considered, the quality of the evidence, and the rating of the strength of the recommendation [SR]. The Strength of Recommendation, based on the level of the evidence and graded using the USPTF rating system (see Table: Evidence

Rating System), is presented in brackets following each guideline recommendation.

279.    Table 3 is titled "Use of Opioids for Chronic Pain in Special Populations." Table 3 lists recommendations for various opioids, including hydrocodone, in special populations including "hepatic dysfunction." The recommendations include "Recommended," "Use with caution," "Reduced dose," and "Not recommended."

280.    For hydrocodone (which is assumed to be immediate release since no extended release hydrocodone products were available at the time the VA Guideline was published), the "hepatic dysfunction" column (where "hepatic dysfunction" is not defined or separated into mild, moderate, or severe hepatic impairment) contains no recommendation and is left blank.

281.    A POSA would not interpret a blank space on the chart to mean that no adjustment in starting dose was required for patients with mild or moderate hepatic impairment, for an extended release hydrocodone formulation. The blank space simply provides no information.

282.    The "References" section shown after the chart cites to only three references, two of which concern the use of drugs in pregnancy and lactation, one of which concerns opioids in renal failure and dialysis, and none of which concerns hydrocodone or hepatic impairment.

283.    The conclusion that Table 3 provides no information regarding the use of hydrocodone in hepatically impaired patients is consistent with the authors' own warning that "*if evidence exists*, the discussion following the recommendations for each annotation includes an evidence table that identifies the studies that have been considered."

284.    Table 3 has a blank box for dosing in hepatically impaired patients of both IR and ER oxycodone (*i.e.*, OxyContin), which requires a reduction in starting dose for patients with

-72-

mild and moderate hepatic impairment.  That omission alone would tell a POSA that the information in Table 3 is incomplete.

285.    Table E1 is titled "Use of Short-Acting, Orally Administered Opioid in Adults." Table E1 addresses hydrocodone only in combination with acetaminophen (APAP), aspirin (ASA), or ibuprofen (IBU), and lists an initial dosage of 5 to 10 mg.  Table E1 further states "Hepatic/Renal dysfunction – Use with caution."

286.    A POSA would not interpret Table E1 to mean that one could administer an extended release hydrocodone formulation to a patient with mild or moderate hepatic impairment without reducing the starting dose.  To the contrary, the warning to "use with caution" (which in the context of the VA Guideline applies only to immediate release formulations including acetaminophen, aspirin, or ibuprofen) would instruct the POSA to start with the lowest dose and to monitor the patient's progress.  The table legend cites to no reference for its statements regarding hydrocodone, including the "use with caution" instruction.

287.    No statements in the VA Guidelines suggest that a patient with mild or moderate hepatic impairment should receive the same starting dose as an unimpaired patient.

288.    The VA Guideline explains that "[t]he initiation phase . . . involves selecting an appropriate opioid agent *and dose for the individual patient, after considering the information obtained during the comprehensive assessment of the patient*."  This statement does not suggest that a patient with mild or moderate hepatic impairment should receive the same starting dose as an unimpaired patient.  The dose selected for an "individual patient" with hepatic impairment would not necessarily be the same dose selected for an unimpaired patient.

289.    The VA Guideline's suggestion to use "long-acting" opioids teach directly away from using hydrocodone, since no extended release hydrocodone formulation existed at the time

-73-

the VA Guideline was published. The VA Guideline expressly recommends "controlled release morphine or methadone" in one instance, and "methadone, morphine CR, oxycodone CR, or transdermal fentanyl" in another.

\*        \*        \*

290.    A POSA would recognize that the VA Guideline contains no data regarding the use of hydrocodone in hepatically impaired patients, and instructs the physician to "use caution" with hydrocodone in patients with hepatic dysfunction.

291.    The VA Guideline does not teach or suggest that no adjustment in starting dose is required in patients with mild or moderate hepatic impairment.

292.    A POSA would not have been motivated to combine any information from the VA Guideline with the teachings of Devane, Huang, Jain or any other reference to arrive at the inventions of the Asserted Claims, and none of those references, alone or together, render the Asserted Claims obvious.

### e.    Johnson Does Not Teach Not Adjusting the Starting Dose for Patients with Mild or Moderate Hepatic Impairment

293.    The Johnson literature survey article is cited on the face of the Patents-in-Suit.

294.    A POSA would have found the results of the inventors' hepatic impairment study to be surprising in view of what Johnson purports to teach.

295.    Johnson focuses on immediate release opioids, which are not informative regarding the dosing of extended release opioids.

296.    Johnson is silent as to dosing in mild or moderate hepatic impairment.

297.    Johnson's statement about dosing in patients with severe hepatic impairment would be understood as a caution as to all hepatically impaired patients.

-74-

298.    If a POSA did review the table at page 7 of Johnson, a POSA as of the earliest filing date of the Patents-in-Suit understood, based both on his or her knowledge of hydrocodone metabolism and on the dosing of other extended release opioids, that if a 50% dose reduction was recommended for patients with severe hepatic impairment, then dose reduction might also be necessary for patients with mild or moderate hepatic impairment.  A POSA would not conclude that a dose reduction in such patients would be "unwarranted."

299.    Johnson recognized the problem solved by the Patents-in-Suit, and yet teaches away from the claimed inventions.  For example, Johnson states that "hydrocodone may accumulate and should be used cautiously" in patients with hepatic dysfunction and that "usual *or adjusted* doses" of hydrocodone may be appropriate.  Those statements highlight the unpredictability and the lack of knowledge in the art regarding the proper dosing of hydrocodone formulations in hepatically impaired patients.

300.    Only after the hepatic impairment study performed by the inventors, and the inventors' recognition that no adjustment in starting dose would be required for Zohydro® ER in patients with mild or moderate hepatic impairment, was it possible to provide an instruction to administer an extended release, hydrocodone-only dosage unit to a patient with mild or moderate hepatic impairment without adjusting the starting dose.  A POSA would not have *a priori* expected that to be the case.

301.    Johnson groups hydrocodone with hydromorphone, which is a metabolite of hydrocodone, when stating that "usual or adjusted doses" may be used.  Johnson was published in 2007.  The 2006 and 2007 labels for Dilaudid® (immediate release hydromorphone tablets) state, based on pharmacokinetic data (which did not exist for immediate release hydrocodone products), that:

mean exposure to hydromorphone ($C_{max}$ and $AUC_\infty$) is increased 4-fold in patients with moderate (Child-Pugh Group B) hepatic impairment compared with subjects with normal hepatic function. Due to increased exposure of hydromorphone, *patients with moderate hepatic impairment should be started at a lower dose* and closely monitored during dose titration.

302.    A POSA would *not* have understood from Johnson that hydromorphone (or hydrocodone) could be administered to patients with mild or moderate hepatic impairment without adjusting the starting dose because that interpretation contradicts dosing instructions in effect at the time.

303.    A POSA would have agreed with the inventors' statement that the lack of any need to adjust the starting dose for Zohydro ER for patients with mild or moderate hepatic impairment was "surprising."

304.    Johnson adds nothing that would provide any motivation for a POSA to administer the formulations disclosed in Devane, Huang, or Jain to a patient with mild or moderate hepatic impairment without adjusting the starting dose, as required by the Asserted Claims.

### f.    Smith Does Not Teach Not Adjusting the Starting Dose for Patients with Mild or Moderate Hepatic Impairment

305.    A POSA would not read Smith as teaching that no dose adjustment was required for patients with mild or moderate hepatic impairment.

306.    The information in Table 5 of Smith is derived from the package inserts of various opioids. The cited package inserts are in some cases those from extended release opioids, *e.g.*, OxyContin (oxycodone) and Opana ER (oxymorphone), but because no extended release hydrocodone product was available when Smith was published, Smith cites only to a package insert for immediate release hydrocodone.

307. The product label for IR hydrocodone provides no information and cites to no data that would inform the dosing of a single-entity, extended release hydrocodone formulation in patients with mild or moderate hepatic impairment, as required by the Asserted Claims.

308. A POSA as of the earliest filing date of the Patents-in-Suit would have recognized that although Smith summarizes some useful information, it contains incomplete and inaccurate information about hydrocodone metabolism. Specifically, Smith inaccurately states that hydrocodone is broken down by a single cytochrome P450 enzyme, CYP2D6. In fact, hydrocodone is broken down by two CYP450 enzymes—CYP2D6 and another enzyme, CYP3A4.

309. A POSA as of the earliest filing date of the Patents-in-Suit was aware of the importance of CYP3A4 in hydrocodone metabolism. A POSA was also aware that CYP-mediated metabolism may be affected by hepatic impairment, resulting in decreased rates of drug clearance and drug accumulation in the body, especially with repeated administration. A POSA, knowing that hydrocodone is metabolized by two enzymes whose expression is likely to be impaired in hepatically impaired patients, would not have had a reasonable expectation that an extended release hydrocodone formulation could be administered to patients with mild or moderate hepatic impairment without adjusting the starting dose. A POSA would instead have understood that deficiencies in CYP2D6 and in CYP3A4 could lead to increased hydrocodone exposure and overdose if the starting dose was not adjusted in hepatically impaired patients.

310. A POSA would not read Smith as teaching that no dose adjustment was required for patients with mild or moderate hepatic impairment.

311.    Smith adds nothing that would provide any motivation for a POSA to administer the formulations disclosed in Devane, Huang, or Jain to a patient with mild or moderate hepatic impairment without adjusting the starting dose, as required by the Asserted Claims.

### 5.    Objective Indicia of Nonobviousness

#### a.    Unexpected Results

312.    Based on what was known to a POSA as of the invention date regarding opioid metabolism and the dosing requirements of extended release opioids in hepatically impaired patients, the inventions set forth in the Asserted Claims were surprising and unexpected.

313.    At the time the first provisional application for the Patents-in-Suit was filed, the finding that an extended release, single-entity formulation containing hydrocodone as its only active ingredient could be administered to a hepatically impaired patient without adjusting the starting dose was surprising and unexpected.

314.    The Cephalon Hepatic Impairment Study indicated that the increased exposure (*i.e.*, $AUC_{0-inf}$) seen in hepatically impaired patients with hydrocodone was consistent with the prior art.  The individuals who performed the Cephalon Hepatic Impairment Study, which was complete by January 2012, before the earliest filing date of the Patents-in-Suit, expected that a dose adjustment would be required for hepatically impaired patients.  Cephalon's statements from before the filing of the first provisional application for the Patents-in-Suit confirm that the results found by the inventors were surprising and unexpected.

315.    The inventors confirmed that the results they observed were surprising and unexpected.

316.    Mr. Hartman stated:

> Q: Was it shortly after you analyzed -- withdrawn.  Was it shortly
>     after you analyzed the [final hepatic impairment study] data

-78-

that you came to the conclusion that there was a potential invention here?

A:  It was, yeah.  It was the first time that I looked at the analyzed data that *I realized we were looking at something novel and unexpected.*

317.  Dr. Robinson also testified that the results of the hepatic impairment study were unexpected:

Q.  Prior to the completion of the hepatic impairment study, do you remember anyone at Zogenix communicating an expectation that the product would require a dose adjustment based upon a population having some degree of hepatic impairment?

A.  So prior to completing the hepatic study and obtaining the results that we did, *there was a general expectation, based on literature of other opioids with similar chemical structure that we believed to be metabolized through a similar pathway, most notably OxyContin, that we would have expected from the general metabolic pathway that hydrocodone would have been treated the same way and would have required some special consideration for a hepatically impaired population.*

\*      \*      \*

Q.  Did there come a point in time in this project, Dr. Robinson, where you believed that either you or others had come up with an invention?

A.  I -- there was a point in the project where we felt that we had novel results, yes.

Q.  And what do you mean when you say "novel results"?

A.  So what I mean by that in relationship to hydrocodone HC-CR was that *we undertook a hepatic special population study with HC-CR product and got results that were unexpected from our perspective.*

318.  Dr. Rubino testified that he was surprised by the results of the hepatic impairment study:

-79-

Q. Is there some point in time where you thought you had developed something novel or new as part of the work you did on Zohydro?

A. I -- really, it's the – it's the same kind of answer, I think -- I don't want to speculate on whether or not I thought that this was novel. I don't recall.

Q. You don't remember thinking about it one way or the other?

A. Well, I can say that I was, at the very least, surprised. You know, there was definitely an expectation going in that we would see an effect. So -- but I've been involved in a lot of these studies, so you learn to just design as good of a study as you can and see what the results show.

### b.      Long-Felt Need and Failure of Others

319.    There existed a long-felt need for a method of administering an extended-release opioid product to hepatically impaired patients without reducing the starting dose. That need was fulfilled by the inventions of the Asserted Claims.

320.    As stated in the patent specification:

It is a problem that opioids, including extended release opioids, generally require reduced dosing in patients with hepatic impairment, because the liver is the source of most opioid metabolism. Using the same dosage in hepatically impaired patients as in those without hepatic impairment in general leads to higher $C_{max}$ , higher AUCs, longer $t_{1/2}$, and can result in excessive or persistent sedation, coma or death.

321.    A POSA would have recognized this need based both on the metabolic pathway for hydrocodone, and on the hepatic impairment data available for other extended release opioid products, and the methods of administration of the claimed inventions fulfilled it by requiring no adjustment in starting dose for patients with mild or moderate hepatic impairment.

322.    In contrast, Cephalon in 2012 failed where the inventors succeeded to fulfill the need that existed in the art of needing to adjust the starting dose for extended release opioid products in hepatically impaired patients to give a lower dose than that given to unimpaired

-80-

patients. Vantrela ER requires a label instruction stating that a lower dose must be used in patients with mild or moderate hepatic impairment: "In patients with mild or moderate hepatic impairment, initiate therapy with one half of the recommended initial dose followed by careful dose titration."

### c.      Alleged "Near Simultaneous Invention"

323.    Contrary to Alvogen's contentions, Purdue Pharma's hepatic impairment study does not provide support for the obviousness of the claimed invention.

324.    Purdue began its hepatic impairment study in 2012 and published its results in 2013. On July 31, 2012—months before Purdue concluded its hepatic impairment study on November 20, 2012 or finalized its hepatic impairment study report on May 23, 2013, and over a year before Purdue published the results of its hepatic impairment study in September 2013—the inventors of the Patents-in-Suit filed their first provisional patent application. Purdue did not publish the results of its hepatic impairment study until over a year after the first provisional application for the Patents-in-Suit was filed.

325.    Around the same time that Purdue conducted the hepatic impairment study for its single-entity extended release hydrocodone product, Cephalon conducted the Cephalon Hepatic Impairment Study for Vantrela ER. Teva published (as Bond 2013, cited in the patent specification) the findings of the Cephalon study at the same PAINWeek conference at which Purdue first published its results. In stark contrast to the results seen for Zohydro® ER, the results for the Vantrela ER study showed that "systemic exposure to hydrocodone was ~70% higher in subjects with moderate hepatic impairment vs normal hepatic function[.]" The Vantrela ER label requires a dose adjustment for patients with mild and moderate hepatic impairment, and Vantrela ER cannot be used in patients with severe hepatic impairment. The

results seen with Vantrela ER confirm that the pharmacokinetics of extended release hydrocodone formulations are unpredictable in patients with hepatic impairment.

326.   Extended release opioid products generally require dose adjustment in patients with hepatic impairment. The fact that no adjustment in starting dose was required in one extended release opioid product apart from Zohydro® ER does not change the fact that other extended release opioids, including Vantrela ER, require an adjustment of the starting dose for hepatically impaired patients.

### C.   The Asserted Claims Are Directed To Patent Eligible Subject Matter

327.   The Asserted Claims are directed to patent-eligible subject matter.

#### 1.   The Asserted Claims Are Not Directed to Natural Phenomena or Law of Nature

328.   The Patents-in-Suit do not merely claim the observation of hydrocodone metabolism, nor claim how a patient's body metabolizes a particular formulation. Rather, they claim methods of treating pain in a patient with mild or moderate hepatic impairment by administering an oral dosage unit. The pharmacokinetic profile that results from that administration is dependent upon the properties of the dosage unit and the dose strength administered. The dosage unit contains hydrocodone bitartrate, a non-naturally-occurring, semi-synthetic compound, and is formulated, for example, using immediate release and extended release coating materials and excipients, in order to a provide pain relief over a twelve hour time period.

329.   The pharmacokinetic profile provided by such a dosage unit is not a "law of nature" or "natural phenomenon"—it is the result of both the design of the dosage unit and the recognition, based on clinical testing in hepatically impaired patients, that the dosage unit may be

administered to patients with mild or moderate hepatic impairment without adjusting the starting dose relative to an unimpaired patient.  The inventors of the Patents-in-Suit recognized, based on clinical testing, that unexpectedly, the same starting dose of a specific dosage unit could be administered to patients with mild or moderate hepatic impairment that could be administered to patients without hepatic impairment.

330.    Moreover, Darwish reports that when patients with moderate hepatic impairment were given a single 15 mg dose of a Teva ER hydrocodone formulation, "total systemic exposure to hydrocodone, as assessed by AUC, was also ~70% higher in subjects with moderate hepatic impairment compared with subjects with normal hepatic function."  Darwish also reports that the AUC increase observed in patients taking Zohydro® ER was only 26%, or 2.8 times lower than was seen with the Teva formulation.

331.    These results make clear that not all hydrocodone ER formulations are created equal with respect to hepatically impaired patients.  The observed difference between the two formulations also makes clear that there is no "law of nature" governing hydrocodone ER formulations.

332.    For example, the 70% increase in AUC seen with the Teva ER formulation is also well above the highest threshold allowed by the Asserted Claims, which allow, at most, a formulation that provides an increase of 50% in AUC versus AUC in the non-impaired population, and usually requires a much lower AUC.

333.    Thus, the pharmacokinetic values in the Asserted Claims are determined *by the drug formulation*.  That is, using the methods of the Asserted Claims a physician administers a specific drug formulation, and the formulation—not the patient's metabolism—provides the very specific pharmacokinetic values (i.e., $C_{max}$ and AUC) stated in the claims, such that it is

unnecessary to make any measurement or adjustment at all when dosing a patient with mild or moderate hepatic impairment.

334.  The claimed methods transform the patient's body, resulting in hydrocodone pharmacokinetic profile that differs from the body's natural state and thereby alters a natural condition, *i.e.*, pain.  Therefore, the claims are not directed to a "law of nature" or "natural phenomenon" but instead to a method of treating a particular condition.

### 2.  The Asserted Claims Recite an Inventive Concept

335.  The prior art did not teach administration of a single-entity, extended release hydrocodone product to patients with mild and moderate hepatic impairment without adjusting the starting dose relative to patients without hepatic impairment.  To the contrary, prior art single-entity extended release opioids required dosage adjustments when administered to patients with mild and moderate hepatic impairment.

336.  The claimed step of not adjusting the starting dose in patients with mild and moderate hepatic impairment is an inventive concept.

337.  The Court's findings during claim construction support the conclusion that the claimed step of not adjusting the starting dose in patients with mild and moderate hepatic impairment is an inventive concept:

> [not] adjusting the starting dose relative to a patient without hepatic impairment is, in fact, a manipulative difference over the prior art;
>
> the claim phrase explaining that hepatically and non-hepatically impaired patients get the same starting dose . . . does have an effect on how the administering step is performed . . . because patients with hepatic impairment ingest a different dose than they normally would, given the prior art;
>
> a physician would *not* normally give a hepatically impaired patient the same dose as a patient without a hepatic impairment; and

> [s]ince the method of treating pain in the hepatically impaired patient is different than the prior art's method of treating pain in that same patient, having a patient ingest the same initial dose regardless of their hepatic impairment is not just a mental step.

338. All of the reasons why the asserted claims are non-obvious also show that they contain an inventive step. Thus, Pernix incorporates that discussion (*supra* Section VI(B)) herein.

339. In addition, in 2010, the FDA gave Cephalon the option of submitting literature to support the dosing of an extended release hydrocodone-only oral dosage unit in hepatically impaired patients in lieu of administering that dosage unit to hepatically impaired patients in a clinical study. Cephalon did not submit Devane, Jain, Huang, or any other literature to the FDA. Instead, Cephalon and Teva performed the FDA-required study, which did not lead to the inventions in the Asserted Claims. This reinforces that neither Devane, nor the FDA Guidance, nor any other art diminishes the inventiveness of the concepts in the Asserted Claims.

340. The Asserted Claims do not resemble the claims from the *Mayo* case.

\*          \*          \*

341. The Asserted Claims are not directed to a natural phenomenon and recite an inventive concept.

### D.   The Asserted Claims Do Not Lack Written Description

342. The asserted claims do not lack written description.

343. A POSA reading the Patents-in-Suit would understand that the inventors had actual possession of the claimed invention.

344. The claimed invention is a method of treating pain in patients with mild or moderate hepatic impairment by administering a single-entity extended release hydrocodone oral dosage unit that produces pharmacokinetic values such that the starting dose does not need to be

adjusted in patients with mild or moderate hepatic impairment relative to patients without hepatic impairment.

345.    The Patents-in-Suit disclose exemplary formulations that can be used in the practice of the claimed methods.

346.    Example 1 of the Patents-in-Suit states that:

> Formulations of the invention comprise an active ingredient, a group of inactive ingredients in which the active ingredient is intermixed and a coating of inactive ingredients.  The active ingredient may consist only of hydrocodone bitartrate in an amount of 10, 15, 20, 30, 40, 50, 60, 70 or 80 mg.  The inactive ingredient may be comprised of a sugar, a polymer, and silicon dioxide and talc.  The coating may be comprised of a polymer, silicon dioxide, talc, dyes and coloring agents in a gelatin capsule.

347.    Examples 2 and 3 of the Patents-in-Suit further identify formulations comprising hydrocodone bitartrate and inactive ingredients including sugar spheres NF, hypromellose 2910 USP, ammonio methacrylate copolymer Type B NF (also known as Eudragit® RS), silicon dioxide NF, and talc USP along with a capsule shell containing other inactive ingredients.

348.    Examples 4 and 5 of the Patents-in-Suit further specify weight percent ranges for the active ingredient (5% to 60%), controlled release polymers (0%-30%), and other excipients (25%-95%).

349.    Example 6 of the Patents-in-Suit includes two tables.  Table 1 lists six "immediate release component hydrocodone solutions," numbered (i)-(vi), that may be coated onto sugar spheres to produce immediate release beads.  Each example IR hydrocodone solution listed in Table 1 contains 6% (w/w) of hydrocodone bitartrate, and varying percentages by weight of excipients including HPMC 2910 (also known as hypromellose 2910), polyethylene glycol 6000, povidone K30, fumaric acid, citric acid, silicon dioxide, talc, and purified water.

350. Table 2 discloses seven example "modified release coating solutions," numbered (i)-(vii), which are modified release coatings that may be applied to the IR beads mentioned above to form modified release beads. The example modified release coating solutions disclosed in Table 2 contain rate-controlling polymers including Eudragit RS 100, Eudragit RL 100, Eudragit L 100, and Ethocel (ethylcellulose), and other excipients including triethyl citrate, dibutyl sebacate, silicon dioxide, and talc.

351. In addition to the immediate release component hydrocodone solutions listed in Table 1 and the modified release coating solutions listed in Table 2, Example 6 discusses other aspects for manufacturing the modified release beads, including the use of acetone and isopropyl alcohol as solvents for dissolving the rate-controlling polymer to be applied to the IR beads, and drying of the modified release beads.

352. The Patents-in-Suit also state that the ratio of hydrocodone in the IR component to modified release component is "most preferably" 20:80, although the Patents-in-Suit disclose other ratios as well.

353. Example 7 of the Patents-in-Suit relates to dissolution testing of "the dosage form of the current invention" that was performed in a USP dissolution apparatus at pH 6.8. The patent specification notes that there are four USP dissolution apparatuses, and that "more preferably, dissolution apparatus 2" is used.

354. Example 8 of the Patents-in-Suit relates to an *in vivo* study (*i.e.*, a clinical study) in which a single-entity extended release hydrocodone formulation "prepared as described in example 6 and shown to demonstrate the dissolution profile as described in example 7" were administered to subjects without hepatic impairment, and subjects with mild or moderate hepatic

impairment.  The pharmacokinetic results from that study are tabulated in Figure 1 of the Patents-in-Suit.

355.    Example 8 of the Patents-in-Suit shows that the inventors had possession of the claimed invention.

356.    Example 8 discloses a clinical study where patients with mild or moderate hepatic impairment received a single-entity extended release hydrocodone oral dosage unit, which produced the claimed pharmacokinetic values (summarized in Figures 1-6) and supported a label instruction requiring no adjustment in the starting dose for patients with mild or moderate hepatic impairment relative to patients without hepatic impairment.

357.    The Patents-in-Suit more than adequately disclose a representative number of single-entity extended release hydrocodone formulations that could potentially be used in the practice of the claimed methods.

358.    Tables 1 and 2 of Example 6 disclose six different hydrocodone solutions that can be used to manufacture IR beads and seven different modified release coatings that provide for at least a total of *forty-two* different extended release hydrocodone formulations that could potentially be used in the practice of the claimed methods.  The possible combinations further increase when those 42 different formulations are manufactured with the IR variants for encapsulation in varying percentages by weight.

359.    The Patents-in-Suit expressly disclose various dose amounts of hydrocodone that can be used in the practice of the claimed methods, including at least the nine different amounts to be contained in a capsule in Example 1.

360.    Examples 1 and 6 together disclose at least 378 different single-entity extended release hydrocodone formulations (*i.e.*, the forty-two different extended release hydrocodone

formulations in Example 6 multiplied by the nine different hydrocodone dose amounts in Example 1).

361.    A POSA could visualize, recognize, and make other formulations to use in the practice of the claimed methods based on the disclosure in the Patents-in-Suit of representative formulations along with preferred and most preferred target ranges for the pharmacokinetic profiles that the inventors unexpectedly achieved.  A POSA would know how to do so, for example, by varying the amounts of excipients, hydrocodone, and ratio of IR beads to modified release coated beads, and then testing, in an appropriate pharmacokinetic study, whether the formulation yielded the desired pharmacokinetic profile.

362.    A POSA would understand that the same principles used in making and testing a capsule formulation could also be used to make and test, for example, a tablet formulation.

363.    For example, a POSA would understand that Devane, which is incorporated by reference in its entirety in the Patents-in-Suit, also discloses and claims multilayer tablets and minitablets filled into capsules as further embodiments of the multiparticulate formulations disclosed therein.

364.    Devane states at paragraph 74 that:

> the different individual populations of active ingredient containing particles may be compressed (optionally with additional excipients) into mini-tablets which may be subsequently filled into capsules in the appropriate proportions

and that

> [a]nother suitable dosage form is that of a multilayer tablet.  In such dosage forms, the first component of the multiparticulate modified release composition may be compressed into one layer with the second component being subsequently added as a second layer of the multilayer tablet.

365.    A POSA as of the earliest filing date of the Patents-in-Suit understood how to design and test encapsulated minitablets and multilayer tablets, providing even more options for dosage units falling within the scope of the claims.

366.    A POSA would have understood how to design and test additional single entity dosage form variants such as tablets containing coated beads at this time.

**PERNIX'S PROPOSED CONCLUSIONS OF LAW**

## I. INFRINGEMENT

1. Plaintiffs have the burden of proving infringement by a preponderance of the evidence. *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011).

2. A party who "actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

3. Induced infringement "must be predicated on direct infringement," *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017) (quotations omitted), and "requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1056 (Fed. Cir. 2010) (quotations omitted).

4. In the Hatch-Waxman context, an ANDA product label that encourages, recommends, or promotes direct infringement is sufficient to demonstrate specific intent to induce infringement by the ANDA owner. *See, e.g.*, *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017) ("When proof of intent to encourage depends on the label accompanying the marketing of a drug, '[t]he label must encourage, recommend, or promote infringement.'"); *Eli Lilly*, 845 F.3d at 1368-69; *Braintree Labs., Inc. v. Breckenridge Pharm., Inc.*, 688 F. App'x 905, 908-910 (Fed. Cir. 2017); *AstraZeneca*, 633 F.3d at 1057-1061.

5. An ANDA product label evidences an ANDA owner's specific intent to induce infringement when it "contain[s] directives that will 'inevitably lead some consumers to practice the claimed method'[.]" *Novartis Pharms. Corp. v. Breckenridge Pharm., Inc.*, 248 F. Supp. 3d 578, 585 (D. Del. 2017); *Eli Lilly*, 845 F.3d at 1369 ("evidence that the product labeling that Defendants seek would inevitably lead some [consumers] to infringe establishes the requisite

intent for inducement"); *AstraZeneca*, 633 F.3d at 1060 (finding specific intent where label "would inevitably lead some consumers to practice the claimed method"); *Vanda Pharms. Inc. v. West-Ward Pharms.*, No. 2016-2707, 2018 U.S. App. LEXIS 9360, at \*29-30 (Fed. Cir. April 13, 2018) ("Even if not every practitioner will prescribe an infringing dose, that the target dose range 'instructs users to perform the patented method' is sufficient to 'provide evidence of [defendant's] affirmative intent to induce infringement.'").

6.    When no single actor performs all steps of a method claim, direct infringement occurs if "the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Eli Lilly*, 845 F.3d at 1364 (quotations omitted).  A physician and patient jointly infringe a claimed method if the physician "direct[s] or controls" the patient.  *Id.*  This direction and control occurs when a physician (1) "conditions participation in an activity or receipt of a benefit" upon the patient's performance of one or more steps of a patented method, and (2) "establishes the manner or timing of that performance."  *Id.* at 1365 (quotations omitted).

7.    A defendant can be held liable for induced infringement even if the proposed ANDA product has substantial noninfringing uses.  *Sanofi*, 875 F.3d at 646 ("there is no legal or logical basis" to conclude that because the ANDA product "has substantial noninfringing uses . . . the district court could not permissibly find intent to encourage an infringing use"); *Vanda*, No. 2016-2707, 2018 U.S. App. LEXIS 9360, at \*30-31 ("even if the proposed ANDA product has 'substantial noninfringing uses,' [defendant] may still be held liable for induced infringement").

## II.    OBVIOUSNESS UNDER 35 U.S.C. § 103

8.    Issued patent claims are presumed by statute to be valid.  35 U.S.C. § 282.

9. The presumption that an issued patent claim is valid can be overturned only with clear and convincing evidence of invalidity. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2240-41 (2011).

10. "[A]lthough the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the [PTO]." *Creative Compounds*, 651 F.3d at 1314.

11. The ultimate determination of obviousness is a question of law based on underlying factual findings, including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). In other words, the party challenging the validity of a patent on obviousness grounds must prove by clear and convincing evidence the scope and content of the prior art, the level of ordinary skill in the pertinent art, and the differences between the claimed invention and the prior art. *See In re Cyclobenzaprine*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012).

12. Obviousness is determined from the perspective of the POSA at the time of the invention. 35 U.S.C. § 103(a).

13. A patent claim is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art in the art to which

said subject matter pertains."  35 U.S.C. § 103(a); *see also In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986) (to determine obviousness, prior art must be considered as a whole).

14.  "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so."  *In re Cyclobenzaprine,* 676 F.3d at 1068-69 (internal quotations and citations omitted).

15.  The party challenging the patent bears the burden of persuasion with respect to the issue of obviousness and must present evidence sufficient to establish a rational reason to select and combine teachings of the prior art to produce the claimed invention with a reasonable expectation of success.  *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

16.  A finding of obviousness cannot be based upon hindsight selection of elements of the claimed invention from among the disclosures of the prior art.  *Otsuka Pharm. Co. v. Sandoz, Inc.,* 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight."); *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) (It is impermissible to use "hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention."); *In re Hedges*, 783 F.2d at 1041 ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art." (internal citations omitted)).

17.     Reasoning that simply retraces the path of the inventor with hindsight, and discounts the number and complexity of available alternatives, is always inappropriate. *See Ortho-McNeil Pharm. Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008); *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." (Internal citations omitted)).

18.     "[A] patent composed of several elements is not proved obvious merely be demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 401; *see also Unigene Labs., Inc. v. Apotex Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) ("Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination.").

19.     It is important that the record supply a reason, available within the knowledge of a POSA, to take particular steps or make particular modifications to achieve the claimed invention. *See KSR*, 550 U.S. at 418 ("it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"); *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1336-37 (Fed. Cir. 2010) (methods of using compound known to have low bioavailability were not obvious where there was "no evidence from before the time of the invention that would teach, suggest, or motivate or supply any common sense reason for a person of ordinary skill in the art to reject the bioavailability concerns and routinely, simply, or easily arrive at the inventive result").

20.    Merely stating that there is a "general motivation" to develop an invention is insufficient proof of a motivation to combine particular references.  *See Innogenetics*, 512 F.3d at 1373 ("[K]nowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the particular claimed [invention].");  *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008); *Corning Inc. v. SRU Biosystems*, 400 F. Supp. 2d 653, 670-71 (D. Del. 2005) (criticizing expert's analysis where expert relied only on references selected by counsel, used the claims of the patent-in-suit to select and focus on particular disclosures of those references, and referred only to "general motivations" to combine references).

21.    Consideration of whether the prior art contains a teaching, suggestion, or motivation to make the claimed invention can guarantee against hindsight analysis.  *See Ortho-McNeil*, 520 F.3d at 1364-65 (explaining that *KSR* approved the "teaching, suggestion, or motivation" test for guarding against hindsight).

22.    The Court must look to the hypothetical POSA to determine whether such a person would have had a reasonable expectation of success in achieving the claimed invention. *See Eli Lilly*, 619 F.3d at 1340 (rejecting argument that inventors' pursuit of reloxifene as a treatment indicates that a POSA would have a reasonable expectation of success; "the record will not allow this court to conflate Lilly scientists with those of ordinary skill in the art"); *Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1363 (Fed. Cir. 2009) (rejecting argument that inventor's expectation that cells would produce desired protein supported obviousness case).

23.    An invention claimed in a patent is not obvious unless a person of ordinary skill in the art could reasonably have predicted that the invention would succeed in solving the problem.  *In re Cyclobenzaprine*, 676 F.3d at 1070-73; *Abbott Labs.*, 544 F.3d at 1351-52.

24. Objective indicia, such as long felt-but unmet need and failure of others, can serve as probative evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

25. Objective indicia evidence is not meant to shift the burden of persuasion from the party challenging the patent to the patentee, but rather it gives the patentee an opportunity to produce evidence of secondary considerations that can be used in the Court's analysis on the issue of obviousness. *See In re Cyclobenzaprine*, 676 F.3d at 1075-76.

## III. ANTICIPATION UNDER 35 U.S.C. § 102

26. Defendant bears the burden of proving invalidity, on a limitation-by-limitation basis, by clear and convincing evidence. *Microsoft Corp.*, 564 U.S. at 95.

27. Anticipation requires that a single reference disclose every limitation of the claimed invention, expressly or inherently. *Rapoport v. Dement*, 254 F.3d 1053, 1057 (Fed. Cir. 2001).

28. "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002); *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991) ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient."), abrogated in part on other grounds by *Pfaff v. Wells Elecs.*, 525 U.S. 55 (1998); *Mehl/Bio. Int'l Corp. v. Milgraum M.D.*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("Occasional results are not inherent."); *Glaxo, Inc. v. Novopharm Ltd.*, 830 F. Supp. 871, 874 (E.D.N.C. 1993), *aff'd*, 52 F.3d 1043 (Fed. Cir. 1995) (no inherency where a person following the prior art "sometimes obtains the result set forth in the claim, it must invariably happen."); *Eli Lilly & Co. v. Teva Pharms., USA, Inc.*, 2004 U.S. Dist. LEXIS 14724, at *79-*87 (S.D. Ind. July 29, 2004), *aff'd*, 2005 U.S. App. LEXIS 14583 (Fed. Cir. July 13,

2005) (finding 99.99% "probability" that prior clinical trials embodied all of claim limitations insufficient to prove inherency).

29.    "An anticipating reference [also] must enable that which it is asserted to anticipate." *Abbott Labs.*, 544 F.3d at 1345.  "Thus, it is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Net MoneyIn, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).

## IV.    PATENT ELIGIBLE SUBJECT MATTER UNDER 35 U.S.C. § 101

30.    Section 101 provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," excepting only laws of nature, natural phenomena, and abstract ideas from those broad categories of patent-eligible subject matter. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014), quoting *Ass'n for Molecular Pathol. v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013).

31.    To prevail on a defense under § 101, a party must prove by clear and convincing evidence that: (1) the claims of the patents-in-suit are directed to a law of nature or a natural phenomenon, and, if so, (2) the additional elements of the claims lack an "inventive concept" that "transform[s] the nature of the claim into a patent-eligible application." *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012); *Alice*, 134 S. Ct. at 2355; *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013) ("[A]ny attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear

and convincing evidence."), *cert. granted, judgment vacated sub nom.*, *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014).

32. The Supreme Court has cautioned that courts must "tread carefully in construing [the subject matter eligibility] exclusionary principle lest it swallow all of patent law" because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice,* 134 S. Ct. at 2354, quoting *Mayo,* 132 S. Ct. at 1293-94.

33. Thus, "a process is not unpatentable simply because it contains a law of nature," and "an application of a law of nature . . . to a known structure or process may well be deserving of patent protection." *Mayo,* 132 S. Ct. at 1293-94 (citation omitted).

34. "The 'directed to' inquiry [*i.e., Alice* step one], therefore, cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* a law of nature and/or natural phenomenon." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis original).

35. Rather, the Court should consider "whether the claims . . . focus on a specific means or method . . . or are instead directed to a result or effect that itself is the [ineligible concept] and merely invoke generic processes . . . ." *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). *Alice* step two requires analysis of the claims as a whole, considering their "elements both individually and as an ordered combination," to determine whether they "recite well-understood, routine, conventional activity already engaged in by the scientific community." *Rapid Lit. Mgt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016) (citation omitted).

36.     "[T]he natural ability of the subject matter to *undergo* the process does not make the claim 'directed to' that natural ability.  Otherwise, claims directed to actually 'treating cancer with chemotherapy' or 'treating headaches with aspirin' would be patent ineligible."  *Vanda*, Nos. 2016-2707, 2018 U.S. App. LEXIS 9360, at \*38-\*39 (quoting *CellzDirect*, 827 F.3d at 1049; emphasis in original).

37.     A method of treatment claim that teaches "a new way of using an existing drug that is safer for patients" is not directed to a law of nature.  *Vanda*, Nos. 2016-2707, 2018 U.S. App. LEXIS 9360, at \*35-\*40.

## V.     WRITTEN DESCRIPTION UNDER 35 U.S.C. § 112

38.     The written description requirement of 35 U.S.C. § 112 can be satisfied by an 1) express, 2) implicit or 3) inherent disclosure.  MPEP § 2163 II.A.3.(b) ("To comply with the written description requirement of 35 U.S.C. 112, para. 1, or to be entitled to an earlier priority date or filing date under 35 U.S.C. §§ 119, 120, or 365(c), each claim limitation must be expressly, implicitly, or inherently supported in the originally filed disclosure.").

39.     An application implicitly satisfies the written description requirement if a POSA would find it "reasonably clear what the invention is and that the patent specification conveys that meaning."  *All Dental Prodx, LLC v. Advantage Dentals Prods, Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002).

40.     In other words, the test for sufficiency is whether "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the invention as of the filing date."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

41.    The test for reasonably conveying an invention is a flexible one, "requir[ing] an objective inquiry into the four corners of the specification from the perspective of a [POSA]." *Id.*

42.    A failure to "specifically mention a limitation that later appears in the claims is not a fatal one when one skilled in the art would recognize upon reading the specification that the new language reflects what the specification shows has been invented." *All Dental Prodx.*, 309 F.3d at 779.

43.    That is, the "reasonably conveys" standard does not require the prior disclosure and later claim to match exactly. *Ariad Pharm.*, 598 F.3d at 1352 ("the [written] description requirement does not demand any particular form of disclosure or that the specification recite the claimed invention in haec verba").

44.    The reasonably conveys standard only requires that a POSA would discern the invention from the prior application. *See Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1575-76 (Fed. Cir. 1985) (a parent disclosure preferring a lower operating range, yet indicating no upper limit, combined with the industry standards at the time, was sufficient for a POSA to discern that higher ranges could be used); *see also Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1566 (Fed. Cir. 1991) (*citing Ralston Purina Co.*, 772 F.2d at 1575 ("[the claimed ranges] need not correspond exactly to those disclosed in parent application; issue is whether one skilled in the art could derive the claimed ranges from the parent's disclosure")).

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PERNIX IRELAND PAIN DAC and PERNIX THERAPEUTICS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 1:16-cv-00139 (WCB) |
| v. | ) ) ) | **HIGHLY CONFIDENTIAL INFORMATION – FILED UNDER SEAL** |
| ALVOGEN MALTA OPERATIONS LTD., | ) ) | |
| Defendant. | ) ) ) ) | |

**EXHIBIT 14
ALVOGEN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2

## TABLE OF CONTENTS

I.    Background ...............................................................................................................1

    A.    The Parties .......................................................................................................1

    B.    The Hatch-Waxman Act....................................................................................1

    C.    Zohydro® ER ....................................................................................................3

    D.    Alvogen's Proposed ANDA Product .................................................................4

    E.    Technological Background of the Patents-In-Suit.................................................4

II.    The Present Litigation..............................................................................................8

    A.    Procedural Background......................................................................................8

    B.    The Patents-in-Suit...........................................................................................8

    C.    The Asserted Claims .........................................................................................9

    D.    Development of the Claimed Subject Matter .......................................................13

    E.    The Prosecution History of the '760 And '499 Patents .......................................14

    F.    Claim Construction ..........................................................................................16

III.    Invalidity................................................................................................................16

    A.    Prior Art to the '760 and '499 Patents ..............................................................16

        1.    U.S. Patent Application Publication No. 2006/0240105 (filed March 10, 2006; published October 26, 2006) ("Devane").....................16

        2.    U.S. Patent No. 8,808,740 (filed December 21, 2011; issued August 19, 2014) ("Huang")...................................................................18

        3.    U.S. Patent Application Publication No. 2010/0010030 (filed February 4, 2009; published January 14, 2010) ("Jain").........................21

        4.    Baumann et al., *Analgesic Safety and Efficacy of Controlled Release Hydrocodone*, 76 J. PHARM. SCIS. S107 (Nov. 1987) ("Baumann") ..........................................................................................22

        5.    Johnson, *Opioid Safety in Patients With Renal or Hepatic Dysfunction*, PAIN TREATMENT TOPICS (2007) ("Johnson")....................22

6.      Howard B. Smith, *Opioid Metabolism*, 84 MAYO CLIN. PROC. 613-24 (2009) ("Smith") ...................................................................24

7.      Department of Veterans Affairs, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (2010) ("VA Guideline") ....................................................24

8.      U.S. Food & Drug Administration, Guidance for Industry – Pharmacokinetics in Patients with Impaired Hepatic Function: Study Design, Data Analysis, and Impact on Dosing and Labeling (2003) ("FDA Guidance") .......................................................27

9.      FDA Drug Safety Communication: Prescription Acetaminophen Products to Be Limited to 325 mg Per Dosage Unit; Boxed Warning Will Highlight Potential for Severe Liver Failure (January 2011) ("FDA Acetaminophen Communication") ....................................28

10.     Vicoprofen® Label (2006) .........................................................28

11.     Lortab® Label (May 2011).........................................................29

12.     Vicodin® Label (September 2011) ..............................................29

13.     Nucynta® ER Label (August 2011).............................................29

14.     Exalgo™ ER Label (2010) .........................................................30

15.     U.S. Patent No. 6,733,783 (filed October 30, 2001, issued May 11, 2004) ("Oshlack") ....................................................................30

16.     Nat'l Inst. Health, *Prescription Drug Abuse*, NIH Publ. No. 11-4881 (Oct. 2011) ("NIH Publication") ....................................30

17.     David E. Joranson et al., *Trends in Medical Use and Abuse of Opioid Analgesics*, 283 JAMA 1710 (2000) ("Joranson") ......................30

18.     Anne M. Larson et al., *Acetaminophen Hepatoxicity*, 11 Clinics in Liver Disease 525 (2007) ("Larson") .........................................31

19.     Avinza® ER Label (May 2011) ...................................................31

20.     Kadian® Label (May 2011) ........................................................31

21.     Opana® ER Label (September 2010)............................................32

22.     TussiCaps® Label (July 2010).....................................................32

B.      Patent-Ineligible Subject Matter ........................................................32

1.    Legal Standards ..................................................................32

2.    No Court Has Held Method of Treatment Claims *Per Se* Patent-Eligible. ..............................................................................34

3.    The Asserted Claims Are Directed to a Natural Law ..............................36

4.    The Asserted Claims Lack Any "Inventive Concept" ..............................39

        a.    The Non-Adjustment Limitation Is Conventional .......................41

        b.    The PK Limitations Are Conventional .......................................42

5.    The Asserted Claims Are Preemptive .....................................................43

C.    Anticipation ......................................................................................................43

1.    Legal Standards ......................................................................................43

2.    The Asserted Claims are Anticipated by Devane ....................................48

        a.    Claims 1 and 12 of the '760 Patent ..............................................48

        b.    Claims 2-4, 11, 17 and 19 of the '760 Patent ..............................54

        c.    Claim 1 of the '499 Patent ...........................................................54

        d.    Devane Enables Practice of the Claimed Subject Matter ..............55

3.    The Asserted Claims are Anticipated by Huang .....................................55

        a.    Claim 1 of the '760 Patent ...........................................................55

        b.    Claims 2-4, 11, 17 and 19 of the '760 Patent ..............................60

        c.    Claim 1 of the '499 Patent ...........................................................60

        d.    Huang Enables Practice of the Claimed Subject Matter ...............61

D.    Obviousness ......................................................................................................62

1.    Legal Standards ......................................................................................62

2.    The Asserted Claims Would Have Been Obvious Over Devane in View of One or More of Jain, the Vicodin® Label, the Lortab® Label, or the VA Guideline ......................................................................65

        a.    Claims 1 and 12 of the '760 Patent ..............................................65

b.     Claims 2-4, 11, 17 and 19 of the '760 Patent ..............................70

c.     Claim 1 of the '499 Patent................................................71

d.     Reasonable Expectation of Success............................................72

3.     Claims 1-4 and 12 of the '760 Patent and Claim 1 of the '499 Patent Would Have Been Obvious Over Jain in View of the FDA Acetaminophen Communication.............................................................75

a.     Claims 1 and 12 of the '760 Patent.............................................75

b.     Claims 2-4 of the '760 Patent.....................................81

c.     Claim 1 of the '499 Patent..........................................81

d.     Reasonable Expectation of Success............................................82

E.     Objective Indicia of Nonobviousness ................................................83

1.     Legal Standards ....................................................................83

2.     Unexpected Results Do Not Support Nonobviousness ...........................85

3.     Long-Felt, But Unmet Need and Failure of Others Do Not Support Nonobviousness ..................................................................88

4.     Near-Simultaneous Invention Weighs In Favor of Obviousness..............90

F.     Lack of Written Description...............................................................91

1.     Legal Standards ....................................................................91

2.     The Asserted Claims Lack Written Description Support ........................92

IV.     Noninfringement .................................................................................94

A.     No Direct Infringement ....................................................................96

B.     No Induced Infringement ..................................................................96

1.     Alvogen Will Not Induce Infringement of Claims 1-4 and 11 of the '760 Patent Because There Will Not Be Direct Infringement of These Claims..........................................................................97

a.     Claims 1-4 and 11 of the '760 Patent Contain Two Claim Steps Performed By Different Actors.........................................97

b.    Physicians Do Not "Condition" Continued Treatment on Patients' Performance of the "Administering" Step. ....................99

2.    No Intent to Induce Infringement...........................................................102

a.    Legal Standards ........................................................................102

b.    Alvogen's Draft Label Does Not Intentionally Induce  the Treatment of Patients with Mild or Moderate HI ......................104

c.    Alvogen's Draft Label Does Not Intentionally Induce Administration of a Non-Adjusted Starting Dose ......................107

V.    No Exceptional Case .....................................................................................108

VI.    Alvogen Is Entitled to Relief ........................................................................109

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abbvie Deutschland GmbH & Co. KG v. Janssen Biotech Inc.,
759 F.3d 1285 (Fed. Cir. 2014).......................................................................................92

Abraxis Bioscience, Inc. v. Navinta, LLC,
No. 07-1261, 2009 WL 5174454 (D.N.J. Dec. 18, 2009) ...............................................109

Acorda Therapeutics Inc. v. Apotex Inc.,
No. 07-4937, 2011 WL 4074116 (D.N.J. Sept. 6, 2011), aff'd, 476 F. App'x
746 (Fed. Cir. 2012) ................................................................................. 103, 105, 106

Alice Corp. Pty. v. CLS Bank Int'l,
134 S. Ct. 2347 (2014) ................................................................................. 32, 33, 39

Allergan, Inc. v. Sandoz Inc.,
726 F.3d 1286 (Fed. Cir. 2013)........................................................................................64

Ariad Pharm., Inc. v. Eli Lilly & Co.,
598 F.3d 1336 (Fed. Cir. 2010)..................................................................................passim

Ariosa Diagnostics, Inc. v. Sequenom, Inc.,
788 F.3d 1371 (Fed. Cir. 2015).......................................................... 33, 34, 38, 43

AstraZeneca AB v. Aurobindo Pharma Ltd.,
232 F. Supp. 3d 636 (D. Del. 2017) ...............................................................................109

AstraZeneca LP v. Apotex, Inc.,
633 F.3d 1042 (Fed. Cir. 2010)......................................................................................106

Atlas Powder Co. v. IRECO Inc.,
190 F.3d 1342 (Fed. Cir. 1999)..................................................................................passim

Aventis Pharma S.A. v. Hospira, Inc.,
743 F. Supp. 2d 305 (D. Del. 2010), aff'd, 675 F.3d 1324 (Fed. Cir. 2012).........................62

Aventis Pharms, Inc. v. Barr Labs., Inc.,
411 F. Supp. 2d 490 (D.N.J. 2006), aff'd, 208 Fed. Appx. 842-43 (Fed. Cir.
2006)........................................................................................ 47, 48, 49, 58

B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,
72 F.3d 1577 (Fed. Cir. 1996).........................................................................................89

Bai v. L & L Wings, Inc.,
160 F.3d 1350 (Fed. Cir. 1998).......................................................................................95

Bayer AG v. Elan Pharm. Research Corp.,
212 F.3d 1241 (Fed. Cir. 2000)..................................................................................96

Becton Dickinson & Co. v. C.R. Bard, Inc.,
922 F.2d 792 (Fed. Cir. 1990)..............................................................................95, 96

Bilski v. Kappos,
561 U.S. 593 (2010) ..................................................................................................32

Boehringer Ingelheim Pharms., Inc. v. HEC Pharm Co., Ltd.,
C.A. No. 15-5982, 2016 WL 7177704 (D.N.J. Dec. 8, 2016)................................... 35, 38, 39

Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.,
246 F.3d 1368 (Fed. Cir. 2001)...........................................................................*passim*

Checkpoint Sys., Inc. v. All-Tag Security S.A.,
858 F.3d 1371 (Fed. Cir. 2017)................................................................................108

In re Clarke,
356 F.2d 987 (CCPA 1966) ................................................................................. 19, 20

Cognex Corp. v. Int'l Trade Comm'n,
550 Fed. App'x 876 (Fed. Cir. 2013) ...........................................................................96

In re Cruciferous Sprout Litig.,
301 F.3d 1343 (Fed. Cir. 2002)............................................................................ 47, 50, 58

Cubist Pharm., Inc. v. Hospira, Inc.,
805 F.3d 1112 (Fed. Cir. 2015)..................................................................................88

Cybor Corp. v. FAS Techs., Inc.,
138 F.3d 1448 (Fed. Cir. 1998) (en banc) .....................................................................95

In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,
676 F.3d 1063 (Fed. Cir. 2012)..................................................................................63

In re De Blauwe,
736 F.2d 699 (Fed. Cir. 1984)............................................................................ 84, 85, 86

Desenberg v. Google, Inc.,
392 F. App'x 868 (Fed. Cir. 2010)..............................................................................99

Desper Prods., Inc. v. QSound Labs., Inc.,
157 F.3d 1325 (Fed. Cir. 1998)..................................................................................95

In re Donohue,
766 F.2d 531 (Fed. Cir. 1985)...................................................................................45

e2Interactive, Inc. v. Blackhawk Network, Inc.,
    No. 09- 629, 2012 WL 13000393 (W.D. Wis. Jan. 17, 2012)................................ 99, 100, 101

Ecolochem, Inc. v. S. Cal. Edison Co.,
    227 F.3d 1361 (Fed. Cir. 2000).......................................................................................88

Elec. Power Grp., LLC v. Alstom S.A.,
    830 F.3d 1350 (Fed. Cir. 2016).......................................................................................33

Electro Sci. Indus., Inc. v. Gen. Scanning Inc.,
    247 F.3d 1341 (Fed. Cir. 2001).......................................................................................89

Eli Lilly & Co. v. Teva Parenteral Meds., Inc.,
    845 F.3d 1357 (Fed. Cir. 2017)...............................................................101, 102, 105, 106

Endo Pharm. Inc. v. Actavis Inc.,
    No. 14-1381, 2015 WL 5580488 (D. Del. Sept. 23, 2015) ................................ 34, 35, 37, 38

Endo Pharm. Inc. v. Actavis Inc.,
    No. 14-1381, 2015 WL 7253674 (D. Del. Nov. 17, 2015).............................................*passim*

Enfish, LLC v. Microsoft Corp.,
    822 F.3d 1327 (Fed. Cir. 2016)...................................................................................33, 38

Ericsson, Inc. v. D-Link Sys., Inc.,
    773 F.3d 1201 (Fed. Cir. 2014).......................................................................................44

Ferring B.V. v. Watson Labs., Inc.,
    764 F.3d 1401 (Fed. Cir. 2014).......................................................................................94

In re Freeman,
    474 F.2d 1318 (C.C.P.A. 1973) ......................................................................................86

Galderma Labs., L.P. v. Tolmar, Inc.,
    737 F.3d 731 (Fed. Cir. 2013)....................................................................................85, 88

Genetic Techs. Ltd. v. Merial L.L.C.,
    818 F.3d 1369 (Fed. Cir. 2016).............................................................................. 33, 34, 38

Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l,
    618 F.3d 1294 (Fed. Cir. 2010)...................................................................................89, 90

GlaxoSmithKline LLC v. Glenmark Pharms., Inc.,
    No. 14-....................................................................................................................106

In re Gleave,
    560 F.3d 1331 (Fed. Cir. 2009).......................................................................................45

In re GPAC Inc.,
    57 F.3d 1573 (Fed. Cir. 1995)......................................................................................62

In re GPAC,
    57 F .3d 1573, 1580 (Fed. Cir. 1995).........................................................................65, 67

Graham v. John Deere Co.,
    383 U.S. 1 (1966)......................................................................................................62, 64

In re Grasselli,
    713 F.2d 731 (Fed. Cir. 1983).......................................................................................85

In re Graves,
    69 F.3d 1147 (Fed. Cir. 1995).......................................................................................45

Hewlett-Packard Co. v. Mustek Sys., Inc.,
    340 F.3d 1314 (Fed. Cir. 2003).....................................................................................44

In re Huang,
    100 F.3d 135 (Fed. Cir. 1996)..................................................................................84, 85

Impax Labs., Inc. v. Aventis Pharms., Inc.,
    468 F.3d 1366 (Fed. Cir. 2006)..........................................................45, 47, 48, 50

Intellectual Ventures I LLC v. Capital One Bank (USA),
    792 F.3d 1363 (Fed. Cir. 2015).....................................................................................32

In re Kahn,
    441 F.3d 977 (Fed. Cir. 2006).......................................................................................88

Kao Corp. v. Unilever U. S., Inc.,
    441 F.3d 963 (Fed. Cir. 2006).......................................................................................85

In re Kao,
    639 F.3d 1057 (Fed.Cir.2011)..................................................................................85, 87

King Pharms., Inc. v. Eon Labs, Inc.,
    616 F.3d 1267 (Fed. Cir. 2010).....................................................................................43

KSR Int'l Co. v. Teleflex Inc.,
    550 U.S. 398 (2007)......................................................................63, 64, 74, 78

Leapfrog Enters., Inc. v. Fisher-Price, Inc.,
    485 F.3d 1157 (Fed. Cir. 2007).................................................................................64, 84

Liebel- Flarsheim Co. v. Medrad, Inc.,
    481 F.3d 1371 (Fed. Cir. 2007).....................................................................................44

Limelight Networks, Inc. v. Akamai Techs., Inc.,
  134 S. Ct. 2111 (2014) ..................................................................................97

Markman v. Westview Instruments, Inc.,
  52 F.3d 967 (Fed. Cir. 1995) .........................................................................95

Mayo Collaborative Servs. v. Prometheus Labs., Inc.,
  566 U.S. 62 (2012) .................................................................................*passim*

MeadWestVaco Corp. v. Rexam Beauty &Closures, Inc.,
  731 F.3d 1258 (Fed. Cir. 2013)......................................................................85

MEHL/Biophile Int'l Corp. v. Milgraum,
  192 F.3d 1362 (Fed. Cir. 1999).......................................................................46

Merck & Cie v. Gnosis S.P.A.,
  808 F.3d 829 (Fed. Cir. 2015)............................................................ 65, 67, 85, 87

In re Merck & Co.,
  800 F.2d 1091 (Fed. Cir. 1986).......................................................................86

Microstrategy Inc. v. Bus. Objects S.A.,
  429 F.3d 1344 (Fed. Cir. 2005).......................................................................96

Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.,
  976 F.2d 1559 (Fed. Cir. 1992).......................................................................88

Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.,
  878 F.3d 1336 (Fed. Cir. 2018).......................................................................47

Muniauction, Inc. v. Thomson Corp.,
  532 F.3d 1318 (Fed. Cir. 2008)..................................................................84, 97

N. Am. Vaccine, Inc. v. Am. Cyanamid Co.,
  7 F.3d 1571 (Fed. Cir. 1993) .........................................................................95

Newell Cos. v. Kenney Mfg. Co.,
  864 F.2d 757 (Fed. Cir. 1988).........................................................................84

NIH, Prescription Drug Abuse,
  NIH Pub. No. 11-4881 (Oct. 2011)...............................................................6, 30

Novartis Pharm. Corp. v. Breckenridge Pharm., Inc.,
  248 F. Supp. 3d 578 (D. Del. 2017) ........................................................ 106, 108

Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.,
  719 F.3d 1346 (Fed. Cir. 2013)................................................................83, 86

x

In re NTP, Inc.,
    654 F.3d 1279 (Fed. Cir. 2011)............................................................................................45

In re O'Farrell,
    853 F.2d. 894 (Fed. Cir. 1988)............................................................................................64

Octane Fitness, LLC v. ICON Health & Fitness, Inc.,
    134 S. Ct. 1749 (2014) ......................................................................................................108

Oil Co. of Cal. v. Atl. Richfield Co.,
    208 F.3d 989 (Fed. Cir. 2000).............................................................................................43

on Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.,
    282 F. Supp. 3d 793 (D. Del. 2017) ....................................................................................99

Ormco Corp. v. Align Tech., Inc.,
    463 F.3d 1299 (Fed. Cir. 2006)...........................................................................................84

Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.,
    No. 07-1000 (MLC), 2015 WL 5921035 (D.N.J. Oct. 9, 2015).......................................109

Par Pharm., Inc. v. TWI Pharm., Inc.,
    773 F.3d 1186 (Fed. Cir. 2014).....................................................................................63, 64

Parker v. Flook,
    437 U.S. 584 (1978) ............................................................................................................34

In re Paulsen,
    30 F.3d 1475 (Fed. Cir. 1994).............................................................................................46

Perfect Web Techs., Inc. v. InfoUSA, Inc.,
    587 F.3d 1324 (Fed. Cir. 2009)...........................................................................................86

Perricone v. Medicis Pharm. Corp.,
    423 F.3d 1368 (Fed. Cir. 2005)............................................................................... 47, 51, 58

Pfizer, Inc. v. Apotex, Inc.,
    480 F.3d 1348 (Fed. Cir. 2007)............................................................................... 62, 63, 87

Phillips Petroleum Co. v. Huntsman Polymers Corp.,
    157 F.3d 866 (Fed. Cir. 1998).............................................................................................95

Purdue Pharma Prod. L.P. v. Par Pharm., Inc.,
    642 F. Supp. 2d 329 (D. Del. 2009), aff'd, 377 F. App'x 978 (Fed. Cir. 2010)....................62

Rapid Litg. Mgmt. Ltd. v. CellzDirect, Inc.,
    827 F.3d 1042 (Fed. Cir. 2016)...........................................................................................36

Rasmusson v. SmithKline Beecham Corp.,
    413 F.3d 1318 (Fed. Cir. 2005).................................................................45

Recro Gainesville LLC v. Alvogen Malta Operations Ltd.,
    No. 14-cv-01364 (GMS).....................................................................3

In re Samour,
    571 F.2d 559 (C.C.P.A. 1978) .............................................................46

Sanofi v. Glenmark Pharm. Inc.,
    USA, 204 F. Supp. 3d 665 (D. Del. 2016) .......................................... 106

Santarus, Inc. v. Par Pharm., Inc.,
    694 F.3d 1344 (Fed. Cir. 2012)................................................ 64, 72, 76, 77

Schering Corp. v. Geneva Pharm., Inc.,
    339 F.3d 1373 (Fed. Cir. 2003)................................................ 43, 45, 46

Sciele Pharma Inc. v. Lupin Ltd.,
    684 F.3d 1253 (Fed. Cir. 2012).................................................................62

Shire LLC v. Amneal Pharm., LLC,
    No. 11-3781, 2014 WL 2861430 (D.N.J. June 23, 2014)
    ................................................................................103, 104, 105, 106

Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,
    637 F.3d 1269 (Fed. Cir. 2011)................................................................94

Singh v. Brake,
    317 F.3d 1334 (Fed. Cir. 2003).................................................................21

SmithKline Beecham Corp. v. Apotex Corp.,
    403 F.3d 1331 (Fed. Cir. 2005)..........................................................*passim*

Soft Gel Techs., Inc. v. Jarrow Formulas, Inc.,
    864 F. 3d 1334 (Fed. Cir. 2017)................................................................63

In re Spada,
    911 F.2d 705 (Fed. Cir. 1990)................................................ 47, 51, 52, 53

Spectrum Int'l, Inc. v. Sterilite Corp.,
    164 F.3d 1372 (Fed. Cir. 1998)................................................................95

Teleflex, Inc. v. Ficosa NA Corp.,
    299 F.3d 1313 (Fed. Cir. 2002)........................................................... 94, 95

Terlep v. Brinkmann Corp.,
    418 F.3d 1379 (Fed. Cir. 2005)................................................................95

Teva Pharm. USA, Inc. v. Sandoz, Inc.,
    135 S. Ct. 831 (2015) ......................................................................................95

Therasense Inc. v. Becton, Dickinson & Co.,
    593 F.3d 1325 (Fed. Cir. 2010)................................................................84, 85

Titanium Metals Corp. of Am. v. Banner,
    778 F.2d 775 (Fed. Cir. 1985).......................................................................46

Trustees of Columbia Univ. in City of New York v. Illumina, Inc.,
    620 F. App'x 916 (Fed. Cir. 2015)................................................................85

Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.,
    412 F.3d 1319 (Fed. Cir. 2005)....................................................................44

Vanda Pharms. Inc. v. Roxane Labs., Inc.,
    203 F. Supp. 3d 412 (D. Del. 2016) .............................................................35

Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.,
    No. 16-2707, 2708, 2018 WL 1770273 (Fed. Cir. Apr. 13, 2018) .................35, 36

VFormation, Inc. v. Benetton Grp. SpA,
    401 F.3d 1307 (Fed. Cir. 2005).....................................................................96

Vita-Mix Corp. v. Basics Holding, Inc.,
    581 F.3d 1317 (Fed. Cir. 2009)...................................................... 102, 103, 104

Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,
    520 U.S. 17 (1997) .......................................................................................95

Warner-Lambert Co. v. Apotex Corp.,
    316 F.3d 1348 (Fed. Cir. 2003)......................................................... 96, 103, 104

Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC,
    683 F.3d 1356 (Fed. Cir. 2012)................................................................64, 87

In re Wright,
    569 F.2d 1124 (C.C.P.A. 1977) ................................................................85, 88

Wyers v. Master Lock Co.,
    616 F.3d 1231 (Fed Cir. 2010)......................................................................84

**Statutes**

21 U.S.C. § 355.............................................................................................2

21 U.S.C. §§ 355(b)(1), (c)(2) ........................................................................2

21 U.S.C. § 355(j)(2)(A)(vii)...........................................................................2

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ...........................................................................................3, 4

21 U.S.C. § 355(j)(2)(B) ...........................................................................................................3

21 U.S.C. § 355(j)(4)(F) ...........................................................................................................2

21 U.S.C. § 355(j)(5)(B)(iii) ....................................................................................................3

21 U.S.C. § 355(j)(7)(A)(iii) ....................................................................................................2

35 U.S.C. § 101 ...................................................................................................................32, 34

35 U.S.C. §§ 101, 102, 103, 112 ...........................................................................................8, 109

35 U.S.C. § 102(a) .......................................................................................................29, 30, 43

35 U.S.C. § 102(b) .............................................................................................................passim

35 U.S.C. § 102(e) ........................................................................................................... 18, 44

35 U.S.C. § 103(a) ...................................................................................................................62

35 U.S.C. § 112 ................................................................................................................45, 91

35 U.S.C. § 112, ¶ 4 (2006) ...................................................................................................96

35 U.S.C. § 271(a) ...................................................................................................................94

35 U.S.C.§ 271(e)(2)(A) ...........................................................................................................94

35 U.S.C. § 271(e)(4) ..............................................................................................................109

35 U.S.C. § 285 ..................................................................................................... 108, 109, 110

Asserted Claims Are Directed to a Natural Law ......................................................................36

Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No.
    98-417, 98 Stat. 1585 (1984) ...........................................................................................1, 2

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ..................................................1

Federal Food, Drug, and Cosmetic Act section 505(j) ............................................................94

Florida Statute § 456.44 ........................................................................................................101

Hatch-Waxman Act ........................................................................................... 1, 2, 94, 109

Medicare, Prescription Drug, Improvement and Modernization Act Title XI .............................1

**Other Authorities**

21 C.F.R. §§ 314.53(b), (c)(2) ...............................................................................2

21 C.F.R. § 314.94(a)(12) .....................................................................................2

"Abbreviated New Drug Application" ("ANDA")...............................................2, 4

Anne M. Larson et al., *Acetaminophen Hepatoxicity* ..............................................31

*Controlled Release Hydrocodone*, 76 J. PHARM. SCIS. S107 (Nov. 1987)....................... 22, 78, 80

David E. Joranson et al., *Trends in Medical Use and Abuse of Opioid Analgesics*, 283 JAMA 1710 (2000)....................................................................................30

*Hepatic Dysfunction*, PAIN TREATMENT TOPICS (2007).........................................7, 22

Howard S. Smith, *Opioid Metabolism* ......................................................................7

Liver Diseases, *FDA Advisory Panel Tightens Controls on Acetaminophen Products*, https://www.aasld.org/fda-advisories/fdaadvisory-panel-tightens-controls-acetaminophen-products ......................................................................77

84 MAYO CLIN. PROC. 613-24 (2009) .................................................................7, 24

Research Report Series: Prescription Drug Abuse, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/si-tes/default/files/rxreportfinalprint.pdf) ......................6

Rule 131 ..............................................................................................................20

U.S. Patent No. 6,733,783 (filed October 30, 2001, issued May 11, 2004)................30

U.S. Patent No. 8,808,740 (filed December 21, 2011; issued August 19, 2014) ........18

U.S. Patent Nos. 6,228,398....................................................................................3

Alvogen Malta Operations Ltd. ("Alvogen") sets forth below its proposed findings of fact and conclusions of law.  By setting forth specific information, Alvogen does not waive its right to prove additional information or represent that this information is exhaustive.  For example, Alvogen may prove any matters identified in its pleadings, its interrogatory responses, or its expert witnesses' opening reports, rebuttal reports or depositions.  Alvogen respectfully requests that a finding of fact presented below more properly considered a conclusion of law, or vice versa, be so considered.

## I.    Background

### A.    The Parties

1.    Plaintiff Pernix Ireland Pain DAC ("Pernix Ireland") is a corporation organized and existing under the laws of Ireland, having its principal place of business at 3 Burlington Road, Dublin, Ireland D04 RD68.

2.    Plaintiff Pernix Therapeutics, LLC (collectively with Pernix Ireland, "Pernix" or "Plaintiffs") is a corporation organized and existing under the laws of Louisiana having its principal place of business at 10 North Park Place, Suite 201, Morristown, New Jersey 07960.

3.    Defendant Alvogen Malta Operations Ltd. ("Alvogen") is a corporation organized and existing under the laws of Malta.

4.    The Court has subject-matter jurisdiction, as well as personal jurisdiction, over the parties.

### B.    The Hatch-Waxman Act

5.    The Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 301 et seq., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (the "Hatch-Waxman Amendments" or "Hatch-Waxman Act"), as further amended by Title XI of the Medicare, Prescription Drug, Improvement and

1

Modernization Act (the "MMA"), outlines the rules that the U.S. Food and Drug Administration ("FDA") must follow when considering whether to approve a brand-name or generic drug.

6.      An applicant seeking to market a previously unapproved brand-name drug must prepare a New Drug Application ("NDA") for consideration by the FDA.  See 21 U.S.C. § 355.

7.      The NDA must include, among other things, any patents that claim the "drug" or a "method of using [the] drug" for which the NDA was submitted and for which a claim of patent infringement could reasonably be asserted.  See 21 U.S.C. §§ 355(b)(1), (c)(2); 21 C.F.R. §§ 314.53(b), (c)(2).

8.      Upon NDA approval, the FDA publishes the patents and information about the patents for the approved drug in *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly referred to as the "Orange Book."  See 21 U.S.C. § 355(j)(7)(A)(iii).

9.      In 1984, Congress passed the Hatch-Waxman Act to simplify the procedure for obtaining FDA approval of generic drugs and to decrease the price of pharmaceuticals through increased competition.  Pub. L. No. 98-417, 98 Stat. 1585 (1984).

10.     The Hatch-Waxman Act requires an applicant seeking approval of a generic version of a drug to submit a so-called "Abbreviated New Drug Application" ("ANDA").  In the ANDA, the applicant must show, among other things, that its generic drug is "bioequivalent" to a reference "listed drug" to receive FDA approval.  See 21 U.S.C. § 355(j)(4)(F).

11.     When filing an ANDA seeking approval of a generic version of a drug listed in the Orange Book, the ANDA applicant must "certify" to any patent information listed in the Orange Book.  See 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12).

12.     When seeking FDA approval to market prior to any such patent's expiration date, the ANDA applicant must, generally speaking, submit a so-called "Paragraph IV Certification,"

2

asserting that the listed patent is invalid, unenforceable and/or will not be infringed.  See 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

13.    The applicant must provide notice both to the patent holder and the NDA holder of the applicant's Paragraph IV Certification.  See 21 U.S.C. § 355(j)(2)(B).

14.    If the patent owner brings suit against the applicant within 45 days of receiving such notice, then FDA may not approve the ANDA until the earliest of the patent's expiration, the district court's resolution of the patent litigation in favor of the ANDA applicant, or the expiration of an automatic 30-month stay, unless the district court shortens the stay.  See 21 U.S.C. § 355(j)(5)(B)(iii).

**C.    Zohydro® ER**

15.    Pernix holds approved NDA No. 202880 for Zohydro® ER (hydrocodone bitartrate) extended-release capsules in 10 mg, 15 mg, 20 mg, 30 mg, 40 mg and 50 mg strengths ("Zohydro ER").

16.    Pernix submitted information on United States Patent Nos. 9,265,760 ("the '760 patent") and 9,339,499 ("the '499 patent") (collectively, the "Patents-in-Suit" or the "Asserted Patents") to FDA to list in the Orange Book in connection with NDA No. 202880.

17.    The Orange Books also lists U.S. Patent Nos. 6,228,398 ("the '398 patent"), 6,902,742 ("the '742 patent"), 9,132,096 ("the '096 patent"), 9,326,982, 9,333,201, 9,421,200, 9,433,619, 9,452,163, 9,610,286 and 9,713,611 as covering the Zohydro ER drug product or methods of using the drug product.

18.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

3

19.     FDA listed the above patents in the Orange Book in connection with NDA No. 202880.

20.     By causing those patents' listings, Pernix maintains that, before their expiration, an infringement suit could reasonably be asserted against an ANDA applicant attempting to seek FDA approval for and to market a generic version of Zohydro ER.

### D.     Alvogen's Proposed ANDA Product

21.     Alvogen submitted ANDA No. 206986 ("ANDA") to FDA to obtain approval to market the products identified in ANDA No. 206986, namely hydrocodone bitartrate extended-release capsules in 10 mg, 15 mg, 20 mg, 30 mg, 40 mg and 50 mg strengths ("the ANDA Product").

22.     Alvogen's ANDA includes Paragraph IV Certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that, in pertinent part, the manufacture, use, importation, sale or offer for sale of Alvogen's ANDA product will not infringe any valid claim of the '760 and '499 patents.

### E.     Technological Background of the Patents-In-Suit

23.     Opioids like hydrocodone are "used clinically primarily for the treatment of pain . . . [and] are amongst the oldest known pharmaceuticals . . . ." (See '760 patent at 1:42-44.)

24.     The liver is a site for transformation of opioids from parent compounds to active or inactive metabolites. (PERNIX_HEP0001534; '760 patent at 2:41-44.) "In patients with liver failure, reduced metabolism usually results in accumulation of the parent drug in the body with repeated administration." (PERNIX_HEP0001534.) Therefore, patients with liver failure, also called hepatic impairment ("HI"), might require a reduced dose to avoid overdosing with certain opioids. As of July 31, 2012, the earliest filing date for the Patents-in-Suit, the population of patients treated for pain with an extended-release ("ER") opioid necessarily included patients

4

with mild or moderate HI.

25.     It was widely known and well understood by those of ordinary skill in the art ("POSA") that the effects, tolerability and response to the different opioids may be different. Moreover, each individual patient's pain response may be different, and the general dosing practice among physicians was therefore to start at the lowest dose and titrate to effect. (See, e.g., PERNIX_HEP1126809; ACT-HYD2-023437; ACT-HYD2-023414.) For instance, when prescribing to "opioid naïve" patients, i.e., patients who were not previously taking an opioid, a physician would typically start with the lowest dosage available and increase the dosage amount until the patient reported effective pain relief. (See, e.g., PERNIX_HEP1126812; '760 Patent at 17:54-60.) When treating so-called "opioid tolerant" patients, i.e., patients who already have been taking one or more opioids as a pain treatment regimen, a physician would use conversion tables to determine the corresponding dose of the new opioid to which the patient should be transferred. (See, e.g., PERNIX_HEP1126812; '760 Patent at 17:54-60.)

26.     Hydrocodone bitartrate was first approved as an active pharmaceutical ingredient in the United States in 1943. (See Zohydro ER Label ("Initial U.S. Approval: 1943").) As the below chart illustrates, the number of prescriptions for products containing hydrocodone was well over a billion between 1991 and 2010:

5



(NIH, Prescription Drug Abuse, NIH Pub. No. 11-4881 (Oct. 2011), (Research Report Series: Prescription Drug Abuse, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/sites/default/files/rxreportfinalprint.pdf).)

27.     At least as early as 2001, various entities began filing patent applications covering hydrocodone extended-release ("ER") dosage forms.  (See, e.g., ACT-HYD2-021346; ACT-HYD2-021066; ACT-HYD2-022082.)  These dosage forms typically combined immediate-release components with ER components using inactive ingredients that were well-known and conventional in the prior art.  (See, e.g., ACT-HYD2-021359-360 (Tables 1A, 2A and 3A); ACT-HYD2-021086 (Tables 6 and 7); ACT-HYD2-022106-107, ACT-HYD2-022110-111 (Tables 7, 8 and 14).)  Like virtually all opioid products, these hydrocodone ER dosage forms were disclosed for use in treating pain.  (ACT-HYD2-021349 (1:15-30); ACT-HYD2-021083 (¶ 70); ACT-HYD2-022091 (2:21-37), ACT-HYD2-022093 (5:13-17), ACT-HYD2-022094 (7:25-28).)

28.     A POSA would have looked to the extensive safety information derived from

6

decades of clinical use of hydrocodone combination products to inform his or her expectation as to whether a dose adjustment would be necessary for patients with mild or moderate HI when administering a drug product containing hydrocodone as the only active ingredient. A POSA would have expected that a hydrocodone-only product would have the same pharmacokinetics as hydrocodone combination products. For example, the prior art reported that 10 mg of a hydrocodone-only ER dosage form and 10 mg of a hydrocodone-combination IR product achieved comparable mean $AUC_{0\text{-inf}}$ levels. (See ACT-HYD2-021088 (Table 10).)

29.     A number of hydrocodone immediate-release commercial products existing before the earliest effective filing date of the Patents-in-Suit, such as Vicodin[®] (hydrocodone + acetaminophen), Vicoprofen[®] (hydrocodone + ibuprofen) and Lortab[®] (hydrocodone + acetaminophen), noted special considerations for administering the products to patients with severe hepatic impairment ("HI"), but *not* mild or moderate HI. (See ACT-HYD2-022214; ACT-HYD2-023201, ACT-HYD2-023203; ACT-HYD2-022210-211.) Specifically, the labels stated that the products should be used "with caution" in patients with *severe* HI. (ACT-HYD2-022214; ACT-HYD2-023201, ACT-HYD2-023203; ACT-HYD2-022210-211.)

30.     This dosing practice for hydrocodone is reflected throughout the prior art. (See Sarah J. Johnson, *Opioid Safety in Patients with Renal or Hepatic Dysfunction*, PAIN TREATMENT TOPICS (2007) ("Johnson"), Howard S. Smith, *Opioid Metabolism*, 84 MAYO CLIN. PROC. (2009) ("Smith"), and VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (2011) ("VA Guideline") (PERNIX_HEP0001534-535, PERNIX_HEP0001538; Smith at 620; ACT-HYD2-022220, ACT-HYD2-022277).)

31.     Furthermore, the bioavailability of an ER version of Vicodin[®] in patients afflicted with mild and moderate HI was known to be similar to patients without HI. (ACT-HYD2-

7

021146 (¶ 64).)  As such, a POSA would not have expected that a hydrocodone single-entity ER dosage form would have required a dosage adjustment in patients with mild or moderate HI.

## II.    The Present Litigation

### A.    Procedural Background

32.    Pernix filed a complaint against Alvogen in this District on March 4, 2016 for alleged infringement of the '760 patent.  (D.I. 1.)

33.    Pernix filed a first amended complaint against Alvogen in this District on May 31, 2016 for alleged infringement of, among others, the '760 and '499 patents.  (D.I. 22.)

34.    Pernix filed a second amended complaint against Alvogen in this District on October 12, 2016, to add, among other things, factual allegations related to alleged infringement of the '760 and '499 patents.  (D.I. 37.)

35.    Alvogen answered Pernix's second amended complaint on November 30, 2016, pleading affirmative defenses of noninfringement and invalidity under 35 U.S.C. §§ 101, 102, 103, 112 and obviousness-type double patenting.  (D.I. 48.)  Alvogen also asserted counterclaims seeking declaratory judgment that the '760 and '499 patents are invalid and would not be infringed.  (Id.)

36.    Pernix answered Alvogen's counterclaims on December 23, 2016.  (D.I. 48.)

### B.    The Patents-in-Suit

37.    The '760 patent, entitled "Treating Pain in Patients with Hepatic Impairment," issued on February 23, 2016.  The named inventors on the '760 patent are Andrew Hartman, Christopher M. Rubino and Cynthia Y. Robinson.

38.    The '760 patent lists Pernix Ireland Pain Limited as assignee.  The online database for the United States Patent and Trademark Office indicates that Pernix Ireland Pain Designated Activity Company became assignee of the '760 patent on September 28, 2017.

8

39.      The '760 patent issued from U.S. Application No. 14/815,219, filed on July 31, 2015, which is a continuation of U.S. Application No. 14/523,162, filed on Oct. 23, 2014, which is a continuation-in-part of U.S. Application No. 13/950,969, filed on July 24, 2013, which claims priority to U.S. Provisional Application No. 61/779,698 filed on March 13, 2013 and U.S. Provisional Application No. 61/667,601, filed on July 31, 2012.

40.      The Orange Book lists July 25, 2033 as the '760 patent's expiration date.

41.      The '499 patent, entitled "Treating Pain in Patients with Hepatic Impairment," issued on May 17, 2016.  The named inventors on the '499 patent are Andrew Hartman, Christopher M. Rubino and Cynthia Y. Robinson.

42.      The '499 patent lists Pernix Ireland Pain Limited as assignee.  The online database for the United States Patent and Trademark Office indicates that Pernix Ireland Pain Designated Activity Company became assignee of the '499 patent on September 28, 2017.

43.      The '499 patent issued from U.S. Patent Application No. 14/978,217, filed on April 21, 2016, which is a continuation of the '219 application, filed on July 31, 2015, which is a continuation of the '162 application, which is a continuation-in-part of the '969 application, filed on July 24, 2013, which claims priority to U.S. Provisional Application No. 61/779,698 filed on March 13, 2013 and U.S. Provisional Application No. 61/667,601, filed on July 31, 2012.

44.      The Orange Book lists July 25, 2033 as the '499 patent's expiration date.

**C.      The Asserted Claims**

45.      Pernix asserts nine claims in this litigation:  claims 1-4, 11, 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent (collectively, the "Asserted Claims").

46.      No other claims are at issue in this litigation.

47.      Claim 1 of the '760 patent recites:

A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment a starting dose of an oral dosage unit having hydrocodone bitartrate as the only active ingredient,

wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate, and

wherein the starting dose is not adjusted relative to a patient without hepatic impairment.

48.    Claim 2 of the '760 patent depends from claim 1 and requires that the dosage unit provides a release profile of hydrocodone that does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of no more than 30%, and does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 50%.

49.    Claim 3 of the '760 patent depends from claim 1 and further requires that the dosage unit provides a release profile of hydrocodone that does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of no more than 14%, and does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

50.    Claim 4 of the '760 patent depends from claim 1 and further requires that the dosage unit provides a release profile of hydrocodone that does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of no more than 9%, and does not

10

increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

51.    Claim 11 of the '760 patent depends from claim 9, which in turn depends from claim 1, and further requires that the dosage unit provides a release profile of hydrocodone such that the average hydrocodone $AUC_{0\text{-}inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 352 ng*h/mL to about 666 ng*h/mL.

52.    Claim 12 of the '760 patent recites:

A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient,

wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,

wherein the dosage unit provides a release profile of hydrocodone that:

(1) does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%;

(2) does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%;

(3) does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%; and

11

(4) does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

53.    Claim 17 of the '760 patent depends from claim 12 and further requires that the dosage unit provides a release profile of hydrocodone such that the average $AUC_{0-inf}$ per 20 mg of hydrocodone bitartrate dosed to subjects not suffering from renal or hepatic impairment is in the range of about 300 ng*h/mL to about 500 ng*h/mL; dosed to subjects suffering from mild hepatic impairment is in the range of about 300 ng*h/mL to about 570 ng*h/mL; and dosed to subjects suffering from moderate hepatic impairment is in the range of about 300 ng*h/mL to about 700 ng*h/mL.

54.    Claim 19 of the '760 patent depends from claim 17 and further requires that the dosage unit provides a release profile of hydrocodone such that the average hydrocodone $AUC_{0-in}$ per 20 mg of hydrocodone bitartrate dosed to subjects suffering from moderate hepatic impairment is in the range of about 352 ng*h/mL to about 666 ng*h/mL.

55.    Claim 1 of the '499 patent recites:

A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient,

wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,

wherein the dosage unit provides a release profile of hydrocodone that:

does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and

12

does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

### D.    Development of the Claimed Subject Matter

56.    Development of the claimed subject matter was premised on a prior art hydrocodone ER dosage form, referred to in the Patents-in-Suit as HC-ER.  (See U.S. Patent Application Publication No. 2006/0240105 ("Devane"); Pernix's Amended Responses to Actavis's Corrected First Set of RFA Nos. 10, 16-18 (Oct. 17, 2017); '760 patent at 10:5-6, 22:50-23:48.)  Devane disclosed HC-ER more than one year before the earliest effective filing date of the Patents-in-Suit.  (Pernix's Amended Responses to Actavis's Corrected First Set of RFA Nos. 10, 16-18 (Oct. 17, 2017); Devane at ¶¶ 99-101.)

57.    In fact, Example 6 of the Patents-In-Suit, which discloses hydrocodone ER formulations allegedly encompassed by the Asserted Claims, is an almost verbatim copy of Example 3 from Devane.  (Compare Devane at ¶¶ 99-101 with the '760 patent at 20:60-22:29.)

58.    A company called Zogenix, Inc. obtained the rights to Devane's HC-ER dosage form in 2007 and began efforts to commercialize the formulation as Zohydro ER.  (Pernix's Amended Responses to Actavis's Corrected First Set of RFA Nos. 10, 16-18 (Oct. 17, 2017).)

59.    During the FDA approval process for Zohydro ER, Zogenix stated to FDA ████  ████████████████████████████████████████  ████████████████████████████████  ████████████████████████████  (DARA_Z0258279.)

60.    FDA nevertheless requested that Zogenix follow an FDA Guidance issued in 2003 to conduct an HI study with Devane's HC-ER.  (PERNIX_HEP0003017; PERNIX_HEP0015644.)  Zogenix followed the FDA Guidance in conducting the HI study.

13

61.     The Patents-in-Suit summarize the results of this HI study in Example 8.  ('760 patent, at 22:50-23:48; '499 patent, at 22:50-23:48.)  Specifically, Example 8 reports pharmacokinetic ("PK") values achieved from administering Devane's HC-ER formulation in patients with mild or moderate HI and without HI, namely the area under the curve ("AUC") and the maximum concentration of drug in the body ("$C_{max}$").  (See '760 patent, at 22:50-23:48.)  The AUC and $C_{max}$ results demonstrated that the body's physiological response to Devane's HC-ER formulation is similar in patients with no, mild or moderate HI.  (See id.; PERNIX_HEP0015629.)

**E.      The Prosecution History of the '760 And '499 Patents**

62.     The application leading to the '760 patent was filed July 31, 2015 and originally contained 25 claims.  (PERNIX_HEP1163260, PERNIX_HEP1163264.)

63.     On October 29, 2015, the Examiner issued a Non-Final Rejection rejecting the then-pending claims as anticipated by U.S. Patent Application No. 2005/0232987 ("Srinivasan"), which, according to the Examiner, taught bilayered release tablets and extended-release suspensions comprising hydrocodone bitartrate.  (PERNIX_HEP1163352.)  The Examiner also noted that a POSA would have viewed as obvious administering Srinivasan's bilayered release tablets and extended release suspensions comprising hydrocodone bitartrate.  (Id.)

64.     In response, the Applicants amended their claims to require administering a hydrocodone-only oral dosage unit to a patient with mild or moderate HI. (PERNIX_HEP1163360-364.)

65.     On December 15, 2015, the Applicants filed, and the Examiner approved, a terminal disclaimer to U.S. Patent Application No. 14/523,162.  (PERNIX_HEP1163424, PERNIX_HEP1163428.)

66.     A Notice of Allowance issued on January 22, 2016.  (PERNIX_HEP1163435.)

14

67.    The Examiner explained that the closest prior art discussing hydrocodone bitartrate administration to hepatically impaired patients (U.S. Patent Application No. 2010/0010030) ("Jain") taught administration of an extended-release hydrocodone and acetaminophen combination formulation.  (PERNIX_HEP116436.)  The Examiner noted that administration of that formulation provided "pharmacokinetics similarity between hepatic impaired patients and normal subjects."  (Id. (citing PERNIX_HEP0001589 at ¶ 64).)

68.    The Examiner nevertheless allowed the claims because, he stated, although separating the hydrocodone and acetaminophen from the formulation might produce similar parameters, the various non-hydrocodone opioid ER products disclosed by Applicants in the specification did "not demonstrate the desired consistent pharmacokinetics," i.e., similar PK values in patients with and without mild or moderate HI.  (Id.)  The Examiner also cited the alleged unpredictability in the art of producing an ER hydrocodone-only formulation would not have led a POSA to administer hydrocodone-only formulation to HI patients without adjusting the dose.  (Id.)

69.    The application leading to the '499 patent was filed on December 22, 2015 with 26 original claims.  (PERNIX_HEP1164138.)

70.    On February 25, 2016, the Examiner issued a Non-Final Rejection, rejecting the then-pending claims as unpatentable on obviousness-type double-patenting grounds over, among other references, the '760 patent.  (PERNIX_HEP1164330, PERNIX_HEP1164333.)

71.    In response, the Applicants filed and the Examiner approved a terminal disclaimer to pending Patent Application Nos. 14/523,162, 13/950,969 and 14/978,302. (PERNIX_HEP1164436, PERNIX_HEP116441.)

72.    A Notice of Allowance issued on April 8, 2016.  (PERNIX_HEP1164453.)

15

## F.    Claim Construction

73.    On August 3, 2017, the Court issued a Markman Order construing certain terms of the Asserted Claims.  (D.I. 69.)

74.    The Court construed the term "administering" to mean "delivering into the body." (Id. at 1.)

75.    The Court construed the phrase "starting dose is not adjusted relative to a patient without hepatic impairment" to mean "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced due to that hepatic impairment relative to the dose prescribed to a patient without hepatic impairment when initiating treatment." (Id. at 2.)

76.    The Court construed the terms "subject" and "average [or mean]" in the phrases "[average/mean] hydrocodone $[AUC_{0\text{-}inf}/C_{max}]$ . . . [in/dosed to] subjects . . .," and "[average/mean] hydrocodone $[AUC_{0\text{-}inf}/C_{max}]$ . . . [in/dosed to] subjects . . . relative to subjects" in accordance with their plain and ordinary meanings.  (Id. at 3-4.)

## III.    Invalidity

### A.    Prior Art to the '760 and '499 Patents

#### 1.    U.S. Patent Application Publication No. 2006/0240105 (filed March 10, 2006; published October 26, 2006) ("Devane")

77.    Devane published on October 26, 2006 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (Devane at (43).)

78.    Devane discloses a multiparticulate modified release dosage form for delivering an active ingredient to the body.  (Devane at ¶ 33.)

79.    Devane discloses that his invention can be used for pain management, stating "[i]n embodiments which include drug compounds used for pain management, such as for

16

example, hydrocodone, the compositions and dosage forms of the present invention may provide continuous analgesia for up to 24 hours . . . ." (Devane at ¶ 70.)

80.    Devane further discloses a clinical trial that "evaluate[d] the safety, efficacy, and PK of hydrocodone formulations in subjects immediately following bunionectomy study." (Id. at ¶ 104).

81.    Devane also claims "[a] method for the treatment of pain" comprising administering the claimed compositions. (Id. at claim 81.)

82.    Example 3 of Devane discloses "[m]ultiparticulate modified release hydrocodone compositions" containing "an immediate release component" and "a modified release component." (Devane at ¶¶ 99-101.) Example 3, more specifically, teaches formulations for preparing such compositions. (Id.; see also id. at Tables 6 and 7.)

83.    And the dosage form ███████████████████████████████████

███████████████████████████████████████████████████████████████

███ ("Devane's HC-ER Formulation"). (See Pernix's Amended Responses to Actavis's Corrected First Set of RFA Nos. 1-19, Nos. 6, 7)

84.    Devane's HC-ER Formulation provides the following PK values in patients with normal hepatic function and patients with mild or moderate hepatic impairment:

| PK Parameters | Patients without HI | Patients with mild HI | Patients with moderate HI |
|---|---|---|---|
| $AUC_{0\text{-inf}}$ | 391 ng*hr/mL | 509 ng*hr/mL | 440 ng*hr/mL |
| $C_{max}$ | 22 ng*hr/mL | 24 ng*hr/mL | 25 ng*hr/ml |

Hydrocodone $C_{max}$ values are 8-10% higher in patients with mild or moderate hepatic impairment, respectively, while $AUC_{0\text{-inf}}$ values are 10% and 26% higher in patients with mild and moderate hepatic impairment, respectively. (Zohydro ER Label at 22.)

17

##### 2.   U.S. Patent No. 8,808,740
##### (filed December 21, 2011; issued August 19, 2014) ("Huang")

85.   Huang was filed by another on December 21, 2011 and claims priority to U.S. Appl. No. 61/426,306, filed on December 22, 2010.  (ACT-HYD2-022082.)  Huang is prior art to the '760 and '499 patents under 35 U.S.C. § 102(e).  (Id.)

86.   Huang states that "[i]t is a[n] . . . object of certain embodiments of the present invention to provide a method of treating pain in human patients with a solid controlled release dosage form comprising an opioid analgesic . . . ."  (ACT-HYD2-022091 at 2:21-25.)

87.   Huang also states that "[i]t is a[n] . . . object of certain embodiments of the present invention to treat a disease or condition (e.g., pain) by administering a solid controlled release dosage form as disclosed herein to a patient in need thereof."  (Id. at 2:26-29.)

88.   Huang further provides that "[i]t is a[n] . . . object of certain embodiments of the present invention to provide a use of a medicament (e.g., an opioid analgesic) in the manufacture of a dosage form for the treatment of a disease state (e.g., pain)."  (Id. at 2:34-37.)  And Huang also discloses that "[i]n certain embodiments, the present invention is directed to a method of treating pain in a patient or subject comprising administering a solid controlled release dosage form comprising an opioid analgesic as disclosed herein."  (ACT-HYD2-022094 at 7:25-28.)

89.   Huang further discloses that his invention is directed to hydrocodone-containing dosage forms, stating that "the present invention is directed to a solid controlled release dosage form comprising a therapeutically effective amount of hydrocodone or a pharmaceutically acceptable salt thereof, and a controlled release excipient . . . ."  (ACT-HYD2-022093 at 5:13-17.)

90.   Claim 95 of Huang recites "a method of treating pain in a subject in need thereof, comprising administering to the subject a solid controlled release dosage form according to claim

18

1." (ACT-HYD2-022117 at claim 95.)

91.    Huang discloses ████████, an ER dosage form containing hydrocodone bitartrate as the only active ingredient.  (ACT-HYD2-022111 at ████.)  ████████ is marketed by ███████████████████████████.  (███████████████████████ ████████.)

92.    Huang's ████████ also falls within the scope of Huang's claimed method of treating pain, as it is encompassed by Huang's claim 1.  (ACT-HYD2-022111-112 at ██████ ████.)

93.    Huang's ████████ provides the following PK values in patients with normal hepatic function and patients with mild or moderate hepatic impairment:

| PK Parameters | Patients without HI | Patients with mild HI | Patients with moderate HI |
|---|---|---|---|
| $AUC_{0-inf}$ | ██████████ | ██████████ | ██████████ |
| $C_{max}$ | ██████████ | ██████████ | ██████████ |

Hydrocodone $C_{max}$ values are ████████████████ in patients with mild or moderate hepatic impairment, respectively, while AUC values are ███████████████ in patients with mild and moderate hepatic impairment, respectively.  (ACT-HYD2-023236; ACT-HYD2-022333; Fanelli Decl. Ex. B.)

94.    Pernix cannot antedate or "swear behind" Huang's December 21, 2011 filing date. To antedate a prior art reference that discloses a species not reduced to practice within a claimed genus, the patentee must demonstrate that:  (1) the inventors appreciated that the species they reduced to practice included or pointed to the species disclosed in the prior art reference; or (2) the prior art species would have been an obvious variant of the species reduced to practice.  In re Clarke, 356 F.2d 987, 992-93 (CCPA 1966) (holding that an applicant for a patent claiming a

19

genus of compounds could not antedate an anticipatory reference disclosing a different species than the species the applicant reduced to practice because "there was no evidence that the applicant considered that the [prior art] species reasonably could be expected to have properties related to that found for the [applicant's] species, such that the [prior art] species would be properly included within the invention").[1]

95.     Here, the Asserted Claims recite a genus of HC-ER oral dosage forms that achieve certain PK values or that do not require an adjustment in their starting dose when administered to patients with mild or moderate HI.

96.     It is undisputed that the named inventors of the Patents-in-Suit reduced to practice only a single species within that genus – Devane's HC-ER formulation, *i.e.*, Zohydro ER.  (See '760 patent at 10:5-6; 22:50-23:48; '499 patent at 10:5-6, 22:50-23:48.)  Huang, however, discloses a different species within the broadly claimed genus.  (ACT-HYD2-022110 at ███ ██.)  Huang also inherently discloses treating patients with mild or moderate HI for pain by administering ████████, wherein the starting dose is not adjusted and ████████ achieves PK values that fall within the Asserted Claims.

97.     The testimony of named inventors Andrew Hartman and Cynthia Robinson confirms that they did not understand why Devane's HC-ER formulation achieved the results it did in HI patients:

> Q. Do you know what it is about the Zohydro formulation that resulted in the surprising results?
>
> A. I honestly couldn't say.

(Robinson Dep. Tr. at 254:20-25.)

---

[1] In re Clarke arises out of Rule 131 practice in *ex parte* prosecution but involves the same issues of conception and reduction to practice at issue here.

Q. . . . Why do you believe the Zohydro product performed differently, in your view, than the other products that you -- opioid products that you were referencing?

THE WITNESS: I don't know the answer to that question.

(Hartman Dep. Tr. at 167:24-168:5; see also Boyd Dep. Tr. at 82:10-13.)

98. As such, the inventors could not have appreciated that other HC-ER formulations, including ▮▮▮▮▮▮▮ of Huang, would similarly provide the claimed PK values and not require an adjustment in their starting dose, or that Devane's HC-ER formulation was representative of such formulations. Pernix has also denied that the Asserted Claims would have been obvious over Huang. (Pernix's Supplemental Response to Interrogatory No. 12 at 9-10.)

99. Pernix relies on uncorroborated inventor testimony that the named inventors conceived of the alleged invention claimed in the Asserted Claims before Huang's December 21, 2011 filing date. But uncorroborated inventor testimony is insufficient as a matter of law to antedate Huang. Singh v. Brake, 317 F.3d 1334, 1340-41 (Fed. Cir. 2003) ("It is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony.").

### 3. U.S. Patent Application Publication No. 2010/0010030 (filed February 4, 2009; published January 14, 2010) ("Jain")

100. Jain published on January 14, 2010 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b). (PERNIX_HEP0001571.)

101. Jain discloses an hydrocodone ER formulation called Vicodin CR, containing 15 mg hydrocodone bitartrate and 500 mg acetaminophen and "indicated for the relief of moderate to moderately severe pain." (PERNIX_HEP0001587 at ¶¶ 26, 34.)

102. Jain further discloses a study in which normal and HI patients were given Vicodin CR. (PERNIX_HEP0001589 at ¶ 64.) The study examined the effects of HI on the

21

pharmacokinetics of Vicodin CR in 24 subjects:  8 subjects with normal liver function; 8 subjects with mild impairment; and 8 subjects with moderate impairment.  (Id.)  The study found that the mean $C_{max}$ and AUC of hydrocodone were "similar in patients with normal hepatic function and patients with mild and moderate hepatic impairment."  (Id.)  Specifically, Jain states:

> Following oral administration of a single tablet of Vicodin CR, mean $C_{max}$ and AUC values of hydrocodone were similar in normal subjects and subjects with mild and moderate hepatic impairment. Mean $C_{max}$ and AUC values of acetaminophen were similar in normal subjects and subjects with mild hepatic impairment, and 34 to 42% higher in subjects with moderate hepatic impairment.

(Id.)

### 4.    Baumann et al., *Analgesic Safety and Efficacy of Controlled Release Hydrocodone*, 76 J. PHARM. SCIS. S107 (Nov. 1987) ("Baumann")

103.    Baumann published in 1987 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (PERNIX_HEP0081550.)

104.    Baumann tested the "safety, relative efficacy and duration of analgesia of controlled release hydrocodone" ("CRHC") in 40 patients suffering from acute pain, wherein hydrocodone was the only active in the dosage form tested.  (Id.)  Baumann administered 5 mg CRHC, 10 mg CRHC, 2 mg hydromorphone (DIL), or placebo in a double-blind study.  (Id.) Baumann reported that 10 mg CRHC "had a dose dependent prolongation in relief during the 4-8 hour period" and resulted "in safe, extended analgesia beyond that seen with 2 mg hydromorphone with no delay in onset."  (Id.)

### 5.    Johnson, *Opioid Safety in Patients With Renal or Hepatic Dysfunction*, PAIN TREATMENT TOPICS (2007) ("Johnson")

105.    Johnson published in 2007 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (PERNIX_HEP0001529.)

106.    Johnson discusses the need to balance pain control with opioids with the risk of

22

overdose due to altered drug clearance.  (Id.)  Johnson states that opioids should be used cautiously in patients with hepatic dysfunction and generally states that usual doses may be appropriate for certain opioids, such as hydrocodone:

> Knowledge of altered opioid metabolism and excretion in patients with renal and/or hepatic dysfunction is essential for adequate pain relief while minimizing adverse effects . . . . Opioids should be used cautiously in this patient population due to possible accumulation of the parent drug and/or metabolites.  **Usual** or adjusted **doses may be appropriate for certain opioids** (**e.g.**, morphine, hydromorphone, **hydrocodone**).

(PERNIX_HEP0001535 (emphasis added).)

107.   Johnson only recommends dose adjustment for hydrocodone in patients with *severe* HI, not mild or moderate HI, as can be seen in Johnson's table, reproduced below:

**Recommended Use of Opioids in Hepatic Dysfunction**
[Demerol PI 2002; Dolophine PI 2006; Guay et al 1988; Klein and Magida, 1971; Murphy 2005; Propoxyphene PI 2005; Tegeder et al. 1999]

| Opioid | Recommended Usage | Comment | Dosing Recommendations* |
|---|---|---|---|
| Morphine | Use *cautiously* and monitor patient for sedation. | In severe hepatic impairment, the parent drug may not be readily converted to metabolites. | Increase the dosing interval by twice the usual time period. |
| Hydromorphone/ Hydrocodone | Use *cautiously* and monitor patient carefully for symptoms of opioid overdose. | In severe hepatic impairment, the parent drug may not be readily converted to inactive metabolites. | Decrease initial dose by 50% of the usual amount. |
| Oxycodone | Use *cautiously* and monitor patient carefully for symptoms of opioid overdose. | In severe hepatic impairment, the parent drug may not be readily converted to inactive metabolites. | Decrease initial dose by 1/2 to 1/3 of the usual amount. |
| Codeine | *Avoid use.* | In severe hepatic impairment, codeine may not be converted to the active metabolite, morphine. | —— |
| Methadone | *Not advised.* | Not advised in severe liver failure due to risk of methadone accumulation. | —— |
| Fentanyl | Appears safe, generally no dose adjustment necessary. | Decreased hepatic blood flow affects metabolism more than hepatic failure. | Dosing adjustment usually not needed. |
| Meperidine | *Do not use.* | Inactive metabolite is associated with risk of seizure. | —— |
| Propoxyphene | *Do not use.* | Hepatotoxicity reported with or without acetaminophen component. | —— |

*Recommended dose in severe hepatic impairment.

(PERNIX_HEP0001530.)

23

**6.** **Howard B. Smith,** *Opioid Metabolism***,**
**84 MAYO CLIN. PROC. 613-24 (2009) ("Smith")**

108. Smith published in 2009 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b). (Smith at 613.)

109. Smith states that "[o]pioids are a cornerstone of the management of cancer pain and postoperative pain and are used increasingly for the management of chronic noncancer pain." (Id.)

110. Smith reviews a substantial number of opioid analgesics and recommends that physicians identify and accommodate patient-specific metabolic concerns such as organ dysfunction. (Id. at 621.) Smith states that dose reduction for some opioids may be necessary depending on the severity of organ impairment and the metabolism of the given opioid. (Id.)

111. Smith recommends dose adjustment for some opioids – including morphine, codeine, oxycodone, methadone and hydromorphone – in patients with hepatic impairment, but not for hydrocodone. (Id. at 620, Table 5.)

**7.** **Department of Veterans Affairs, VA/DoD**
**Clinical Practice Guideline for Management**
**of Opioid Therapy for Chronic Pain (2010) ("VA Guideline")**

112. The VA Guideline published in 2010 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b). (ACT-HYD2-022217.)

113. The VA Guideline contains general recommendations on management of opioid therapy for chronic pain. (ACT-HYD2-022220.) Updating an earlier-published guideline providing similar recommendations, the VA Guideline directs itself toward "the clinician who is interested in knowing more about . . . the management of chronic pain," intends to "promote evidence-based management of individuals with chronic pain" and identifies "critical decision points in management of patients with chronic pain who are candidates for opioid therapy . . . ."

24

(Id.)

114.    According to the VA Guideline, during the titration phase, the dosage is adjusted in every patient to achieve the desired clinical outcome (*i.e.*, pain relief, improved function, patient satisfaction with minimal adverse effects).  (ACT-HYD2-022241, ACT-HYD2-022246, Fig. 1.)  The VA Guideline also recommends using a long-acting formulation, or starting with short-acting opioids and later converting to long-acting opioids for continuous, chronic pain. (ACT-HYD2-02243, ACT-HYD2-02248.)

115.    The VA Guideline discloses that no dose adjustment is needed in mild or moderate hepatically impaired patients receiving hydrocodone products.  (ACT-HYD2-022244 at Table 3, Appendix E.)

116.    Table 3 of the VA Guideline, reproduced below, recommends dose adjustment for certain opioids in chronic pain patients with HI, but not for hydrocodone.

25

Table 3: Use of Opioids for Chronic Pain in Special Populations

| Medication | Swallowing difficulty | GI mal-absorption | Pregnancy Risk Category (a) | Lactation (a) | Hepatic dysfunction | Renal dysfunction | Renal Dialysis | Prolonged QTc | Seizures | Elderly or debilitated | Decreased CYP-2D6 activity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Codeine (b) | | | C*‡ | ◆ᵉ | ✖ | | ✖ | | | | Less effective |
| Fentanyl transdermal | ✚ | ✚ | C†‡ | UC (c) | ◆ and ↓ | | ◆ | | | | |
| Hydrocodone | | | C†‡ | PC | | ◆ and ↓ | ◆ | | | | ? less effective |
| Hydromorphone | ✚ (OS, RS) | ✚ (RS) | B†‡ | PC | ◆ and ↓ | | ◆(RBD) | | | | |
| Methadone (e) | ✚ (OS) | | B†‡ | PC | ◆ and ↓ | | ◆ | ◆ | | | |
| Morphine | ✚ (OS, RS) | ✚ (RS) | C†‡ | PC | | ↓ or ✖ | ◆ or ✖(RBD) | | | ◆ and ↓ | |
| Morphine SR/CR (8-12h); ER (24h) | | | C†‡ | PC | | ↓ or ✖ | ◆ or ✖(RBD) | | | ◆ and ↓ | |
| Oxycodone | ✚ (OS) | | B†‡ | PC | | ◆ and ↓ | ✖(ND) | | | | ? less effective |
| Oxycodone CR (12h) | | | B†‡ | PC | | ◆ and ↓ | ✖(ND) | | | | |
| Oxymorphone | | | B†‡ | PC | ✖ | ◆ and ↓ | ◆(RBD) | | | | |
| Oxymorphone ER (12h) | | | B†‡ | PC | ✖ | ◆ and ↓ | ◆(RBD) | | | | |
| Propoxyphene | | | C†‡ | PC | ✖ | ✖ | ✖ | ◆ | ✖ | | |
| Tapentadol | | | C† | ✖(f) | ◆ | ↓ or ✖ | ✖(ND) | ◆ | | | |
| Tramadol | | | C† | PC | ◆ and ↓ | ◆ and ↓ | ✖ (RBD) | | ✖ | ◆ and ↓ | ? less effective |
| Tramadol ER (24h) | | | C† | PC | ◆ and ↓ | ◆ and ↓ | ✖ (RBD) | | ✖ | ◆ and ↓ | ? less effective |

CR = Controlled release
OS = Oral solution
RS = Rectal suppository
SR = Sustained release
TDS = Transdermal system
RBD = Removed by dialysis
ND = No data

✚ = Recommended
◆ = Use with caution
↓ = Reduce dose
✖ = Not recommended
? less effective = conversion to the active metabolite may be decreased. Impact on analgesic efficacy unknown.

Pregnancy Risk Categories
A = controlled studies show no risk
B = no evidence of risk in humans
C = Risk cannot be ruled out, but potential benefits may justify potential risk
D = Positive evidence of risk; however, potential benefits may outweigh potential risk
X = Contraindicated in pregnancy.
*human data suggest risk (Briggs et al., 2008
† human data suggest risk in 3ʳᵈ trimester (Briggs et al., 2008
‡Risk category D if prolonged periods or high doses at term (Briggs et al., 2008)

Use while breast-feeding
UC = usually compatible; either not excreted into human breast milk in clinically significant amounts or not expected to cause toxicity in infant
PC = probably compatible; no or limited human data
◆ = potential toxicity; no or limited human data
✖ = not recommended due to potential toxicity; no or limited human data
CI = contraindicated; potential for severe toxicity based on animal and/or human data

117.    Likewise, Table E1 of the VA Guideline, reproduced in part below, does not recommend dose adjustment for hydrocodone in patients with HI.

26

Table E 1: Use of Short-acting, Orally Administered Opioids in Adults

| Short-Acting Opioid † | Initial Oral Dosage | Dosage Titration | Analgesic Onset (Min) Peak (Min) Duration (H) | Dosing In Special Populations | Other Considerations |
|---|---|---|---|---|---|
| Codeine (alone or in combination with APAP or ASA) | 30 mg q 4 to 6 h | Increase dose as needed and tolerated to a maximum of 360 mg/d (4000 mg/d APAP; 2000 mg/d APAP in chronic alcoholics) Ceiling effect occurs at doses > 60 mg/dose | 15 to 30 30 to 60 4 to 6 | Elderly or debilitated– Use with caution Hepatic dysfunction – conversion to active metabolite (morphine) may be reduced in patients with cirrhosis; avoid use in patients with liver disease Renal dysfunction – use lower dosage or an alternative analgesic | May be less effective in patients with decreased CYP-2D6 activity (due to poor CYP-2D6 metabolism or CYP-2D6 inhibiting drugs‡) because of decreased conversion to the active metabolite, morphine CODEINE ALONE IS A WEAK ANALGESIC AND MORE EFFECTIVE ALTERNATIVES ARE AVAILABLE (INCLUDING CODEINE IN COMBINATION WITH APAP OR ASA) |
| Hydrocodone (in combination with APAP, ASA, or IBU) | 5 to 10 mg q 4 to 6 h | Increase dose as needed and tolerated Maximum dose: 60 mg/d (4000 mg/d APAP; 2000 mg/d APAP in chronic alcoholics) for hydrocodone + APAP combination, or 37.5 mg/d (1000 mg/d IBU) for hydrocodone + IBU combination | 15 to 30 30 to 60 4 to 8 | Elderly or debilitated – Use with caution; start at low end of dosing range Hepatic / Renal dysfunction – Use with caution | Conversion to the active metabolite, hydromorphone, may be decreased in patients with decreased CYP-2D6 activity (due to poor CYP-2D6 metabolism or CYP-2D6 inhibiting drugs²). Impact of decreased formation of hydromorphone on analgesic efficacy of hydrocodone is unknown |
| Hydromorphone | 2 mg q 4 to 6 h | Individually titrate as needed and tolerated; doses ≥ 4 mg q 4 to 6 h may be necessary | 15 to 30 30 to 60 4 to 6 | Elderly or debilitated – Use with caution, starting at low end of dosing range. Hepatic / Renal dysfunction – Use with caution. | |

(ACT-HYD2-022277.)

### 8.   U.S. Food & Drug Administration, Guidance for Industry – Pharmacokinetics in Patients with Impaired Hepatic Function: Study Design, Data Analysis, and Impact on Dosing and Labeling (2003) ("FDA Guidance")

118.   The FDA Guidance published in 2003 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (ACT-HYD23058.)

119.   The purposes of the FDA Guidance are to:  (i) advise when hepatic impairment studies should and should not be conducted; (ii) recommend how to design and conduct the studies; (iii) define the inclusion criteria for the patient populations to be studied; and (iv) describes how to analyze, interpret and report the results.  (ACT-HYD2-023061.)

120.   For instance, the FDA Guidance "recommends a PK study in patients with impaired hepatic function if hepatic metabolism and/or excretion accounts for a substantial portion (>20 percent of the absorbed drug) of the elimination of a parent drug or active metabolite."  (ACT-HYD2-023063.)

27

121.    With respect to interpreting and reporting the results, the FDA Guidance provides that where "the effect of hepatic impairment on the PK of the drug is obvious (e.g., two-fold or greater increase in AUC), dosage adjustments should be recommended in labelling."  (ACT-HYD2-023067.)  The FDA Guidance also states that "[a] conclusion that there is no effect (really, no clinically important effect) of hepatic impairment on the drug's PK, would usually be supported by the establishment of . . . a standard 90 percent confidence interval of 80-125 percent for AUC and $C_{max}$."  (ACT-HYD2-023068.)

### 9. FDA Drug Safety Communication: Prescription Acetaminophen Products to Be Limited to 325 mg Per Dosage Unit; Boxed Warning Will Highlight Potential for Severe Liver Failure (January 2011) ("FDA Acetaminophen Communication")

122.    The FDA Acetaminophen Communication published in January 2011 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (ACT-HYD2-023247.)

123.    The FDA Acetaminophen Communication provides FDA's recommendation to manufacturers to "limit the strength of acetaminophen in prescription drug products, which are predominantly combinations of acetaminophen and opioids" to "325 mg per tablet, capsule, or other dosage unit."  (Id.)  (FDA Acetaminophen Communication at ACT-HYD2-023247.)

124.    The FDA Acetaminophen Communication explains that limiting "products containing acetaminophen (e.g., Tylenol)" will help to reduce the risk of liver injury and toxicity levels associated with the acetaminophen in prior-art products including, among others, Vicodin (hydrocodone + acetaminophen) and Lortab (hydrocodone + acetaminophen).  (Id.)

### 10. Vicoprofen® Label (2006)

125.    The Vicoprofen® Label published in 2006 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (ACT-HYD2-023210.)

126.    The Vicoprofen® Label discloses an immediate-release product containing 7.5 mg

28

hydrocodone bitartrate and 200 mg ibuprofen.  (ACT-HYD2-023197.)  The Vicoprofen® Label notes special considerations, including using with caution in and monitoring of "patients . . . with severe impairment of hepatic . . . function" when administering the products to patients with severe HI, but not in patients with mild or moderate HI.  (ACT-HYD2-023201, ACT-HYD2-023203)

### 11.    Lortab® Label (May 2011)

127.    The Lortab® Label published in May 2011 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (ACT-HYD2-022212.)

128.    The Lortab® Label discloses an immediate-release product containing 10 mg hydrocodone bitartrate and 500 mg acetaminophen.  (ACT-HYD2-022210.)  The Lortab® Label states that the product "should be used with caution in . . . patients . . . with severe impairment of hepatic . . . function," but not in patients with mild or moderate HI.  (ACT-HYD2-022210-211

### 12.    Vicodin® Label (September 2011)

129.    The Vicodin® Label published in September 2011 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(a).  (ACT-HYD2-022216.)

130.    The Vicodin® Label discloses an immediate-release product containing 10 mg hydrocodone bitartrate and 500 mg acetaminophen.  (ACT-HYD2-022213.)  The Vicodin® Label states that the product "should be used with caution in . . . patients . . . with severe impairment of hepatic . . . function," but not in patients with mild or moderate HI.  (ACT-HYD2-022214.)

### 13.    Nucynta® ER Label (August 2011)

131.    The Nucynta® Label published in August 2011 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(a).  (ACT-HYD2-023402.)

132.    The Nucynta® Label discloses an ER product containing tapentadol, an opioid agonist indicated for pain management.  (ACT-HYD2-023362, ACT-HYD2-023368.)  The

29

Nucynta® Label states that "[n]o dosage adjustment is recommended in patients with mild hepatic impairment."  (ACT-HYD2-023370.)

### 14.    Exalgo™ ER Label (2010)

133.    The Exalgo™ Label published in 2010 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (PERNIX_HEP0013307.)

134.    The Exalgo™ Label discloses an ER product containing hydromorphone hydrochloride, an opioid agonist indicated for pain management.  (Id.)  The Exalgo™ Label states that patients with severe and moderate HI should be started on a reduced dose, but not those with mild HI.  (PERNIX_HEP0013315.)

### 15.    U.S. Patent No. 6,733,783 (filed October 30, 2001, issued May 11, 2004) ("Oshlack")

135.    Oshlack issued on May 11, 2004 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).  (ACT-HYD2-021346.)

136.    Oshlack discloses solid oral controlled-release dosage forms comprising an analgesically effective amount of hydrocodone.  (Id., ACT-HYD2-021349.)

### 16.    Nat'l Inst. Health, *Prescription Drug Abuse*, NIH Publ. No. 11-4881 (Oct. 2011) ("NIH Publication")

137.    The NIH Publication published in October 2011 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(a).

138.    The NIH publication discloses that the number of prescriptions for products containing hydrocodone was well over a billion between 1991 and 2010.  (See supra ¶ 26.)

### 17.    David E. Joranson et al., *Trends in Medical Use and Abuse of Opioid Analgesics*, 283 JAMA 1710 (2000) ("Joranson")

139.    Joranson published in 2000 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).

140.    Joranson discloses that by the early 2000s there were increasing reports of opioid misuse including drug overdoses.  (Joranson at 1710-14.)

**18.    Anne M. Larson et al., *Acetaminophen Hepatoxicity*, 11 Clinics in Liver Disease 525 (2007) ("Larson")**

141.    Larson published in 2007 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).

142.    Larson discloses that acetaminophen overdose can lead to serious and even fatal hepatotoxicity.  (Larson at 525.)

**19.    Avinza® ER Label (May 2011)**

143.    The Avinza® Label published in May 2011 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).

144.    The Avinza® Label discloses an ER product containing morphine sulfate.  (ACT-HYD2-023404.)  The Avinza® Label states that the product "should be administered cautiously and in reduced dosages in patients with severe . . . hepatic insufficiency," but not in patients with mild or moderate HI.  (ACT-HYD2-023420.)

**20.    Kadian® Label (February 2010)**

145.    The Kadian® Label published in February 2010 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).

146.    The Kadian® Label discloses an ER product containing morphine sulfate.  (ACT-HYD2-023427.)  The Kadian® Label states that the product "should be administered with caution, and in reduced dosages in . . . patients with severe . . . hepatic insufficiency," but not in patients with mild or moderate HI.  (ACT-HYD2-023433.)

### 21.   Opana® ER Label (September 2010)

147.   The Opana® ER Label published in September 2010 and is prior art to the '760 and '499 patents under pre-AIA 35 U.S.C. § 102(b).

148.   The Opana® ER Label discloses an ER product containing oxymorphone hydrochloride.  (PERNIX_HEP1126809.)

### 22.   TussiCaps® Label (July 2010)

149.   The TussiCaps® Label published in July 2010 and is prior art to the '760 and '499 patents under 35 U.S.C. § 102(b).

150.   The TussiCaps® Label discloses an immediate-release product containing 10 mg hydrocodone bitartrate and 8 mg chlorpheniramine maleate.  (ACT-HYD2-023350.)  The TussiCaps® Label states that the product "should be used with caution in . . . patients . . . with severe impairment of hepatic . . . function," but no dose adjustment is recommended for patients with mild or moderate HI.  (ACT-HYD2-023352.)

## B.   Patent-Ineligible Subject Matter

### 1.   Legal Standards

151.   35 U.S.C. § 101 states that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

152.   Subject-matter eligibility, accordingly, is a "threshold test," Bilski v. Kappos, 561 U.S. 593, 602 (2010), and a question of law.  Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1366 (Fed. Cir. 2015).

153.   The Supreme Court has set forth a two-step framework for determining whether a claim is patent eligible under 35 U.S.C. § 101.  Alice Corp. Pty. v. CLS Bank Int'l, 134 S. Ct. 2347, 2355 (2014); Mayo Collaborative Servs. v. Prometheus Labs., Inc., 566 U.S. 62, 77-79

32

(2012).  The first step is to determine whether the claims are "directed to" a patent-ineligible concept, e.g., a law of nature, abstract idea, etc.  Alice, 134 S. Ct. at 2355.  If they are, then the second step is to "search for an 'inventive concept,' i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  Id. (internal omitted).

154.   In analyzing whether claims are "directed to" a natural law under step one, courts must "look[] at the focus of the claims, their character as a whole."  Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016)(internal quotations omitted).  Identification of this focus turns on a review of the claims "in light of the specification," as well as a consideration of "the claimed advance over the prior art."  Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1335 (Fed. Cir. 2016) ("'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification."); Genetic Techs. Ltd. v. Merial L.L.C., 818 F.3d 1369, 1375 (Fed. Cir. 2016) (looking into "the focus of the claimed advance over the prior art").  See also Ariosa Diagnostics, Inc. v. Sequenom, Inc., 788 F.3d 1371, 1376 (Fed. Cir. 2015) ("The description supports the conclusion that the claims . . . are directed to a naturally occurring thing or natural phenomenon.").

155.   At step two, merely reciting "steps consisting of well-understood, routine, conventional activity" is "not sufficient to transform unpatentable natural correlations into patentable applications of the regularities."  Mayo, 566 U.S. at 80.  In other words, "simply appending conventional steps, specified at a high level of generality, to laws of nature . . . cannot make those laws . . . patentable."  Id. at 82.  "[O]ne must do more than simply state the law of nature while adding the words 'apply it.'"  Id. at 72.

156.   The "inventive concept necessary at step two . . . cannot be furnished by the

unpatentable law of nature [] itself." Genetic Techs., 818 F.3d at 1376.

157.    A patent claim, however, does not "automatically fall[] within the patentable subject matter of § 101" simply because it "implements an [abstract principle or natural law] in some specific fashion . . . ." Parker v. Flook, 437 U.S. 584, 593 (1978)(stating that determination of patentable subject matter should not "depend simply on the draftsman's art").

158.    The Court may also inquire "whether the Asserted Claims preempt use of the natural law, not whether they preempt all uses of other limitations recited by the claims. See Ariosa, 788 F.3d at 1379 ("[P]atent claims should not prevent the use of the basic building blocks of technology—abstract ideas, naturally occurring phenomena, and natural laws. While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility."). Preemption concerns may be quite narrow in scope. Mayo, 566 U.S. at 86 ("the laws of nature at issue here are narrow laws that may have limited applications, but the patent claims that embody them nonetheless implicate this concern."); see also Ariosa, 788 F.3d at 1379.

### 2.    No Court Has Held Method of Treatment Claims *Per Se* Patent-Eligible.

159.    For instance, in Endo Pharm. Inc. v. Actavis Inc., No. 14-1381, 2015 WL 7253674 (D. Del. Nov. 17, 2015) ("Endo I"), this Court held pharmaceutical method of treatment claims invalid as patent ineligible. The Endo claims recited methods for treating pain with the known opioid drug oxymorphone. Endo Pharm. Inc. v. Actavis Inc., No. 14-1381, 2015 WL 5580488, at *1-2 (D. Del. Sept. 23, 2015) ("Endo II"). Those methods required: (1) providing an oral dosage form; (2) measuring the clearance rate of creatinine, which indicates kidney health; and (3) administering the correct dosage of the drug based on the clearance rate. Id. The claims also recited a wherein clause requiring certain AUC levels in the body after administering the

34

correct dosage.  Id.  The Court characterized the natural law as "the bioavailability of oxymorphone is increased in people with impaired kidney function."  Id. at *6.  It then rejected plaintiffs' argument that the method steps did more than simply apply a law of nature as "thoroughly unconvincing" because the subject matter of the alleged invention was merely "'the connection between the severity of renal impairment and the bioavailability of oxymorphone,' or, in other words, the reaction of the human body of a renally impaired individual to oxymorphone, which is unquestionably a natural law."  Endo I, 2015 WL 7253674 at *3 (quoting Endo II, 2015 WL 5580488 at *6).

160.    Similarly, in Boehringer Ingelheim Pharms., Inc. v. HEC Pharm Co., Ltd., C.A. No. 15-5982, 2016 WL 7177704, at *7-9 (D.N.J. Dec. 8, 2016), the court found methods of treating metabolic disorders with DPP-IV inhibitors to be directed to the natural result of the body metabolizing DPP-IV inhibitors through the liver.

161.    Recently, in Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd., No. 16-2707, 2708, 2018 WL 1770273, at *12-15 (Fed. Cir. Apr. 13, 2018) ("Vanda I"), the Federal Circuit analyzed method of treatment claims without pronouncing that method of treatment claims were *per se* patent-eligible.  In that case, the named inventors discovered that a specific dosing regimen of iloperidone may be employed to safely treat schizophrenia.  Id. at *2; Vanda Pharms. Inc. v. Roxane Labs., Inc., 203 F. Supp. 3d 412, 427 (D. Del. 2016) ("Vanda II").  The court thus held that the claims were not "directed to" a natural law but at treating schizophrenia by "administering" iloperidone in the specific dosing regimen – "internally administering iloperidone to the patient in an amount that is 12mg/day or less" or between "12mg/day" and "24mg/day."  Vanda I, 2018 WL 1770273 at *14.

162.    Unlike the claims found patent-eligible in Vanda, the Asserted Claims are not

35

directed to any specific dosing regimen.  The Asserted Claims that simply recite PK values do not refer to dosing at all, and the Asserted Claims reciting non-adjustment of the starting dose do not prescribe a specific dosing regimen but rather an unspecified starting dose with subsequent dosing open to doctor and patient discretion.  Moreover, the prior art already taught safely administering hydrocodone dosage forms to treat pain in HI patients, and the "administering" step is not the "focus" of the Asserted Claims.  (See, e.g., ACT-HYD2-021171; PERNIX_HEP0001545 at ¶ 64.)  For the same reason, the claims in Vanda are also meaningfully different from the method of treatment claims in Mayo.  Compare id. with Mayo, 566 U.S. at 74.  The "administering" step of Vanda's claims was the "focus" of the claims, while the natural law was the focus of Mayo's claims.  Vanda I, 2018 WL 1770273 at *14.[2]

163.    Therefore, while method claims that are directed to "new and useful" technique or process can be found patent-eligible (see Rapid Litg. Mgmt. Ltd. v. CellzDirect, Inc., 827 F.3d 1042, 1048 (Fed. Cir. 2016); Vanda I, 2018 WL 1770273 at *14), they will not be found patent-eligible when they "essentially state the discovery of a natural law and 'simply tell doctors to apply the law somehow when treating their patients.'"  Endo I, 2015 WL 7253674 at *2 (quoting Mayo, 566 U.S. at 82.)

### 3.    The Asserted Claims Are Directed to a Natural Law

164.    The Asserted Claims are directed to the alleged discovery that the response of the human body to Devane's HC-ER prior art formulation is similar in patients with and without mild or moderate HI.  Evaluating the human body's physiological response to a pharmaceutical formulation is a quintessential patent-ineligible law of nature.  See, e.g., Mayo, 566 U.S. at 72.

---

[2] Chief Judge Prost, writing in dissent, found that the Majority's "efforts to distinguish Mayo cannot withstand scrutiny" and held the Vanda claims failed Steps One and Two.  Vanda I, 2018 WL 1770273 at *18-21.

36

Indeed, a law of nature is a relationship that is the consequence of entirely natural processes, even if those natural processes flow from a man-made drug. Endo II, 2015 WL 5580488 at *6 (citing Mayo, 566 U.S. at 77) (finding patent-ineligible claims directed to administering a certain dosage of the semi-synthetic drug oxymorphone based on measuring the bioavailability of the oxymorphone in patients with renal impairment).

165.    Figure 6 of the Patents-In-Suit depicts the outcome of administering Devane's HC-ER formulation to patients with and without mild or moderate HI and demonstrates that the similar bioavailability of hydrocodone between the patient populations.

166.    The Patents-In-Suit go on to state that

> ***The basic concept of the invention*** can be seen when viewing FIG. 6 and understanding the results shown there. . . . The results show that although there are some differences in terms of the blood plasma levels obtained, ***the differences are small and the blood levels are actually very similar pharmacologically***. Thus, when using a formulation of the type described here no separate dosing instructions need be given with respect to patients with and without hepatic impairment.

(See '760 patent, at 15:36-47.)  Thus the Patents-In-Suit themselves admit that a natural law is the "basic concept of the invention . . . ."  (Id.)

167.    Claims 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent recite this natural law in their "wherein" clauses by claiming certain PK values achieved by Devane's HC-ER dosage form when administered to patients with and without HI.  As such, these claims recite nothing more than an observation of the natural law.

168.    The limitation of "wherein the starting dose is not adjusted relative to a patient without hepatic impairment" (the "non-adjustment limitation") recited in claim 1 of the '760 patent simply restate this natural law, i.e., that similar PK values are achieved when administering Devane's HC-ER formulation to patients without HI and with mild or moderate

37

HI, by allowing a physician to forego adjusting the starting dose in patients with mild or moderate HI.

169.   Additionally, the Patent Office's Reasons for Allowance of the '760 patent point to the non-adjustment of the starting dose in patients with mild or moderate HI as the basis for allowance.  (PERNIX_HEP1163435, PERNIX_HEP1163436)

170.   And in fact, Pernix stated to this Court that, except for the non-adjustment limitation, the remainder of the Asserted Claims recites "mere empty language."  (D.I. 65 at 4-5.) Pernix also stated that "[t]he importance of not adjusting the starting dose for the relevant claims is recited throughout the specification and prosecution history, where the applicants emphasize that . . . [not] adjusting the starting dose . . . is an essential part of the claimed invention."  (Id. at 5-6 (citing '760 patent at 2:31-52, 7:61-8:13, 8:64-9:5, 23:39-48).)

171.   Thus, this natural law (i.e., the relationship between HI and the bioavailability of hydrocodone in the body after administration of Devane's HC-ER prior art formulation) is the "focus" of the Asserted Claims, as evidenced by the specifications of the Patents-In-Suit calling it the "basic concept" of the invention and the inventors' deeming it the claimed advance over the prior art.  And as such, the Asserted Claims are "directed to" this natural law.  Enfish, 822 F.3d at 1335; Genetic Techs., 818 F.3d at 1375; Ariosa, 788 F.3d at 1376.

172.   As the Endo Court explained, "a patent that . . . describes a relationship that is the consequence of entirely natural processes sets forth a natural law."  Endo II, 2015 WL 5580488 at *6 (citing Mayo, 566 U.S. at 77).  Indeed, the Asserted Claims are similar to the Endo claims that simply correlated the severity of renal impairment with the bioavailability of oxymorphone. Endo I, 2015 WL 7253674 at *3.  The Asserted Claims are also similar to the claims in Boehringer that were directed to the natural result of the body metabolizing DPP-IV inhibitors

38

through the liver.  2016 WL 7177704 at *7-9.

173.    Additionally, the Asserted Claims do not even cover a new way of using an existing drug.  Rather, the Asserted Claims cover using hydrocodone to treat a condition (pain) that it was already known to treat.  Jain, for example, teaches methods of treating patients with mild or moderate HI with ER hydrocodone dosage forms.  (PERNIX_HEP0001589 at ¶ 64.)  The Patents-in-Suit copied the claimed HC-ER formulation from Devane, which also teaches using hydrocodone to treat pain in all classes of patients.  (Devane at ¶¶ 70, 99-101, 104, claim 81; Plaintiffs' Resp. to RFA Nos. 10, 16-18.)  As such, the Asserted Claims do not recite a new use of hydrocodone to treat HI, but merely recite the well-known use of hydrocodone to treat pain.

174.    That the Asserted Claims recite using a man-made drug does not transform them into patent-eligible subject matter.  The claims at issue in Mayo also recited administering non-naturally-existing compositions.  In Mayo, the claims recited the step of "administering a drug providing 6-thioguanine to a subject having [an] immune-mediated gastrointestinal disorder."  Mayo, 566 U.S. at 74.  The compound 6-thioguanine is a synthetic purine analogue, i.e., a non-naturally-existing molecule, as is any drug metabolized into this compound in the body.  Likewise, in Endo, the active drug was oxymorphone, which like hydrocodone is a man-made, semi-synthetic opioid.

### 4.    The Asserted Claims Lack Any "Inventive Concept"

175.    The second step of the patent-eligibility inquiry is to "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  Alice Corp. Pty. v. CLS Bank Int'l, 134 S. Ct. 2347, 2355 (2014) (internal quotation omitted).  Merely reciting "steps consisting of well-understood, routine, conventional activity" is "not sufficient to transform unpatentable natural correlations into patentable applications of the

39

regularities." Mayo, 566 U.S. at 80.  In other words, "simply appending conventional steps, specified at a high level of generality, to laws of nature . . . cannot make those laws . . . patentable." Id. at 82.

176.    Excluding the natural law itself, all aspects of the Asserted Claims are routine and conventional and appear repeatedly in the prior art.

177.    To the extent the subject matter of the preamble of the Asserted Claims is limiting, "methods of treating pain in a patient having mild or moderate hepatic impairment" had been routine and common practice for years prior to the Patents-In-Suit.  The patent specifications acknowledge that opioids, including hydrocodone, are used primarily to treat pain and are among the oldest-known pharmaceuticals.  (See '760 patent at 1:42-47.)  The specifications also acknowledge that hydrocodone, like other opioids, was routinely administered to patients with HI.  (Id. at 2:48-4:29.)  The specifications further list a number of ER opioids that are used to treat pain in patients with HI.  (Id. at 3:10-4:29.)

178.    It is undisputed that methods of treating pain in patients with HI were well-known, routine and conventional.  (See supra at ¶¶ 26-31.)

179.    For example, all aspects of the step of "administering to the patient having mild or moderate hepatic impairment [a starting dose of][3] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate" were conventional and routine, whether considered in isolation or in the context of the claims overall and repeatedly appear in the prior art.

180.    First, "administering" an oral dosage unit merely requires a patient to "deliver[] into the body" the dosage unit, i.e., the same activity required by any patient with respect to any

---

[3] The recitation of "a starting dose" occurs only in claims 1-4 and 11 of the '760 patent.

oral dosage form. (D.I. 69 at 1.) Furthermore, administering hydrocodone immediate-release and ER products to patients with HI was well-known, conventional and routine practice. (ACT-HYD2-022214; ACT-HYD2-023201, ACT-HYD2-023203; ACT-HYD2-022210; ACT-HYD2-021146 (¶ 64); ACTHYD2-021165, ACT-HYD2-021170-171; PERNIX_HEP0001538, PERNIX_HEP0001545-547; ACT-HYD2-022220, ACT-HYD2-022277.)

181.    In addition, the prior art disclosed and taught administering ER dosage forms containing hydrocodone as the only active to treat pain, including Devane's HC-ER formulation. (ACT-HYD2-021083 (¶ 70); ACT-HYD2-022091, ACT-HYD2-022093, ACT-HYD2-022094 (2:21-37, 5:13-17, 7:25-28).)

182.    Moreover, several other opioids were available as single-ingredient ER oral dosage forms. (See '760 patent at 2:5-12 (listing oxycodone, tapentadol, oxymorphone and morphine as available in such dosage forms).) The labels for all these products refer to administration to patients with HI. (PERNIX_HEP1126836, ACT-HYD2-023370, PERNIX_HEP1126809, ACT-HYD2-023403)

183.    Thus, administering an ER hydrocodone oral dosage unit to patients with mild or moderate HI was well-known, conventional and routine.

184.    Second, the named inventors did not develop the claimed hydrocodone ER dosage units recited in the claims. Instead, they used Devane's HC-ER formulation. The wholesale reuse of a prior-art formulation cannot be the "inventive concept" necessary to render the Asserted Claims patent-eligible subject matter.

### a.    The Non-Adjustment Limitation Is Conventional

185.    Although the natural law is not considered under the Step Two analysis, to the extent it is considered, the non-adjustment limitation recited in claims 1-4 and 11 of the '760 patent is conventional because the 2003 FDA Guidance provides exactly when to do so

41

(i.e., when not to adjust dosage) and the named inventors did nothing more than follow its teachings. (ACT-HYD2-023067; PERNIX_HEP0015644.) Indeed, whether a drug requires a dosage adjustment is a routine decision made based upon HI studies performed in accordance with such guidance and the resulting PK values. And the Background of the Invention Section of the Patents-In-Suit acknowledges the "need for adjusting dose" was a recognized problem associated with "changes in pharmacokinetic parameters," such as AUC and $C_{max}$, in patients suffering from HI. (See, e.g., '760 patent at 4:30-34).

186.    Labels for various commercial opioids predating the Patents-in-Suit provide for non-adjustment of the starting dose in HI patients. The label for Nucynta® (tapentadol ER), for example, explicitly states that "[n]o dosage adjustment is recommended in patients with mild hepatic impairment." (ACT-HYD2-023370.) Similarly, the label for Exaglo™ (hydromorphone ER) states to "[s]tart patients with moderate and severe hepatic . . . impairment on a reduced dose," but not those with mild HI. (PERNIX_HEP0013311.)

187.    U.S. Patent Application Publication No. 2010/0010030 ("Jain") taught that administering an ER hydrocodone oral dosage form provided similar AUC and $C_{max}$ in patients with and without HI, thus requiring no dose adjustment. (PERNIX_HEP001572 (¶ 64).)

188.    Therefore, it was well-understood, routine and conventional to provide no starting-dose adjustment in patients with mild and moderate HI patients relative to non-HI patients where PK levels were similar for both HI and non-HI. (See, e.g., ACT-HYD2-023067.) That is all Pernix has done in claiming the non-adjustment limitation.

### b.    The PK Limitations Are Conventional

189.    Claims 2-4, 12, 17 and 19 of the '760 patent and claim 1 of the '499 recite release profiles requiring certain PK values achieved by administering the Devane HC-ER formulation to HI and non-HI patients. The PK values are the inherent result of administering the Devane

42

HC-ER formulation, which the named inventors did not invent, and FDA requested the test that led to the named inventors to report these PK values.

190.    First, these claims simply recite the natural law itself – namely, the PK values resulting from administration of the prior-art Devane HC-ER dosage form to various patient populations.

191.    Second, the PK values themselves – AUC and $C_{max}$ – were standard measures in the pharmaceutical industry for decades before the filing of the Patents-In-Suit. (See, e.g., ACT-HYD-023065-068.)

192.    The PK limitations therefore represent a conventional observation and cannot serve as unconventional steps that make the Asserted Claims patent eligible.

### 5.    The Asserted Claims Are Preemptive

193.    Regarding preemption, the proper question is whether the Asserted Claims preempt *use of the natural law*, not whether they preempt all uses of other limitations recited by the claims.  See Ariosa, 788 F.3d at 1379.

194.    Here, the Asserted Claims unfairly monopolize or preempt administering any HC-ER dosage form that satisfies the natural law, i.e., the comparable bioavailability of hydrocodone in the body of patients with and without mild or moderate HI.  As such, there is no utility for, or application of, the natural law that would fall outside the Asserted Claims.

### C.    Anticipation

#### 1.    Legal Standards

195.    Under 35 U.S.C. § 102 a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior-art reference.  King Pharms., Inc. v. Eon Labs, Inc., 616 F.3d 1267, 1274 (Fed. Cir. 2010) (citations omitted); see also Schering Corp. v. Geneva Pharm., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003); Oil Co. of Cal. v. Atl. Richfield Co., 208

43

F.3d 989, 994-95 (Fed. Cir. 2000).

196.    A person is not entitled to a patent if the invention claimed was "described in a printed publication . . . more than one year prior to the date of the application for patent in the United States."  Pre-AIA 35 U.S.C. § 102(b).

197.    A person is not entitled to a patent if the invention claimed was "described in – (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent." 35 U.S.C. § 102(e)

198.    Anticipation is a question of fact.  SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1343 (Fed. Cir. 2005)  It must be proven by clear and convincing evidence. Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1224 (Fed. Cir. 2014).  Although "[a]nticipation is a question of fact, [] validity is a question of law."  Liebel- Flarsheim Co. v. Medrad, Inc., 481 F.3d 1371, 1377 (Fed. Cir. 2007).

199.    A well-known axiom of patent law holds that a product or method "which would literally infringe if later in time anticipates if earlier."  Upsher-Smith Labs., Inc. v. Pamlab, L.L.C., 412 F.3d 1319, 1322 (Fed. Cir. 2005) (quoting Schering, 339 F.3d at 1379); Bristol– Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1378 (Fed. Cir. 2001).

200.    "The anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed."  Hewlett-Packard Co. v. Mustek Sys., Inc., 340 F.3d 1314, 1325 (Fed. Cir. 2003); see also Upsher-Smith Labs., 412 F.3d at 1322 (holding that a patent that optionally includes an ingredient can anticipate a patent that specifically excludes the

44

ingredient).

201.   Where a prior art reference discloses a method of treatment, the reference may be enabled even if a person of ordinary skill would have no reasonable scientific basis to conclude that the method would be effective.  Rasmusson v. SmithKline Beecham Corp., 413 F.3d 1318, 1325-26 (Fed. Cir. 2005).  "The standard for what constitutes proper enablement of a prior art reference for purposes of anticipation under section 102 . . . differs from the enablement standard under section 112."  Id. at 1325.  "The reason is that section 112 'provides that the specification must enable one skilled in the art to 'use' the invention whereas [section] 102 makes no such requirement as to an anticipatory disclosure."  Id. at 1325 (quoting In re Hafner, 410 F.2d 1403 (CCPA 1969)).

202.   Also, the reference need not evidence "actual creation or reduction to practice."  In re Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009); Schering, 339 F.3d at 1380-81).at 1380-81).

203.   Further, "anticipation does not require actual performance of suggestions in a disclosure.  Rather, anticipation only requires that those suggestions be enabling to one of skill in the art."  Bristol-Myers Squibb, 246 F.3d at 1379.  See also Impax Labs., Inc. v. Aventis Pharms., Inc., 468 F.3d 1366, 1382 (Fed. Cir. 2006); In re Donohue, 766 F.2d 531, 533 (Fed. Cir. 1985).  If the claim limitation at issue "is within the knowledge of a skilled artisan," then a reference anticipates "even if it does not specifically disclose" the claim limitation.  In re Graves, 69 F.3d 1147, 1152 (Fed. Cir. 1995).

204.   "[W]hether a prior art reference is enabling is a question of law with underlying factual inquiries."  In re NTP, Inc., 654 F.3d 1279, 1301 (Fed. Cir. 2011)(citation omitted).  "Enablement of an anticipatory reference may be demonstrated by a later reference."  Bristol-Myers Squibb, 246 F.3d at 1379.  Thus, "a prior art reference must be 'considered together with

45

the knowledge of one of ordinary skill in the pertinent art' . . . at the time the . . . patent was filed." In re Paulsen, 30 F.3d 1475, 1480-81 (Fed. Cir. 1994); In re Samour, 571 F.2d 559, 562-63 (C.C.P.A. 1978) ("The critical issue . . . is whether the claimed subject matter was in possession of the public prior to applicant's filing date[ or conception date,] not whether the evidence showing such possession came before or after the date of the primary reference.")).

205.    "[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." Schering, 339 F.3d at 1377.  Either a single element of claimed subject matter or the entire claimed subject matter may be inherently disclosed.  Schering, 339 F.3d at 1379.

206.    "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." MEHL/Biophile Int'l Corp. v. Milgraum, 192 F.3d 1362, 1365 (Fed. Cir. 1999); see also Schering, 339 F.3d at 1377, 1379.

207.    A reference includes an inherent characteristic if that characteristic is the "natural result" flowing from the reference's explicitly recited teachings.  See SmithKline, 403 F.3d at 1343.  That is, "if the prior art necessarily functions in accordance with, or includes, the claimed limitations it anticipates." Atlas Powder Co. v. IRECO Inc., 190 F.3d 1342, 1347 (Fed. Cir. 1999).

208.    As such, "discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's function, does not render the older composition patentably new to the discoverer." Id.; see also Titanium Metals Corp. of Am. v. Banner, 778 F.2d 775, 781-82 (Fed. Cir. 1985).  The Federal Circuit has specifically "reject[ed] the contention that inherent anticipation requires recognition in the prior art." Schering, 339

46

F.3d at 1377.

209. Newly discovered results of known processes are inherent and therefore unpatentable. See Bristol-Myers Squibb, 246 F.3d at 1376; In re Cruciferous Sprout Litig., 301 F.3d 1343, 1349-51 & n.4 (Fed. Cir. 2002); Perricone v. Medicis Pharm. Corp., 423 F.3d 1368, 1378-80 (Fed. Cir. 2005).

210. It is well settled that "[p]roducts of identical chemical composition can not [sic] have mutually exclusive properties." In re Spada, 911 F.2d 705, 708-09 (Fed. Cir. 1990) (citing In re Papesch, 315 F.2d 381, 391 (CCPA 1963) (holding a chemical composition and its properties inseparable)).

211. It is entirely proper to rely upon secondary references published after the earliest effective filing date of a patent to prove inherent properties of a prior-art composition. See, e.g., Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co., 878 F.3d 1336, 1346 (Fed. Cir. 2018) (finding it proper for the PTAB to rely on unpublished, post-filing extrinsic evidence that "support[ed] what is 'necessarily present' in a prior art's teaching") (quotations in original).

212. Prior art disclosures that are broader than an inherent claim limitation satisfy the standard for inherency *provided* such disclosures include at least one embodiment that naturally and necessarily results in satisfaction of the limitation. SmithKline, 403 F.3d at 1343 (Fed. Cir. 2005); Atlas Powder, 190 F.3d at 1347-49; Aventis Pharms, Inc. v. Barr Labs., Inc., 411 F. Supp. 2d 490, 519-24 (D.N.J. 2006), aff'd, 208 Fed. Appx. 842-43 (Fed. Cir. 2006).

213. The court's decision in Aventis illustrates this principle. In Aventis, the claim at issue recited a method of treating allergic rhinitis in patients with HI by administering fexofenadine while avoiding cardiac events. Aventis, 411 F. Supp. 2d at 519. A prior art patent broadly disclosed that fexofenadine could be administered with suitable pharmaceutical carriers

47

to treat allergic rhinitis in humans and claimed a method of treating patients with fexofenadine. Id. at 519-24. The Aventis court held that "treating hepatically impaired patients is necessarily present in the teaching of the [prior art patent], which discloses a method for treating all patients; *it need not be present in every instance of use or practice* of the [prior art patent's] method." Id. at 522 (emphasis added). This conclusion follows from the Federal Circuit's clarification in SmithKline that an inherent disclosure need not be present in every instance of practicing the prior art. Rather, a defendant "merely [needs to show] that the disclosure [of the prior art] is sufficient to show that the natural result flowing from the operation as taught [in the prior art] would result in the claimed product." SmithKline, 403 F.3d at 1343; see also Atlas Powder, 190 F.3d at 1347-49 (finding anticipation when some prior art embodiments necessarily satisfied the claimed aeration property while others did not). Finally, the Aventis court also concluded that the alleged cardiac "discovery" of the patentee was merely a previously unappreciated property of the prior art treatment method directed to the *same* purpose, i.e., treating allergic rhinitis, and thus was not patentably new. Id. at 523 (citing Atlas Powder, 190 F.3d at 1347; Bristol-Myers, 246 F.3d at 1376).

### 2. The Asserted Claims are Anticipated by Devane

214.    Devane expressly or inherently teaches each and every limitation recited by the Asserted Claims and enables their practice.

#### a. Claims 1 and 12 of the '760 Patent

##### i. *Claim 1 and 12 – "a method of treating pain in a patient"*

215.    The preamble of independent claims 1 and 12 of the '760 patent recites "a method of treating pain in a patient having mild or moderate hepatic impairment . . . ." To the extent the preamble limits these claims, Devane expressly teaches methods of treating pain in all patients requiring pain management.

48

216.    Devane teaches that "[i]n embodiments which include drug compounds used for pain management, such as for example hydrocodone, the compositions and dosage forms of the present invention may provide continuous analgesia for up to 24 hours . . . ."  (Devane at ¶ 70.)

217.    Devane further discloses a clinical trial that "evaluate[d] the safety, efficacy, and PK of hydrocodone formulations in subjects immediately following bunionectomy study."  (Id. at ¶ 104).  Devane also claims "[a] method for the treatment of pain" comprising administering the claimed compositions, including those with hydrocodone.  (Id. at claims 17 and 81.)

218.    As discussed below in ¶¶ 225-229, Devane inherently teaches treating pain in patients with mild or moderate HI.

> **ii.    *Claims 1 and 12 – "administering . . . [a starting dose of] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate"***

219.    All Asserted Claims require the step of "administering to the patient having mild or moderate hepatic impairment [a starting dose of][4] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate."

220.    Devane states that, "[i]n embodiments which include drug compounds used for pain management, such as for example hydrocodone, the compositions and dosage forms of the present invention may provide continuous analgesia for up to 24 hours . . . ."  (Devane at ¶ 70.)

221.    Devane provides an example of "a dosage form of the present invention" at Example 3, which is an ER oral dosage unit having hydrocodone bitartrate as the only active ingredient.  (Id. at ¶ 99-101, 104.)

---

[4] The recitation of "a starting dose" occurs in claim 1 of the '760 patent.

49

222.    The dosage form in Example 3 of Devane is identical to the dosage form called HC-ER in Example 8 of the Patents-In-Suit, which Pernix has commercialized as Zohydro ER. (Plaintiff's Resp. to RFA Nos. 10, 16-18.)

223.    The first dose of this dosage form administered to patients treated for pain management is "a starting dose." (D.I. 69 at 2.)  Thus, Devane expressly teaches administering a starting dose of an ER hydrocodone-only oral dosage unit to a patient.

224.    As discussed in ¶¶ 225-229, Devane inherently teaches administering a hydrocodone-only ER oral dosage unit to patients with mild or moderate HI.

### iii.    *Claims 1 and 12 – "in patients with mild or moderate hepatic impairment"*

225.    Devane expressly teaches administering dosage forms "of the present invention," including what the Patents-in-Suit call HC-ER, to patients with pain generally.  (Devane at ¶¶ 70, 104, claims 17 and 81.)

226.    There is no dispute that, as of July 31, 2012, the population of pain patients receiving such treatment inevitably included patients with mild or moderate HI.

227.    Under Federal Circuit principles of inherency, Devane's disclosure of administering HC-ER to all pain patients inherently discloses administering this dosage form to the subpopulation of pain patients with mild or moderate HI.

228.    Application of Devane's methods to the subpopulation of patients with mild or moderate HI is the "natural result flowing from the operation as taught . . . ." SmithKline, 403 F.3d at 1343.  As such, Devane inherently discloses administering HC-ER to patients with mild or moderate HI.  Id.; Powder, 190 F.3d at 1347-49; Aventis, F. Supp. 2d at 519-524.

229.    Moreover, the Asserted Claims recite a method of using a known product in a known way, i.e., to treat pain.  Bristol-Myers Squibb, 246 F.3d at 1376; Cruciferous, 301 F.3d at

1349-51 & n.4; Perricone, 423 F.3d at 1378-80.

####         iv.      *Claim 1 – "wherein the starting dose is not adjusted relative to a patient without hepatic impairment"*

230.     Administering Devane's dosage form to patients with mild or moderate HI necessarily satisfies the non-adjustment limitation of claim 1 of the '760 patent.

231.     As an initial matter, Devane generally discloses the administration of the HC-ER dosage form to all pain patients and does not suggest that the starting dose be adjusted for any patient subgroup.  (See, e.g., Devane at ¶ 70.)

232.     Furthermore, Devane's HC-ER dosage form in Example 3 necessarily meets the non-adjustment limitation because Devane's HC-ER dosage form is identical to the HC-ER dosage form used in Example 8 of the '760 and '499 patents and to Zohydro ER, both of which Pernix asserts are covered by the Asserted Claims.  It is well settled that "[p]roducts of identical chemical composition can not [sic] have mutually exclusive properties."  In re Spada, 911 F.2d at 708-09.  If Pernix's Zohydro and HC-ER satisfy this limitation, as Pernix asserts, then the identical Devane dosage form necessarily satisfies it as well.  Id.

233.     Furthermore, the Court adopted Pernix's proposed construction of the non-adjustment term to mean that "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced ***due to that hepatic impairment*** relative to the dose prescribed to a patient without hepatic impairment when initiating treatment."  (D.I. 69 at 2 (emphasis added).)

234.     A starting dose is only adjusted "due to" hepatic impairment if the dosage form produces significantly different AUC and $C_{max}$ values in patients with and without mild or moderate HI.  (See ACT-HYD2-023067)  Thus, when a dosage form does not produce such significantly different AUC and $C_{max}$ values, it never be reduced "due to" the HI of the patient.

51

235.    The FDA Guidance provides that dose adjustments are only necessary due to HI when "the effect of hepatic impairment on the PK of the drug is obvious (e.g., two-fold or greater increase in AUC) . . . ." (Id.)

236.    Devane's HC-ER formulation provides far less than a two-fold increase in AUC in patients with and without mild or moderate HI.  Devane's HC-ER formulation provided the following PK values when administered to patients with no, mild and moderate HI.

| PK Parameters | Patients without HI | Patients with mild HI | Patients with moderate HI |
|---|---|---|---|
| $AUC_{0\text{-inf}}$ | 391 ng*hr/mL | 509 ng*hr/mL | 440 ng*hr/mL |
| $C_{max}$ | 22 ng*hr/mL | 24 ng*hr/mL | 25 ng*hr/ml |

Hydrocodone $C_{max}$ values were 8-10% higher in patients with mild or moderate hepatic impairment, respectively, while AUC values were 10% and 26% higher in patients with mild and moderate hepatic impairment, respectively.  (Zohydro ER Label at 22.)

237.    In view of the above, Devane's HC-ER formulation inherently meets the non-adjustment limitation because it produces similar AUC and $C_{max}$ values in patients with and without mild or moderate HI.

238.    Moreover, Devane discloses that "the compositions and dosage forms of the present invention may provide continuous analgesia for up to 24 hours . . . ." (D.I. 119 at ¶ 70.) There was no reason for a POSA not to take this disclosure at face value given that the prior art contains numerous ER opioids and hydrocodone products, including long-used commercial products, that do not require dose adjustment in patients with mild or moderate HI.  (See D.I. 145 at 19-20.)

### v.    *Claim 12 – "wherein the dosage unit provides a release profile. . . ."*

239.    Claim 12 of the '760 patent recites, *inter alia*:

wherein the dosage unit provides a release profile of hydrocodone that:

(1) does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%;

(2) does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%;

(3) does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%; and

(4) does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

240.   For the same reasons Devane's HC-ER formulation satisfies the non-adjustment limitation of claim 1 of the '760 patent, it likewise satisfies limitations (1)-(4) recited above. Once again, identical compositions must necessarily produce identical properties.  In re Spada, 911 F.2d at 708-09.

241.   The claimed AUC and $C_{max}$ parameters recited by the wherein clauses of independent claim 12 are nothing more than unappreciated properties inherent in the teachings in Devane.

242.   And as demonstrated in the table below, Devane's HC-ER formulation meets limitations (1)-(4) of claim 12 of the '760 patent:

| PK Parameters | Patients without HI | Patients with mild HI | Patients with moderate HI |
|---|---|---|---|
| $AUC_{0-inf}$ | 391 ng*hr/mL | 509 ng*hr/mL | 440 ng*hr/mL |
| $C_{max}$ | 22 ng*hr/mL | 24 ng*hr/mL | 25 ng*hr/ml |

53

Hydrocodone $C_{max}$ values were 8-10% higher in patients with mild or moderate hepatic impairment, respectively, while AUC values were 10% and 26% higher in patients with mild and moderate hepatic impairment, respectively. (Zohydro ER Label at 22.)

### b.      Claims 2-4, 11, 17 and 19 of the '760 Patent

243.    Dependent claims 2-4, 11, 17 and 19 of the '760 patent recite "wherein the dosage form provides a release profile of hydrocodone" providing certain AUC and $C_{max}$ values. (See ¶¶ 48-54.)  For the same reasons Devane's HC-ER dosage form satisfies the PK values of claim 12 of the '760 patent, it likewise satisfies these limitations. (See supra at ¶¶ 239-242.)

### c.      Claim 1 of the '499 Patent

244.    Claim 1 of the '499 patent recites:

A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient,

wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,

wherein the dosage unit provides a release profile of hydrocodone that:

does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and

does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

245.    As with claims 1 and 12 of the '760 patent, Devane expressly or inherently discloses (1) "[a] method of treating pain in a patient having mild or moderate hepatic impairment," (2) "administering to the patient having mild or moderate hepatic impairment an

54

oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate," and (3) a "dosage unit [that] provides a release profile of hydrocodone that" meets the claimed PK values.  (See supra at ¶¶ 215-242.)

#### d.      Devane Enables Practice of the Claimed Subject Matter

246.    Devane provides disclosures concerning how to make Devane's HC-ER dosage form, including an express list of its ingredients and respective concentrations, as well as disclosures regarding using HC-ER to treat pain.  (See, e.g., Devane at ¶¶ 63-74, 99-106.) Moreover, the Patents-in-Suit copied the Devane HC-ER dosage form verbatim.

247.    Accordingly, Devane teaches and enables each and every limitation of the Asserted Claims.  (See ¶¶ 215-246.)

#### 3.      The Asserted Claims are Anticipated by Huang

248.    Huang expressly or inherently teaches each and every limitation recited by the Asserted Claims and enables their practice.

#### a.      Claim 1 of the '760 Patent

##### i.      *Claim 1 and 12 – "a method of treating pain in a patient"*

249.    The preamble of independent claims 1 and 12 of the '760 patent recites "a method of treating pain in a patient having mild or moderate hepatic impairment . . . ."  To the extent the preamble limits these claims, Huang expressly teaches methods of treating pain in all patients requiring pain management.

250.    With respect to treating pain generally, Huang discloses that "[i]t is a[n] . . . object of certain embodiments of the present invention to provide a method of treating pain in human patients with a solid controlled release dosage form comprising an opioid analgesic . . . ." (ACT-HYD2-022091 at 2:21-25.)

55

251.   Huang also states that "[i]t is a further object of certain embodiments of the present invention to treat a disease or condition (e.g., pain) by administering a solid controlled release dosage form as disclosed herein to a patient in need thereof."  (Id. at 2:26-29.)

252.   Huang states that "[i]t is a further object of certain embodiments of the present invention to provide a use of a medicament (e.g., an opioid analgesic) in the manufacture of a dosage form for the treatment of a disease state (e.g., pain)."  (Id. at 2:34-37.)

253.   Huang further recites that "[i]n certain embodiments, the present invention is directed to a method of treating pain in a patient or subject comprising administering a solid controlled release dosage form comprising an opioid analgesic as disclosed herein."  (ACT-HYD2-022094 at 7:25-28.)

254.   Huang also claims a method of treating pain "comprising administering to the subject the solid controlled release dosage form according to claim 1."  (ACT-HYD2-022117 at claim 95.)

255.   As discussed below in ¶¶ 261-265, Huang inherently teaches treating pain in patients with mild or moderate HI.

> **ii.**   *Claims 1 and 12 – "administering . . . [a starting dose of] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate"*

256.   All Asserted Claims require the step of "administering to the patient having mild or moderate hepatic impairment [a starting dose][5] of an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate."

---

[5] The recitation of "a starting dose" occurs in claim 1 of the '760 patent.

257. As discussed in ¶¶ 249-254, Huang teaches a method of treating pain using an embodiment of its invention with an opioid analgesic.  Huang discloses ████████, a solid controlled release dosage form comprising hydrocodone bitartrate as the only active ingredient. (ACT-HYD2-022111 at ██████.)

258. Huang's ██████████ is identical to the formulation currently marketed under the name ████████. (████████████████████████████████████) Huang's ██████████ falls within the scope of Huang's method of treating pain, as it is encompassed by Huang's claim 1.  (ACT-HYD2-022111-112 at ████████████)

259. Using Huang's ██████████ in methods for treating pain includes administering a "starting dose."  (D.I. 69 at 2.)  Thus, Huang expressly teaches administering an ER hydrocodone-only oral dosage unit, including a starting dose of the same.

260. As discussed below in ¶¶ 261-265, Huang inherently teaches administering a hydrocodone-only ER oral dosage unit to patients with mild or moderate HI.

### iii.   *Claims 1 and 12 – "in patients with mild or moderate hepatic impairment"*

261. Huang expressly teaches administering ██████████ to patients with pain generally.  (ACT-HYD2-022091 at 2:21-49, ACT-HYD2-022093 at 5:13-17, ACT-HYD2-022094 at 7:25-28, ACT-HYD2-022117 at claim 95.)

262. There is no dispute that, as of July 31, 2012, the population of pain patients receiving such treatment inevitably includes pain patients with mild or moderate HI.

263. Under Federal Circuit principles of inherency, Huang's disclosure of administering ██████████ to all pain patients inherently discloses administering this dosage form to the sub-population of pain patients with mild or moderate HI.

264. Application of Huang's methods to the sub-population of patients with mild or

moderate HI is the "natural result flowing from the operation as taught . . . ." SmithKline, 403 F.3d at 1343. As such, Huang inherently discloses administering ████████ to patients with mild or moderate HI. Id.; Atlas Powder, 190 F.3d at 1347-49; Aventis, 411 F. Supp. 2d at 519-524.

265. Moreover, the Asserted Claims recite a method of using a known product in a known way, i.e., to treat pain. Bristol-Myers Squibb, 246 F.3d at 1376; Cruciferous, 301 F.3d at 1349-51 & n.4; Perricone, 423 F.3d at 1378-80.

### iv. *Claim 1 – "wherein the starting dose is not adjusted relative to a patient without hepatic impairment"*

266. ████████ also inherently satisfies the non-adjustment limitation. As discussed earlier, the Court construed this term to mean that the starting does is not reduced "due to" the patient's mild or moderate HI. (See supra at ¶¶ 75, 233-234.)

267. The 2003 FDA Guidance makes clear that dosage adjustments are only necessary in HI patients when "the effect of hepatic impairment on the PK of the drug is obvious (e.g., two-fold or greater increase in AUC) . . . ." (ACT-HYD2- 023067.) The Guidance also states "[a] conclusion that there is *no effect* (really, no clinically important effect) of hepatic impairment on the drug's PK" may be supported by "the employment of a standard 90 percent confidence interval of 80-125 percent for AUC and $C_{max}$." (ACT-HYD2-023068 (emphasis in original).)

268. Post-filing PK data derived from a clinical study on HI patients who received Huang's ████████████████████ demonstrates that mild and moderate HI has no clinically important effect on the PK of ████████. (ACT-HYD2-023236; ████ Decl. Ex. B.). Huang's ████████ provides the following $AUC_{0\text{-inf}}$ and $C_{max}$ values in patients with and without mild or moderate HI per 20 mg tablet:

58

| PK Parameters | Patients without HI | Patients with mild HI | Patients with moderate HI |
|---|---|---|---|
| $AUC_{0\text{-}inf}$ | ███████ | ███████ | ███████ |
| $C_{max}$ | ███████ | ███████ | ███████ |

Hydrocodone $C_{max}$ values were ██████████████ in patients with mild or moderate hepatic impairment, respectively, while AUC values were ██████████████ in patients with mild and moderate hepatic impairment, respectively.  (ACT-HYD2-023236; ACT-HYD2-022333; Fanelli Decl. Ex. B.)

269.    Applying FDA's 80-125 standard to these values provides a range of no clinical effect for AUC of ██████████ ng*hr/mL and a range of no clinical effect for $C_{max}$ of ████████████.  Thus, ██████████ does not reach the two-fold increase identified in the 2003 FDA Guidance as requiring dose adjustment.  ██████████ also falls within FDA's standard for no clinically important effect of HI.

270.    Accordingly, the ██████████ label expressly states that dose adjustment is unnecessary in patients with mild or moderate HI.  (ACT-HYD2-023226.)

271.    As such, Huang inherently discloses the non-adjustment limitation because ██████████ cannot be adjusted "due to" the patients HI.

> **v.    *Claim 12 – "wherein the dosage unit provides a release profile. . . ."***

272.    Claim 12 of the '760 patent recites, *inter alia*:

> wherein the dosage unit provides a release profile of hydrocodone that:
>
> (1) does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%;
>
> (2) does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects

not suffering from renal or hepatic impairment in an amount of more than 30%;

(3) does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%; and

(4) does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

273. As demonstrated in the table below, Huang's ▮▮▮▮▮▮▮▮ inherently meets limitations (1)-(4) because Huang's ▮▮▮▮▮▮▮ achieves the recited PK values when administered to patients with mild or moderate HI:

| PK Parameters | Patients without HI | Patients with mild HI | Patients with moderate HI |
|---|---|---|---|
| $AUC_{0\text{-inf}}$ | ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ |
| $C_{max}$ | ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ |

Hydrocodone $C_{max}$ values were ▮▮▮▮▮▮▮▮▮▮ in patients with mild or moderate hepatic impairment, respectively, while AUC values were ▮▮▮▮▮▮▮▮▮ in patients with mild and moderate hepatic impairment, respectively. (ACT-HYD2-023236; ACT-HYD2-022333; Fanelli Decl. Ex. B.)

### b.    Claims 2-4, 11, 17 and 19 of the '760 Patent

274. Dependent claims 2-4, 11, 17 and 19 of the '760 patent recite "wherein the dosage form provides a release profile of hydrocodone" providing certain AUC and $C_{max}$ values. (See ¶¶ 48-55.) For the same reasons Huang's ▮▮▮▮▮▮▮ satisfies the PK values of claim 12 of the '760 patent, it likewise satisfies these limitations. (See supra at ¶¶ 272-273.)

### c.    Claim 1 of the '499 Patent

275. Claim 1 of the '499 patent recites:

A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient,

wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,

wherein the dosage unit provides a release profile of hydrocodone that:

does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and

does not increase average hydrocodone $AUC_{0-inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

276.    As with claims 1 and 12 of the '760 patent, Huang expressly or inherently discloses (1) "[a] method of treating pain in a patient having mild or moderate hepatic impairment," (2) "administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate," and (3) a "dosage unit [that] provides a release profile of hydrocodone that" meets certain PK values. (See supra at ¶¶ 249-274.)

### d.    Huang Enables Practice of the Claimed Subject Matter

277.    Huang provides detailed disclosures concerning how to make its ER hydrocodone dosage forms, including an express list of their ingredients and respective concentrations, as well as disclosures regarding using their dosage forms to treat pain. (See, e.g., ACT-HYD2-022097 at 14:55-17:5, ACT-HYD2-022099 at 18:40-47:23.)

61

278.    Accordingly, Huang teaches and enables each and every limitation of the Asserted Claims.  (See supra at ¶¶ 249-277.)

### D.    Obviousness

#### 1.    Legal Standards

279.    A person is not entitled to a patent "if the differences between the subject matter . . . patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).

280.    For the purposes of the obviousness analysis, the scope and content of the prior art "necessarily encompasses not only the field of the inventor's endeavor but also any analogous art."  In re GPAC Inc., 57 F.3d 1573, 1577-78 (Fed. Cir. 1995).

281.    "When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through 'routine testing,' the claims are obvious."  Purdue Pharma Prod. L.P. v. Par Pharm., Inc., 642 F. Supp. 2d 329, 368 (D. Del. 2009), aff'd, 377 F. App'x 978 (Fed. Cir. 2010).  See also Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1367 (Fed. Cir. 2007); Aventis Pharma S.A. v. Hospira, Inc., 743 F. Supp. 2d 305, 344 (D. Del. 2010), aff'd, 675 F.3d 1324 (Fed. Cir. 2012) (finding claims invalid as obvious where "[t]he routine testing and optimization that skilled artisans then would undertake would have quickly led them to the ingredient amounts and ratios disclosed in the asserted claims").

282.    The test for obviousness involves a four-factor analysis:  (1) the scope and content of the prior art; (2) the differences between the art and the claims at issue; (3) the level of ordinary skill in the art; and, if relevant, (4) any secondary considerations.  Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d 1253, 1259 (Fed. Cir. 2012); see Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).

283.    The Supreme Court has emphasized that an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 401 (2007).

284.    A patent claim would have been obvious when a POSA would have had a rationale to combine the teachings of the prior art to achieve the claimed subject matter with a reasonable expectation of success. See Pfizer, Inc. v. Apotex, 480 F.3d 1348, 1361 (Fed. Cir. 2007). Proving obviousness "does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away." Par Pharm., Inc. v. TWI Pharm., Inc., 773 F.3d 1186, 1197-98 (Fed. Cir. 2014) (emphases in original).

285.    Undertaking further study "does not imply lack of awareness of the likely result; rather, studies are frequently conducted to confirm what is suspected to be true." Soft Gel Techs., Inc. v. Jarrow Formulas, Inc., 864 F. 3d 1334, 1342 (Fed. Cir. 2017). And, an "incentive to conduct a confirmatory study frequently exists even when one has every reason to expect success." Id. (affirming obviousness of the asserted claims, stated: "recommendations for future research show a person of skill in the art would have recognized–and at least one [the author of the prior art reference] did recognize–that the [claimed oils] are of interest in the [claimed composition].").

286.    Obviousness requires a reasonable expectation of success in practicing the claimed subject matter, but that expectation need not be absolute. In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1068-69 (Fed. Cir. 2012); Pfizer, 480 F.3d at 1364 ("[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success.");

63

see also In re O'Farrell, 853 F.2d. 894, 904 (Fed. Cir. 1988) ("For obviousness under § 103, all that is required is a reasonable expectation of success."); Allergan, Inc. v. Sandoz Inc., 726 F.3d 1286, 1292 (Fed. Cir. 2013).

287.    "When there . . . are finite number of identified, predictable solutions, person of ordinary skill has good reason to pursue the known options within his or her technical grasp, and if this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense."  KSR, 550 U.S. at 402.

288.    "[I]nherency may supply a missing claim limitation in an obviousness analysis." Twi Pharms., Inc., 773 F.3d at 1194-95.  "[T]he limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art."  Id. at 1196.

289.    "[A]n obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations."  Santarus, Inc. v. Par Pharm., Inc., 694 F.3d 1344, 1354 (Fed. Cir. 2012) (citing In re Kao, 639 F.3d 1057, 1070 (Fed.Cir.2011)). "To hold otherwise would allow any formulation—no matter how obvious—to become patentable merely by testing and claiming an inherent property."  Id.

290.    Objective indicia of nonobviousness can be considered in connection with an obviousness analysis.  See Graham, 383 U.S. at 17-18.  Such evidence, however, cannot overcome a strong *prima facie* case of obviousness based on the prior art.  See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC, 683 F.3d 1356, 1364-65 (Fed. Cir. 2012); Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007).

291.    A patentee bears the burden of producing evidence of objective indicia, establishing a nexus to the claimed subject matter and showing that the objective indicia are

64

commensurate in scope with the claimed subject matter.  See, e.g., In re GPAC, 57 F .3d 1573, 1580 (Fed. Cir. 1995).

292.  Where objective indicia "result[] from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."  Merck & Cie v. Gnosis S.P.A., 808 F.3d 829, 837 (Fed. Cir. 2015).

**2.    The Asserted Claims Would Have Been Obvious
Over Devane in View of One or More of Jain, the
Vicodin® Label, the Lortab® Label, or the VA Guideline**

**a.    Claims 1 and 12 of the '760 Patent**

**i.    *Claims 1 and 12 – "A method of treating pain in a patient
having mild or moderate hepatic impairment"***

293.  The preamble of independent claims 1 and 12 of the '760 patent recites "a method of treating pain in a patient having mild or moderate hepatic impairment . . . ."  To the extent the preamble limits these claims, such a method would have been obvious over Devane in view of one or more of Jain, the Vicodin® Label, the Lortab® Label, or the VA Guideline.

294.  Devane teaches that, "[i]n embodiments which include drug compounds used for pain management, such as for example hydrocodone, the compositions and dosage forms of the present invention may provide continuous analgesia for up to 24 hours . . . ."  (Devane at ¶ 70.) Devane further discloses a clinical trial that "evaluate[d] the safety, efficacy, and PK of hydrocodone formulations in subjects immediately following bunionectomy study."  (Id. at ¶ 104).  Devane also claims "[a] method for the treatment of pain" comprising administering the claimed compositions, including those with hydrocodone.  (Id. at claims 17 and 81.)  A POSA would therefore have understood that Devane discloses methods of treating pain in all patients with hydrocodone formulations.

295.  To the extent this disclosure does not inherently teach and disclose treating pain

65

in the subpopulation of pain patients with HI (see supra ¶¶ 226-229), doing so would have been obvious in view of one or more of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline.  Each of these reference discloses and teaches the use of  hydrocodone to treat pain in patients with mild or moderate HI, and a POSA would therefore have known that such patients suffering from pain may be treated with Devane's HC-ER formulation.  Moreover, a POSA would have known that the effects, tolerability, and response to each opioid may be different. (See supra at ¶ 25.)  As such, a POSA would have been motivated to look to references regarding the administration of hydrocodone in HI patients, such as Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline.  This is because a POSA would have known that the body would metabolize the hydrocodone active from an immediate-release hydrocodone product in the same manner as the hydrocodone active from a hydrocodone ER product.

296.    Jain discloses that its "invention generally provides a method of treatment and improvement of quality of life for patients adversely affected by various pain conditions." (PERNIX_HEP0001571 at Abstract.)  Jain further discloses a study in which normal and HI patients were given an ER formulation, called Vicodin CR, containing 15 mg hydrocodone bitartrate and 500 mg acetaminophen.  (PERNIX_HEP0001587 at ¶ 34, PERNIX_HEP0001589 at ¶ 64.)  The effects of HI on the pharmacokinetics of Vicodin CR were studied in 24 subjects: 8 subjects with normal liver function; 8 subjects with mild impairment; and 8 subjects with moderate impairment.  (Id. at ¶ 64.)  A POSA would therefore have understood that Jain discloses methods of treating pain in all patients, including those with mild and moderate HI, with an ER hydrocodone formulation.

297.    The Vicodin® Label discloses a product containing 10 mg of hydrocodone bitartrate and 500 mg of acetaminophen.  (ACT-HYD2-022213.)  The Vicodin® Label discloses

66

that Vicodin® is indicated for the relief of moderate to moderately severe pain.  (ACT-HYD2-022214.)  The Vicodin® Label notes using caution and monitoring liver function when administering Vicodin® to patients with severe HI, but not mild or moderate HI.  (Id.)  As such, a POSA would have understood that the Vicodin® Label discloses treating pain in all patients, including those with HI, with a hydrocodone formulation.

298.    The Lortab® Label discloses a product containing 10 mg of hydrocodone bitartrate and 500 mg of acetaminophen.  (ACT-HYD2-022210.)  The Lortab® Label discloses that Lortab® is indicated for the relief of moderate to moderately severe pain.  (Id.)  The Lortab® Label notes using caution and monitoring liver function when administering Lortab® to patients with severe HI, but not mild or moderate HI.  (ACT-HYD2-022210-211.)  As such, a POSA would have understood that the Lortab® Label discloses treating pain in all patients, including those with HI, with a hydrocodone formulation.

299.    The VA Guideline discloses updated clinical practice guidelines for management of opioid therapy for chronic pain.  (VA Guideline at 3.)  The VA Guideline provides information on dosing opioid analgesics, including hydrocodone, in patients with HI.  (Id. at 27, Appendix E.)  As such, a POSA would have understood that the VA Guideline discloses methods of treating pain in patients with HI using a hydrocodone formulation.

> **ii.**      ***Claims 1 and 12 – "administering to the patient having mild or moderate hepatic impairment [a starting dose of] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate"***

300.    All Asserted Claims require the step of "administering to the patient having mild

or moderate hepatic impairment [a starting dose of][6] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate."

301.    Devane states that, "[i]n embodiments which include drug compounds used for pain management, such as for example hydrocodone, the compositions and dosage forms of the present invention may provide continuous analgesia for up to 24 hours . . . ." (Devane at ¶ 70.) Devane provides an example of "a dosage form of the present invention" at Example 3, which is an ER oral dosage unit having hydrocodone bitartrate as the only active ingredient.  (Id. at ¶¶ 99-101, 104.)  The dosage form in ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████. (Plaintiff's Resp. to RFA Nos. 10, 16-18.)  The first dose of this dosage form administered to patients treated for pain management is "a starting dose."  (D.I. 69 at 2.)  Thus, a POSA would have understood that Devane teaches administering a starting dose of an ER hydrocodone-only oral dosage unit to a patient.

302.    As discussed above, to the extent Devane's disclosure of treating all patients does not inherently teach and disclose administration to the subpopulation of pain patients with mild or moderate HI, (see supra at ¶¶ 226-229), a POSA would have been motivated to do so by any of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline, all of which disclose and teach administering hydrocodone to patients with mild or moderate HI.

### iii.    *Claim 1 – "wherein the starting dose is not adjusted relative to a patient without hepatic impairment"*

303.    A POSA would have been motivated to administer Devane's HC-ER formulation to patients with mild or moderate hepatic impairment without adjusting the starting dose relative

---

[6] The recitation of "a starting dose" occurs in claim 1 of the '760 patent.

to patients without hepatic impairment.

304.    The Court has construed this phrase to mean that "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced ***due to that hepatic impairment*** relative to the dose prescribed to a patient without hepatic impairment when initiating treatment." (D.I. 69 at 2 (emphasis added).)  Where there are a finite number of potential solutions to a problem, a POSA's selection is more likely to be obvious.  Here there are only two potential solutions – adjust or not adjust the starting dose.  At least because of the teachings of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline, a POSA would have been motivated and found it obvious not to adjust the starting dose.

305.    Jain disclosed that the Vicodin CR formulation would not be adjusted "due to" mild or moderate HI because it produced similar AUC and $C_{max}$ values in patients with and without mild or moderate HI.  Although Jain's formulation contains acetaminophen, a POSA would have understood that the existence of acetaminophen had minimal to no effect on the metabolism of hydrocodone because it was well-known that hydrocodone and acetaminophen are metabolized by different enzymes.

306.    Similarly, the Vicodin Label®, the Lortab® Label, and the VA Guideline all disclosed that hydrocodone formulations did not need their starting doses adjusted "due to" mild or moderate HI, as those references do not recommend adjusting the dose of hydrocodone in patients with mild or moderate HI.  (See supra at ¶¶ 112-117, 128, 130.)

307.    Additionally, and as the above prior art demonstrates, it had long been the practice in the industry not to adjust the starting dose of hydrocodone for patients with mild or moderate hepatic impairment, but instead to titrate from the lowest available dose and dose to effect.  This standard practice would have further motivated a POSA to administer Devane's HC-

69

ER formulation to patients with mild or moderate HI without reducing the starting dose due to the patients' HI.

### iv. *Claim 12 – "wherein the dosage unit provides a release profile of hydrocodone"*

308.    Claim 12 of the '760 patent recites, *inter alia*:

wherein the dosage unit provides a release profile of hydrocodone that:

(1) does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%;

(2) does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%;

(3) does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%; and

(4) does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

309.    The release profile of Devane's HC-ER formulation is an inherent property of the formulation.  (See supra at ¶¶ 232, 236, 240.)

### b.    Claims 2-4, 11, 17 and 19 of the '760 Patent

310.    Dependent claims 2-4, 11, 17 and 19 of the '760 patent recite "wherein the dosage form provides a release profile of hydrocodone" providing certain AUC and $C_{max}$ values.  (See supra ¶¶ 48-51, 53, 54.)  For the same reasons Devane's HC-ER dosage form satisfies the PK values of claim 12, it likewise satisfies these limitations.  (See supra at ¶ 309.)  And for the same reasons discussed above, a POSA would have had a reason to look to one or more of Jain, the

70

Vicodin® Label, the Lortab® Label and the VA Guideline when administering Devane's HC-ER formulation to patients with mild or moderate HI.  (See supra at ¶ 295.)

### c.    Claim 1 of the '499 Patent

311.    Claim 1 of the '499 patent recites:

A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:

administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient,

wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,

wherein the dosage unit provides a release profile of hydrocodone that:

does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and

does not increase average hydrocodone $AUC_{0\text{-}inf}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

312.    As with claims 1 and 12 of the '760 patent, Devane in combination with one or more of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline expressly or inherently renders obvious (1) "[a] method of treating pain in a patient having mild or moderate hepatic impairment," (2) "administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate," and (3) a "dosage unit [that] provides a release profile of hydrocodone that" meets the recited PK limitations.  (See supra at ¶¶ 293-310.)

71

#### d.      Reasonable Expectation of Success

313.    A POSA would have had a reasonable expectation of success in performing a method of treating pain in a patient with mild or moderate HI comprising administering an ER oral dosage form with hydrocodone bitartrate as the only active ingredient wherein the dosage form provides a certain release profile, i.e., PK values (claims 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent), or wherein the starting dose is not adjusted (claims 1-4 and 11 of the '760 patent).

314.    A POSA could have easily combined Devane with one or more of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline because doing so would have required no more than combining prior art elements according to known methods to yield predictable results, i.e., the treatment of pain in patients with mild or moderate HI with Devane's HC-ER dosage form.

### i.      *Claims 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent*

315.    As discussed above, Devane teaches methods of treating pain using Devane's HC-ER formulation.  (Devane at ¶¶ 70, 104, claims 17 and 81.)  A POSA would also have understood that Devane's HC-ER formulation's release profile would have been an inherent property of the formulation when administered to patients with or without HI.  (See supra at ¶¶ 308-310.)  And Pernix asserts that Devane's HC-ER formulation is covered by the Asserted Claims.

316.    As such, the methods of treating pain in claims 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent do not become nonobvious simply by administering Devane's HC-ER formulation to patients with or without mild or moderate HI and "claiming the resulting serum concentrations."  Santarus, 694 F.3d at 1354 (finding a method of treating a gastric acid

72

related disorder comprising administering a pharmaceutical composition that resulted in certain blood serum concentrations of the active ingredient obvious because "an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations").

317.    Consequently, a POSA considering Devane in view of one or more of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline would have had a reasonable expectation of success in performing the methods of claims 12, 17 and 19 of the '760 patent and claim 1 of the '499 patent.

### ii.    *Claims 1-4 and 11 of the '760 patent*

318.    A POSA would also have had a reasonable expectation of success in performing a method of treating pain in a patients with mild or moderate HI comprising administering Devane's HC-ER dosage form, wherein the starting dose was not adjusted relative to a patient without hepatic impairment.  This is because each of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline teaches that no dose adjustment is necessary for hydrocodone in patients with mild or moderate HI.

319.    First, Jain demonstrates that the hydrocodone in an ER dosage form resulted in similar AUC and $C_{max}$ values in patients with mild or moderate HI compared to normal patients. (PERNIX_HEP0001589 at ¶ 64.)  And although Jain's formulation contains acetaminophen, a POSA would have understood that the existence of acetaminophen would have minimal to no effect on the metabolism of hydrocodone because it was well known that hydrocodone and acetaminophen are metabolized by different enzymes.  In fact, Devane discloses that 10 mg of Devane's HC-ER formulation and 10 mg of an immediate-release hydrocodone combination formulation had comparable AUC values.  (Devane at Table 10.)  Consequently, a POSA reading Devane in combination with Jain would have had a reasonable expectation that Devane's HC-ER

73

formulation could be administered to patients with mild or moderate HI without an adjustment in its starting dose.

320.    Second, a POSA would have had a reasonable expectation that the same dosing practices used for the hydrocodone immediate-release products disclosed in the Vicodin® Label, the Lortab® Label and the VA Guideline could be applied to Devane's HC-ER formulation. Indeed, hydrocodone immediate-release products were some of the most widely prescribed opioid products on the market by July 31, 2012.  Therefore, any over-exposure to hydrocodone caused by these products in patients with mild or moderate HI would have been well-known and would have likely necessitated HI studies for these approved products.  The absence of such reports and HI studies confirm that a POSA would have expected that no dose adjustment would have been necessary when administering hydrocodone to mild or moderate HI patients. Furthermore, the ordinary use of hydrocodone IR products presented the same risk of over-exposure as the ER product because, for example, the standard daily dose for Vicodin® was 30 mg, which is the same total daily dose as provided by a twice-daily dose of the 15 mg strength Zohydro ER.  (ACT-HYD2-022216.)

321.    Moreover, a POSA would have known that the effects, tolerability, and response to each opioid may be different.  (See supra at ¶ 25.)  As such, a POSA would have based his or her expectations on hydrocodone immediate-release products that would result in metabolism of the hydrocodone active in the same manner as hydrocodone from an ER product, instead of looking to other non-hydrocodone opioid ER products.

322.    Third, where, as here, there are a finite number of potential solutions to a problem (either adjusting or not adjusting the starting dose), a POSA's selection of the claimed solution is likely obvious.  KSR 550 U.S. at 402.  As such, the choice not to adjust the starting dose is not

74

inventive, and a POSA would have had a reasonable expectation of successfully practicing the claimed methods.

323.    Fourth, as discussed above (see supra at ¶ 307), it had long been the practice in the industry not to adjust the starting dose of hydrocodone for patients with mild or moderate hepatic impairment, but instead to titrate from the lowest available dose to effect.  This standard practice would have further provided a POSA with a reasonable expectation of success.

324.    As for the hydrocodone release profiles recited in claims 1-4 and 11, for the same reasons discussed above in ¶¶ 315-316, a POSA would have had a reasonable expectation of success in performing the claimed methods in which the claimed release profiles were achieved.

325.    Therefore, a POSA considering Devane in view of one or more of Jain, the Vicodin® Label, the Lortab® Label and the VA Guideline would have had a reasonable expectation of success in performing the methods of claims 1-4 and 11 of the '760.

### 3.    Claims 1-4 and 12 of the '760 Patent and Claim 1 of the '499 Patent Would Have Been Obvious Over Jain in View of the FDA Acetaminophen Communication

#### a.    Claims 1 and 12 of the '760 Patent

##### i.    *Claims 1 and 12 – "A method of treating pain in a patient having mild or moderate hepatic impairment"*

326.    The preamble of independent claims 1 and 12 of the '760 patent recites "a method of treating pain in a patient having mild or moderate hepatic impairment . . . ."  To the extent the preamble limits these claims, such a method would have been obvious over Jain in view of the FDA Acetaminophen Communication.

327.    Jain discloses that its "invention generally provides a method of treatment and improvement of quality of life for patients adversely affected by various pain conditions." (PERNIX_HEP0001571 at Abstract.)

75

328.    Jain discloses a study in which normal and HI patients were given an ER formulation, called Vicodin CR, containing 15 mg hydrocodone bitartrate and 500 mg acetaminophen.  (PERNIX_HEP0001587 at ¶ 34, PERNIX_HEP0001589 at ¶ 64.)  The effects of HI on the pharmacokinetics of Vicodin CR were studied in 24 subjects:  8 subjects with normal liver function; 8 subjects with mild impairment; and 8 subjects with moderate impairment.  (Id. at ¶ 64.)

329.    As such, a POSA would have understood that Jain discloses methods of treating pain in all patients, and specifically those with mild moderate HI, with an ER hydrocodone formulation.

> **ii.**    *Claims 1 and 12 – "administering to the patient having mild or moderate hepatic impairment [a starting dose of] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate"*

330.    All Asserted Claims require the step of "administering to the patient having mild or moderate hepatic impairment [a starting dose of][7] an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate."

331.    As discussed above, a POSA would have understood Jain to teach administering hydrocodone to patients with mild or moderate HI.  And a POSA would have understood that administering Jain's Vicodin CR formulation would have involved administering a starting dose.

332.    A POSA reading Jain would have known that acetaminophen was known to cause liver toxicity.  "From 1998 to 2003, acetaminophen was the leading cause of acute liver failure in the United States, with 48% of acetaminophen-related cases (131 of 275) associated with

---

[7] The recitation of "a starting dose" occurs in claim 1 of the '760 patent.

accidental overdose." (ACT-HYD2-023256.) And a 2007 CDC population-based report estimated that, nationally, there are 1600 cases of acute liver failure each year, with acetaminophen-related being the most common etiology. (Id.) In addition, "there were an estimated 56,000 emergency room visits, 26,000 hospitalizations, and 458 deaths related to acetaminophen-associated overdoses per year during the 1990-1998 period." (Id.)

333. The FDA Acetaminophen Communication warns of severe liver toxicity due to chronic administration of acetaminophen, especially in the context of combination products containing acetaminophen and an opioid. (ACT-HYD2-023247.) And in fact, in 2009 an FDA Advisory Committee voted to recommend to FDA that it eliminate prescription acetaminophen combination products. (See American Association for the Study of Liver Diseases, *FDA Advisory Panel Tightens Controls on Acetaminophen Products*, https://www.aasld.org/fda-advisories/fdaadvisory-panel-tightens-controls-acetaminophen-products.)

334. In fact, Zogenix told FDA that the well-known issues with acetaminophen causing liver toxicity was a factor in developing Zohydro as a hydrocodone single-entity ER product. (Boyd Dep. Tr. at 29:20-30:23.) And an inventor of the Patents-In-Suit stated that "the largest motivating factor" in developing Zohydro was that it would not contain acetaminophen like the other commercial hydrocodone products available at the time of the alleged invention. (Hartman Dep. Tr. at 58:24-60:13; see also Robinson Dep. Tr. 158:7-159:9 (testifying to the removal of acetaminophen as a motivating factor in developing Zohydro).)

335. As reflected in the FDA Acetaminophen Communication, a POSA would have been motivated to remove acetaminophen from the Vicodin CR formulation disclosed in Jain to provide an ER formulation that contained hydrocodone as its only active ingredient. Indeed, where there is a design need or market pressure to solve a problem, and there are a finite number

77

of predictable solutions, a POSA has good reason to pursue the known options.  KSR, 550 U.S. at 402.  Here, there was both a market pressure and a design need for a hydrocodone product to treat pain that did not include acetaminophen and one of the obvious finite solutions to try would be a drug containing hydrocodone without acetaminophen (or another analgesic component).

336.    Moreover, removing acetaminophen from Vicodin CR, one of two active ingredients, would have been a routine and predictable modification.  In addition, a POSA would have known that removing the acetaminophen would not impact the PK characteristics of the hydrocodone component.

337.    It was also well-known that hydrocodone is effective for treating pain without the presence of acetaminophen. (See, e.g., Baumann at S107.)  Indeed, a POSA would have been aware of other hydrocodone single-entity ER dosage forms, such as those disclosed in Devane and Huang, which would have provided further motivation to remove acetaminophen from Jain's Vicodin CR.

338.    As such, a POSA would have understood that removing acetaminophen from combination opioid products, such as Jain's Vicodin CR, was desirable to eliminate issues with acetaminophen causing liver toxicity.

### iii.    Claim 1 – "wherein the starting dose is not adjusted relative to a patient without hepatic impairment"

339.    The Court has construed this phrase to mean that "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced *due to that hepatic impairment* relative to the dose prescribed to a patient without hepatic impairment when initiating treatment."  (D.I. 69 at 2 (emphasis added).)

340.    A POSA would have understood that the starting dose of Jain's Vicodin CR formulation would not have been adjusted "due to" mild or moderate HI because it produced

78

"similar" AUC and $C_{max}$ values in patients with and without mild or moderate HI. (PERNIX_HEP0001589 at ¶ 64.) Although Jain's formulation contains acetaminophen, a POSA would have understood that the existence of acetaminophen would have minimal to no effect on the metabolism of hydrocodone because it was well known that hydrocodone and acetaminophen are metabolized by different enzymes. In fact Devane discloses that 10 mg of Devane's HC-ER formulation and 10 mg of an immediate-release formulation had comparable AUC values. (Devane at Table 10.)

### iv. *Claim 12 – "wherein the dosage unit provides a release profile of hydrocodone"*

341. Claim 12 of the '760 patent recites, inter alia:

wherein the dosage unit provides a release profile of hydrocodone that:

(1) does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%;

(2) does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%;

(3) does not increase average hydrocodone $C_{max}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 9%; and

(4) does not increase average hydrocodone $C_{max}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%.

342. Jain discloses that its Vicodin CR formulation achieved "similar" AUC and $C_{max}$ values in patients with mild or moderate HI compared to patients without HI.

(PERNIX_HEP0001589 at ¶ 64.) Jain contrasts the "similar" PK results observed for

79

hydrocodone from "[m]ean Cmax and AUC values of acetaminophen," which were "34 to 42% higher in subjects with moderate hepatic impairment." (Id.)  This distinction would signal to a POSA that "similar" PK results must (i) be less than a 34% increase, and (ii) that the difference between 34% and what constitutes "similar" must have been large enough to allow for a distinction.  When read in this context, Jain's qualitative disclosure of "similar" would be understood by a POSA to refer a PK difference of less than the 25%, the threshold at which the FDA Guidance permits drug sponsors to draw a conclusion that hepatic impairment has "no effect" on the drug's PK.  (ACT-HYD2-023068 ("A conclusion that there is no effect (really, no clinically important effect) of hepatic impairment on the drug's PK, would usually be supported by the establishment of . . . the employment of a standard 90 percent confidence interval of 80-125 percent for AUC and $C_{max}$.").)

343.    Although Jain's formulation contains acetaminophen, a POSA would have understood that the existence of acetaminophen would have minimal to no effect on the metabolism of hydrocodone because it was well known that hydrocodone and acetaminophen are metabolized by different enzymes.  In fact Devane discloses that 10 mg of Devane's HC-ER formulation and 10 mg of an immediate-release formulation had comparable AUC values. (Devane at Table 10.)

344.    As such, a POSA would have understood Jain's modified Vicodin CR formulation would meet condition (2) of claim 12 reciting achieving an average hydrocodone $AUC_{0-inf}$ in subjects suffering from moderate HI relative to subjects not suffering from HI in an amount of no more than 30%.

345.    As for conditions (1), (3) and (4) of claim 12, a POSA would understand Jain's disclosure of "similar" AUC and $C_{max}$ values in patients with mild or moderate HI compared to

80

those without HI to satisfy these limitations.  First, a POSA would expect that the PK differences observed in Jain with respect to patients having mild hepatic impairment would be less than observed PK differences for patients having moderate hepatic impairment.  However, even if Jain's disclosure of "similar" PK values was found to fall slightly outside the claimed PK ranges, the claimed values are not critical and do not provide any unexpected results.

### b.      Claims 2-4 of the '760 Patent

346.    Dependent claims 2-4 of the '760 patent recite "wherein the dosage form provides a release profile of hydrocodone" providing certain AUC and $C_{max}$ values.  (See supra at ¶¶ 48-50.)  For the same reasons Jain's modified dosage form meets or renders obvious the PK values of claim 12, it likewise satisfies these limitations.  (See supra at ¶¶ 341-345.)

### c.      Claim 1 of the '499 Patent

347.    Claim 1 of the '499 patent recites:

> A method of treating pain in a patient having mild or moderate hepatic impairment, the method comprising:
>
> administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient,
>
> wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate,
>
> wherein the dosage unit provides a release profile of hydrocodone that:
>
> does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from mild hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 14%; and
>
> does not increase average hydrocodone $AUC_{0\text{-inf}}$ in subjects suffering from moderate hepatic impairment relative to subjects not suffering from renal or hepatic impairment in an amount of more than 30%.

348.    As with claims 1 and 12 of the '760 patent, Jain in combination with the FDA

81

Acetaminophen Communication renders obvious (1) "[a] method of treating pain in a patient having mild or moderate hepatic impairment," (2) "administering to the patient having mild or moderate hepatic impairment an oral dosage unit having hydrocodone bitartrate as the only active ingredient, wherein the dosage unit comprises an extended release formulation of hydrocodone bitartrate," and (3) a "dosage unit [that] provides a release profile of hydrocodone that" meets certain PK values.  (See supra at ¶¶ 326-346.)

### d.    Reasonable Expectation of Success

349.    A POSA would have had a reasonable expectation of success in performing a method of treating pain in a patient with mild or moderate HI comprising administering an ER oral dosage form with hydrocodone bitartrate as the only active ingredient wherein the dosage form provides a certain release profile, i.e., PK values (claim 12 of the '760 patent and claim 1 of the '499 patent) or wherein the starting dose is not adjusted (claims 1-4 of the '760 patent).

#### i.    *Claim 12 of the '760 patent and claim 1 of the '499 patent*

350.    As discussed above, Jain teaches methods of treating pain in patients with mild or moderate HI using Jain's Vicodin CR.  (PERNIX_HEP0001589 at ¶¶ 5, 64.)  And Jain states that Vicodin CR achieved "similar" AUC and $C_{max}$ values in patients with mild or moderate HI compared to those without HI.

351.    As such, a POSA would have reasonable expected Jain's modified Vicodin CR lacking acetaminophen to achieve the claimed PK values recited in claim 12.  (See supra at ¶¶ 342-345.)  And a POSA considering Jain in view of the FDA Acetaminophen Communication would have had a reasonable expectation of successfully performing the method of claim 12 of the '760 patent.

#### ii.    *Claims 1-4 of the '760 patent*

352.    A POSA would also have had a reasonable expectation of success in performing a

method of treating pain in a patients with mild or moderate HI comprising administering Devane's HC-ER dosage form, wherein the starting dose was not adjusted relative to a patient without hepatic impairment.

353.   Jain demonstrates the hydrocodone in an ER dosage form resulted in similar AUC and $C_{max}$ values in patients with mild or moderate HI compared to normal patients. (PERNIX_HEP0001589 at ¶ 64.)  And although Jain's formulation contains acetaminophen, a POSA would have understood that the existence of acetaminophen would have Jain's modified Vicodin CR dosage form lacking acetaminophen could be administered to patients with mild or moderate HI without an adjustment in its starting dose.

354.   As for the hydrocodone release profiles recited in claims 2-4, for the same reasons discussed above in ¶¶ 350-351, a POSA would have had a reasonable expectation of success in performing the claimed methods in which the claimed release profiles were achieved.

355.   Therefore, a POSA considering Jain in view of the FDA Acetaminophen Communication would have had a reasonable expectation of success in performing the methods of claims 1-4 of the '760.

### E.      Objective Indicia of Nonobviousness

356.   Plaintiffs have not demonstrated any objective indicia of nonobviousness sufficient to overcome Alvogen's *prima facie* showing of obviousness for the reasons set forth below.

#### 1.      Legal Standards

357.   Plaintiffs bear the burden of coming forward with evidence of objective indicia of nonobviousness. Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., 719 F.3d 1346, 1354 (Fed. Cir. 2013) (discussing the concept that the burden of production shifts to the patentee "once the court determine[s] that the challenger has established a prima facie case of obviousness").

83

358.    Objective indicia of nonobviousness are not a significant factor where the record establishes a strong *prima facie* case of obviousness.  Wyers v. Master Lock Co., 616 F.3d 1231, 1246 (Fed Cir. 2010) (secondary considerations of nonobviousness . . . simply cannot overcome a strong prima facie case of nonobviousness."); Agrizap, 520 F.3d at 1344nonobviousness simply cannot overcome such a strong prima facie case of obviousness."); Leapfrog, 485 F.3d at 1162; Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 768-69 (Fed. Cir. 1988) (evidence of secondary considerations was not persuasive to overcome showing of obviousness and noting that "although these factors must be considered, they do not control the obviousness conclusion").

359.    Federal Circuit precedent requires Plaintiffs to prove a nexus between the claimed invention and evidence of objective indicia before the Court can give substantial weight to any objective indicia of nonobviousness.  Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1327 (Fed. Cir. 2008); Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

360.    The patentee must present specific evidence showing nexus; opinion is not enough.  See In re Huang, 100 F.3d 135, 140 (Fed. Cir. 1996); see also In re De Blauwe, 736 F.2d 699, 705 (Fed. Cir. 1984); Mut. Pharm. Co., Inc., 642 F.3d 1370, 1377 (Fed. Cir. 2011).

361.    To fulfill the nexus requirement, the proffered evidence of objective indicia of nonobviousness must be commensurate in scope with the asserted claims.  See Therasense Inc. v. Becton, Dickinson & Co., 593 F.3d 1325, 1336 (Fed. Cir. 2010); Muniauction, 532 F.3d at 1328 ("[S]econdary relates to a narrow aspect of a much broader claim, such evidence is not commensurate with the scope of the claims and fails to establish the nonobviousness of the

84

asserted claims.  See Therasense, 593 F.3d 1325; In re Grasselli, 713 F.2d 731, 743 (Fed. Cir. 1983); MeadWestVaco Corp. v. Rexam Beauty &Closures, Inc., 731 F.3d 1258, 1264-65 (Fed. Cir. 2013) (holding that district court erred where its "analysis of the secondary considerations of nonobviousness involved only fragrance-specific uses, but the [asserted claims] are not fragrance-specific").

362.    Objective indicia of nonobviousness must be attributable to the claimed invention and apart from what is unclaimed or in the prior art. See In re Kao, 639 F.3d 1057, 1068 (Fed. Cir. 2011); Merck & Cie, 808 F.3d at 837.

363.    Plaintiffs have failed to carry their burden to come forward with sufficient proof of objective indicia of nonobviousness such that the Court should find the claims nonobvious.

### 2.    Unexpected Results Do Not Support Nonobviousness

364.    For unexpected results to be probative of non-obviousness, they must be different in kind, as opposed to merely different in degree.  Galderma Labs., L.P. v. Tolmar, Inc., 737 F.3d 731, 739 (Fed. Cir. 2013).

365.    Additionally, unexpected results must be compared to the closest prior art.  In re De Blauwe, 736 F.2d 699, 705 (Fed. Cir. 1984); Kao Corp. v. Unilever U. S., Inc., 441 F.3d 963, 970 (Fed. Cir. 2006) (quoting In re Baxter Travenol Labs., 952 F.2d 388, 392 (Fed. Cir. 1991)); see also Huang, 100 F.3d at 139.  "[T]here is no requirement that the closest prior art be commercialized."  Trustees of Columbia Univ. in City of New York v. Illumina, Inc., 620 F. App'x 916, 932 (Fed. Cir. 2015) ("In In re Wright . . . , failure of a particular reference to constitute the commercial standard did not diminish its position as the closest prior art.") (internal quotation marks and citation omitted).

366.    For a claimed invention to have "unexpected results," there needs to be a nexus between the evidence of the unexpected properties and the claimed invention.  See, e.g., In re

85

Kao, 639 F.3d at 1068-69.

367.    An unexpected property is one that presents a significant superior property or advantage of an invention that one of ordinary skill in the art would have found surprising or unexpected in light of the prior art.  In re Freeman, 474 F.2d 1318, 1325 (C.C.P.A. 1973); In re Merck & Co., 800 F.2d 1091, 1098-99 (Fed. Cir. 1986).

368.    "It is well settled that unexpected results must be established by factual evidence."  De Blauwe, 736 F.2d at 705 ("Due to the absence of tests comparing appellants' heat shrinkable articles with those of the closest prior art, we conclude that appellants' assertions of unexpected results constitute mere argument and conclusory statements in the specification which cannot establish patentability."); Tyco Healthcare, 642 F.3d at 1377 ("Unsupported statements in the specification, however, cannot support a finding of unexpected results."); see also Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1332-33 (Fed. Cir. 2009).

369.    Pernix claims, based on data from non-hydrocodone opioid ER dosage forms that a POSA as of the earliest filing date of the Patents-in-Suit would have expected that an adjustment in starting dose would be required when administering an ER hydrocodone-only dosage unit to patients with mild or moderate HI.  Pernix has not demonstrated that the Asserted Claims achieve any unexpected results.

370.    As an initial matter, Pernix makes the wrong comparison because the closest prior art to the Asserted Claims is Devane or Jain, not, as Pernix suggests, non-hydrocodone opioid ER dosage forms such as Oxycontin$^®$ (oxycodone), Nucynta$^®$ ER (tapentadol), Opana$^®$ ER (oxymorphone), Exalgo$^®$ (hydromorphone) and Kadian$^®$ (morphine sulfate).  Cf. Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., 719 F.3d 1346, 1365 (Fed. Cir. 2013) ("The 'closest prior art' is the reference having the most 'in common' with the claimed invention, not the reference that

86

happens to describe the most impressive results."); <u>Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC</u>, 683 F.3d 1356, 1363 (Fed. Cir. 2012); <u>Pfizer, Inc. v. Apotex, Inc.</u>, 480 F.3d 1348, 1370 (Fed. Cir. 2007) ("[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art.") (internal quotations omitted).  As discussed above, Devane's HC-ER formulation meets the PK values recited by the Asserted Claims, and as such does not require an adjustment in its starting dose in patients with mild or moderate HI.  (<u>Supra</u> at ¶¶ 231-237.)  Jain discloses the administration of an ER hydrocodone combination to patients with mild and moderate HI and reports that it provides similar PK values.  (PERNIX_HEP0001589 at ¶ 64.)  These are consequently considerably closer prior art than non-hydrocodone formulations that, according to Pernix, do require dose adjustment for HI patients.

371.    Moreover, as discussed above, the named inventors on the Patents-in-Suit used the prior art Devane HC-ER formulation in their HI study to arrive at the Asserted Claims. Unexpected results cannot be attributable to what is in the prior art.  <u>In re Kao</u>, 639 F.3d at 1068; <u>Merck & Cie</u>, 808 F.3d at 837.  The same is true with respect to Huang, which discloses ██████████ that also provides the claimed PK values that allow a physician to forgo adjusting the starting dose.

372.    Furthermore, a comparison of the Asserted Claims to Jain, an ER hydrocodone formulation, demonstrates a lack of unexpected results, as Jain's formulation achieved "similar" AUC and $C_{max}$ values in patients with mild or moderate HI compared to patients without HI.  To the extent a comparison to non-hydrocodone opioid ER products is relevant, neither Nucynta[®] nor Exalgo™ required dose adjustments in patients with mild HI.  (<u>See</u> <u>supra</u> at ¶¶ 132, 134.) And there was a long history of safe use of hydrocodone in patients with mild or moderate HI

87

with products such as Vicodin®, Lortab® and Vicoprofen® that did not require dose adjustments.

373.     Lastly, not adjusting the starting dose is merely a difference in degree and not in kind.  Galderma, 737 F.3d at 739.

### 3.     Long-Felt, But Unmet Need and Failure of Others Do Not Support Nonobviousness

374.     A showing of a long-felt and unmet need requires that the need must have been a persistent one that was recognized by those of ordinary skill in the art.  Ecolochem, Inc. v. S. Cal. Edison Co., 227 F.3d 1361, 1377 (Fed. Cir. 2000).  The long-felt need must not have been satisfied by another before the invention.  Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc., 976 F.2d 1559, 1574-75 (Fed. Cir. 1992).  The invention must in fact satisfy the long-felt need.  Id. at 1575.

375.     Long-felt but unmet need applies only where the claimed subject matter proves effective where the prior art was not effective.  See Cubist Pharm., Inc. v. Hospira, Inc., 805 F.3d 1112, 1126 (Fed. Cir. 2015) (upholding finding of no long-felt unmet need where prior art dosing regimens were effective in most cases and the claimed invention only impacted, and therefore applied to, about 5% of the cases treated).

376.     "[P]recedent requires that the [patentee] submit actual evidence of long-felt need, as opposed to argument."  In re Kahn, 441 F.3d 977, 990-91 (Fed. Cir. 2006).  "This is because '[a]bsent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness.'"  Id. (citing Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1325 (Fed. Cir. 2004)); accord In re Wright, 569 F.2d 1124, 1127 (C.C.P.A. 1977).

377.     To show that a long-felt need existed for a new product to accomplish a particular method, Plaintiffs must show that the prior art products were ineffective and/or inadequate in the

88

context of the claimed method of treatment. See Electro Sci. Indus., Inc. v. Gen. Scanning Inc., 247 F.3d 1341, 1352 (Fed. Cir. 2001) (holding that because prior art products were effective for the purpose of the claimed method, there was no long-felt need or failure of others for a new product to practice the method); see also Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l, 618 F.3d 1294, 1304 (Fed. Cir. 2010) ("Where the differences between the prior art and the claimed invention are as minimal as they are here, however, it cannot be said that any long-felt need was unsolved."); B.F. Goodrich Co. v. Aircraft Braking Sys. Corp., 72 F.3d 1577, 1583 (Fed. Cir. 1996) (discounting assertion of long-felt need where the invention was similar to the prior art).

378.    Pernix claims that there existed a long-felt need for a method of administering an extended-release opioid product to hepatically impaired patients without reducing the starting dose.  Pernix has not demonstrated that such a long-felt need existed at the time of the alleged invention.

379.    First, as discussed above, the administration of Devane's HC-ER formulation meets the PK values recited by the Asserted Claims, and thus does not require an adjustment in its starting dose in patients with mild or moderate HI.  As such, to the extent there existed a long-felt, but unmet need for a method of administering an extended-release opioid product to hepatically impaired patients without reducing the starting dose, Devane already met that need. Likewise with regard to Huang's and Jain's formulations, each of which did not require an adjustment in their starting dose in patients with mild or moderate HI.  Moreover, prior to the alleged invention, neither Nucynta® nor Exalgo™ required an adjustment in starting dose for patients with mild HI.  (See ACT-HYD2-023370; PERNIX_HEP0013315.)

380.    Pernix's reliance on Vantrela™ for evidence of failure of others is misplaced. (Vantrela™ Label ("Issued:  Jan 2017").)  Vantrela™ only showed a 70% increase in AUC for

patients with moderate HI, which is below the 200% increase the FDA Guidance says requires a recommendation for dose adjustment.  In fact, Nucynta® provides a 70% increase in AUC for patients with mild HI and its label expressly states that dose adjustment is not required.  Furthermore, the difference in AUC with respect to Vantrela™ will be even smaller in patients with mild HI.  Therefore, Vantrela™ does not demonstrate a failure to provide an ER hydrocodone oral dosage unit that does not require dose adjustment due to HI.

### 4.      Near-Simultaneous Invention Weighs In Favor of Obviousness

381.    "Independently made, simultaneous inventions, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill."  George M. Martin Co. v. Alliance Mach. Sys. Int'l LLC, 618 F.3d 1294, 1305 (Fed. Cir. 2010) (quoting Concrete Appliances Co. v. Gomery, 269 U.S. 177, 184 (1925)) (finding that "in light of the strong evidence of obviousness based on . . . prior art coupled with . . . near-simultaneous invention . . ., [the] objective evidence of non-obviousness, even if fully credited by a jury, would fail to make a difference in this case").

382.    Simultaneous invention is relevant as a secondary consideration when it occurs "within a comparatively short space of time" from the date of invention and "is strong evidence of what constitutes the level of ordinary skill in the art."  George M. Martin Co., 618 F.3d 1294 at 1305-06 (internal citations omitted).

383.    Purdue Pharma L.P. simultaneously and independently created the same alleged "invention" claimed in the Asserted Claims as evidenced by Huang's prior art formulation at least as early as 2010 (see ACT-HYD2-022106 at Table 7, Formulation G; U.S. Appl. No. 61/426,306 at Table 7, Formulation G; see also PRNX00000001), and its subsequent testing in a hepatic impairment study ███████████, (see, e.g., PRNX000000002), the results of which were published in 2013, (see, e.g., ACT-HYD2-022333), which confirmed that it met all of the

90

elements of the Asserted Claims (see, e.g., ACT-HYD2-023211; see also PRNX00000068, PRNX00000071).  This evidence of near-simultaneous inventions supports a finding of obviousness.

### F.      Lack of Written Description

#### 1.      Legal Standards

384.    A patent's "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."  35 U.S.C. § 112.

385.    "Whether a patent claim is supported by an adequate written description is a question of fact."  Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1355 (Fed. Cir. 2010).  The Federal Circuit has stated that "requiring a written description of the invention plays a vital role in curtailing claims . . . that have not been invented, and thus cannot be described."  Id. at 1352.  "[T]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.'"  Id. at 1353-54 (quoting Univ. of Rochester v. G.D. Searle & Co., 358 F.3d 916, 920 (Fed. Cir. 2004)).

386.    When a patent claims a genus and the specification only describes part of that genus, "[w]hether the written description requirement for a genus is met by a particular disclosure depends upon the facts."  Id. at 1351.  Importantly, "[w]hen a patent claims a genus using functional language to define a desired result, 'the specification must demonstrate that the applicant has made a generic invention that achieves the claimed result and . . . that the applicant has invented species sufficient to support a claim to the functionally defined genus."  Id. at 1349.

387.    To that end, the Federal Circuit has held that "'a sufficient description of a genus

91

. . . requires the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can visualize or recognize the members of the genus.'" Abbvie Deutschland GmbH & Co. KG v. Janssen Biotech Inc., 759 F.3d 1285, 1299 (Fed. Cir. 2014) (quoting Ariad, 358 F.3d at 1350).

388.   "[A]nalogizing the genus to a plot of land," a patent does not describe a genus "sufficiently to show that the inventor invented, or had possession of, the genus" when "the disclosed species only abide in a corner of the genus." Id. at 1300.  Moreover, "merely drawing a fence around a perceived genus is not a description of the genus." Id.  "One needs to show that one has truly invented the genus, i.e., that one has conceived and described sufficient representative species encompassing the breadth of the genus." Id.

### 2.   The Asserted Claims Lack Written Description Support

389.   The Asserted Claims encompass administering a broad genus of hydrocodone-only ER oral dosage forms that result in certain PK values and/or that require no adjustment in their starting dose in patients with mild or moderate HI.

390.   In developing the Asserted Claims, the inventors administered a single hydrocodone ER dosage form from the prior art patent publication Devane – the Devane HC-ER formulation – to patients with HI.  (See the '760 patent at 22:50-23:47; Plaintiffs' Resp. to RFA Nos. 10, 16-18.)

391.   Devane's HC-ER formulation is identical to what Pernix contends is the commercial embodiment of the Patents-In-Suit – Zohydro® ER. (See the '760 patent at 10:5-6; Responses to RFA Nos. 10, 16-18.)

392.   Tables 1 and 2 of the Patents-In-Suit provide six immediate-release formulations and seven modified-release formulations, respectively, that can be combined in different

92

combinations to arrive at HC-ER formulations that allegedly fall within the genus of hydrocodone ER formulations encompassed by the Asserted Claims.

393.    All of the immediate release formulations in Table 1 contain the same amount of hydrocodone and differ only in the amounts and types of excipients.  Given this, even though the patents teach that modified release hydrocodone formulations may be formed by combining an immediate release formulation from Table 1 with a modified release coating of Table 2, in view of how little the various formulations differ from each other, the specifications effectively teach, at most, a few unique formulations.  Moreover, the inventors of the Patents-In-Suit only tested a single formulation disclosed in Tables 1 and 2, i.e., Devane's HC-ER formulation, to determine the claimed PK parameters.

394.    Further, there is nothing in the patent specifications that indicates that the limited number of hydrocodone formulations that are disclosed possess certain common structural features, such that disclosure of a few such formulations would describe all hydrocodone ER formulations that achieve the claimed PK values and/or that require no adjustment in their starting dose in patients with mild or moderate HI.

395.    In fact, the inventors of the Patents-In-Suit had no understanding at the time the invention was allegedly reduced to practice (and still have no understanding) as to why Devane's HC-ER formulation achieved the PK values it did in HI patients.  (Robinson Dep. Tr. at 254:20-25; Hartman Dep. Tr. at 167:24-168:5; Boyd Dep. Tr. at 82:10-13.)  In other words, the inventors had no understanding (and still have no understanding) what structural features of Devane's HC-ER formulation produce the similar PK values in patients with mild or moderate HI and patients without HI.

396.    Therefore, a POSA reading the specification of the Patents-In-Suit would not

understand that the inventors were in possession of the full scope of the alleged invention as of the filing date of the Patents-In-Suit. As such, the Asserted Claims lack written description support in the Patents-In-Suit.

## IV.    Noninfringement

397.    In passing the Hatch-Waxman Act, Congress made it "an act of infringement to submit . . . an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act . . . for a drug claimed in a patent or the use of which is claimed in a patent . . . ." 35 U.S.C.§ 271(e)(2)(A).

398.    "[T]he ultimate infringement inquiry provoked by such filing is focused on comparison of the asserted patent claims against the product that is likely to be sold following ANDA approval and determined by traditional patent law principles." Ferring B.V. v. Watson Labs., Inc., 764 F.3d 1401, 1408 (Fed. Cir. 2014) (citing Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1365 (Fed. Cir. 2003).2003).

399.    Accordingly, this infringement inquiry does not "alter a patentee's burden of proving infringement' by a preponderance of the evidence, and [the Federal Circuit] ha[s] rejected shifting the burden to the accused infringer to disprove infringement." Ferring, 764 F.3d at 1408 (citing Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 1567-68 (Fed. Cir. 1997)).

400.    Like with traditional patent infringement, therefore, a patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . ." 35 U.S.C. § 271(a). And the patentee bears the burden of proving infringement by a preponderance of the evidence. Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc., 637 F.3d 1269, 1280 (Fed. Cir. 2011).

401.    Infringement is a question of fact. Teleflex, Inc. v. Ficosa NA Corp., 299 F.3d

94

1313, 1323 (Fed. Cir. 2002); Desper Prods., Inc. v. QSound Labs., Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998); Phillips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 876 (Fed. Cir. 1998).

402.    "A determination of infringement requires a two-step analysis."  Terlep v. Brinkmann Corp., 418 F.3d 1379, 1381 (Fed. Cir. 2005).

403.    First, the court construes the asserted claims to determine their scope and meaning.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995); Markman, 52 F.3d at 979 (explaining that claim construction serves as a threshold inquiry in an infringement determination); see also Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 835 (2015) (explaining that the ultimate question of claim construction remains a question of law).

404.    Second, the trier of fact compares the properly construed claims with the accused product or method to determine whether any claims encompass the accused product, process or method.  Teleflex, 299 F.3d at 1323; N. Am. Vaccine, Inc. v. Am. Cyanamid Co., 7 F.3d 1571, 1574 (Fed. Cir. 1993).  This, too, is a question of fact.  Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998).

405.    To find infringement, the trier of fact must find within the accused product or method each and every limitation of a claim.  See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997); Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1459-60 (Fed. Cir. 1998) (en banc); Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 796 (Fed. Cir. 1990).

406.    Accordingly, if the trier of fact fails to find within the accused product or method a single claim limitation, then it cannot find literal infringement of the entire claim.  Spectrum

Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1379 (Fed. Cir. 1998); see also Microstrategy Inc. v. Bus. Objects S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005); VFormation, Inc. v. Benetton Grp. SpA, 401 F.3d 1307, 1312 (Fed. Cir. 2005); Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000) ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.").

407. Dependent claims contain all the limitations of the independent claim from which they depend. 35 U.S.C. § 112, ¶ 4 (2006); Cognex Corp. v. Int'l Trade Comm'n, 550 Fed. App'x 876, 880 (Fed. Cir. 2013).

408. Accordingly, if an independent claim is not infringed, then each of the dependent claims depending therefrom cannot be infringed. Becton Dickinson, 922 F.2d at 798.

### A. No Direct Infringement

409. Alvogen cannot directly infringe the asserted claims because Alvogen does not practice the claimed methods of treatment.

410. Alvogen is neither a physician nor a patient. Because Alvogen is not a physician, Alvogen cannot treat, diagnose or prescribe drugs to patients. See Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 n.7 (Fed. Cir. 2003) ("That [a generic-drug manufacturer cannot directly infringe a method-of-treatment claim] is hardly surprising—pharmaceutical companies do not generally treat diseases; rather they sell drugs to wholesalers or pharmacists, who in turn sell the drugs to patients possessing prescriptions from physicians. . . . In none of these cases, however, does the company itself *treat* the disease.") (emphasis added). Likewise, because Alvogen is not a patient, Alvogen cannot administer an oral dosage unit. See id. As such, Alvogen cannot directly infringe any claim.

### B. No Induced Infringement

411. Induced infringement is predicated on an underlying act of direct infringement.

96

See Limelight Networks, Inc. v. Akamai Techs., Inc., 134 S. Ct. 2111, 2117-18 (2014).  As a matter of law, then, a plaintiff cannot prove induced infringement without first proving direct infringement.  Id.

412.   Direct infringement of a method claim requires all claim steps to be performed by or attributable to a single actor.  Id.

413.   Where a single actor does not perform all claim steps, the Federal Circuit nonetheless attributes performance of a method step by a third party to an accused infringer where the accused infringer exerts "control or direction" over the third party.  See Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1330 (Fed. Cir. 2008).

414.   "[M]ere 'arms-length cooperation' will not give rise to direct infringement by any party" under the "control or direction" standard.  Id. at 1329.

415.   The standard is satisfied, however, where the accused infringer "conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance."  Akamai, 797 F.3d at 1023.

### 1.   Alvogen Will Not Induce Infringement of Claims 1-4 and 11 of the '760 Patent Because There Will Not Be Direct Infringement of These Claims.

#### a.   Claims 1-4 and 11 of the '760 Patent Contain Two Claim Steps Performed By Different Actors

416.   Claim 1 of the '760 patent, from which claims 2-4 and 11 depend, recites a method of treating pain a patient with mild or moderate HI.  ('760 patent, cl. 1.)  That method recites two distinct steps, and the method is not practiced unless each step is performed.

417.   First, the method requires "administering" to the patient a hydrocodone-only oral dosage unit (the "administering step").  Under the Court's claim construction, this step requires

97

the patient to "deliver[] into the body" the dosage unit.  (D.I. 69 at 1.)

418.    Second, the method requires "the dosage unit [to] comprise[] an extended release formulation of hydrocodone bitartrate, [] wherein the starting dose is not adjusted relative to a patient without hepatic impairment" (the "non-adjustment step").  ('760 patent, cl. 1.)  Under the Court's claim construction, this step requires that "[t]he dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment is not reduced due to that hepatic impairment relative to the dose prescribed to a patient without hepatic impairment when initiating treatment."  (D.I. 69 at 1-2.)  Only a physician can prescribe a dose to a patient.

419.    Thus, each step of claim 1 of the '760 patent is performed by a separate actor – a patient and a physician.  To prove infringement, therefore, Pernix must prove that performance of these steps is attributable to one of those actors.

420.    Despite having previously contended that claims 1-4 and 11 of the '760 patent contain these two distinct steps, and having advanced only a theory of joint infringement regarding these claims in its last infringement contentions and through its infringement expert, Pernix asserted in its Motion for Summary Judgment of Infringement that these claims contain only a single step – the administration step.  Alvogen has moved to strike this theory as untimely.  (D.I. 125.)

421.    Pernix's single-step theory is also incorrect.  Far from merely affecting "how the administration step is performed," as Pernix contended for the first time in its summary judgment filing (D.I. 120 at p. 12 ), the "non-adjustment" step as construed requires a physician to prescribe a dosage unit to a patient with hepatic impairment as part of the claimed method: "[wherein] the dose prescribed to a patient with mild or moderate hepatic impairment when initiating treatment *is* not reduced . . . ."  (D.I. 85 at 2 (emphasis added).)  The Court's

98

construction explicitly recites a physician's act of prescribing the dosage unit by using the present tense verb "is."  The Court adopted this construction "because [it] effectuates the court's finding that the phrase is a limitation" and "not just a mental step."  Id. at 3.  Under this construction, it is apparent that both the patient and the physician must perform separate method steps to practice the claims.

422.    Pernix's reliance on Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc., 282 F. Supp. 3d 793 (D. Del. 2017), is misplaced.  Unlike the "non-adjustment" limitation, the limitation at issue in Orexigen facially referred to an event that occurred in the past: "an individual who *has been* diagnosed as suffering from overweight or obesity."  Id. at 812 (emphasis added).  Thus, the court found that the claim did not recite a separate diagnosing claim step but instead required that "the individual [was] already [] diagnosed prior to the method being performed."  Id.

423.    Courts have found claim language similar to the "non-adjustment" limitation using the word "is" to signify a claim step.  In Desenberg v. Google, Inc., 392 F. App'x 868, 870 (Fed. Cir. 2010), for example, the Federal Circuit held that the claim limitation "wherein a service *is performed* by the user or the provider . . ." included a method step, stating that it "clearly requires the participation of" an additional entity.  (emphasis added.)  Similarly, in e2Interactive, Inc. v. Blackhawk Network, Inc., No. 09- 629, 2012 WL 13000393, at *2, *19 (W.D. Wis. Jan. 17, 2012), the court found the claim limitation "wherein the value is added to the pre-existing customer account by the specific provider" to include a claim step.  (emphasis added.)  Accordingly, unlike the limitation at issue in Orexigen, the "non-adjustment" limitation is a separate method step performed by a physician.

        **b.**        **Physicians Do Not "Condition" Continued Treatment on Patients' Performance of the "Administering" Step.**

424.   Pernix argues that the prescribing physician "directs or controls" the patient's performance of the "administering" step under <u>Akamai</u>'s joint infringement standard. Specifically, Pernix contends that a prescribing physician conditions continued treatment (which it alleges constitutes the receipt of a benefit) on the patient administering Alvogen's ANDA Product as prescribed (which it alleges constitutes the performance of a claim step).  Pernix's evidence demonstrates the  opposite.

425.   Pernix's sole evidence is a form template titled "Consent for Chronic Opioid Therapy" used by some physicians ("Consent Form").  As an initial matter, documents like the Consent Form are not contracts.  More significantly, however, the Consent Form demonstrates by its own terms that a patient's receipt of continued treatment is *not* conditioned on the patient administering the drug as prescribed:

> I have been informed by my physician that the initiation of a narcotic/opioid medication is a trial. Continuation of the medication is based on evidence of benefit to me from, associated side effects of, and compliance with instructions on, usage of the medication. I have also been informed by my physician that continuation and any changes in dosage of the medication will be determined by pain relief, functional improvement, side effects, and adherence to usage restrictions. Lack of significant improvement, the development of adverse side effects, or other considerations *may lead my physician to discontinue this treatment* or to change dosage.

(Consent Form at 1.)

426.   This does not state that treatment will be categorically discontinued if the patient fails to adhere to the physician's prescribing directions.  Rather, it merely informs the patient that "compliance with instructions on[] usage of the medication" and "adherence to usage restrictions" are among a number of factors that "may lead" to discontinuation.  (<u>Id.</u>)

427.   In fact, a separate section of the Consent Form specifically addresses the consequences of a patient's failure to adhere to prescribing directions, but provides only that, in

the event of such failure, "early refills may not be allowed." (Id.)  Even the all-caps paragraph at the end of the Consent Form merely informs the patient that failure to adhere "MAY RESULT IN CESSATION OF OPIOID PRESCRIBING BY MY PHYSICIAN," not that it categorically will so result.  (id.)

428.    Pernix relatedly relies on Florida Statute § 456.44 ("the Florida statute"), which mandates that certain physicians use a written controlled substance agreement.  The Florida statute does not, however, suggest that physicians condition continued treatment on patients' administering an opioid exactly as prescribed; it merely requires such an agreement to outline "[p]atient compliance and reasons for which drug therapy may be discontinued, such as a violation of the agreement," all the while failing to specify those "reasons" and employing a non-categorical "may" similar to the Consent Form.

429.    Pernix's own expert admitted in sworn testimony that patients' taking the medication as prescribed is merely a factor that *might* impact subsequent prescribing directions.  Indeed, even when there are signs of "aberrant behaviors," Pernix's expert testified that the patient will only be reminded of the content of the consent form and not automatically discontinued from treatment.  Patient compliance with prescribing directions is thus not a condition of treatment.

430.    The Eli Lilly case is illustrative.  The claims there required administration of folic acid (performed by patients) followed by administration of the toxic chemotherapy agent pemetrexed (performed by healthcare professionals).  Eli Lilly & Co. v. Teva Parenteral Meds., Inc., 845 F.3d 1357, 1362 (Fed. Cir. 2017).  The Federal Circuit found that because the folic acid pretreatment was critical for patient safety, no physician would ever administer the toxic chemotherapy agent knowing that a patient had failed to take the folic acid.  Id. at 1366.

101

Therefore, "physicians cross the line from merely guiding or instructing patients to take folic acid to conditioning pemetrexed treatment on their administration of folic acid." Id.

431.    Here, by contrast, documents like the Consent Form are not categorical, and, in fact, physicians continue treatment despite patients failing to comply with prescribing directions, even when they exhibit "aberrant behavior." Physicians prescribing Alvogen's ANDA Product, therefore, will *not* "cross the line from merely guiding or instructing patients" to "conditioning" continued treatment on the patient's administering the drug exactly as prescribed. See Eli Lilly, 845 F.3d at 1368 ("Our holding today does not assume that patient action is attributable to a prescribing physician solely because they have a physician-patient relationship.").

432.    In addition, it is undisputed that physicians cannot know whether a patient takes an extended-release opioid exactly as prescribed. Unlike in Eli Lilly, where folic acid pretreatment could in principle be verified by blood tests, physicians know that verification of adherence to the prescribing directions for Alvogen's ANDA Product is impossible. Conditioning must require at least the possibility of verifying that the condition is met, even if it "does not [in fact] require double-checking another's performance . . . ." Id. at 1366.

### 2.    No Intent to Induce Infringement

#### a.    Legal Standards

433.    "Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." Vita-Mix Corp. v. Basics Holding, Inc., 581 F.3d 1317, 1328 (Fed. Cir. 2009).

434.    Intent to induce infringement can be demonstrated by circumstantial evidence but, "where a product has substantial non-infringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be

102

infringing the patent." Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1365 (Fed. Cir. 2003); see also Acorda Therapeutics Inc. v. Apotex Inc., No. 07-4937, 2011 WL 4074116, at *19-20 (D.N.J. Sept. 6, 2011), aff'd, 476 F. App'x 746 (Fed. Cir. 2012) (Where there is "a substantial non-infringing use for [a] product, . . . more than the mere sale of the product is required" to establish intent to induce infringement.).

435.   "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." Vita-Mix, 581 F.3d at 1327.

436.   Where a drug product label merely provides information that describes infringing uses or permits physicians to infringe, but does not include instructions that encourage or necessarily result in infringement, the label is not evidence of specific intent to induce infringement.  See Takeda, 785 F.3d at 630-31; Acorda, 2011 WL 4074116 at *19-20; Shire LLC v. Amneal Pharm., LLC, No. 11-3781, 2014 WL 2861430, at *4-5 (D.N.J. June 23, 2014).

437.   Rather, specific intent may be inferred only "where . . . evidence . . . goes beyond a product's characteristics or the knowledge that it may be put to infringing uses." Takeda, 785 F.3d at 630 (citations, footnote and internal quotation marks omitted).

438.   Although "advertising an infringing use or instructing how to engage in an infringing use" can provide circumstantial evidence of intent to induce infringement, "such instructions need to evidence intent to encourage infringement.  The question is not just whether instructions describe the infringing mode, but whether the instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent." Id. at 630-31.  Merely "describing an infringing mode is not the same as recommending, encouraging, or promoting an infringing use, or suggesting that an infringing use should be performed." Id. at 631.

439.    A label that "may be understood to permit an infringing use" does not demonstrate intent to induce infringement.  Shire, 2014 WL 2861430, at *5.

### b.    Alvogen's Draft Label Does Not Intentionally Induce the Treatment of Patients with Mild or Moderate HI

440.    To demonstrate inducement, Pernix first relies on general instructions in Alvogen's Draft Label that do not refer to hepatic impairment in any way.  (PTX001345



441.    Pernix contends that these statements will induce physicians to administer Alvogen's ANDA Product to patients with mild or moderate HI because some patients in the population of pain patients will have HI.  Pernix is wrong because where, as here, there are substantial non-infringing uses (i.e., treatment of patients without HI), mere knowledge that some users will infringe the asserted claims cannot establish intent.  See, e.g., Warner-Lambert, 316 F.3d at 1365, Vita-Mix, 581 F.3d at 1329.

442.    Pernix also relies on sections in the label ▆▆▆▆▆▆▆▆▆▆ that provide ▆▆▆▆▆▆▆▆▆▆▆▆▆▆  (PTX00013439, PTX00013445, PTX00013455, PTX00013459.)  With respect to the mild and moderate HI, the label informs that ▆▆▆▆▆▆▆▆▆▆▆ (PTX00013439, PTX00013445, PTX00013455.)

443.    These statements do not demonstrate intentional inducement because they, at most, "[m]erely describe[e] an infringing mode" without "recommending, encouraging, or promoting an infringing use, or suggesting that an infringing use should be performed."  Takeda,

----

8 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  (See PTX00013465-66.)

104

785 F.3d at 630-31 (internal quotation marks and citations omitted); see also Eli Lilly, 845 F.3d at 1368.

444.    Courts have found that similar language in proposed ANDA labels did not demonstrate inducement.  In Acorda, 2011 WL 4074116 at *14, for example, the patent claimed a method of administering a drug to patients with food.  The patent owner argued that the label induced infringement because it described the effects of food on the pharmacokinetics of the drug, including by providing pharmacokinetic data for patients who had taken the drug with food.  Id. at *17.  The court disagreed because these passages did not "direct any action on the part of any physician, but merely call[ed] attention to the pharmacokinetics section and the differences between tablets and capsules in the fed and fasted states."  Id.  Accordingly, the proposed label did "not suggest that [the drug] be used in the fed state" and the plaintiff failed to show inducement.  Id. at *18 (citing Vita-Mix, 581 F.3d at 1324-26.)

445.    Just as the proposed label in Acorda merely described the effect of food on treatment without encouraging administration of the claimed drug with food, the Alvogen Draft Label merely ███████████████████████████████████████████████ ████████████████.

446.    Similarly, in Shire, 2014 WL 2861430 at *4, the claimed method required taking a drug with food.  The plaintiff pointed to a passage in the "Dosage and Administration" section of the label stating that the products may be taken "with or without food."  Id. at *5.  The court rejected this as evidence of intent because "the statement that the medication may be taken with or without food cannot reasonably be understood to be an instruction to engage in an infringing use."  Id.  Rather, the statement "is indifferent to which option is selected" and may "[a]t most . . . be understood to permit an infringing use. . . ."  Id.

105

447.     The Alvogen Draft Label is similarly indifferent as to whether a treated patient has mild or moderate HI or normal liver function.[9]

448.     Eli Lilly is again instructive.  There, the label directed patients to perform the claim step of administering folic acid.  845 F.3d at 1367 ("Instruct patients on the need for folic acid . . . ."; "[The patient] must also take folic acid . . . ."; "It is very important to take folic acid . . . .") (quoting label).  Here, by contrast, the label at most describes the use of the product in patients with hepatic impairment.  That is insufficient.  See id. at 1368 ("The question is not just whether [those] instructions describ[e] the infringing mode, . . . but whether the instructions teach an infringing use such that we are willing to infer from those instructions an affirmative intent to infringe the patent."  (quoting Takeda, 785 F.3d at 631).

449.     The cases Pernix relies on are inapposite.  In AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1060 (Fed. Cir. 2010), the court affirmed a preliminary injunction finding that inducement was likely to be proved at trial where, unlike here, there was insufficient evidence to establish substantial non-infringing uses and the label characterized the relevant activity as "desirable" "in all patients."  In Sanofi v. Glenmark Pharm. Inc., USA, 204 F. Supp. 3d 665, 675 (D. Del. 2016), the court found induced infringement because the Indications and Usage section of the label directed the reader to the clinical studies section, which encouraged infringement by disclosing that the only population shown to benefit from the drug met the claimed parameters.  Finally, in Novartis Pharm. Corp. v. Breckenridge Pharm., Inc., 248 F. Supp. 3d 578, 583, 598 (D. Del. 2017), the Indication and Use section of the labels specifically instructed the co-

---

[9] Pernix cites a footnote in GlaxoSmithKline LLC v. Glenmark Pharms., Inc., No. 14-877-LPS-CJB, 2017 U.S. Dist. LEXIS 82534 at *52 n.12 (D. Del. May 23, 2017), an unpublished Report and Recommendation distinguishing Acorda and Shire.  There, however, the Magistrate found that there was a genuine issue a fact regarding inducement because "nearly half" of the patients had the relevant condition, (see id.), in contrast to the small fraction of pain patients who also have mild or moderate HI.

administration of the two compounds as recited in the claims at issue, and the Dosage and Administration section prescribed doses of the compounds that fell within the claimed ratios. In all these cases, the finding of intentional inducement of infringement relied on the instructions in the label, not on the fact that some physicians would infringe.

### c.    Alvogen's Draft Label Does Not Intentionally Induce Administration of a Non-Adjusted Starting Dose

450.    Alvogen will also not induce infringement of claims 1-4 and 11 of the '760 patent for the independent reason that the Alvogen Draft Label does not encourage, promote or recommend administration of Alvogen's ANDA Product to patients with mild or moderate HI *without adjusting the dose*.

451.    Pernix again relies on the informational statements in the label relating to dosing in patients with mild or moderate HI. But the statement that ███████████████████ ████████ facially does not recommend promote or encourage non-adjustment. Rather, it informs physicians that they may or may not adjust the starting dose. The merely descriptive, or informative, nature of this statement is highlighted by contrasting it with the instruction regarding ███████████████ in the same section of the label:

████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████

(See PTX00013439, PTX00013445, PTX00013445 (emphasis added).)

452.    Whereas the label affirmatively directs a physician to ████████████████ ██████████████████████████, it merely informs that ██████████████

107

████████ in patients with mild or moderate HI.  (Id.)  At most, the latter statement is "[m]erely describing an infringing mode," and is not "recommending, encouraging, or promoting" non-adjustment in such patients.  Takeda, 785 F.3d at 630-31; see also Eli Lilly, 845 F.3d at 138.

453.    Pernix's reliance on ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████  ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ (PTX00013459.)

454.    In sum, the Alvogen Draft Label neither encourages, recommends or promotes administering Alvogen's ANDA Product to patients with mild or moderate HI, nor encourages, recommends or promotes administering to such patients without adjusting the starting dose.  Therefore, Alvogen will not induce infringement of the Asserted Claims.

## V.    No Exceptional Case

455.    35 U.S.C. § 285 permits the "court in exceptional cases [to] award reasonable attorney fees to the prevailing party" in an action for relief from patent infringement.  An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014).  The court "may determine whether a case is 'exceptional' in the case-by-case exercise of [its] discretion, considering the totality of the circumstances."   A party must establish its entitlement to attorneys' fees based on a preponderance of the evidence.  at 1758.

456.    The "purpose behind § 285 is to prevent a party from suffering a 'gross injustice . . .'"  Checkpoint Sys., Inc. v. All-Tag Security S.A., 858 F.3d 1371, 1376 (Fed. Cir. 2017)

108

(internal quotations omitted). Accordingly, the "exercise of discretion in favor of awarding attorney fees should be bottomed upon a finding of unfairness[,] . . . bad faith . . ., or some other equitable consideration . . . which makes it grossly unjust that the [prevailing party] . . . be left to bear the burden of [its] own counsel fees."  ("[F]ee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'") (quoting Octane Fitness, 134 S. Ct. at 1753).

457.    As a general policy matter, "[a] fee award with a deterrent impact on generic pharmaceuticals and a compensatory effect on branded pharmaceuticals, particularly in a typical patent case, would run afoul of the policies underlying the Hatch-Waxman Act."  Otsuka Pharm. Co., Ltd. v. Sandoz, Inc., No. 07-1000 (MLC), 2015 WL 5921035, at *6-8 (D.N.J. Oct. 9, 2015).

458.    Attorney fees are not awarded, therefore, in cases involving the filing of an ANDA where the arguments are neither frivolous nor vexatious.  See, e.g., AstraZeneca AB v. Aurobindo Pharma Ltd., 232 F. Supp. 3d 636, 649 (D. Del. 2017); Abraxis Bioscience, Inc. v. Navinta, LLC, No. 07-1261, 2009 WL 5174454 (D.N.J. Dec. 18, 2009).

459.    Plaintiffs cannot meet their burden of proof to show that this is an exceptional case by a preponderance of the evidence and that they are entitled to an award of costs, expenses and reasonable attorney fees under 35 U.S.C. § 271(e)(4) and 35 U.S.C. § 285.  Alvogen presented meritorious defenses of noninfringement and invalidity based on Sections 101, 102, 103 and 112 of the Patent Act.

## VI.    Alvogen Is Entitled to Relief

460.    Alvogen is entitled to a judgment declaring that it does not directly infringe or induce infringement of the Asserted Claims.

461.    Alvogen is entitled to a judgment declaring that the Asserted Claims are invalid under 35 U.S.C. §§ 101, 102, 103 and 112.

462.    Alvogen is entitled to a judgment declaring that this is not an exceptional case

under 35 U.S.C. § 285.